EXHIBIT B

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

---

JAMES CHOI and 165 GREGORY ROAD
ASSOCIATES, LLC, individually and derivatively on
behalf of 37 PARSONS CAPITAL ADVISORS LLC
and MY CAPITAL INVESTMENT LLC,

Plaintiffs,

-against-

37 PARSONS REALTY LLC, ANTONIO WONG a/k/a
ANTONIO WONG, JR., WONG REAL ESTATE
CONSULTANCY LLC a/k/a WRE CONSULTANCY,
YAN S. FOK, MING YI CHEUNG,
JAY LAU, LAU & ASSOCIATES P.C., JOHN and
JANE DOES 1-50, and ABC ENTITIES 1-50,

Defendants.

---

Civil Action No.: 1:19-cv-3875

COMPLAINT AND
DERIVATIVE CLAIMS

---

Plaintiffs JAMES CHOI and 165 GREGORY ROAD ASSOCIATES, LLC, individually

and derivatively on behalf of 37 PARSONS CAPITAL ADVISORS LLC and MY CAPITAL

INVESTMENT LLC, by and through their attorneys Cohen, LaBarbera & Landrigan, LLP, make

their complaint and allege as follows:

## JURISDICTION AND VENUE

1. This is a civil action arising under certain provisions of federal law, including without

limitation the Racketeer Influenced and Corrupt Organizations Act, and because this action

arises under the laws of the United States, this Court has original subject matter jurisdiction

under such provisions of law as include without limitation 28 U.S.C. §1331 and

supplemental jurisdiction over any and all state law claims forming part of the same case

and controversy under such provisions of law as include without limitation 28 U.S.C.

§1367.

2.  This Court has personal jurisdiction over all Defendants because all or some Defendants are domiciled in the State of New York, all Defendants transact business within the State of New York, and all Defendants have sufficient minimum contacts with the State of New York.

3.  Venue lies in the Eastern District of New York pursuant to 28 U.S.C. §1391 because all Defendants are located in the Eastern District of New York, a substantial part of the events or omissions giving rise to this action occurred in the Eastern District of New York, and this action involves a dispute over the rights, title, and interest to a parcel of real property located in the Eastern District of New York.

**THE PARTIES**

4.  Plaintiff James Choi (hereinafter "Choi") is a natural person of full age residing within the State of New York.

5.  Plaintiff 165 Gregory Road Associates LLC (hereinafter "165 GRA") is a limited liability company organized under the laws of the State of New York, having an address of 40 Matthews Street, Suite 203, Goshen, New York 10924. At all relevant times, Plaintiff Choi (whether individually and/or as trustee of a trust) is or was the member of Plaintiff 165 GRA.

6.  Plaintiff 37 Parsons Capital Advisors LLC, (hereinafter "37 PCA") a limited liability company organized under the laws of the State of New York and having an address of 136-20 38th Avenue, 3A-106, Flushing, New York, 11354, brings suit derivatively by its member 165 GRA.

7.   Plaintiff My Capital Investment LLC, (hereinafter "MCI") a limited liability company organized under the laws of the State of New Jersey, having an address of 7483 SW 24 St. Ste.101, Miami, Florida 33155, brings suit derivatively by its member 37 PCA.

8.   Defendant 37 Parsons Realty LLC (hereinafter "37 PR") is a limited liability company organized under the laws of the State of New York, having an address of 157-05 Cross Island Parkway, Whitestone, New York, 11357.

9.   Defendant Antonio Wong a/k/a Antonio Wong, Jr. (hereinafter "Wong") is a natural person of full age having a last known address of 3544 28th St., 4C, Astoria, New York 11106.

10.  Defendant Wong Real Estate Consultancy LLC a/k/a WRE Consultancy, LLC (hereinafter "WRE") is a limited liability company organized under the laws of the State of New York, having an address of 42-11 Kissena Blvd., Flushing, New York 11355.

11.  Defendant Yan S. Fok (hereinafter "Fok") is a natural person of full age having a last known address of 141-05 Holly Ave., Flushing, New York 11355.

12.  Defendant Ming Yi Cheung (hereinafter "Cheung") is a natural person of full age having a last known address of 6004 84th St., Middle Village, New York 11379.

13.  Defendant Jay Lau (hereinafter "Lau") is a natural person of full age having a last known address of 134 Rockaway Avenue, Garden City, New York, 11530.

14.   Defendant Lau & Associates P.C. (hereinafter "L&A") is a professional corporation organized under the laws of the State of New York, having an address of 133-47 Sanford Avenue, Unit C1E, Flushing, New York, 11355.

15.  Defendants John and Jane Does 1-50 are natural persons to be identified hereafter and against whom Plaintiffs reserve all rights to assert such claims as they deem advisable upon further investigation and discovery.

16. Defendants ABC Entities 1-50 are legal persons to be identified hereafter and against whom Plaintiffs reserve all rights to assert such claims as they deem advisable upon further investigation and discovery.

## FACTUAL BACKGROUND

***The Defendants present a purported business opportunity to Plaintiffs Choi and 165 GRA:***

17. Choi is the sole member of 165 GRA.

18. At a time shortly before the events alleged in this Complaint, Choi made the acquaintance of Defendant Wong.

19. For the relevant periods described in this Complaint, Wong was acting as the agent of his co-Defendants and assisted them in wrongfully obtaining Plaintiffs' property as part of an enterprise existing for the purpose of committing such racketeering and fraudulent actions against numerous victims, including but not limited to the Plaintiffs, as described herein and in the sworn statements made by others of the Defendants' victims.

20. Wong represented to Choi that he and his associates were real estate developers and investors.

21. Wong offered Choi that he join them in a new investment opportunity in real property (hereinafter the "Project".)

22. The Project included the purchase of a property located at and commonly known as 37-05 Parsons Boulevard, Flushing, New York in the County of Queens (hereinafter the "Property.")

23. Wong presented to Choi an "Acquisition and Development Plan," a true and accurate copy of which is annexed hereto and made part hereof as EXHIBIT A, regarding the Property.

24. The Acquisition and Development Plan stated, *inter alia*, as follows:

a.    That the Project would require a total investment of $13,000,000.00;

b.    That the Property could be "flipped" to a developer after one year at a potential profit of $10,000,000.00;

c.    That in the alternative the Property could be developed into a new condominium in three years at a potential profit of $36,800,000.00;

d.    That Defendants projections were reasonable based on comparable properties and projects;

e.    That the seller of the Property was presently in contract to sell the Property for $10,000,000.00;

f.    That Defendants had an opportunity to purchase the controlling interest, specifically 99.99% of the membership interests thereto, in MCI, the entity which had a contract to purchase the Property, for $3,000,000.00;

g.    That Wong had secured a bridge financing commitment for up to $8,000,000.00 for the purchase of the Property;

h.    That the Defendants had $1,000,000.00 in cash on hand; and

i.    That Wong proposed to raise the remaining $4,000,000.00 needed by accepting investments in $500,000.00 shares.

25.   A true and accurate copy of the purported contract dated August 27, 2015 to purchase the Property from Community Homes Housing Development Fund Company, Inc. by MCI as provided by Defendants to Plaintiffs (hereinafter the "Real Property Contract") is annexed hereto and made part hereof as EXHIBIT B.

26.   The terms of the Real Property Contract do not permit an assignment of the Contract.

27. Wong provided to Plaintiff Choi an "Investment Portfolio Overview" and "Brochure" a true and accurate copy of which are annexed hereto and made part hereof as EXHIBIT C, for an entity called WRE Consultancy, LLC.

28. Upon information and belief, WRE Consultancy, LLC is a trade name or fictitious name for Defendant Wong Real Estate Consultancy LLC. For purposes of this Complaint, WRE Consultancy, LLC and Wong Real Estate Consultancy, LLC are presumed to be one and the same and are herein referred to as "WRE."

29. Said Investment Portfolio Overview purports to demonstrate that WRE was engaged in significant development projects (hereinafter the "Portfolio Projects") in Manhattan contemporaneously to The Defendants' proposal of the Project to Choi.

30. The Portfolio Projects include the following properties: 88 Leonard Street, New York, New York; 305 West End Avenue, New York, New York; 10 West 65th Street, New York, New York; 265-7 Broadway, New York, New York; 540-550 West 38th Street, New York, New York; 799 Broadway, New York, New York; 1800 Park Avenue, New York, New York; and 37 Union Square West, New York, New York.

31. True and accurate copies of contemporaneous news publications which name the true participants in the Portfolio Projects and contradict numerous representations within the Investment Portfolio Overview are annexed hereto and made part hereof as EXHIBIT D.

32. Upon information and belief, none of the Defendants ever materially participated in any portion or filled any role in the development of the Portfolio Projects.

33. The Investment Portfolio Overview contained false and misleading statements or implications intended to give Choi the false belief or impression that the Defendants were legitimate real estate development businesses and businessmen.

6

34. The Investment Portfolio Overview contained false and misleading statements or implications intended to give Choi the false belief or impression that the Defendants were more sophisticated parties than was true.

35. The Investment Portfolio Overview contained false and misleading statements or implications intended to give Choi the false belief or impression that the Defendants were more reputable than was true.

36. The Investment Portfolio Overview contained false and misleading statements or implications intended to give Choi the false impression that Choi could trust the Defendants with his investment.

37. In addition or in the alternative, the Investment Portfolio Overview intentionally overstates the involvement of Defendants in the Portfolio Projects with the purpose of causing Choi and/or others to believe that Defendants were more experienced, sophisticated, trustworthy, and well-funded than was true.

38. The Investment Portfolio Overview caused Plaintiffs to believe that said Defendants were legitimate and more reputable, more trustworthy, more sophisticated, and more suitable for investment than was the truth.

39. Plaintiffs were reasonable in arriving at such belief due to the extensive, deliberate lengths by said Defendants to lead Plaintiffs to such beliefs as recited above.

***Plaintiffs Choi and 165 GRA enter what they believe to be a business relationship with Defendants:***

40. Because of Defendants' persuasive sales pitch and false statements, Plaintiff Choi chose to invest $500,000.00 in the Project through Plaintiff 165 GRA.

41. Plaintiff Choi's investment was structured as a $500,000.00 capital contribution by Plaintiff 165 GRA, as a member, to 37 PCA.

42. A true and accurate copy of the "Initial Contributions of the Members" of 37 PCA as provided to Plaintiffs by Defendants is annexed hereto and made part hereof as EXHIBIT E.

43. The Initial Contributions of the Members states that Plaintiff 165 GRA is a member of 37 PCA.

44. The Initial Contributions of the Members states that Defendants WRE, Fok, and Cheung, as well as Manhai Wong, Zheng Wang, Yang Fan, Shi Meng Huang, YPA Management Holdings, LLC, and Jimmy Li also made capital contributions to of $500,000.00 each into 37 PCA.

45. 37 PCA was organized under the laws of the State of New York on or about October 25, 2015.

46. The address for process for 37 PCA provided to the Department of State is Wong Real Estate Consultancy, LLC, 136-20 38th Avenue, 3A-106, Flushing, New York 11354.

47. 37 PCA then purportedly purchased 99.99 percent of the membership interests of MCI for $3,000,000.00.

48. A true and accurate copy of the Membership Interest Purchase Agreement dated "November ___, 2015" to purportedly purchase the 99.99 percent of the membership interests of MCI as provided by Defendants to Plaintiffs is annexed hereto and made part hereof as EXHIBIT F.[1]

---

[1] Plaintiffs are not in possession of the fully countersigned copies of certain exhibits hereto because Defendants refused to provide them to Plaintiffs, including documents signed by one or more of the Plaintiffs and to which Plaintiffs were entitled under the law, but upon information and belief, all such exhibits were either fully countersigned and/or confirmed by the course of conduct of the Defendants.

49. Defendants advised Plaintiffs that the $3,000,000.00 purchase of 99.99 percent of the membership interest was paid as consideration for 37 PCA's obtaining the value of the Real Property Contract held by MCI.

50. Defendants advised Plaintiffs that purchasing 99.99% of the membership interest in MCI was necessary because 37 PCA's Real Property Contract was not assignable.

51. Plaintiffs sent their $500,000.00 capital contribution to 37 PCA by sending such funds to Defendants Lau and L&A to be held in escrow until such funds were to be used to pay the sellers of the Property the remaining balance owed them at the closing.

52. A true and accurate copy of the bank wire instructions emailed from an employee of Lau and L&A providing to Plaintiffs to send said funds is annexed hereto and made part hereof as EXHIBIT G.

53. Thereafter, the Defendants ceased all communications with Plaintiffs.

54. Based upon the Defendants' series of misrepresentations, Plaintiff Choi was left believing that he, through Plaintiff 165 GRA, was a member of 37 PCA, which in turn owned 99.99 percent of MCI, which in turn owned the Property, purchased for $10,000,000.00 and being held for investment, with anticipated profits to be realized after a few years.

55. Notwithstanding Defendant Lau's duties to Plaintiffs as attorney and escrow agent, the Defendants Lau and L&A released Plaintiffs' funds to the Defendants without authority.

56. Notwithstanding the representations of the Defendants, they used Plaintiffs' funds to purchase the Property in the name of their own entity for their own use and gain and to the Plaintiffs' injury.

57. Notwithstanding the provisions of the agreements entered between Plaintiffs and Defendants, the Defendants used Plaintiffs' funds to purchase the Property in the name of their own entity for their own use and gain and to the Plaintiffs' injury.

***Plaintiffs discover Defendants fraud and other breaches of duties and obligations:***

58. After Plaintiff Choi had not heard from Defendants for some time, be began to become concerned that Defendants were not dealing honestly with him.

59. Accordingly, counsel for Choi sent repeated emails to Defendants Lau and L&A seeking information regarding the status of the Project and copies of documents confirming the status of the Project.

60. In response to Choi's inquiries, Defendants Lau and L&A knowingly and intentionally misrepresented the status of the Project to Choi and deliberately concealed the true status of the Project.

61. Eventually, counsel for Choi searched the public record for any records of a conveyance of the Property to confirm whether or not the Defendants had purchased the Property as planned under the Project.

62. Counsel for Choi then discovered that the Property had been purchased but not by MCI.

63. As agreed by the parties, MCI, which was owned by Plaintiff 37 PCA, was to purchase the Property.

64. Instead, Defendant 37 PR purchased the Property. A true and accurate copy of the Deed transferring the property from the seller to 37 PR is annexed hereto and made part hereof as EXHIBIT H.

65. The operating agreement of 37 PR, a true and accurate copy of which is annexed hereto and made part hereof as EXHIBIT I, was sent to Plaintiff's counsel, presumably in error, by Defendants Lau and L&A.

66. Pursuant to the operating agreement of 37 PR, the members of that entity are Kevin Zhang, Man Chung Wong, Henry Yau, and the Defendants Fok and Cheung.

67. All or some of the members of 37 PR, including without limitation Fok and Cheung, are or were members of Plaintiff 37 PCA.

68. Those Defendants who were or are members of both 37 PR and 37 PCA owed the Plaintiffs the fiduciary duties of loyalty and care.

69. Notwithstanding those fiduciary duties of loyalty and care, those Defendants who were or are members of both 37 PR and 37 PCA breached those duties by contriving to cut Plaintiffs out of the deal that Plaintiffs had not only agreed and entered into a partnership to purchase together but even used the funds Plaintiffs provided to purchase the Property.

*Defendants' other victims:*

70. In addition to the unlawful acts by Defendants against Plaintiffs, including but not limited to those alleged in the instant Complaint, the Defendants have practiced other and similar unlawful acts against other persons and parties, hereinafter referred to as the "Other Aggrieved Parties")[2], including but not limited to the following.

71. According to a verified complaint by Great Wall Realty Corp., Defendant Wong and others committed fraud by, *inter alia*, obtaining loans secured by properties not owned by Defendant Wong by fraudulently prepared documents. True and accurate copies of the

---

[2] Nothing alleged or incorporated herein shall be construed as an admission by Plaintiffs regarding any priority of claim by any Other Aggrieved Party to any money or property, including without limitation the Property.

verified complaint and verified third-party complaint are annexed hereto and made part hereof as EXHIBIT J. Said action resulted in Defendant Wong giving a Confession of Judgment for the sum of $5,000,000.00 dollars. A true and accurate copy of Wong's Affidavit of Confession of Judgment and Judgment by Confession is annexed hereto and made part hereof as EXHIBIT K, the provisions of which are hereby incorporated by reference.

72. According to a verified complaint, Defendants Wong, WRE, and others, including Wong's associate Jimmy Li, committed fraud, deceptive trade practices, and other tortious and unlawful acts against Xiao Dong Chen and Yan Jie Huang, including but not limited to holding themselves out to be real estate investors, taking Chen and Huang's money on the pretext of assisting them in investing in real estate, and then unlawfully taking the plaintiffs' money and refusing to return same. The plaintiffs also allege that the defendants' attorneys unlawfully released plaintiffs' money directly to defendants without authorization. A true and accurate copy of the summons and verified complaint is annexed hereto and made part hereof as EXHIBIT L, the allegations of which are hereby incorporated by reference.

73. In two separate actions, various plaintiffs have made verified complaints that Defendants Lau and L&A and others have unlawfully released plaintiffs' money held in escrow by Defendants Lau and L&A to other parties, including without limitation Defendant Wong and his associated entities at the direction of parties who thereafter absconded with the plaintiffs' money, including without limitation Defendant Wong and his associated entities. A true and accurate copy of the summonses and verified complaints are annexed hereto and made part hereof as EXHIBITS M and N, the allegations of which are hereby

incorporated by reference. The repeated instances of Lau and L&A's losing their clients money deposited with them in escrow in instances of Defendant Wong's involvement forces Plaintiffs to conclude that Lau and L&A were materially participating in or aiding and abetting the Defendants' defrauding of Plaintiffs and the Other Aggrieved Parties.

74. According to a verified complaint, Defendants Wong and WRE and others (including Manhai Wong and a "Sissy Yan Fok," believed to be Defendant Fok), converted $1,500,000.00 as the result of a scheme to defraud the plaintiffs in that action including but not limited to by to holding themselves out to be real estate investors, taking the plaintiffs' money on the pretext of assisting them in investing in real estate, and then unlawfully taking the plaintiff's money and refusing to return same. A true and accurate copy of the verified complaint is annexed hereto and made part hereof as EXHIBIT O, the allegations of which are hereby incorporated by reference.

75. Finally, according to a verified complaint by Wing Fung Chau and Flushing Parsons 888 LLC, Defendant 37 PR accepted $500,000.00 from them as a down-payment for the purchase of the Property and subsequently disappeared. A true and accurate copy of the verified complaint is annexed hereto and made part hereof as EXHIBIT P, the allegations of which are hereby incorporated by reference.

*Alter ego:*

76. The individual Defendants (other than Defendant Lau) exercised complete domination and control over the various entities involved in their scheme, including without limitation by disregarding the provisions of the governing instruments of said entities and moving funds from capital accounts, contractual rights, and property from one entity to another for the purpose of defrauding the Plaintiffs and taking Plaintiffs' money to apply it for their own

13

use and gain at the expense of and injury to Plaintiffs and thereby committed a fraud and/or other wrongs against the Plaintiffs and thus abused the privilege of doing business in the corporate form.

77. The Defendant Lau exercised complete domination and control over the Defendant L&A, including without limitation by wrongfully releasing and/or taking escrow funds held by L&A, notwithstanding the legal obligations of L&A to hold such funds in an attorney trust account, and thereby took Plaintiffs' money to apply it for his and/or his co-Defendants' own use and gain at the expense of and injury to Plaintiffs and thereby committed a fraud and/or other wrongs against the Plaintiffs and thus abused the privilege of doing business in the corporate form.

78. Accordingly, the entities used by Defendants were mere alter egos of the individual Defendants, and their corporate forms should be disregarded in assigning liability to the individual Defendants.

## AS AND FOR A FIRST CAUSE OF ACTION
### (18 U.S.C. § 1961 *et seq*.
### Racketeer Influenced and Corrupt Organizations Act as to All Defendants)

79. Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

*Factual allegations common to all RICO Counts:*

80. Upon information and belief, for all relevant periods, Defendant Wong was acting as the agent of each and all his co-Defendants and as the "front man" of their association as part of an enterprise existing for the purpose of committing such racketeering and fraudulent actions against numerous victims, including but not limited to the Plaintiffs, as described herein and in the sworn statements made by others of such Defendants' victims.

14

81. Defendants' RICO violations affected interstate commerce and were effected by the use of the mails, wires, and/or other instrumentalities of interstate commerce.

**Plaintiffs' Standing Under RICO:**

82. Plaintiffs are persons within the meaning of 18 U.S.C. §§1961(3) and 1962.

83. Plaintiffs have sustained an injury to their business or property by the conduct constituting Defendants' RICO violations as alleged and demonstrated throughout this Complaint.

84. The Defendants' RICO violation did in fact cause Plaintiffs' injuries as the direct, intended result of the Defendants' scheme to defraud the Plaintiffs as alleged and demonstrated throughout this Complaint.

85. The Defendants' RICO violation proximately caused Plaintiffs' injuries as the direct, intended result of the Defendants' scheme to defraud the Plaintiffs as alleged and demonstrated throughout this Complaint.

**Culpable Persons:**

86. Defendant Wong as natural person is a person within the meaning of 18 U.S.C. §1961(3).

87. Defendant WRE as a limited liability company is a person within the meaning of 18 U.S.C. §1961(3).

88. Defendant 37 PR as a limited liability company is a person within the meaning of 18 U.S.C. §1961(3).

89. Defendant L&A as a professional corporation is a person within the meaning of 18 U.S.C. §1961(3).

90. Defendant Lau as natural person is a person within the meaning of 18 U.S.C. §1961(3).

91. Defendant Fok as natural person is a person within the meaning of 18 U.S.C. §1961(3).

92. Defendant Cheung as natural person is a person within the meaning of 18 U.S.C. §1961(3).

*Scienter:*

93. The Defendants intended to obtain Plaintiffs' property by means of materially false or fraudulent pretenses or representations.

94. The Defendants' intent is evidenced by such examples as include without limitation Wong's preparing and presenting the Investment Portfolio Overview and other false marketing materials to Plaintiffs on behalf of himself and WRE, making the materially false representations to Plaintiffs as described above, refusing to provide documents relevant to the Project and Plaintiffs' investment, and practicing similar schemes on the Other Aggrieved Parties.

95. 37 PR intended to obtain Plaintiffs' property by means of materially false or fraudulent pretenses or representations.

96. 37 PR's intent is evidenced by such examples as include without limitation its wrongfully taking Plaintiffs' funds without permission or authority to purchase the Property and concealment of its malfeasance from Plaintiffs.

*Racketeering Activity—18 U.S.C. §1341, 18 U.S.C. §1343, and 18 U.S.C. §1344:*

97. The Defendants conspired and participated in the commission of one or more racketeering activities within the definition of 18 U.S.C. §1961(1), including without limitation mail fraud, wire fraud, and financial institution fraud.

98. Specifically, Defendants Wong and WRE, on behalf of themselves and the other Defendants, committed mail and/or wire fraud by his making false representations to Plaintiffs by means of the mails and/or electronic mails, including without limitation representations regarding the purpose and status of the Project.

99. Further, Defendants Wong and WRE, on behalf of themselves and the other Defendants, committed mail and/or wire fraud by making use of the mails and/or electronic mail to provide Plaintiffs documents, including without limitation contracts, operating agreements, due diligence packages, and other documents intended for and used to present Defendants' fraudulent scheme as a legitimate project and deceive Plaintiffs so that Defendants could obtain Plaintiffs' money by false and fraudulent pretenses, representations, and promises.

100. By way of example but without limitation, on or about November 9, 2015 at 12:19 p.m., Defendant Wong, purportedly on behalf of WRE, emailed Plaintiff Choi advising that Choi "join 37 Capital Parsons Advisors directly as part of the operating agreement . . . as an equal partner/member of the LLC." This communication through the channels and instrumentalities of interstate commerce falsely promised and misrepresented to Plaintiff that Plaintiff would become a partner in the Project and the entity to own the Property in furtherance of the Defendants' scheme to defraud Plaintiffs by taking Plaintiffs' money and use it for their own use and gain in purchasing for themselves the Property with the use of Plaintiffs' money.

101. By way of additional example but without limitation, on or about November 11, 2015 at 11:55 a.m. Defendant Wong emailed Plaintiff Choi proposing they meet at Wong's office to sign an operating agreement and attached a proposed operating agreement for Plaintiff Choi to sign. This communication through the channels and instrumentalities of interstate commerce falsely promised and misrepresented to Plaintiffs that Plaintiffs would become a partner in the Project and the entity to own the Property in furtherance of the Defendants' scheme to defraud Plaintiffs by taking Plaintiffs' money and using it for their own use and gain in purchasing for themselves the Property with the use of Plaintiffs' money.

102. Still further, Defendants Wong, WRE, Lau, and L&A, on behalf of themselves and the other Defendants, committed mail, wire, and/or financial institution fraud by using the mails, electronic mail, and/or other instrumentalities of interstate commerce to fraudulently induce the release of Plaintiffs' money from the custody of one or more financial institutions by Defendants Lau and L&A so that Defendants could obtain Plaintiffs' money by false and fraudulent pretenses, representations, and promises.

103. The Defendants then used Plaintiffs' money to enrich themselves and their enterprise by using it to purchase property in the name of 37 PR, of which Defendants Fok and Cheung are members.

104. Based on the foregoing, the Defendants devised and/or intended to devise one or more schemes or artifices to defraud Plaintiffs and others.

105. Based on the foregoing, the Defendants devised and/or intended to devise one or more schemes or artifices for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.

106. Based on the foregoing, the Defendants did or could have reasonably foreseen the use of the mails in furtherance of their schemes or artifices to defraud Plaintiffs.

107. Based on the foregoing, the Defendants did in fact use the mails in furtherance of their schemes or artifices to defraud Plaintiff.

108. Based on the foregoing, the Defendants transmitted or caused to be transmitted by means of wire, radio, and/or television communication in interstate or foreign commerce, writings, signs, signals, pictures, and/or sounds for the purpose of executing such scheme or artifice.

109. Based on the foregoing, the Defendants knowingly executed or attempted to execute a scheme or artifice to obtain Plaintiffs' property under the custody or control of a financial institution by means of false or fraudulent pretenses, representations, or promises.

**Pattern of Racketeering:**

110. The Defendants committed not less than two acts of racketeering activity, one or more of which occurred within ten years after the commission of a prior act of racketeering.

111. First, the Defendant Wong committed the predicate acts of racketeering activity as alleged in detail above.

112. Next, as reported in a sworn statement, See Exhibit J, Defendant Wong committed two acts of racketeering, in addition to the acts of racketeering he perpetrated against Plaintiffs as alleged herein, by committing financial institution fraud against Other Aggrieved Parties by falsely obtaining millions of dollars from the custody and control of financial institutions, including without limitation $1,100,000.00 from Wisdom Ventures LLC and Bloomingdale Drive Funding Co. on or about July 26, 2012 and $2,500,000.00 from Quontic Bank on or about January 9, 2013.

113. In addition, as reported in a sworn statement, See Exhibit L, Defendants Wong and WRE, and others including Jimmy Li, committed several acts of racketeering against Other Aggrieved Parties in the form of mail and/or wire fraud by, *inter alia*, mailing bad checks in furtherance of a Ponzi scheme on May 25, 2016 and August 15, 2016, emailing a loan application in furtherance of a Ponzi scheme and a promissory note in furtherance of a Ponzi scheme on February 16, 2016.

114. Still further, as reported in a sworn statement, See Exhibit O, Defendants Wong, WRE, Fok, and Manhai Wong committed several acts of racketeering against Other Aggrieved

Parties in the form of mail fraud, wire fraud and/or financial institution fraud by, *inter alia*, persuading Other Aggrieved Parties to wire $1,500,000.00 to an attorney escrow account as an investment in a purported real estate project and then subsequently inducing the attorneys to release the funds to themselves and others without authorization by the aggrieved parties and absconding with their money in a scheme beginning in September 2014 through June 2016.

115. Yet again, as reported in two sworn statements, See Exhibits M and N, Defendants Wong and WRE committed several acts of racketeering against Other Aggrieved Parties in the form of mail fraud, wire fraud and/or financial institution fraud by, *inter alia*, persuading Other Aggrieved Parties to wire $500,000.00 to an attorney escrow account as an investment in a purported real estate project and then subsequently inducing the attorneys, namely the Defendants Lau and L&A, who were either aiding and abetting the scheme or fraudulently induced by Wong, to release the funds to himself and others without authorization by the aggrieved parties and absconding with their money.

116. The Defendants' pattern of racketeering constitute a continuous and related series of acts forming a closed-ended scheme against the instant Plaintiffs, by unlawfully obtaining the Plaintiffs' monies and using it for their own gain as part of their larger, open-ended scheme to defraud a continual parade of victims of schemes similar to the one perpetrated on the instant Plaintiffs and the plaintiffs in the above-cited cases. Further, the Defendants continue to hold, invest, and otherwise make use of Plaintiffs' money as part of their ongoing enterprise and scheme and continuously harm Plaintiff as part of an ongoing enterprise.

*RICO Enterprise:*

117. The Defendants constitute a group associated in fact and involved in interstate commerce.

118. The Defendants' group functions to fulfill the purpose of, *inter alia*, deceiving innocent investors, including without limitation Plaintiffs and the Other Aggrieved Parties, into believing that they are *bona fide*, successful real estate developers; persuading said investors to wire their money for the purpose of purchasing real property to an attorney escrow account; inducing the escrow agent by fraud, or perhaps nefarious cooperation in the case of Defendant Lau and L&A, to release the escrowed money to the Defendants, whereupon they disappear and abscond with their victims' money.

119. The Defendants have various relationships among those associated with the enterprise, including without limitation that of limited liability company and member, as between 37 PR and Fok and Cheung; attorney and client, as between Lau and L&A and one or more Defendants, including Wong; and repeat coconspirators, such as Wong, Jimmy Li, and Fok. The Defendants also have various relationships specific to the racketeering enterprise they comprise. For example, Wong and Jimmy Li appear to regularly act as the "front men" who find and solicit the victims, WRE poses as the large-scale developer by offering fraudulent promotional materials to the victims, Lau facilitates the fraudulent taking of the escrowed funds, and various single-purpose entities, such as 37 PR, function as the purported investment vehicle.

120. This association in fact has gone on for years, swindling victim after victim, demonstrating a longevity sufficient to permit those associates to pursue the enterprise's purpose, as described above.

### Count One—§1962(a)

121. The Defendants as an ongoing enterprise received the income of the funds taken from Plaintiffs and other victims in acts of racketeering as described above and invested said income into real property, ostensibly owned in a partnership with their victims but in reality purchased by a different entity to the direct injury to the victims, including Plaintiffs.

122. As part of the ongoing enterprise, the Defendants use said real property for their profit, in the instant case apparently by taking a $500,000.00 down-payment from a third party for the sale of the Property and then disappearing with the money. See Exhibit P.

123. The Defendants received income in the form of Plaintiffs' money from the above-described racketeering activity.

124. The Defendants used and invested such income in the establishment or operation of an enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

125. The Defendants' engagement in and effect on interstate commerce includes without limitation their use of the mails, electronic mail, and bank wires in furtherance of their racketeering activity.

126. Plaintiffs were injured by the investment of racketeering income including without limitation by the Defendants' taking Plaintiffs' money and any additional income derived therefrom and belonging to Plaintiffs and placing it in one or more real property investments beyond the reach of Plaintiff but for the intervention of this Court.

127. The Defendants accomplished the foregoing by the use of one or more racketeering activities within the meaning of 18 U.S.C. §1961(1) as described herein.

128. The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5) as described herein.

129. As direct and proximate result of the Count I Defendant(s)' racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiffs have been injured in their business and property including without limitation in that they have lost their $500,000.00 delivered to Defendants, the profits promised them by Defendants, their interest in the Property, and attorneys' fees and costs.

130. Wherefore, Plaintiff requests that this Court enter judgment against the Defendants as follows: actual damages in an amount to be determined at trial but in any event not less than $1,500,000.00, treble damages, and attorney's fees.

### Count Two—§1962(b)

131. Plaintiffs were injured by the acquisition of an interest or control over an enterprise.

132. The Defendants' engagement in and effect on interstate commerce includes without limitation their use of the mails, electronic mail, and bank wires in furtherance of their racketeering activity.

133. The Defendants acquired and maintained interests in and control of the enterprise through a pattern of racketeering activity.

134. Specifically, the Defendants took the capital investments of the Plaintiffs, obtained by Defendants' sending fraudulent documents and communications through the mails and/or electronic mail and their fraudulently inducing the releasing of funds from financial institutions, into one entity set up for that purpose and later took those funds unlawfully and used them to purchase properties in the name of one or more other entities controlled by the Defendants of which Plaintiff was not a member, and practiced variations of this

scheme upon other victims, and thereby invested the proceeds of their racketeering offenses against their victims and used said proceeds to acquire, maintain, and grow an enterprise engaged in racketeering.

135. The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5) as described herein.

136. The Defendants have directly and indirectly acquired and maintained interests in and control of the enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

137. As direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiffs have been injured in their business and property including without limitation in that they have lost their $500,000.00 delivered to Defendants, the profits promised them by Defendants, their interest in the Property, and attorneys' fees and costs.

138. Wherefore, Plaintiff requests that this Court enter judgment against the Defendants as follows: actual damages in an amount to be determined at trial but in any event not less than $1,500,000.00, treble damages, and attorney's fees.

### Count Three—§1962(c)

139. The Defendants as an association in fact comprise an enterprise engaged in and whose activities affect interstate commerce, including but limited to by use of the mails, electronic mails, and bank wires to fraudulently obtain the property of other and invest their victims' property in the enterprise by accumulating real property and engaging is similar schemes.

140. The Defendants are employed by or associated with the enterprise.

141. The Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff.

142.  Specifically, the Defendants took the capital investments of the Plaintiffs, obtained by fraudulent documents and communications sent through the mails and/or electronic mail and fraudulently induced the releasing of funds from financial institutions, into one entity set up for that purpose and later took those funds unlawfully and used them to purchase properties in the name of other entities controlled by the Defendants of which Plaintiff was not a member, and practiced variations of this scheme upon other victims, and thereby invested the proceeds of their racketeering offenses against their victims and used said proceeds to acquire, maintain, and grow an enterprise engaged in racketeering.

143. Pursuant to and in furtherance of their fraudulent scheme, The Defendants committed multiple related acts of racketeering as described above.

144. The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5) as described herein.

145. The Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c) as described above.

146. As direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property including without limitation in that they have lost their $500,000.00 delivered to Defendants, the profits promised them by Defendants, their interest in the Property, and attorneys' fees and costs.

147. Wherefore, Plaintiff requests that this Court enter judgment against the Defendants as follows: actual damages in an amount to be determined at trial but in any event not less than $1,500,000.00, treble damages, and attorney's fees.

### Count Four—§1962(d)

148. As set forth above, the Defendants agreed and conspired to violate 18 U.S.C. § 1962(a) (b) and (c). Specifically, the Defendants conspired to take the capital investments of the Plaintiffs—after obtaining same by fraudulent documents and communications sent through the mails and/or electronic mail and by fraudulently inducing the releasing of funds from financial institutions—into one entity set up for that purpose and to take those funds unlawfully and use them to purchase properties in the name of other entities controlled by the Defendants of which Plaintiff was not a member, and practice variations of this scheme upon other victims, and thereby invest the proceeds of their racketeering offenses against their victims and used said proceeds to acquire, maintain, and grow an enterprise engaged in ongoing racketeering.

149. Plaintiffs were injured by an overt predicate act of racketeering in furtherance of the conspiracy.

150. This conspiracy is evidenced by the concerted actions taken by the Defendants and was intended to and did  (1) use or invest income that was derived from a pattern of racketeering activity in an interstate enterprise (§ 1962(a)); (2) acquire or maintain interests in the enterprise through a pattern of racketeering activity (§ 1962(b)); and (3) conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity (§ 1962(c)).

151. The Defendants have intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, acquire or maintain interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as described herein.

152. The Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

153. Said conduct constitutes a conspiracy to violate 18 U.S.C.A. § 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d).

154. As direct and proximate result of the Count IV Defendant(s)' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property including without limitation in that they have lost their $500,000.00 delivered to Defendants, the profits promised them by Defendants, their interest in the Property, and attorneys' fees and costs.

155. Wherefore, Plaintiff requests that this Court enter judgment against the Defendants as follows: actual damages in an amount to be determined at trial but in any event not less than $1,500,000.00, treble damages, and attorney's fees.

### AS AND FOR A SECOND CAUSE OF ACTION
### (Fraud as to All Defendants)

156. Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

157. For the relevant periods described in this Complaint, Wong was acting as the agent of his co-Defendants and assisted them in wrongfully obtaining Plaintiffs' property as part of an enterprise existing for the purpose of committing fraudulent actions against numerous

victims, including but not limited to the Plaintiffs, as described herein and in the sworn statements made by others of the Defendants' victims.

158. Defendants made a representation to Plaintiffs that they were in the business of real estate development in projects in which in reality Defendants were not involved.

159. More specifically, Defendants made a representation to Plaintiffs that the Defendants would invest Plaintiffs' money when in reality they intended and did take Plaintiffs' money and use it for their own gain.

160. By way of example but without limitation, on or about November 9, 2015 at 12:19 p.m., Defendant Wong, purportedly on behalf of WRE, emailed Plaintiff Choi a message which falsely promised and misrepresented to Plaintiff that Plaintiff would become a partner in the Project and the entity to own the Property in furtherance of the Defendants' scheme to defraud Plaintiffs by taking Plaintiffs' money and use it for their own use and gain in purchasing for themselves the Property with the use of Plaintiffs' money.

161. The misrepresentations were material as evidenced by the fact that they effected the entire purpose of the transaction of the sale of interest in an entity intended to be and in fact ultimately drained of its capital accounts in order to purchase real property to enrich the tortfeasors.

162. The Defendants intentionally, knowingly, and willfully made the misrepresentations to Plaintiffs in order to defraud them as made evident by the elaborate ruse perpetrated on the Plaintiffs, including without limitation false marketing materials, a series of single-purpose entities, and so on.

163. Defendants' representations were untrue as evidenced by the fact that Plaintiffs' money was used to purchase the property for a subset and/or different set of investors through a different entity than the entity into which the Plaintiffs invested.

164. Defendants knew the representations were untrue and, in addition or in the alternative, made the representation in reckless disregard for the truth of the representation as made evident by the very nature of their scheme as practiced upon the Plaintiffs.

165. Defendants made the representation with the intent to deceive Plaintiffs and for the purpose of inducing Plaintiffs to act upon it.

166. The Plaintiffs relied on the misrepresentations of the Defendants.

167. Plaintiffs were reasonable in arriving at such belief due to the extensive, deliberate lengths by said Defendants to lead Plaintiffs to such beliefs as recited above.

168. Defendants 37 PR, Lau, and L&A were aware of the fraud perpetrated against Plaintiffs by their co-Defendants and provided substantial assistance in the commission of the fraud.

169. Specifically, Defendants Lau and L&A clearly knew about and substantially assisted the fraud by contriving to release Plaintiffs' funds from escrow under the false pretense that they were authorized to do so even though the funds were apparently delivered to and used by an entity in which Plaintiffs were not members to purchase the Property with an entity which did not have the contractual right to purchase the Property.

170. Defendant 37 PR clearly knew about and substantially assisted the fraud, and profited at Plaintiffs' expense as a result of the fraud, by serving as the conduit for Plaintiffs' money and by taking title to the Property to which it had no right.

171. As the direct and proximate result of the Defendants' misrepresentations, the Plaintiffs suffered damages in an amount to be determined at trial but in any event not less than $1,500,000.00.

172. Because Defendants' misrepresentations were willful, wanton, and malicious, and were made in furtherance of a pattern of fraudulent schemes upon numerous victims and in aid of a racketeering organization, Plaintiffs are entitled to punitive damages.

### AS AND FOR A THIRD CAUSE OF ACTION
**(Conversion as to All Defendants)**

173. Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

174. Defendants, without authority, intentionally exercised and continue to exercise control over Plaintiffs' property and thereby interfered with Plaintiffs' right of possession.

175. Defendants received possession of the Plaintiffs' property and thereafter, without authority, intentionally exercised control over it in such a manner as to interfere with Plaintiffs' right of possession.

176. Specifically, the Defendants Wong, WRE, Fok, and Cheung took Plaintiffs' money by false pretenses and kept that money to purchase the Property in the name of Defendant 37 PR for the Defendants' own enrichment with an entity in which Plaintiffs' have no ownership or other interest.

177. Defendants Lau and L&A unlawfully took Plaintiffs' money out of escrow and delivered it to their co-Defendants, who then purchased the Property through 37 PR rather than 37 PCA.

178. Defendants have thereby converted Plaintiffs' property and are accordingly liable, *inter alia*, for its value.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of Fiduciary Duty as to Defendants WRE, Fok, Cheung, Lau, and L&A)

179. Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

180. As co-members with Plaintiff 165 GRA, WRE, Fok, Cheung, Manhai Wong, Zheng Wang, Yang Fan, Shi Meng Huang, YPA Management Holdings, LLC, and Jimmy Li owed Plaintiff 165 GRA the fiduciary duties of loyalty and care.

181. Further, as escrow agents holding Plaintiffs' money and as their purported attorneys, Defendants Lau and L&A owed Plaintiffs the fiduciary duties of loyalty and care.

182. Defendants' fiduciary duties required that Defendants act in good faith and fair dealing with Plaintiffs and act in Plaintiffs' best interests.

183. Defendants WRE, Fok, Cheung, and possibly others breached their fiduciary duties to Plaintiffs by engaging in a conspiracy to defraud Plaintiffs and by actively defrauding them as described above.

184. Defendants Fok, Cheung, and possibly others, breached their fiduciary duties to Plaintiffs by unlawfully taking the business opportunity of 37 PCA to buy the Property.

185. Defendants Fok, Cheung, and possibly others, breached their fiduciary duties to Plaintiffs by unlawfully taking the Plaintiffs' capital contributions to 37 PCA and using those funds to purchase the Property through a new entity, 37 Parsons Realty, LLC, for themselves and others.

186. Defendants Lau and L&A breached their fiduciary duties to Plaintiffs by either negligently, recklessly, or intentionally releasing Plaintiffs' funds out of escrow to be unlawfully be put to use by the other Defendants for their personal gain.

187. Based on the foregoing, the Defendants failed to act in good faith and fair dealing with Plaintiffs and to act in Plaintiffs' best interests.

188. Further, the Defendants were required to make truthful and complete disclosures to Plaintiffs but did not; rather, the Defendants conspired to and did defraud the Plaintiffs as described above.

189. Defendant's breach was a substantial factor in causing Plaintiffs to sustain damages. As the direct and foreseeable result of Defendant's breach, Plaintiffs sustained damages in an amount to be determined at trial but in any event not less than $1,500,000.00.

### AS AND FOR A FIFTH CAUSE OF ACTION
**(Accounting as to Defendants WRE, Lau, and L&A)**

190. Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

191. WRE is the manager of 37 PCA.

192. Plaintiff 165 GRA is a member of 37 PCA.

193. Under the terms of the operating agreement and/or the New York Limited Liability Company Act, Plaintiff 165 GRA is entitled to examine the books and records of 37 PCA.

194. Under New York common law, Plaintiff 165 GRA is entitled to an accounting for 37 PCA.

195. Plaintiff 165 GRA demanded that WRE provide an opportunity to examine the books and records of 37 PCA.

196. Plaintiff 165 GRA demanded that WRE provide an accounting for 37 PCA.

197. WRE refused to provide 165 GRA an opportunity to examine the books and records of 37 PCA.

198. WRE refused to provide an accounting for 37 PCA.

199. Accordingly, 165 GRA is entitled to a court-mandated examination of the books and records of 37 PCA and an accounting by the manager WRE.

200. There was one or more fiduciary relationships and/or relationships of agency and confidence between Plaintiffs and Defendants Lau and L&A, including without limitation the relationships of Defendants Lau and L&A attorneys and escrow agents for Plaintiffs.

201. Under New York common law, Plaintiffs are entitled to an accounting by Defendants Lau and L&A for the money Plaintiffs delivered to Defendants Lau and L&A which has since disappeared.

202. Plaintiffs demanded that Defendants Lau and L&A provide an accounting for said money.

203. Defendants Lau and L&A refused to provide any accounting to Plaintiffs.

204. Accordingly, Plaintiffs are entitled to a court-mandated accounting by Defendants Lau and L&A.

## AS AND FOR A SIXTH CAUSE OF ACTION
**(Breach of Contract as to Defendants Wong, WRE, Fok, Cheung, Lau, and L&A)**

205. Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

206. Plaintiffs entered one or more valid, binding and enforceable contracts with the Defendants Wong, WRE, Fok, Cheung, and others for the investment of $500,000.00 into a venture to buy the Property for the consideration of a share in the ownership and profit of purchasing, developing, and/or reselling the Property.

207. Said contract or contracts required that Plaintiffs provide $500,000.00 and that Defendants would invest the money in the Property and develop and/or sell the property for the benefit of both Plaintiffs and Defendants.

208. The Defendants promised a return to Plaintiffs of an estimated profit of $1,000,000.00.

209. Plaintiffs entered one or more valid, binding and enforceable contracts with the Defendants Lau and L&A that Lau and L&A would hold Plaintiffs' funds in escrow and release said

33

funds only for the purchase of the Property by an entity in which Plaintiffs' had an ownership or other interest.

210. Plaintiffs fulfilled all material obligations under the contracts.

211. Defendants materially breached the contracts by taking Plaintiff's money and using it to purchase the Property with a different entity in which Plaintiffs had no ownership interest.

212. Plaintiffs sustained damages as the direct and foreseeable result of Defendant's breach in an amount to be determined at trial but in any event not less than $1,500,000.00.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Unjust Enrichment Defendants 37 PR, Wong, WRE, Fok, and Cheung)

213. Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

214. Defendants have obtained $500,000.00 from Plaintiffs and took that money for their own use rather than purchase the Property for the entity in which Plaintiff 165 GRA holds an ownership interest.

215. Due to the Defendants obtaining Plaintiffs' money by fraud and using it to their own enrichment, in fairness and good conscience, the money should not be retained.

216. The law requires that Defendants to repay Plaintiffs.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### (Constructive Trust as to Defendants Wong, WRE, Fok, Cheung, Lau, and L&A)

217. Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

218. As co-members of 37 PCA with Plaintiff 165 GRA, WRE, Manhai Wong, Fok, Zheng Wang, Cheung, Yang Fan, Shi Meng Huang, YPA Management Holdings, LLC, and Jimmy Li, owed Plaintiff 165 GRA the fiduciary duties of loyalty and care.

219. The Defendants promised that they were legitimate real estate developers and would use Plaintiffs' money to purchase the Property for the benefit of both Plaintiffs' and Defendants.

220. As escrow agents holding Plaintiffs' money and as their purported attorneys, Defendants Lau and L&A owed Plaintiffs the fiduciary duties of loyalty and care.

221. Defendants Lau and L&A promised Plaintiffs that they would hold Plaintiffs' funds in escrow and release said funds only for the purchase of the Property by an entity in which Plaintiffs' had an ownership or other interest.

222. In reliance on those promises, the Plaintiffs transferred $500,000.00 to the Defendants.

223. Rather than fulfill that promise, the Defendants used the money to buy the Property in the name of a different entity in which Plaintiffs owned no interest and enriched themselves unjustly at the expense of the Plaintiffs.

## AS AND FOR A NINTH CAUSE OF ACTION
### (N.Y. Gen. Bus. Law § 349 as to Defendants Wong, WRE, Fok, Cheung, Lau, and L&A)

224. Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

225. Defendants Wong, WRE, Fok, and Cheung are engaged in the business of real estate investing.

226. In addition or in the alternative, Defendants Wong, WRE, Fok, and Cheung hold themselves out to be in the business of real estate investing.

227. Defendants Lau and L&A are engaged in the business of practicing law.

228. In addition or in the alternative, Defendants Lau and L&A hold themselves out to be engaged in the business of practicing law.

229. Defendants acts as alleged above constitute deceptive acts and practices in the conduct of Defendants' business, trade and commerce within the meaning of N.Y. Gen. Bus. Law § 349.

230. Plaintiffs relied on Defendants' deception to their detriment including but not limited to as fully set forth above.

231. Defendants knowingly and/or willfully violated N.Y. Gen. Bus. Law § 349.

232. By reason of the foregoing, Plaintiffs sustained damages in an amount to be determined at trial but in any event not less than $1,500,000.00.

233. Plaintiffs are entitled to attorneys' fees and costs pursuant to N.Y. Gen. Bus. Law § 349.

234. Plaintiffs are entitled to treble damages pursuant to N.Y. Gen. Bus. Law § 349.

## JURY DEMAND

235. Plaintiffs demand trial by jury as to all issues so triable.

WHEREFORE, Plaintiffs demand judgment against the Defendants as follows:

    a. Compensatory damages in an amount to be determined at trial but in any event not less than $1,500,000.00;

    b. Punitive damages in an amount to be determined at trial;

    c. Treble damages under the Racketeer Influenced and Corrupt Organizations Act and/or N.Y. Gen. Bus. Law § 349;

    d. Attorneys' fees and costs under such provisions of law as include without limitation the Racketeer Influenced and Corrupt Organizations Act and/or N.Y. Gen. Bus. Law § 349;

    e. An accounting by WRE of 37 PCA and by Lau and L&A regarding Plaintiffs' money placed in escrow with those Defendants;

     f.   An examination of the books and records of 37 PCA;

     g.   Interest; and

     h.   Such other and further relief as the Court deems just, proper, and equitable.

## DERIVATIVE ACTIONS ON BEHALF OF 37 PCA AND MCI

236.  Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

237.  Based on the foregoing and below allegations, 37 PCA and MCI have suffered harm as the result of the Defendants actions and omissions.

238.  At all relevant times, Plaintiff 165 GRA was and is a member of 37 PCA.

239.  Plaintiff 165 GRA has the authority to bring this action on behalf of 37 PCA and/or brings this action derivatively on behalf of 37 PCA

240.  At all relevant times, 37 PCA is or was the 99.99% member and controlling member of MCI.

241.  Plaintiff 37 PCA has the authority to bring this action on behalf of MCI and/or brings this action derivatively on behalf of MCI**.**

*Demands made:*

242.  Defendant WRE is the managing member of both 37 PCA and MCI.

243.  On or about July 25, 2018, Plaintiffs sent a demand (the "Demand") to Defendant WRE, Defendant Wong as the agent of Defendant WRE, 37 PCA, and other *de jure* and/or *de facto* related parties by means of Certified Mail, Return Receipt Requested. A true and accurate copy of that demand is annexed hereto and made part hereof as EXHIBIT Q.

244.  Plaintiffs twice mailed the Demand to WRE using the address of 42-11 Kissena Blvd., Flushing, New York 11355, the address provided for WRE in the operating agreement for 37 PCA.

245. Both of Plaintiffs' mailing of the Demand sent to WRE was returned, presumably because WRE or its agent refused to sign for them. Plaintiffs also twice mailed a copy of the Demand to the address of 136-20 38th Ave., Suite 3A, Flushing, New York 11354, the address provided to the New York Secretary of State for Wong Real Estate Consultancy LLC.

246. That mailing was also apparently refused twice.

247. Still further, Plaintiffs mailed the Demand to the address of 7483 SW 24 St. Ste.101, Miami, Florida 33155, the only known address for MCI. That mailing was accepted according the return receipt received; however, the only response Plaintiffs received was an email from an attorney claiming that his clients had no knowledge of the subject of the Demand.

248. The Demand was also sent to Defendants Wong and Cheung, who returned receipts, but neither they nor any other person or party to whom Plaintiffs mailed the Demand took any action or made any communication regarding the Demand to the best of Plaintiffs' knowledge.

249. The Demand was also sent to and received by other members of 37 PCA who are not presently named as defendants herein, namely Ming Yi Cheung, Shi Meng Huang, and Yang Fan, but neither they nor any other person or party to whom Plaintiffs mailed the Demand took any action or made any communication regarding the Demand to the best of Plaintiffs' knowledge.

250. The Demand was also sent to but apparently refused by Manhai Wong (twice), Defendant Fok, Zheng Wang, YPA Management Holdings LLC, and Jimmy Li as the remaining members of 37 PCA, but neither they nor any other person or party to whom Plaintiffs

mailed the Demand took any action or made any communication regarding the Demand to the best of Plaintiffs' knowledge.

251. The Demand was also sent to and received by Jian Zhang as the only other member of MCI besides 37 PCA, but neither he nor any other person or party to whom Plaintiffs mailed the Demand took any action or made any communication regarding the Demand to the best of Plaintiffs' knowledge.

252. A letter similar to the Demand was also sent to and received by Defendants Lau and L&A, who were or held themselves out to be attorneys for 37 PCA and/or its members, but neither they nor any other person or party to whom Plaintiffs mailed the Demand took any action or made any communication regarding the Demand to the best of Plaintiffs' knowledge.

253. The Demand demanded that the membership and/or management of 37 PCA and MCI, *inter alia*, rectify the circumstances and damages caused by their failure to take title to the Property under 37 PCA or MCI notwithstanding their use of the Plaintiffs' money to purchase the Property and to provide an accounting or grant access to the books and records of 37 PCA and MCI.

254. To date, the membership and/or management of neither 37 PCA nor MCI did or attempted to rectify the circumstances and damages caused by their failure to take title to the Property under 37 PCA or MCI notwithstanding their use of the Plaintiffs' money to purchase the Property or to provide an accounting or grant access to the books and records of 37 PCA or MCI.

*Demands or further demands would be futile:*

255. Based on the foregoing, the Plaintiffs have alleged with particularity that they made an attempt to secure the initiation of the action sought by the management of 37 PCA and MCI.

256. In addition or in the alternative, Plaintiffs are excused from the requirement to serve such a demand or to make any further attempts to serve such a demand.

257. Defendant WRE is the managing member of both 37 PCA and MCI.

258. Defendant WRE is also sued herein, *inter alia*, for RICO violations, fraud, conversion, and breaches of fiduciary duty in direct connection to the grounds upon which Plaintiffs would demand WRE take action.

259. Likewise, the other members of 37 PCA and MCI are either named as Defendants herein, *inter alia*, for RICO violations, fraud, conversion, and breaches of fiduciary duty in direct connection to the grounds upon which Plaintiffs would demand action or connected to or implicated by the allegations of this Complaint.

260. Based on the foregoing, demand would be futile because WRE is directly interested in the challenged actions and the membership of 37 PCA and MCI is too compromised or interested in the challenged actions to force the manager to take action.

261. Specifically, the manager of 37 PCA and MCI and a subset of the membership breached their fiduciary duties and enacted a scheme to defraud Plaintiffs and perhaps others in order to enrich themselves and their associates at the expense of their victims, including without limitation by defrauding Plaintiffs Choi and 165 GRA of their $500,000.00 capital investment and using that money to obtain the Property under the title of another entity to which Plaintiffs had no membership interests.

262. Based on the foregoing, demand would be futile because WRE and the membership of 37 PCA and MCI did not fully inform themselves about the challenged actions notwithstanding diligent efforts by Plaintiffs to sound the alarm by mailing the Demand.

263. Specifically, Plaintiffs mailed the Demand to everyone they could think of related to the actions and omissions requiring redress, but the Demand was either refused, ignored, or denied.

264. Based on the foregoing, demand would be futile because the challenged actions were so egregious on their face that it could not have been the product of sound business judgment of the WRE or the controlling membership.

265. Specifically, the unlawful taking of membership capital investments, which were obtained by fraud, and purchasing a property for a subset of the members and other associates is the product of a criminal enterprise—not possibly that of sound business judgment.

266. Wherefore, each of the following causes of action are brought individually by 37 PCA and/or MCI and/or derivatively on behalf of 37 PCA and/or MCI by members thereof.

### AS AND FOR A FIRST DERIVATIVE CAUSE OF ACTION
#### (Declaratory Relief as to Defendant 37 PR)

267. Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

268. MCI had at all relevant times a contractual right to purchase the Property.

269. MCI was at all relevant times the contractual assignee of leases, rents, and/or other possessory interests to the Property.

270. MCI's contractual interests to the Property were not assignable under the terms of the contract to the entity which unlawfully took title to the Property, namely Defendant 37 PR.

271. Notwithstanding the foregoing, Defendant 37 PR unlawfully took title to and possession of the Property as the result of the above-described racketeering, breaches of fiduciary duties, fraud, deceptive trade practices, and other unlawful conduct.

272. As a result of the foregoing, there exists a present and justiciable controversy relating to the rights, title, and interests in real property, namely, the Property.

273. As a result of the foregoing, there exists a present and justiciable controversy relating to the rights, title, and interests in the ownership interests in the entity or entities involved in the corporate structure which owns or is entitled to own the Property.

### AS AND FOR A SECOND DERIVATIVE CAUSE OF ACTION
**(Breach of Fiduciary Duty as to Defendants Wong, WRE, Fok, Cheung, Lau, and L&A)**

274. Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

275. As co-members with Plaintiff 165 GRA, WRE (and as manager), Manhai Wong, Fok, Zheng Wang, Cheung, Yang Fan, Shi Meng Huang, YPA Management Holdings, LLC, and Jimmy Li, owed 37 PCA the fiduciary duties of loyalty and care.

276. Further, as escrow agents holding Plaintiffs' money and as their purported attorneys, Defendants Lau and L&A owed Plaintiffs the fiduciary duties of loyalty and care.

277. Defendants' fiduciary duties required that Defendants act in good faith and fair dealing with Plaintiffs and act in Plaintiffs' best interests.

278. Defendants Wong and WRE breached their fiduciary duties to Plaintiffs by actively defrauding them as described above.

279. Defendants Fok, Cheung, and possibly others, breached their fiduciary duties to Plaintiffs by engaging in a conspiracy to defraud Plaintiffs and by unlawfully taking the business opportunity of 37 PCA, and Defendants used that opportunity and those funds purchased the Property through a new entity, 37 PR, for themselves and others.

280. Defendants Lau and L&A breached their fiduciary duties to Plaintiffs by either negligently, recklessly, or intentionally releasing Plaintiffs' funds out of escrow to be unlawfully be put to use by the other Defendants for their personal gain.

281. Based on the foregoing, the Defendants failed to act in good faith and fair dealing with Plaintiffs and to act in Plaintiffs' best interests.

282. Further, the Defendants were required to make truthful and complete disclosures to Plaintiffs but did not; rather, the Defendants conspired to and did defraud the Plaintiffs as described above.

283. Defendants' breaches caused Plaintiffs to sustain damages. As the direct and foreseeable result of Defendant's breach, Plaintiffs sustained damages in an amount to be determined at trial.

### AS AND FOR A THIRD DERIVATIVE CAUSE OF ACTION
### (Constructive Trust as to Defendants Wong, WRE, Fok, Cheung, Lau, and L&A)

284. Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

285. As co-members of 37 PCA with Plaintiff 165 GRA, WRE (and as manager), Manhai Wong, Fok, Zheng Wang, Cheung, Yang Fan, Shi Meng Huang, YPA Management Holdings, LLC, and Jimmy Li, owed 37 PCA the fiduciary duties of loyalty and care.

286. The Defendants promised that they were legitimate real estate developers and would use Plaintiffs' money to purchase the Property for the benefit of both Plaintiffs and Defendants.

287. As escrow agents holding Plaintiffs' money and as their purported attorneys, Defendants Lau and L&A owed Plaintiffs the fiduciary duties of loyalty and care.

288. Defendants Lau and L&A promised Plaintiffs that they would hold Plaintiffs' funds in escrow and release said funds only for the purchase of the Property by an entity in which Plaintiffs' had an ownership or other interest.

43

289. In reliance on those promises, the Plaintiffs transferred $500,000.00 to the Defendants.

290. Rather than fulfill that promise, the Defendants used the money to buy the Property in the name of a different entity in which Plaintiffs owned no interest and enriched themselves unjustly at the expense of the Plaintiffs.

## AS AND FOR A FOURTH DERIVATIVE CAUSE OF ACTION ON BEHALF OF 37 PCA
### (Accounting as to Defendant WRE)

291. Plaintiffs repeat and reassert each of the foregoing allegations as if set forth in their entirety.

292. WRE is the manager of MCI.

293. Plaintiff 37 PCA is a member of MCI.

294. Under the terms of the operating agreement and/or the New York Limited Liability Company Act, Plaintiff 37 PCA is entitled to examine the books and records of MCI.

295. Under New York common law, Plaintiff 37 PCA is entitled to an accounting for MCI.

296. Plaintiff 37 PCA demanded that WRE provide an opportunity to examine the books and records of MCI.

297. Plaintiff 37 PCA demanded that WRE provide an accounting for MCI.

298. WRE refused to provide 37 PCA an opportunity to examine the books and records of MCI.

299. WRE refused to provide an accounting for MCI.

300. Accordingly, 37 PCA is entitled to a court-mandated examination of the books and records of MCI and an accounting by the manager WRE for MCI.

### JURY DEMAND

301. Derivative Plaintiffs demand trial by jury as to all issues so triable.

WHEREFORE, Derivative Plaintiffs demand judgment against the Defendants as follows:

    i. Compensatory damages in an amount to be determined at trial but in any event not less than $1,500,000.00;

j.   Punitive damages in an amount to be determined at trial;

k.   Attorneys' fees and costs under such provisions of law as include without limitation N.Y. Bus. Corp. Law § 626;

l.   Declaratory relief in the form of an order and judgment declaring that Plaintiff My Capital Investment LLC is the lawful owner of the Property, that Plaintiff 37 Parsons Capital Advisors LLC is the 99.99% member of My Capital Investment LLC, and that Plaintiff 165 Gregory Road Associates LLC owns a portion of 37 Parsons Capital Advisors LLC proportionate to its capital investment and is entitled to a proportionate share of 37 Parsons Capital Advisors LLC's profits;

m.   An accounting by WRE for MCI;

n.   An examination of the books and records of MCI;

o.   Interest; and

p.   Such other and further relief as the Court deems just, proper, and equitable.

Dated:  Chester, New York
        July 3, 2019

COHEN, LABARBERA & LANDRIGAN, LLP


 /s/Kyle A. Seiss_____
Kyle A. Seiss, Esq.
99 Brookside Avenue
Chester, New York 10918
Tel: (845) 291-1900
Fax: (845) 291-8601
Email: kseiss@cll-law.com
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

---

JAMES CHOI and 165 GREGORY ROAD
ASSOCIATES, LLC, individually and derivatively on
behalf of 37 PARSONS CAPITAL ADVISORS LLC
and MY CAPITAL INVESTMENT LLC,

                          Plaintiffs,

              -against-

37 PARSONS REALTY LLC, ANTONIO WONG a/k/a
ANTONIO WONG, JR., WONG REAL ESTATE
CONSULTANCY LLC a/k/a WRE CONSULTANCY,
YAN S. FOK, MING YI CHEUNG,
JAY LAU, LAU & ASSOCIATES P.C., JOHN and
JANE DOES 1-50, and ABC ENTITIES 1-50,

                          Defendants.

---

Civil Action No.: 1:19-cv-3875

FED. R. CIV. P. RULE 7.1
STATEMENT

---

Pursuant to Federal Rule of Civil Procedure 7.1, and to enable District Court Judges and

federal Magistrate Judges to evaluate possible disqualification or recusal, the undersigned counsel

for JAMES CHOI and 165 GREGORY ROAD ASSOCIATES, LLC, individually and derivatively

on behalf of 37 PARSONS CAPITAL ADVISORS LLC and MY CAPITAL INVESTMENT LLC

certifies that there are no corporate parents, affiliates or subsidiaries of said parties which are

publicly held.

Dated: July 3, 2019
       Chester, New York

COHEN, LABARBERA & LANDRIGAN, LLP


  /s/Kyle A. Seiss
Kyle A. Seiss, Esq.
99 Brookside Avenue
Chester, New York 10918
Tel: (845) 291-1900

Fax: (845) 291-8601
Email: kseiss@cll-law.com
*Attorneys for Plaintiffs*

JS 44 (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
JAMES CHOI and 165 GREGORY ROAD ASSOCIATES, LLC, individually and derivatively on behalf of 37 PARSONS CAPITAL ADVISORS LLC and MY CAPITAL INVESTMENT LLC

## DEFENDANTS
37 PARSONS REALTY LLC, ANTONIO WONG a/k/a ANTONIO WONG, JR., WONG REAL ESTATE CONSULTANCY LLC a/k/a WRE CONSULTANCY, et al

**(b)** County of Residence of First Listed Plaintiff   New York County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Queens County
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Cohen, LaBarbera & Landrigan, LLP
99 Brookside Avenue, Chester, New York 10918
(845) 291-1900

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ❏ 1   U.S. Government
Plaintiff
- ☒ 3   Federal Question
*(U.S. Government Not a Party)*
- ❏ 2   U.S. Government
Defendant
- ❏ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                         *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ❏ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - | ❏ 690 Other | ❏ 423 Withdrawal | ❏ 376 Qui Tam (31 USC |
| ❏ 130 Miller Act | ❏ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ❏ 140 Negotiable Instrument | Liability | ❏ 367 Health Care/ | | | ❏ 400 State Reapportionment |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' | Product Liability | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted | Liability | ❏ 368 Asbestos Personal | | ❏ 840 Trademark | ❏ 460 Deportation |
| Student Loans | ❏ 340 Marine | Injury Product | | | ☒ 470 Racketeer Influenced and |
| (Excludes Veterans) | ❏ 345 Marine Product | Liability | | | Corrupt Organizations |
| ❏ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ❏ 480 Consumer Credit |
| of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | ❏ 490 Cable/Sat TV |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle | ❏ 371 Truth in Lending | Act | ❏ 862 Black Lung (923) | ❏ 850 Securities/Commodities/ |
| ❏ 190 Other Contract | Product Liability | ❏ 380 Other Personal | ❏ 720 Labor/Management | ❏ 863 DIWC/DIWW (405(g)) | Exchange |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal | Property Damage | Relations | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | Injury | ❏ 385 Property Damage | ❏ 740 Railway Labor Act | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| | ❏ 362 Personal Injury - | Product Liability | ❏ 751 Family and Medical | | ❏ 893 Environmental Matters |
| | Medical Malpractice | | Leave Act | | ❏ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | Act |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | ❏ 791 Employee Retirement | ❏ 870 Taxes (U.S. Plaintiff | ❏ 896 Arbitration |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | Income Security Act | or Defendant) | ❏ 899 Administrative Procedure |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate | | ❏ 871 IRS—Third Party | Act/Review or Appeal of |
| ❏ 240 Torts to Land | ❏ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ❏ 245 Tort Product Liability | Accommodations | ❏ 530 General | | | ❏ 950 Constitutionality of |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - | ❏ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 446 Amer. w/Disabilities - | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration | | |
| | Other | ❏ 550 Civil Rights | Actions | | |
| | ❏ 448 Education | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original
Proceeding
- ❏ 2 Removed from
State Court
- ❏ 3 Remanded from
Appellate Court
- ❏ 4 Reinstated or
Reopened
- ❏ 5 Transferred from
Another District
*(specify)*
- ❏ 6 Multidistrict
Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
18 U.S.C. § 1961 et seq.

Brief description of cause:
Civil RICO

## VII. REQUESTED IN
COMPLAINT:
❏ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $
1,500,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ❏ No

## VIII. RELATED CASE(S)
IF ANY
*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE _____    SIGNATURE OF ATTORNEY OF RECORD _____

## FOR OFFICE USE ONLY

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

# CERTIFICATION OF ARBITRATION ELIGIBILITY

Local Arbitration Rule 83.7 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000, exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed.

Case is Eligible for Arbitration ☐

I, _____, counsel for _____, do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

☑ monetary damages sought are in excess of $150,000, exclusive of interest and costs,

☐ the complaint seeks injunctive relief,

☐ the matter is otherwise ineligible for the following reason

## DISCLOSURE STATEMENT - FEDERAL RULES CIVIL PROCEDURE 7.1

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks:

None

## RELATED CASE STATEMENT (Section VIII on the Front of this Form)

Please list all cases that are arguably related pursuant to Division of Business Rule 50.3.1 in Section VIII on the front of this form. Rule 50.3.1 (a) provides that "A civil case is 'related' to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 50.3.1 (b) provides that " A civil case shall not be deemed "related" to another civil case merely because the civil case: (A) involves identical legal issues, or (B) involves the same parties." Rule 50.3.1 (c) further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (d), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

## NY-E DIVISION OF BUSINESS RULE 50.1(d)(2)

1.) Is the civil action being filed in the Eastern District removed from a New York State Court located in Nassau or Suffolk County? ☐ Yes ☑ No

2.) If you answered "no" above:
a) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in Nassau or Suffolk County? ☐ Yes ☑ No

b) Did the events or omissions giving rise to the claim or claims, or a substantial part thereof, occur in the Eastern District? ☑ Yes ☐ No

c) If this is a Fair Debt Collection Practice Act case, specify the County in which the offending communication was received: .

If your answer to question 2 (b) is "No," does the defendant (or a majority of the defendants, if there is more than one) reside in Nassau or Suffolk County, or, in an interpleader action, does the claimant (or a majority of the claimants, if there is more than one) reside in Nassau or Suffolk County? ☐ Yes ☐ No
*(Note: A corporation shall be considered a resident of the County in which it has the most significant contacts).*

## BAR ADMISSION

I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court.

☑ Yes            ☐ No

Are you currently the subject of any disciplinary action (s) in this or any other state or federal court?

☐ Yes (If yes, please explain            ☑ No

I certify the accuracy of all information provided above.

Signature: _____

EXHIBIT A

# 37-05 PARSONS BOULEVARD FLUSHING, NY 11354



**Acquisition and Development Plan
$13,000,000**

# BUILDING OVERVIEW



- **The Subject property is 37-05 Parsons Boulevard. Located on the corner of 37th Avenue and Parsons Boulevard.**
- **Currently operated as a 39 unit rental building**
- **Located just two blocks away from Flushing Commons billion dollar multi-use development**

# LOCATION







# AREA OVERVIEW

Flushing has enjoyed a tremendous renaissance in recent years and is affectionately referred to as a suburb of Shanghai and Beijing. This hub is and a nexus of all transportation centrally located to both major NYC airports, the Long Island Railroad and the 7 Subway train which was recently extended to Manhattan's west side at the multi-billion dollar development, Hudson Yards.

This building boom has attracted elite developers such as Rockefeller Group, Related and AECOM Capital. A massive influx of foreign and institutional investors such as Blackstone have also poured into the area.



Flushing Commons is a multiphase mixed used hotel, residential and commercial development.

It features a number of High end restaurants, hundreds of condos and a Hyatt Place hotel.

# DEMOGRAPHICS

**Flushing's population is nearly 70% Chinese and subsequently serves as a recognizable haven for investors from Mainland China. There is an extensive service industry that caters to the booming Chinese population providing everything from restaurants, to health care to financial services.**





# Comparable Sales 2015

142-26 Roosevelt Avenue $322.89 psf (buildable)

138-12 Northern Boulevard $341.27 psf (buildable)

160-04 & 160-06 Northern Blvd. $1,106 psf (5% cap)





# EXIT STRATEGY 1

- Flip to a developer (1 year)
  - Price per buildable square foot @ $300/psf
  - Potential profit **$10,000,000**









# Exit Strategy 2

- Condo Development (3 years)
  - New condominium prices @ $1000/psf
  - Construction hard and soft costs @ $350/psf
  - Potential Profit: **$ 36,800,000**



# Contract Key Points

- $10,000,000.00 Purchase Price

- $1,000,000.00 deposit

- $9,000,000.00 at Closing

- Time is of the Essence

# Key Deal Points

- Currently a 39 unit rental building on a 16,000sf lot in Flushing Queens with a total of **76,800 buildable sf**!
- 37 Parsons Capital Advisors are in contract for 13mm and purchasing the contract for 3mm.
- Wong primary exit strategy is a resale to a Chinese National Real estate Developer @ 300 psf
- Wong has a commitment from a bridge lender for up to 8mm (@11.25%). Non Recourse/No Personal Guarantee
- Wong needs 5M to close.
- Paying $3m to My Capital to buy the units in the LLC 99.99
- Wong would like to offer the remaining 8 shares @ 500k a piece.

# Deal Structure

- Total Equity Cost Roughly $10,000,000 for acquisition Plus $3,000,000 to My Capital for a total cost of $13,000,000

- Sources of Capital:

- $1,000,000 in hand

- $8,000,000 Bridge Loan

- $5,000,000.00 raised by issuing new units.

# CONCLUSION

- Flushing's unique geographic and demographic position creates a lucrative insulated market. Although inextricably tied to Mainland China, Flushing thrives independently of economic conditions in China. It serves as a safe haven for overseas investment in both rising and falling markets.

- 37-05 Parsons is a solid investment for a broad range of portfolios. With multiple exit scenarios, it represents a rare opportunity to acquire a development site at a substantial discount to the current market.

# 37-05 PARSONS BOULEVARD

# COMING SOON

# 78 UNITS



EXHIBIT B

## CONTRACT OF SALE

### COMMUNITY HOMES HOUSING DEVELOPMENT FUND COMPANY, INC., as Seller,

and

### MY CAPITAL INVESTMENT LLC, as Purchaser

PREMISES:

**37-05 PARSONS BOULEVARD
FLUSHING, NEW YORK 11354**

1171420

### CONTRACT OF SALE

**CONTRACT OF SALE** (this "**Contract**") dated as of August 27, 2015 (the "**Effective Date**"), is made by and between **COMMUNITY HOMES HOUSING DEVELOPMENT FUND COMPANY, INC.**, having an office at 111 Division Street, New York, NY 10002("**Seller**") and **MY CAPITAL INVESTMENT LLC**, having an office at _____("**Purchaser**").

### W I T N E S S E T H

**WHEREAS**, Seller is the owner of that certain plot, piece or parcel of land known as Lot 8 in Block 5015 of Queens County, State of New York and described on **Exhibit A** attached hereto and made a part hereof and the buildings and improvements thereon erected and more commonly known as 37-05 Parsons Boulevard, Flushing, New York 11354(collectively, the "**Premises**"); and

**WHEREAS**, upon the terms and conditions herein set forth, Seller agrees to sell and convey, and Purchaser agrees to purchase, the Premises.

**NOW, THEREFORE**, in consideration of the mutual covenants and conditions hereinafter set forth and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.      Purchase and Sale

(a)      Upon payment to Seller of the Purchase Price (as hereinafter defined), Seller agrees to sell and convey, and Purchaser agrees to purchase, the Premises.

(b)      This sale includes all right, title and interest, if any, of Seller in and to (i) any land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Premises to the center line thereof and all right, title and interest of Seller in and to any award made or to be made in lieu thereof and in and to any unpaid award for damage to the Premises by reason of change of grade of any street and Seller will execute and deliver to Purchaser at the Closing (as hereinafter defined), on demand, all proper instruments for the conveyance of such title and the assignment and collection of any such award; (ii) strips or gores, if any, between the Premises and abutting properties, whether owned or claimed by deed, limitations or otherwise, and whether or not they are located inside or outside of the boundaries of the Premises; and (iii) easements, licenses, privileges and rights of way, if any, in or upon the Premises and all other rights, hereditaments and appurtenances, if any, belonging or in anywise pertaining to the Premises or the improvements.

(c)      This sale also includes all right, title and interest of Seller, if any, in and any fixtures, articles of personal property and equipment attached or appurtenant to the Premises, but no part of the Purchase Price shall be deemed to be paid for such fixtures, articles of personal property or equipment.

(d).      This sale also includes any and all leases and occupancy agreements listed

on **Exhibit B** attached hereto and made a part hereof (collectively the **"Leases"** and each a **"Lease"**), together with all rents and other sums due or to become due thereunder (the **"Rents"**) and any and all security deposits in Seller's possession in connection therewith, all of which are listed on Exhibit B (the **"Security Deposits"**). The term "Leases" shall include any leases entered into by Seller between the date hereof and Closing (as hereinafter defined). Seller represents and warrants that **Exhibit B** is true, correct and complete as of the date of this Contract. Notwithstanding the foregoing, Purchaser shall not have the right to cancel on the ground that there is any erroneous representation on Exhibit B, provided the error is not material and Seller does not intentionally mislead or defraud by presenting such figure on Exhibit B.

(e)      This sale also includes (i) all assignable contracts and agreements (collectively, the **"Service Contracts"**) listed and described on **Exhibit C** attached hereto and made a part hereof, relating to the upkeep, repair, maintenance or operation of the Premises, Improvements or Personal Property, and (ii) all assignable existing permits, licenses, approvals and authorizations issued by any governmental authority in connection with the Premises (the property described in clause (ii) of this subsection (e) being sometimes herein referred to collectively as the **"Licenses and Permits"**).

(f)      This sale also includes all air and development rights, if any; provided, however, that Seller makes no representation as to the existence of same, but represents that it has not previously conveyed such rights.

2.      Purchase Price

(a)      The purchase price for the Premises i **NINE MILLION SEVEN HUNDRED THOUSAND and 00/100 ($9,700,000.00) DOLLARS** (the **"Purchase Price"**), payable as follows:

(i)      **NINE HUNDRED SEVENTY THOUSAND and 00/100 ($970,000.00) DOLLARS** on the signing of this Contract by wire transfer in immediately available federal funds to the escrow account of Escrow Agent (as hereinafter defined) pursuant to this agreement (the **"Deposit"**); and

(ii)      **EIGHT MILLION SEVEN HUNDRED THIRTY THOUSAND and 00/100 ($8,730,000.00) DOLLARS** at the Closing by one or more certified checks of Purchaser or by one or more bank teller's checks payable to the order of Seller or as Seller may direct. At Seller's election, the payment of all or a portion of the aforesaid sum shall be made by one or more wire transfers of immediately available funds pursuant to wiring instructions to be given to Purchaser not later than two business days prior to Closing.

(b)      Any checks to be given by Purchaser under this Contract must be unendorsed and drawn on a bank located in the State of New York.

3.      State of Title; Title Examination; Due Diligence.

(a)      The Premises is sold subject only to all matters referred to in **Exhibit D**

2

attached hereto and made a part hereof (the "**Permitted Exceptions**").

(b)    Seller shall give, and Purchaser shall accept, such title to the Premises as any title insurance company authorized to do business in the State of New York and selected by the Purchaser (the "**Title Company**") will approve and insure, subject only to the Permitted Exceptions and the usual printed exclusions contained in the standard form of title insurance policy issued by the Title Company.

(c)    Promptly after execution and delivery of this Contract, Purchaser shall obtain a title commitment from the Title Company with respect to the Premises (the "**Title Commitment**") and will direct that copies of the Title Commitment and all updates thereof and revisions thereto be provided to Seller's attorney concurrently with Purchaser's receipt of same. Receipt by Seller's attorney of a copy of the title report shall be deemed notice of Purchaser's objection to each and every exception to title contained in the Report other than those exceptions which are Permitted Exceptions. If the Title Commitment discloses any encumbrance, lien or other title exception that is not a Permitted Encumbrance, then Purchaser may object to the same by giving written notice (a "**Title Notice**") to Seller not later than twenty (20) days after the Effective Date, *time being of the essence*. If Purchaser fails to give a Title Notice by the date which is twenty (20) days after the Effective Date, any lien, encumbrance or other title exception existing as of the Effective Date shall be deemed a Permitted Encumbrance hereunder. In addition, Purchaser shall have the right to give a Title Notice with respect to any new lien, encumbrance or other title exception that is not a Permitted Encumbrance and appears in any update of the Title Commitment, provided Purchaser shall have given a Title Notice to Seller with respect to same within five (5) days after Purchaser's receipt of such update, *time being of the essence*. Anything herein to the contrary notwithstanding, Seller shall have no obligation to cure, or attempt to cure, any alleged lien, encumbrance or other title exception (including, without limitation, any survey matter) raised in a Title Notice unless (i) the same is a mortgage executed by Seller prior to the Effective Date that has not been satisfied, (ii) the same is a lien other than a mortgage described in (i) above created voluntarily by the execution of a document by Seller (and specifically not any other predecessor in title) which can be satisfied by the payment of money only; provided, however, the costs of satisfaction or clearance of the matters described in this subsection (ii) do not exceed the sum of One Hundred Thousand and 00/100 ($100,000.00) Dollars in the aggregate, or (iii) an encumbrance created voluntarily by the execution of a document by Seller after the Effective Date; provided, however, that Seller may, in its sole discretion, extend the Closing Date for up to ninety (90) days in order to cure any matter described in the foregoing subsections (i), (ii) or (iii). Purchaser may, at its option, choose to take title subject to such mortgage, lien or encumbrance and set off against the Purchase Price an amount equal to the sum which Seller is hereby obligated to expend pursuant to this Section 3(c). The exercise of the foregoing election shall not alter or affect the limitation of liability of Seller as stated in Section 14 hereof.

(d)    Notwithstanding anything to the contrary contained in this Contract, the fact that the Premises does not have the proper certificates or permits (or, if there be such certificate(s) or permit(s), that there exist any variances between such certificate(s) or permit(s) and the actual state or use(s) or condition(s) of the Premises) shall not be deemed to be an objection to title nor any other grounds for the Purchaser to not perform as required under this Contract.

3

(e)     If a search of the title discloses judgments, bankruptcies or other returns against persons having names the same as or similar to that of Seller, Seller will, on request, deliver to Purchaser an affidavit showing that such judgments, bankruptcies or other returns are not against Seller and otherwise in such reasonable form and content so that the Title Company may remove such judgments, bankruptcies or other returns as exceptions to title.

4.      Closing Deliveries.

A.     At Closing, Seller shall execute and/or deliver as applicable the following:

(a)     A deed to the Premises (the **"Deed"**) in the form attached hereto and made a part hereof as **Exhibit E** and shall be duly executed and acknowledged so as to convey to Purchaser the fee simple to the Premises free of all liens and encumbrances, except for the Permitted Exceptions, and which shall contain the covenant required by subdivision 5 of Section 13 of the Lien Law.

(b)     A duly executed bill of sale (the "**Bill of Sale**") conveying any Personal Property with a warranty of title and without any warranty, express or implied, as to merchantability and fitness for any purpose and in the form attached hereto as **Exhibit F**.

(c)     (i) a certified or bank or attorney's trust account check to the order of the recording officer of the county in which the Deed is to be recorded for the amount of the documentary stamps to be affixed to the deed in accordance with Article 31 of the Tax Law of New York State, and (ii) a certified or bank check to the order of the Finance Administrator for the amount of the Real Property Transfer Tax imposed by Title II of Chapter 46 of the Administrative Code of the City of New York in respect of the Deed. At Seller's option, on no less than one (1) business day's notice, Purchaser shall deliver certified or bank or attorney's trust account checks in payment of said stamps and taxes and shall be credited in such amount(s) against the balance of the Purchase Price. Seller and Purchaser agree to sign and swear to the transfer tax returns required to be filed in connection with the delivery of such checks. The parties agree that the checks to be delivered hereunder can be made payable to, and the returns required to be executed delivered to, the Title Company.

(d)     An assignment of the Leases, Rents, Security Deposits and Service Contracts in the form annexed hereto as **Exhibit G** (the "**Assignment of Leases**"), together with an updated rent roll showing any changes in the status of the Leases, including, but not limited to new Leases or Leases that have gone into default by reason of the acts or omissions to act of Seller or the tenants thereunder.

(e)     A notice (the **"Tenant Notice"**) in the form attached hereto as **Exhibit H**, which Purchaser shall send to each tenant under each of the Leases promptly after the Closing, informing such tenant of the sale of the Premises and of the assignment to Purchaser of Seller's interest in, and obligations under, the Leases (including, if applicable, any Security Deposits), and directing that all Rents and other sums payable after the Closing under each such Lease be paid as set forth in the notice.

(f)     A non-foreign affidavit containing such information as shall be required by

4

Internal Revenue Code Section 1445(b)(2) and the regulations issued thereunder in the form attached hereto and made a part hereof as **Exhibit I.**

(g)     A New York State Real Estate Transfer Tax Return (the "**TP-584**"), a New York City Real Property Transfer Tax Return (the "**RPT**") and a Real Property Transfer Report (the "**RP-5217NYC**") required for filing the Deed.

(h)     Such evidence as the Title Company may reasonably require as to the authority of the person or persons executing the documents on behalf of Seller, together with such affidavits and instruments as may be customarily and reasonably required by the Title Company.

(i)     Originals and/or copies (as and to the extent in Seller's possession) of the Leases, the Service Contracts and Licenses and Permits, together with other leasing and property files and records located at the Premises or the Seller's office which are related to the continued operation, leasing and maintenance of the Premises (the "**Property Records**"). Seller shall allow Purchaser and Purchaser's agents and representatives access to the Property Records on reasonable notice and during business hours prior to the Closing.

(j)     A closing statement (the "**Closing Statement**") mutually acceptable to Seller and Purchaser executed by Seller.

(k)     A certificate of the Seller certifying that the Seller's representations in this Contract are true, complete and correct as of the Closing.

(l)     Such additional documents as shall be reasonably required to consummate the transactions contemplated by this Contract.

(m)     Keys to all entrance doors to, and equipment and utility rooms located in, the Premises which are in Seller's possession.

B.     At Closing, Purchaser shall execute as required and deliver the following:

(a)     The balance of the Purchase Price.

(b)     The TP-584, the RPT, and the RP5217NYC.

(c)     The Closing Statement.

5.     Representations and Warranties

(a)     Seller represents and warrants to Purchaser that the following representations (none of which representations or warranties shall survive the Closing unless otherwise specified herein) are true and correct as of the date hereof and shall be true and correct at Closing, subject to nonrenewals by tenants of leases in the ordinary course of Seller's operation of the Premises:

(i)     Seller is a not-for-profit corporation duly formed, validly existing and in good standing under the laws of the State of New York and has the requisite right, power and authority to enter into and to perform the terms of this Agreement.  The transactions contemplated by this Contract have been duly authorized by all required corporate action of the Seller, its shareholders and directors.  Seller is not subject to any law, order, decree, restriction or agreement which prohibits or would be violated by this Agreement or the consummation of the transactions contemplated hereby.  The Seller has not entered into any other contract for the sale of the Premises nor does any person or entity other than Purchaser have any right or option to acquire the Premises or any interest therein.  This Agreement constitutes, and each document and instrument contemplated hereby to be executed and delivered by Seller, when executed and delivered, shall constitute the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its respective terms (subject to bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally).  Neither the entry into, nor the performance of, this Contract by Seller, will (a) violate, conflict with, result in a breach under, or constitute a default under, the organizational documents of Seller, or any document or agreement to which Seller is a party or by which Seller or the Premises is bound, or (b) require the consent or approval of any governmental authority or any third party (or if such consent is required, Seller shall obtain same at its sole cost and expense prior to the Closing).

(ii)     There are no actions or proceedings pending or threatened with respect to the Premises which will not be resolved or satisfied on or before the Closing, including, without limitation, any complaints by any rent regulatory agency.  This representation shall survive Closing.

(iii)     Seller has not received any written notice from any governmental agency exercising any right of eminent domain or threatening the exercise of any such right.

(iv)     There are no written maintenance or service agreements made by Seller affecting the other than as set forth on **Exhibit C.**  None of such agreements shall remain in effect after the Closing or, if such agreements shall remain in effect, each of said agreements are cancelable, without penalty, on no more than thirty (30) days' notice.

(v)     Seller has no knowledge of a discharge or other adverse environmental condition, including, but not limited to, the presence of any Hazardous Materials (hereinafter defined) on the Premises, or any discharge or Hazardous Materials onto or from the Premises in violation of any law, rule or ordinance.  For purposes of this Agreement, the term **"Hazardous Materials"** means and includes those elements or compounds which are or at any time hereafter contained in the list of hazardous substances adopted by the United States Environmental Protection Agency (the "EPA") or the list of pollutants designated by Congress or the EPA or defined by any other federal, state or local statute, law, ordinance, code, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning, any hazardous, toxic or dangerous waste, polluting substance or material, as now or at any time hereafter in effect.

(vi)     There are no persons employed by Seller at the Premises in connection with the operation or maintenance of the Premises whose employment agreements, if

any, will be binding upon Purchaser after the Closing. There are no union contracts affecting any employees at the Premises, and Seller will not enter into any such union contracts.

(vii)    There is no litigation, proceeding or claim pending against the Seller as relating to the Premises.

(viii)    All of the Leases are assignable to Purchaser and will be enforceable against the tenant parties thereto in accordance with their respective terms after the Closing. No brokerage or other commissions are due to any third parties with respect to the Leases. Landlord is not in default under any of the Leases. Except as set forth on **Exhibit C**, none of the tenants are in default under any Leases. No apartment in the Premises is "rent controlled" under applicable law, and with respect to each apartment subject to so-called "rent stabilization laws," no tenant has paid, and Seller has not received, any rent or other sums in excess of the "legal regulated rent" for any apartment in the Premises. The representations contained in this Paragraph (viii) shall survive the Closing.

(b)    Purchaser represents and warrants to Seller as of the date hereof and as of the Closing as follows:

(i)    If Purchaser is an entity, Purchaser is duly formed and in good standing under the laws of New York and is not subject to any law, order, decree, restriction or agreement which prohibits or would be violated by this Contract or the consummation of the transactions contemplated hereby.

(ii)    Purchaser has full power and authority to enter into and perform this Contract in accordance with its terms and this Contract and all documents executed by Purchaser which are to be delivered to Seller at Closing are, and at the time of Closing will be, duly authorized, executed and delivered by Purchaser and are, and at the time of Closing will be, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms.

(iii)    Neither the execution, delivery or performance of this Contract nor the consummation of the transactions contemplated hereby, is prohibited or requires Purchaser to obtain any consent, authorization, approval or registration under, any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Purchaser.

(iv)    There are no judgments, orders or decrees of any kind against Purchaser unpaid and unsatisfied of record, nor any actions, suits or other legal or administrative proceedings pending or, to Purchaser's actual knowledge, threatened against Purchaser, which would have a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Contract.

(v)    Purchaser is not acquiring the Premises with the assets of an employee benefit plan (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or, if plan assets will be used to acquire the Premises, Purchaser will deliver to Seller at Closing a certificate containing such factual representations as shall permit Seller and its counsel to conclude that no prohibited transaction would result from the

consummation of the transactions contemplated by this Contract. Purchaser is not a "party in interest" within the meaning of Section 3(3) of ERISA with respect to any beneficial owner of Seller.

(vi)    Purchaser is not now nor shall it be at any time prior to or at the Closing an individual, corporation, partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity (collectively, a "**Person**") with whom a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories (collectively, a "**U.S. Person**"), is prohibited from transacting business of the type contemplated by this Contract, whether such prohibition arises under United States law, regulation, executive orders and lists published by the Office of Foreign Assets Control, Department of the Treasury ("**OFAC**") (including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. Persons may not transact business or must limit their interactions to types approved by OFAC, such Persons, "**Specially Designated Nationals and Blocked Persons**") or otherwise. Neither Purchaser nor any Person who owns an interest in Purchaser (collectively, a "**Purchaser Party**") is now nor shall be at any time prior to or at the Closing a Person with whom a U.S. Person, including a United States Financial Institution as defined in 31 U.S.C. 5312, as periodically amended ("**Financial Institution**"), is prohibited from transacting business of the type contemplated by this Contract, whether such prohibition arises under United States law, regulation, executive orders and lists published by OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise.

(vii)    Neither Purchaser nor any Purchaser Party, nor any Person providing funds to Purchaser: (a) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws; (b) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (c) has had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws. For purposes of this subsection, the term "**Anti-Money Laundering Laws**" shall mean laws, regulations and sanctions, state and federal, criminal and civil, that: (w) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (x) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (y) require identification and documentation of the parties with whom a Financial Institution conducts business; or (z) are designed to disrupt the flow of funds to terrorist organizations. Such laws, regulations and sanctions shall be deemed to include the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "**Patriot Act**"), the Bank Secrecy Act, 31 U.S.C. Section 5311 *et seq.*, the Trading with the Enemy Act, 50 U.S.C. App. Section 1 *et seq.*, the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 *et seq.*, and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

(viii)   To the best of Purchaser's knowledge, Purchaser is in compliance with any and all applicable provisions of the Patriot Act.

6.      Access; Operation.

(a)               (a)      This Contract is not subject to an Inspection Report or Due Diligence of the Premises.  In the event Purchaser requires access to the Premises, Purchaser shall obtain Seller's consent to access the Premises at reasonable times and upon reasonable prior notice to Seller and shall obtain insurance in accordance with Section 6(b) of this Contract.  Seller shall not unreasonably withhold, delay or otherwise condition Seller's consent to said access.  Purchaser shall indemnify and hold Seller free and harmless from and against any and all damages, costs or expenses (including, but not limited to, reasonable attorneys' fees and disbursements) suffered by Seller arising from Purchaser's, or its agents', representatives' or employees' access to the Premises.  Neither Purchaser nor its authorized representatives shall be permitted to conduct borings of the Premises or drilling in or on the Premises, or any other invasive testing, in connection with the preparation of an environmental audit or in connection with any other inspection of the Premises without the prior written consent of Seller, which consent may be conditioned on Purchaser paying Seller on demand the cost of repairing and restoring any borings or holes created or any other damage as aforesaid).  The provisions of this Section 6(a) shall survive the Closing.

(b)      Prior to conducting any permitted physical inspection or testing at the Premises, other than mere visual examination, including, without limitation, boring, drilling and sampling of soil, Purchaser shall obtain, or cause its contractor to obtain, and during the period of such inspection or testing shall maintain, at its or its contractor's sole cost and expense, commercial general liability insurance, including a contractual liability endorsement, and personal injury liability coverage, with Seller and its managing agent, if any, as additional insureds, from an insurer reasonably acceptable to Seller, which insurance policies must have limits for bodily injury and death of not less than Two Million ($2,000,000) Dollars for any one occurrence and not less than Two Million ($2,000,000) Dollars for property damage liability for any one occurrence.  Prior to making any entry upon the Premises for any permitted physical inspections or testing (other than mere visual examination), Purchaser shall furnish to Seller a certificate of insurance evidencing the foregoing coverages.

(c)      Seller covenants and agrees that the Premises shall be operated substantially in the manner in which it presently is being operated and Seller shall maintain its current (or substantially similar) insurance coverage.  Notwithstanding the foregoing, Seller shall be under no obligation to make any capital improvements unless the failure to do so would reasonably be expected to violate applicable law.

7.      Apportionments.

(a)   The following are to be apportioned at the Closing (except as otherwise provided for herein, such apportionments to be made in accordance with the Customs in Respect to Title Closings Recommended by The Real Estate Board of New York, Inc.):

9

(i)     Real estate taxes and assessments, including proceeds of any certiorari proceeding for the fiscal tax year during which the Closing occurs. If the Closing shall occur before the tax rate is fixed, the apportionment of taxes shall be upon the basis of the tax rate for the next preceding year applied to the latest assessed valuation.

(ii)    Water rates, water meter charges and sewer rents, if any, on the basis of the fiscal period for which assessed. If a water meter or meters exist on the Premises, the unfixed meter charges and the unfixed sewer rent thereon based on the time intervening from the date of the last reading shall be apportioned on the basis of such last reading and shall be appropriately readjusted after the Closing on the basis of the next subsequent bills. Seller shall obtain a final water meter reading within twenty (20) days of Closing.

(iii)   Fuel oil, if any, at Seller's cost.

(iv)    Natural gas, at the then prevailing rates charged to Seller.

(v)     Electricity, at the then prevailing rates charged to Seller.

(vi)    Rents.

(vii)   Any other customary adjustments made in connection with the sale of similar buildings.

(b)    The provisions of this Section 7 shall survive the Closing.

8.      Violations.

The Premises shall be sold free of all notes, notices or violations of law or municipal ordinances, orders or requirements noted in or issued by any governmental authority having jurisdiction against or affecting the Premises as of the Closing and any and all conditions which may give rise to such notes, notices or violations. Seller shall pay any fines, and any interest or penalties thereon, resulting from any violations which have been assessed as of the date of Closing This Section 8 shall survive for 30 days after Closing.

9.      Assessments.

If on the day of Closing the Premises or any part thereof shall be or shall have been affected by an assessment or assessments which are or may become payable in annual installments, of which the first installment is then a charge or lien or has been paid, then apportionments shall be based on time of ownership.

10.     . Pending Tax Reduction Proceedings.

Seller shall have the right to continue any pending proceedings to review the real estate tax assessment of the Premises applicable to the fiscal tax year in which the Closing occurs and Purchaser agrees to reasonably cooperate with Seller in connection therewith. In the event

10

any real estate tax refund is received for the fiscal year in which the Closing occurs, such refund, after deduction of Seller's reasonable costs and expenses in connection therewith, including reasonable attorneys' fees and disbursements, shall be apportioned between Seller and Purchaser based on the respective number of days of ownership of Seller and Purchaser during the fiscal tax year in which the Closing occurs. The provisions of this Section 10 shall survive the Closing.

      11.      Time and Place of Closing.

      The closing of title (the **"Closing"**) shall take place on or about **November 15, 2015**, but no later than December 15, 2015 at the offices of Geng & Zhang PLLC attorneys for Seller, 39-07 Prince Street Suite 3E Flushing NY 11354, commencing at 10:00 a.m. TIME IS OF THE ESSENCE WITH RESPECT TO THE PARTIES' OBLIGATIONS TO CLOSE. Purchaser shall be entitled to conduct environmental inspections and testing including, but not limited to, invasive testing underneath all buildings and above-ground structures on the Premises, provided that, with respect to any invasive testing, Purchaser shall (A) provide evidence of appropriate insurance coverage, (B) repair any damage caused by such testing and (C) indemnify and hold the Seller harmless from and against any and all loss, liability, damage, claim or expense arising from any structural damage caused by such testing (but not any loss, liability, damage claim or expense resulting from adverse environmental test results). Purchaser's indemnification obligations described in this Section 11 shall survive the termination of this Agreement. However, the closing of this transaction is not contingent upon the result of environmental examination, Purchaser shall have no right to cancel this agreement regardless the result of environmental examination.

      12.      Notices.

Any notice or demand which, under the provisions of this Contract or otherwise, must or may be given or made by any party hereto, shall be in writing, and may be given or made (a) by personal delivery or (b) by delivery by a reputable overnight carrier addressed for next business day delivery. All notices shall be addressed:

      (A)      To Purchaser, at c/o Steven B. Fuerst, Esq., Lowenstein Sandler LLP, 1251 Avenue of the Americas, New York, New York 10020, e-mail: sfuerst@lowenstein.com

      (B)      To Seller, c/o Fuqiang Zhang, Esq., 39-07 Prince Street Suite 3E Flushing NY 11354, e-mail: info@law-gz.com.

Notices may be sent by email provided that receipt is acknowledged by return email. Addresses for notices may be changed from time to time by notice delivered in accordance with this Section 12.

      13.      Sole Agreement of the Parties.

      (a)      All understandings and agreements previously made between the parties

regarding the Premises are merged in this Contract, which alone fully and completely expresses their agreement, and this Contract is being entered into after full investigation, neither party relying upon any statement or representation not embodied in this Contract made by the other. Purchaser has examined and has investigated to Purchaser's satisfaction the physical nature and condition of the Premises and the existing buildings and improvements thereon, subject to the terms and conditions contained herein. Purchaser acknowledges that neither Seller nor any real estate broker, agent, officer, employee, servant or representative of Seller has made any representations whatsoever regarding the subject matter of this transaction or any fact thereof including, without limitation, representations as to the physical nature or condition of the Premises, the existence of any Hazardous Materials at the Premises, the existing or projected rents, existing or future expenses, or any other matter or thing affecting or related to the Premises or the operation thereof, except as herein specifically set forth, and Purchaser further agrees to take title to the Premises "as is" and in its then existing condition as of the Closing. In executing, delivering and performing this Contract, Purchaser has not relied upon and does not rely upon and Seller is not liable for or bound in any manner by, express or implied warranties, guaranties, promises, statements, representations, "set-ups", proposals or information pertaining to the Premises, the rents, expenses and operations thereof made or furnished by Seller or by any real estate broker, agent, officer, employee, servant or other person representing or purporting to represent Seller, to whomsoever made or given, directly or indirectly, verbally or in writing, unless such warranties, guaranties, promises, statements, representations or information are expressly and specifically set forth herein. The acceptance of the Deed by Purchaser shall be deemed to be a full performance and discharge of every agreement and obligation on the part of Seller hereunder and no representation, warranty or agreement, express or implied, of Seller shall survive the Closing except those, if any, which are herein specifically stated to survive the Closing.

(b)     Except as may be expressly set forth herein, Seller makes no representations or warranties whatsoever, whether express or implied or arising by operation of law, with respect to the Premises or the Condition of the Premises (as hereinafter defined); nor shall any adverse change in the Condition of the Premises before the Closing give rise to any obligation on the part of Seller or remedy on the part of Purchaser. Seller is selling and conveying, or causing to be sold and conveyed, the Premises at the Closing in its then existing condition, AS IS, WHERE IS, WITH ALL FAULTS, AND WITHOUT ANY WRITTEN OR ORAL REPRESENTATIONS OR WARRANTIES WHATSOEVER, WHETHER EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW, other than representations and warranties of Seller, if any, expressly set forth in this Contract. Without limiting the generality of the foregoing, except for any representations and warranties of Seller contained in this Contract, the transactions described in this Contract are without statutory, express or implied warranty, representation, agreement, statement or expression of any opinion regarding the Condition of the Premises or any aspect thereof, including any and all statutory, express or implied representations or warranties related to the suitability for habitation, merchantability or fitness for a particular purpose or created by any affirmation of fact or promise, by any description of the Premises or by operation of any legal requirements.

(c)     For purposes of this Contract, the term **"Condition of the Premises"** means the following:

(i)     The quality, nature and adequacy of the physical condition of the Premises, including the quality of the design, labor and materials used to construct the improvements included in the Premises; the construction of the facilities, condition of structural elements, foundations, roofs, glass, mechanical, plumbing, electrical, HVAC, sewage and utility components and systems; the capacity or availability of sewer, water or other utilities; the geology, soils, subsurface conditions, groundwater, landscaping and irrigation of or with respect to the Premises, the location of the Premises in or near any special taxing district, flood hazard zone, wetlands area, protected habitat, geological fault or subsidence zone, hazardous waste disposal or clean-up site, or other special area; the existence, location or condition of ingress, egress, access and parking; the condition of any fixtures; the presence of any asbestos or other hazardous materials, dangerous or toxic substance, material or waste in, on, under or about the Premises and the improvements located thereon; and any environmental, botanical, hydrological, geological, meteorological, structural or other condition or hazard or the absence thereof heretofore, now or hereafter affecting in any manner the Premises.

(ii)     The habitability, merchantability, fitness, suitability and adequacy of the Premises for its use and purpose and any conditions at or which affect the Premises with respect to a particular use, purpose or development, potential or otherwise.

(iii)     The compliance or non-compliance of the Premises or any part thereof in accordance with, and in the context of, (A) all legal requirements, including those relating to zoning, building, public works, parking, fire and police access, handicap access, life safety, subdivision and subdivision sales and (B) all agreements, covenants, conditions, restrictions (public or private), development agreements, site plans, building permits, building rules and other instruments and documents governing or affecting the use, management and operation of the Premises.

(iv)     The availability, cost, terms and coverage of liability, hazard, comprehensive and any other insurance of or with respect to the Premises.

(v)     The condition of title to the Premises, including vesting, legal description, matters affecting title, title defects, liens, encumbrances, boundaries, encroachments, mineral rights, options, easements and access; violations of restrictive covenants, zoning ordinances, setback lines or development agreements; the availability, cost and coverage of title insurance; leases, rental agreements, occupancy agreements, rights of parties in possession of, using or occupying the Premises; and standby fees, taxes, bonds and assessments.

14.     Vendee's Lien; Seller's Inability to Convey Title; Default by Purchaser

(a)     In case of default by Seller, the Deposit and the Net Cost of Title Examination (as hereinafter defined) are hereby made liens upon the Premises, but such liens shall not continue after default by Purchaser hereunder. The term "**Net Cost of Title Examination**" is defined for purposes of this Contract as the reasonable expense actually incurred by Purchaser for

title examination by the Title Company and survey updating; provided, however, that Seller's liability for such examination shall not exceed the net amount that would be charged by a title company and surveyor in the State of New York for title examination of the Premises and survey updating without issuance of a policy.

(b) If, for any reason whatsoever (other than a willful default by Seller under this Contract), Seller shall be unable to convey title to the Premises subject to and in accordance with the terms of this Contract, the sole obligation of Seller shall be to refund the Deposit and to reimburse Purchaser for the Net Cost of Title Examination, and upon the making of such refund and reimbursement, this Contract shall wholly cease and terminate and neither party shall have any further claim against the other by reason of this Contract (except as expressly set forth herein) and the lien, if any, of Purchaser against the Premises shall wholly cease. Seller shall not be required to bring any action or proceeding or to otherwise incur any expense to render the title to the Premises to the state required by this Contract, other than, subject to Section 3(c) hereof, to discharge all liens (in a liquidated amount) and judgments affecting the Premises and matters consented to or voluntarily placed by Seller on the Premises. Notwithstanding the foregoing, Purchaser may accept such state of title as Seller may be able to convey without reduction of the Purchase Price and without indemnity or any other liability on the part of Seller, except with respect to any provisions of this Contract which are herein specifically stated to survive the Closing.

(c) In the event that Purchaser defaults under this Contract and, as a result, the Closing does not take place, the sole and exclusive remedy of Seller shall be to receive and retain the Deposit as liquidated damages, it being agreed that Seller's damages in case of Purchaser's default might be difficult or impossible to ascertain and that the Deposit constitutes a fair and reasonable amount of damages under the circumstances and is not a penalty.

(d) If Seller defaults under this Contract, Purchaser shall be entitled, as its sole and exclusive remedy, to (i) specific performance, or (ii) terminate this Contract and obtain a refund of the Deposit

15. Destruction and Condemnation.

(a) If by reason of fire or other casualty, any part of the Premises shall be damaged or destroyed, in whole or in part, Seller shall promptly so notify Purchaser of such fire or other casualty within ten (10) business days of the occurrence thereof, and this Contract shall continue in full force and effect and the Closing shall nonetheless proceed as scheduled herein. Purchaser shall have no right to a reduction in the Purchase Price and Seller shall not have any responsibility for the restoration or repair of the Premises. However, Seller agrees to (i) pay over to Purchaser at Closing (or, at Purchaser's election, Purchaser shall receive a credit against the portion of the Purchase Price payable at Closing) the amount of any insurance monies collected by Seller, less (x) the amount of any rental insurance collected by Seller which is allocable to any period of time prior to the Closing and (y) any actual and reasonable expenses of Seller in making repairs to the Premises for safety and protective measures occasioned by such casualty; and (ii) assign, transfer and set over to Purchaser all of Seller's right, title and interest, if any, in and to any insurance monies that are uncollected at the time of the Closing and that may be paid or made in respect of such casualty, against the delivery by Purchaser to Seller of (x) reimbursement for any

· 14

and all actual and reasonable expenses of Seller in making such permitted repairs to the Premises occasioned by such casualty, less any insurance monies collected by Seller on account thereof, and (y) an agreement signed by Purchaser whereby Purchaser agrees to turn over to Seller any rental insurance collected by Purchaser which is allocable to any period of time prior to the Closing and credit Purchaser with the amount of any deductible relating thereto.

(b)     If on or prior to the date set for the Closing there is a condemnation affecting the Premises, Seller shall so notify Purchaser and Purchaser may, within ten (10) business days thereafter (time being expressly of the essence) notify Seller whether it elects to terminate this Contract. If Seller receives such notice electing to terminate this Contract within such ten (10) business day period, then the Deposit shall be returned to Purchaser and upon such return, · Purchaser shall have no rights with respect to the Premises or this Contract, except for such liabilities which expressly survive a termination of this Contract. In the event that Purchaser does not so elect to terminate this Contract, the parties shall proceed to close pursuant thereto without abatement or other adjustment to the Purchase Price except that at the Closing, Seller shall (i) pay over to Purchaser the net amount of the condemnation award collected by Seller, less the actual and reasonable expenses of Seller in making repairs to the Premises occasioned by such taking (if a partial taking); and (ii) assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any condemnation award that is uncollected at the time of the Closing and that may be paid or made in respect of such taking, against the delivery by Purchaser to Seller of reimbursement for the actual and reasonable expenses of Seller in making repairs to the Premises occasioned by such partial taking and which were not reimbursed under clause (i).

(c)     Notwithstanding the foregoing, in the event of a casualty or condemnation prior to Closing that results in more than 10% of the Premises being substantially destroyed or taken, Purchaser may cancel this Contract, whereupon the Deposit shall be refunded to the Purchaser.

(d)     This Section 15 supersedes the provisions of Section 5-1311 of the General Obligations Law of the State of New York.

16.          Unpaid Taxes.

The amount of any unpaid taxes, assessments, water charges and sewer rents which Seller is obligated to pay and discharge, with the interest and penalties thereon to a date not less than two (2) business days after the date of the Closing, may, at the option of Seller, be allowed to Purchaser out of the balance of the Purchase Price and such amount shall be a credit to Purchaser against the Purchase Price. If on the date of the Closing there are any other liens or encumbrances which Seller is obligated to pay and discharge pursuant to this Contract and which may be satisfied and discharged by the payment of a liquidated sum, Seller shall satisfy the same, provided Seller shall deliver to Purchaser at the Closing instruments in recordable form and sufficient to satisfy such liens and encumbrances of record, together with the cost of recording or filing said instruments, or the Title Company shall agree to omit the same from Purchaser's title report. Purchaser, if request is made within a reasonable time prior to the Closing, agrees to provide at the Closing separate certified checks as requested aggregating up to the amount of the cash balance of the Purchase Price to facilitate the satisfaction of any such liens or encumbrances. The existence

15

of any such taxes or other liens and encumbrances shall not be deemed objections to title if Seller shall comply with the foregoing requirements.

17.         Broker.

Purchaser and Seller each represents and warrants to the other that it has not dealt with any broker or finder in connection with this transaction other than Century Homes Realty Group LLC (collectively, the "**Broker**"), whose commission shall be paid by Seller pursuant to a separate agreement. Each party agrees to indemnify and hold the other party harmless from and against all claims, losses, liabilities and expenses (including, without limitation, reasonable attorney's fees and disbursements) which may be asserted against, imposed upon or incurred by such party by reason of any claim made by any other broker, consultant, finder or like agent for commissions or other compensation which arises from actions taken or claimed to be taken by or through the indemnifying party relating to the transaction contemplated under this Agreement. The provisions of this Section 17 shall survive the Closing or termination of this Contract.

18.         Assignment.

This Contract may not be assigned by Purchaser; provided, however, that upon notice to Seller at least ten (10) business days prior to the Closing, Purchaser may assign this Contract to an entity no less than fifty (50%) percent of which is at all times controlled by Purchaser and/or members of his immediate family or trusts therefor (an "**Affiliate**") and such Affiliate shall expressly assume all obligations of Purchaser under this Contract. Purchaser shall provide a copy of the instrument effecting such assignment to Seller. Notwithstanding any such assignment of this Contract by Purchaser, Purchaser shall remain jointly and severally liable under the terms of this Contract.

19.         No Oral Modification.

This Contract may not be changed or terminated orally. This Contract shall be binding upon, and inure to the benefit of, the heirs, executors, administrators, successors and permitted assigns of the respective parties, but nothing contained herein shall be deemed a waiver of the provisions of Section 18 hereof.

20.         Governing Law.

This Contract shall be governed by and construed in accordance with the laws of the State of New York.

21.         Escrow.

(a)         The Deposit shall be paid to and held in escrow by Seller's attorneys, Geng & Zhang PLLC, as attorney (the "**Escrow Agent**"). The Escrow Agent shall invest the Deposit in an interest bearing account. Simultaneously with the Closing hereunder, the Escrow Agent shall deliver to Seller the Deposit with accrued interest collected thereon (but without a credit against the Purchase Price for any such accrued interest collected thereon). The Escrow Agent shall

16

promptly deliver copies of all notices delivered to it by any party to the other party hereunder. If Purchaser defaults hereunder, the Escrow Agent shall, upon written demand of Seller, subject to the provisions set forth below, deliver to Seller the Deposit with accrued interest collected thereon upon twenty (20) days' written notice to Purchaser. In the event, however, that Purchaser shall be entitled under the terms of this Contract to a refund of the Deposit, then, in such case, the Escrow Agent shall, upon written demand by Purchaser, subject to the provisions set forth below, deliver to Purchaser the Deposit with accrued interest collected thereon, upon ten (10) days' written notice to Seller.

(b)     Any notice, demand or request to the Escrow Agent shall be sufficient only if received by the Escrow Agent within the applicable time period set forth herein, if any. Notices, demands and requests to the Escrow Agent shall be given to it at **Geng & Zhang PLLC, 39-07 Prince Street Suite 3E Flushing NY 11354**, Attention: Fuqiang Zhang, Esq., in the manner provided for in Section 12 hereof for the giving of notices. Notices from the Escrow Agent to Seller or Purchaser shall be given to the parties as provided in Section 12 hereof.

(c)     Upon receipt of a written demand for the Deposit made by Purchaser or Seller in accordance with Section 21(b) above, the Escrow Agent shall promptly deliver a copy thereof to the other party. The other party shall have the right to object to the delivery of the Deposit by delivery to and receipt by the Escrow Agent of written notice of objection within ten (10) days after the recipient party's receipt of the notice from Escrow Agent. Such notice of objection may be signed by the attorney for Seller or Purchaser, as the case may be. Upon receipt of such notice of objection, the Escrow Agent shall promptly give a copy thereof to the party who made the written demand.

(d)     In the event that the Escrow Agent shall have received a notice of objection as provided for in Section 21(c) above, whether or not litigation has been instituted, then and in any such event, the Escrow Agent shall not comply with any claims or demands on it with respect to the delivery of the Deposit and shall continue to hold the Deposit until the Escrow Agent has received either (i) a written notice signed by both Seller and Purchaser directing the disbursement of the Deposit, or (ii) a final order or judgment of a court of competent jurisdiction after the expiration of any applicable appeal period, entered in an action, suit or proceeding between Seller and Purchaser directing or ruling that either Seller or Purchaser is entitled to the Deposit, in which case the Escrow Agent shall then disburse the Deposit in accordance with such order or judgment. The Escrow Agent shall not be or become liable in any way or to any person for its refusal to comply with any such claims or demands until and unless it has received a direction of the nature described in clause (i) above or a true copy of the order or judgment described in clause (ii) above. Upon disbursement of the Deposit by the Escrow Agent as provided in this Section 21(d), the Escrow Agent shall be released of and from all liability hereunder. Notwithstanding the foregoing provisions of this Section 21(d), the Escrow Agent shall have the following rights:

(i)     If the Escrow Agent shall have received a written notice signed by either Seller or Purchaser advising that a litigation between Seller and Purchaser over entitlement to the Deposit has been commenced, the Escrow Agent may, on notice to Seller and Purchaser, deposit the Deposit and the accrued interest collected thereon with the Clerk of the Court in which said litigation is pending;

17

(ii)     Escrow Agent may, on notice to Seller and Purchaser, take such affirmative steps as it may, at its option, elect in order to terminate its duties as the Escrow Agent, including, but not limited to, the deposit of the Deposit and the accrued interest collected thereon with a court of competent jurisdiction and the commencement of an action for interpleader, the costs thereof to be borne by whichever of Seller or Purchaser is the losing party; or

(iii)     Upon the taking by the Escrow Agent of either of the actions described in (i) or (ii) above, the Escrow Agent shall be released of and from all liability hereunder.

(e)     The Escrow Agent shall not be responsible in any manner for the validity or sufficiency of any cash, instruments or any other property delivered to it hereunder, for the value or collectability of any check or other instrument so delivered or for any representation made or obligations assumed by any other party to this Contract. Nothing herein contained shall be deemed to obligate the Escrow Agent to deliver any cash or any other property referred to herein, unless the same shall have first been received by the Escrow Agent pursuant to this Contract. The Escrow Agent shall have the right to act in reliance upon any document, instrument or signature believed by it to be genuine and to assume that any person purporting to give any notice or instructions in accordance with the provisions hereof has been duly authorized to do so. The Escrow Agent shall not be liable for any action taken or omitted hereunder except in the case of its gross negligence or willful misconduct.

(f)     The Escrow Agent shall not be bound by any modification, cancellation or rescission of this Contract unless the same is in writing and signed by all parties hereto. In no event, however, shall any modification of this Contract that shall affect the rights or duties of the Escrow Agent be binding on the Escrow Agent unless the Escrow Agent shall have given its prior written consent.

(g)     Purchaser and Seller, jointly and severally, agree to indemnify the Escrow Agent and to hold it harmless against all claims against it or liabilities incurred by it in the due performance of or arising out of its performance of its duties hereunder and to pay all costs, damages, judgments and expenses, including reasonable attorneys' fees and disbursements, suffered or incurred by the Escrow Agent in connection with or arising out of any dispute under this Agreement, unless caused by Escrow Agent's gross negligence or willful misconduct.

(h)     Seller and Purchaser agree that the Escrow Agent shall not be restricted in any manner whatsoever from acting as attorney for Seller with respect to any matter and consent to the Escrow Agent so acting as attorney for Seller with respect to any matter, including, but not limited to, any litigation or matter related to this Contract, the Deposit or the transaction contemplated by this Contract, and whether or not there is a controversy between Seller and Purchaser with respect thereto.

22.          Leasing.

Between the date of this Contract and the Closing, Seller shall not permit occupancy of, or enter into any new lease for space in, the Premises except (i) with the prior written consent

of the Purchaser or (ii) as required by applicable law. Purchaser has received a copy of leases and is satisfied with the content of Leases, including but not limited to amount of rent and security deposit.

   23.    Miscellaneous.

     (a)  Purchaser shall not record this Contract or a memorandum thereof and any attempt to record the same shall be a material default by Purchaser hereunder and thereupon, at the option of Seller, this Contract shall be deemed cancelled and Seller shall have any and all remedies for a default by Purchaser as provided herein or by law.

     (b)  Wherever in this Contract the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.

     (c)  Seller and Purchaser are each represented by counsel in the negotiation of this Contract. Accordingly, ambiguities in this Contract shall not be construed against the party drafting this Contract, notwithstanding any contrary rule of construction or interpretation at law or in equity.

     (d)  This Contract is not an offer by either party, and it shall not have any binding effect unless and until Purchaser and Seller shall have both executed same and fully executed copies thereof have been delivered to Seller and Purchaser, or their respective attorneys.

     (e)  This Contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein, and all prior agreements, understandings, representations and statements, oral or written, are merged into this Contract.

     (f)  No failure or delay of either party in the exercise of any right given to such party hereunder or the waiver by any party of any condition hereunder for its benefit (unless the time specified herein for exercise of such right, or satisfaction of such condition, has expired) shall constitute a waiver of any other or further right, nor shall any single or partial exercise of any right preclude other or further exercise thereof. The waiver of any breach hereunder shall not be deemed to be a waiver of any other or any subsequent breach hereof.

     (g)  This Contract may be executed in any number of counterparts, each of which shall be an original with the same force and effect as if the signature thereto and hereto were upon the same instrument. PDF and facsimile signatures shall have the same force and effect as original signatures.

     (h)  The captions of this Contract are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Contract or any of the provisions hereof.

(i) All Exhibits attached to this Contract are incorporated into this Contract by reference as if fully set forth herein.

(j) The provisions of this Contract are intended to be solely for the benefit of the parties hereto, and the execution and delivery of this Contract shall not be deemed to confer any rights upon, nor obligate any of the parties hereunder, to any person or entity other than the parties hereto.

(k) If any provision of this Contract as applied to either party or to any circumstance shall be adjudged by a court of competent jurisdiction to be void or unenforceable for any reason, the same shall in no way affect, to the maximum extent permitted by law, any other provisions of this Contract, the application of any such other provision under circumstances different from those adjudicated by the court, or the validity or enforceability of this Contract as a whole.

(l) The parties hereto agree that at any time or from time to time after the Closing to execute, acknowledge as appropriate and/or deliver such further instruments and other documents (and to bear its own costs and expenses incidental thereto) and to take such other actions as the other party may reasonably request in order to carry out the intent and purpose of this Contract; provided, however, that Seller shall not be obligated to incur any expense of any nature and/or to incur any obligations in addition to those set forth in this Contract and/or the respective closing documents.

24. Like-Kind Exchange.

Each party (herein, the "**Exchanging Party**") may consummate the sale or purchase, as the case may be, of the Premises as part of a so-called like-kind exchange (the "**Exchange**") pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended, provided that: (a) the Exchanging Party shall effect the Exchange through an assignment of this Agreement, or its rights under this Agreement, to a qualified intermediary and the other party to this Agreement shall not be required to acquire or hold title to any real property or sell the Premises to any other third party, as the case may be, for purposes of consummating the Exchange; (b) the Exchanging Party shall pay any additional costs that would not otherwise have been incurred by either party had the Exchanging Party not consummated the sale or purchase, as the case may be, through the Exchange and (c) the Exchanging Party shall, and hereby does, indemnify, and hold the other party harmless from, any loss, cost, damages, liability or expense which may arise or which the other party may suffer in connection with, an Exchange. The other party shall not by this Agreement or acquiescence to the Exchange (i) have its rights under this Agreement affected or diminished in any manner or (ii) be responsible for compliance with or be deemed to have warranted to the Exchanging Party that the Exchange in fact complies with Section 1031 of the Code; nor shall the terms or provisions of this Agreement be modified, amended or extended thereby.

20

**IN WITNESS WHEREOF**, Seller and Purchaser have executed this Contract as of the date and year first above written.

**SELLER:**

**COMMUNITY HOMES HOUSING
DEVELOPMENT FUND COMPANY, INC**

By: *Christopher Kui , President*

Taxpayer Identification Number

**PURCHASER:**

~~[PURCHASER]~~
**MY CAPITAL INVESTMENT LLC**

By: *Jian Yang Zhang , Managing Member*

Taxpayer Identification Number

46- 257 89 36

Geng & Zhang PLLC
(only with respect to its obligations under Section 21)

By: *TING GENG*
　　　Partner

21

## EXHIBIT A

### Legal Description

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Queens County, City and State of New York, bounded and described as follows:

22

## SCHEDULE A DESCRIPTION

ALL that certain plot piece or parcel of land, with the buildings and Improvements thereon erected, situate, lying and being in the Third Ward of the Borough and County of Queens, City and State of New York, being more particularly bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of 37th Avenue (formerly known as Washington Street) with the easterly side of Parsons Boulevard (formerly known Parsons Avenue);

RUNNING THENCE easterly, along the southerly side of 37th Avenue, a distance of 178.04 feet;

THENCE southerly, parallel with Parsons Boulevard (formerly Parsons Avenue); a distance of 90.00 feet;

THENCE westerly, parallel with 37th Avenue, a distance of 178.04 feet to the easterly side of parsons Boulevard (formerly Parsons Avenue); and

THENCE northerly, along the easterly side of Parsons Boulevard (formerly Parsons Avenue), a distance of 90.00 feet to the point or place of BEGINNING.

FOR INFORMATION ONLY, NOT INSURED: SAID PREMISE BEING KNOWN AS AND BY 37-05 PARSONS BOULEVARD, FLUSHING, NY

BLOCK:     5015
LOT:       8
COUNTY:    QUEENS

1

EXHIBIT B

Leases, Rents, Security Deposits

Parsons Blvd - Total 39 Units
144-04 / 144-06 37th Avenue, Flushing, NY 11354

# MONTHLY RENT ROLL

| Unit No. | | Collectible Legal Rent | Preferential | Collectible Gov't Subsidy (SCRIE/DRIE) | Actual Rent paid by Tenant |
|---|---|---|---|---|---|
| 1A | St'o | $1,764.66 | $118.41 | 548.41 | $1,097.84 |
| 1B | 1BR | $1,587.96 | $187.96 | | $1,400.00 |
| 1C | 1BR | $1,352.00 | | | $1,352.00 |
| 1D | St'o | $841.70 | | | $841.70 |
| 1E | 1BR | $1,480.00 | $200.00 | | $1,280.00 |
| 1F | 1BR | $2,215.13 | $935.13 | | $1,280.00 |
| 1G | 1BR | $1,944.30 | $696.70 | | $1,247.60 |
| 1H | 2BR | $1,019.07 | | | $1,019.07 |
| 1J | 1BR | $1,595.15 | $431.45 | | $1,163.70 |
| 1K | 1BR | $2,054.51 | $323.89 | | $1,730.62 |
| 1L | for Community Facility | Vacant-Market $3800.00 | | | $3,800.00 |
| 1M | 1BR | $1,491.01 | $234.50 | | $1,256.51 |
| 1N | St'o | $1,066.43 | $166.43 | | $900.00 |
| 2A | St'o | $1,324.28 | $378.75 | | $945.53 |
| 2B | 1BR | $1,037.03 | | $82.93 | $954.07 |
| 2C | 1BR | $1,092.39 | | | $1,092.39 |
| 2D | St'o | $1,044.09 Vacant + | | | $1,044.09 |
| 2E | 1BR | $1,502.48 | $422.48 | | $1,080.00 |
| 2F | 1BR | $1,080.00 | | | $1,080.00 |
| 2G | 1BR | $928.11 | | | $928.11 |
| 2H | 2BR | $1,260.02 | | | $1,260.02 |
| 2J | 1BR | $1,370.80 | $207.10 | | $1,163.70 |
| 2K | 1BR | $2,170.18 | $770.59 | | $1,399.59 |
| 2L | 2BR | $1,042.57 | $70.85 | | $971.72 |
| 2M | 1BR | $1,080.00 | | | $1,080.00 |
| 2N | St'o | $2,490.61 | $1,590.61 | | $900.00 |
| 3A | St'o | $1,361.40 | $461.40 | | $900.00 |
| 3B | 1BR | $1,134.97 | $154.37 | | $980.60 |
| 3C | 1BR | $1,025.78 | $20.10 | | $1,005.68 |
| 3D | St'o | $1,402.77 | $502.77 | | $900.00 |
| 3E | 1BR | $1,055.11 | | $247.07 | $808.04 |
| 3F | 1BR | $2,448.41 | $1,325.21 | | $1,123.20 |
| 3G | 1BR | $1,242.54 | $173.18 | | $823.65 |
| 3H | 2BR | $1,237.91 | | | $1,237.91 |
| 3J | 1BR | $1,161.60 | $81.60 | | $1,080.00 |
| 3K | 1 BR | $1,468.86 | $28.86 | | $1,440.00 |
| 3L | 2BR | $1,712.68 | | $265.72 | $1,446.96 |
| 3M | 1BR | $1,674.94 | $246.42 | | $1,428.52 |
| 3N | St'o | $1,156.90 | $256.90 | | $900.00 |
| | | $57,718.35 | $9,985.66 | $1,144.13 | $46,342.82 |

| | |
|---|---|
| 2M | 1,159.10 |
| 2N | 900.00 |
| 3A | 909.00 |
| 3B | 980.60 |
| 3C | 1,015.94 |
| 3D | 909.00 |
| 3E | 806.04 |
| 3F | 1,123.20 |
| 3G | 823.65 |
| 3H | 1,250.29 |
| 3J | 1,080.00 |
| 3K | 1,440.00 |
| 3L | 1,446.96 |
| 3M | 1,428.52 |
| 3N | 900.00 |
| Total: | 43,623.77 |

## COMMUNITY HOMES HDFC

### 37-05 Parson Blvd, Flushing

| | Security Deposit |
|---|---|
| 1A | 1,097.84 |
| 1B | 1,438.50 |
| 1C | 2,700.00 |
| 1D | 841.70 |
| 1E | 1,280.00 |
| 1F | 1,280.00 |
| 1G | 1,247.60 |
| 1H | 1,019.07 |
| 1J | 1,163.70 |
| 1K | 1,730.62 |
| 1L | vacant |
| 1M | 1,291.06 |
| 1N | 909.00 |
| 2A | 954.99 |
| 2B | 1,065.55 |
| 2C | 1,092.39 |
| 2D | vacant |
| 2E | 1,109.70 |

## EXHIBIT C

Service Contracts; Licenses and Permits

24

EXHIBIT D

Permitted Exceptions

1.       Any laws, regulations or ordinances presently in effect or which will be in effect on the Closing Date (including, but not limited to, zoning, building and environmental protection) as to the use, occupancy, subdivision or improvement of the Premises adopted or imposed by any governmental body or the effect of any noncompliance with or any violation thereof, provided only that they do not prevent the Premises from being used for their current purpose.

2.       Possible lack of right to maintain vaults, vaulted areas or coal chutes in sidewalks, or the right of governmental or municipal authorities to require the removal of any vault, coal chute, or other projection or encumbrance which may be significantly beyond the building lines.

3.       Rights of any utility company to maintain and operate lines, wires, poles, cables and distribution boxes, in, over and upon the Premises.

4.       Any state of facts shown on or disclosed by a survey of the Premises, provided same do not render title unmarketable.

5.       Minor projections and/or encroachments of retaining walls, stoops, areas, cellar steps, sills, trim, cornices, standpipes, fire escapes, casings, ledges, water tables, lintels, porticos, keystones, bay windows, hedges, copings, cellar doors, sidewalk elevator, fences, fire escapes and the like, or similar projections or objects on, under or above any adjoining streets or the Premises or within any set-back areas, and variations between the lines of record title and fences, retaining walls, hedges and the like.

6.       Real estate taxes and water and sewer charges, subject, however, to adjustment as herein set forth.

7.       Financing statements, chattel mortgages and liens on personalty owned by Seller filed more than five (5) years prior to the date of the Closing and not renewed or filed against property or equipment no longer located on the Premises or owned by tenants; provided the Title Company will omit or insure against any such liens.

8.       Any exceptions caused by Purchaser, its agents, representatives or employees.

9.       Covenants, easements and agreements of record, provided they do not render title unmarketable.

25

EXHIBIT E

Bargain and Sale Deed With Covenants

**THIS BARGAIN AND SALE DEED WITH COVENANTS** (this "**Deed**") is made as of the _____ day of _____, 2015, by COMMUNITY HOMES HOUSING DEVELOPMENT FUND COMPANY, INC., having an address at _____ ("**Grantor**"), in favor of _____, a New York _____, having an address at _____, New York _____ ("**Grantee**").

**W I T N E S S E T H :**

That Grantor, for and in consideration of Ten ($10.00) Dollars and other good and valuable consideration paid by Grantee, the receipt and sufficiency of which are hereby acknowledged, does hereby sell, grant, bargain, alien, remise, convey and transfer unto Grantee and the heirs or successors and assigns of Grantee, all that certain plot, piece or parcel of land, with the building and improvements thereon erected, situate, lying and being in the Borough of Queens, the City, County and State of New York (the "**Premises**") bounded and described as follows:

**ALL** that certain plot, piece or parcel of land, situate, lying and being in the Borough of Queens County, City and State of New York, bounded and described as follows:

SEE SCHEDULE A

**SAID PREMISES** being known as and by the Street Number 37-05 Parsons Boulevard, Flushing, in the Borough of Queens, New York City.

**TOGETHER** with all right, title and interest, if any, of Grantor in and to any street and roads abutting the above described Premises to the center lines thereof;

**TOGETHER** with the appurtenances and all the estate and rights of Grantor in and to said Premises;

**TO HAVE AND TO HOLD** the same unto Grantee and the heirs or successors and assigns of Grantee, forever.

**AND** Grantor, in compliance with Section 13 of the Lien Law, covenants that Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvements at the Premises and will apply the same first to the payment of the cost of the improvements before using any part of the total of the same for any other purpose.

26

      **IN WITNESS WHEREOF**, Grantor has duly executed this Deed as of the day and year first above written.

By: _____

          Name:

          Title:

27

STATE OF NEW YORK    )
                            ) ss:

COUNTY OF NEW YORK    )

        On this the _____ day of _____, 2015, before me came _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that they executed the same in their capacity, and that by their signature on the instrument, the individual or the entity on behalf of which the individual acted, executed the instrument.

                                        _____

                                           Notary Public

**Bargain and Sale Deed**
With Covenant Against Grantor's Acts

SECTION:
BLOCK:    5015
LOT:       8
COUNTY:  Queens
ADDRESS:  37-05 Parsons Blvd
             Flushing NY 11354

COMMUNITY HOMES HOUSING
DEVELOPMENT FUND COMPANY, INC.

RETURN BY MAIL TO:

TO

28

EXHIBIT F

Bill of Sale

**BILL OF SALE AND ASSIGNMENT**

KNOW ALL PEOPLE BY THESE PRESENTS, thatCOMMUNITY HOMES HOUSING DEVELOPMENT FUND COMPANY, INC., having an address at _____ ("Seller"), for and in consideration of the sum of Ten and No/100 Dollars ($10.00) lawful money of the United States, and other good and valuable consideration to Seller in hand paid, at or before the ensealing and delivery of these presents, by [PURCHASER] MY CAPITAL INVESTMENT LLChaving an address at _____ ("Purchaser"), the receipt and sufficiency of which is hereby acknowledged, has bargained and sold, and by these presents does grant, bargain, sell, convey, set over, transfer, assign and deliver unto the Purchaser, its successors and assigns, the following:

(a)     All of Seller's right, title and interest in and to all fixtures, equipment and articles of personal property (except for personal property owned by tenants) (hereinafter, the "Personalty") attached to or located on and used in connection with the operation of the parcel of land described in Exhibit A attached hereto (the "Land") and the buildings and improvements erected thereon (collectively, the "Premises"), which Personalty includes all personal property, if any, owned by Seller and located on and used in the operation and maintenance of the Premises, which Personalty is being conveyed simultaneously with the conveyance by Seller to Purchaser of all its right, title and interest in and to the Premises by a Deed of even date herewith;

(b)     All of Seller's right, title and interest in and to all those air and/or development rights, permits, licenses, certificates, approvals, authorizations, variances and consents (including any and all presently pending applications therefor) affecting the Land and the buildings and improvements thereon issued to Seller or to its predecessors in interest in the Premises as holder, claimant, licensee, permitee, successor in interest, applicant and/or owner or lessor of the Premises, by any and all federal, state, county, municipal and local governments, and all departments, commissions, boards, bureaus and offices thereof, having or claiming jurisdiction over the Premises, whether or not the same may presently be in full force and effect, all to the extent that Seller may lawfully transfer the same to Purchaser;

(c)     All of Seller's right, title and interest in and to all unexpired warranties and guaranties affecting the Premises and/or the Personalty, all to the extent that Seller may lawfully transfer the same to Purchaser (it being agreed that nothing in this Section (c) shall be construed to affect Seller's rights under such warranties and guaranties with respect to periods prior to the date hereof); and

(d)     All of Seller's right, title and interest in and to all appraisals, surveys, architectural and/or engineering renderings, plans and specifications, soils and other geological reports and

29

studies, and all other reports, studies and other information relating in any way to development and/or use of the Premises.

    **TO HAVE AND TO HOLD** the same unto Purchaser, its successors and assigns, forever.

    **IN WITNESS WHEREOF**, this Bill of Sale and Assignment has been duly signed and sealed by the Seller as of the _____ day of _____, 2015.

                   **SELLER:**

                   **COMMUNITY    HOMES    HOUSING DEVELOPMENT FUND COMPANY, INC.**

                   **By:** _____
                   **Name:**
                   **Title:**

STATE OF NEW YORK  )
                 ) ss.:
COUNTY OF           )

    On the ___ day of _____ in the year 2015 before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                   _____
                     Notary Public

Exhibit A to Bill of Sale

See Annexed

31

EXHIBIT G

Assignment of Leases, Rents, Security Deposits and Service Contracts

## ASSIGNMENT AND ASSUMPTION OF LEASES, RENTS, SECURITY DEPOSITS AND SERVICE CONTRACTS

THIS ASSIGNMENT AND ASSUMPTION OF LEASES, RENTS, SECURITY DEPOSITS AND SERVICE CONTRACTS (this "Assignment") is by and between COMMUNITY HOMES HOUSING DEVELOPMENT FUND COMPANY, INC., having an address at _____ ("Assignor") and [PURCHASER] MY CAPITAL INVESTMENT LLC, having an address at _____ ("Assignee").

### WITNESSETH:

WHEREAS, Assignor desires to assign to Assignee all of Assignor's right, title and interest in and to the lease agreements identified on Schedule A annexed hereto (collectively, the "Leases"), together with all rents due or coming due on or after the date hereof (the "Rents") and all security deposits under the Leases (the "Leases"), and Assignee desires to assume all of Assignor's obligations and enjoy all of Assignor's rights under the Leases, the Rents and the Security Deposits, all in accordance with the terms and provisions contained herein; and

WHEREAS, Assignor desires to assign to Assignee all of the Assignor's right, title and interest in and to all service contracts and related agreements identified on Schedule B annexed hereto (collectively, the "Service Contracts") to Assignee, and Assignee desires to assume all of the Assignor's obligations and enjoy all of Assignor's rights under the Service Contracts, all in accordance with the terms and provisions contained herein;

NOW, THEREFORE, in consideration of TEN DOLLARS ($10.00) and other good and valuable consideration, receipt of which by Assignor is hereby acknowledged, and in further consideration of the mutual promises, covenants and conditions herein contained, the parties, intending to be legally bound, do hereby agree as follows:

Assignor hereby assigns to Assignee, and Assignee hereby accepts and assumes from Assignor, without recourse, all right, title, and interest of Assignor in and to the Leases and all Rents and Security Deposits, effective as of _____, 2015 (the "Effective Date"), all as fully as though Assignee were the original named landlord under the Leases.

From and after the Effective Date, Assignee shall perform all of the obligations of the landlord under the Leases and enjoy all of landlord's rights under the Leases, Rents and Security Deposits, and Assignor will be released from any and all obligations under the Leases, Rents and Security Deposits arising from and after the Effective Date.

Assignor hereby assigns to Assignee, and Assignee hereby accepts and assumes from Assignor, without recourse, all right, title and interest of Assignor in and to the Service Contracts,

32

effective as of the Effective Date.

From and after the Effective Date, Assignee shall perform all of the obligations of the Assignor under the Service Contracts and enjoy all of Assignor's rights under the Service Contracts and Assignor will be released from any and all obligations under the Service Contracts arising from and after the Effective Date.

This Assignment shall inure to the benefit of, and shall be binding upon, the parties hereto and their respective heirs, executors, administrators, successors, and assigns.

The validity, performance, construction and effect of this Assignment shall be governed by the laws of the State of New York, without regard to the law and principles regarding conflicts of law.

This Assignment may be executed in one or more counterparts, each of which shall be deemed an original instrument, and all of which shall be deemed to constitute but one and the same Assignment.

**IN WITNESS WHEREOF,** the parties have executed and delivered this Assignment as of the dates set forth beside their respective signatures.

**ASSIGNOR:**

**COMMUNITY HOMES HOUSING DEVELOPMENT FUND COMPANY, INC.**

By:_____
    Name:
    Title:

**ASSIGNEE:**

[PURCHASER]
**MY CAPITAL INVESTMENT LLC**

By:_____
    Name:
    Title:

33

STATE OF NEW YORK )
                     ) ss.:
COUNTY OF               )

          On the __ day of _____ in the year 2015 before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                               _____
                                                    Notary Public

STATE OF NEW YORK )
                     ) ss.:
COUNTY OF               )

          On the __ day of _____ in the year 2015 before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                               _____
                                                    Notary Public

Schedule A to Assignment and Assumption

(Leases, Rents, Security Deposits)


Schedule B to Assignment and Assumption

(Service Contracts)

35

EXHIBIT H

Tenant Notice

**COMMUNITY HOMES
HOUSING DEVELOPMENT FUND COMPANY, INC.**

_____
_____, 2015

To:  [Name and address of Tenant]


Re:    37-05 Parsons Boulevard, Flushing, New York (the "Building")

    This letter shall constitute notice to you that the undersigned has this date sold the Building to [PURCHASER] MY CAPITAL INVESTMENT LLC(the "Purchaser").

    The undersigned hereby irrevocably instructs and authorizes you to disregard any and all previous notices sent to you in connection with all rent and additional rent and hereafter to deliver all rent and additional rent to the Purchaser at the following address:

_____
_____
_____


    Thank you for your cooperation in this matter.  If you have any questions, please feel free to call [name] at [number].

                    Sincerely,

                    **COMMUNITY HOMES
                    HOUSING DEVELOPMENT FUND
                    COMPANY, INC.**


                    By:_____

36

EXHIBIT I

Non-Foreign Affidavit Under Internal Revenue Code
Section 1445(6)(2)

STATE OF NEW YORK          )
                           ) ss:
COUNTY OF                  )

_____, being first duly sworn, deposes and states under penalty of perjury:

1.   That I am [a managing member] of COMMUNITY HOMES HOUSING
     DEVELOPMENT FUND COMPANY, INC, the transferor of the fee interest in the
     property located at _____

2.   That the transferor's office address is at _____

3.   That the United States taxpayer identification number for the transferor is _____.

4.   That the transferor is not a "foreign person" as that term is defined in Section 1445(f) of
     the United States Internal Revenue Code of 1986, as amended (the "Code").

     This affidavit is given to the transferee of the property described in paragraph 1 above, for
the purpose of establishing and documenting the non-foreign affidavit exemption to the
withholding requirement of Section 1445 of the Code.   The transferor understands that this
affidavit may be disclosed to the Internal Revenue Service by the transferee and that any false
statement contained herein could be punished by fine, imprisonment, or both.

                              _____
                              Name:

Subscribed and sworn to before me
this ____ day of _____, 2015

_____
     Notary Public

37

EXHIBIT C



# Investment Portfolio Overview
NEW PROJECTS IN DEVELOPMENT

February, 2016

**REPOSITION**

## 88 LEONARD STREET
Residential Condo Building - Tribeca



248,000 Square Ft
Acquisition Price: $260 mm
$1,048 Per Square Ft
Projected Profit: $150 mm
Existing Income: $12 mm
Hold Period: 3 years
IRR: 30%

A

## 305 WEST END AVENUE
Residential Condo Building - Upper West Side



170,000 Square Ft
Acquisition Price: $169 mm
$994 Per Square Ft
Projected Profit: $120 mm
Existing Income: $4 mm
Hold Period: 2 years
IRR: 35%

B

## 10 WEST 65TH STREET
Residential Condo Building – Lincoln Center



130,000 Square Ft
Acquisition Price: $115 mm
$884 Per Square Ft
Projected Profit: $150 mm
Existing Income: $3.5 mm
Hold Period: 3 years
IRR: 43%

C

**GROUND UP**

## 265 - 7 BROADWAY
Residential Condo Building – Tribeca



145,000 Square Ft
Acquisition Price: $135 mm
$930 Per Square Ft
Projected Profit: $365 mm
Hold Period: 2 years
IRR: 45+%

D

## 540-550 WEST 38TH STREET
Hotel / Condo Mix Building – Hudson Yards



506,000 Square Ft
Acquisition Price: $200 mm
$395 Per Square Ft
Projected Profit: $400 mm
Hold Period: 4 years
IRR: 48%

E

## 799 BROADWAY
Hotel - Union Square / Greenwich

**HOTEL CONVERSION**



117,000 Square Ft
Acquisition Price: $110 mm
$940 Per Square Ft
Projected Profit: $200 mm
Hold Period: 4 years
IRR: 60%

F

## 1800 PARK AVENUE
Residential Rental Building - Harlem



690,000 Square Ft
Acquisition Price: $125 mm
$181 Per Square Ft
Projected Profit: $200 mm
Hold Period: 4 years
IRR: 40%

G

## 37 UNION SQUARE WEST
Office Building - Union Square / Flatiron



60,000 Square Ft
Acquisition Price: $110 mm
$1000 Per Square Ft
Projected Profit: $50 mm
Hold Period: 3 years
IRR: 36%

H



# Prosperity
# Growth
# Renaissance

# WONG REAL ESTATE CONSULTANCY

O N E   W O R L D   T R A D E   C E N T E R

---

*INVESTING IN ALL  TYPES OF UNDER – VALUED*

*REAL ESTATE  IN GREATER NEW YORK AREA*



This presentation is for discussion purposes only and is not a solicitation to invest.  Due to changing market conditions and other factors, properties presented may not be available for investment as described. Estimates of acquisition price, property improvements, operating income and return on investment are projected and are subject to a wide range of variables and as such they should be considered forward looking statements.  All information in this document is subject to change without notice.  Images are the property of their respective owners.











Walk the streets of the city like a
traveler from the distant stars
noting every nuance of the human thirst for
survival, for pleasure, for reverence,
for glory and for meaning.



EVERY SINGLE band or musical artist, no matter how famous, will eventually have a show here



The museums and Central Park. You can spend all day at any one of them.



So many people are so open and accepting of others, which is an attitude that should be spread everywhere.



The opportunity and privilege of watching/learning/tasting some of the most inspired art/theater/food from people everywhere, putting their best forward



Each neighborhood is so unique. You can travel to what feels like different worlds in a matter of minutes.



Jaywalking is an art form here and no one will silently judge you for doing it.



All of the hidden gems.



Art! So much art. So many different kinds of art. And so much of it for free!



The ability to take all sorts of crazy classes, like trapeze, Olympic trampoline, and aerial yoga!



The mix of big city life and quieter neighborhoods.

# CHAPTER 1
# "PROSPERITY"

_An artist's playground, a playwright's muse. A romantic, electric dream. The definition of real character._













# 10 WEST 65TH STREET
## *Lincoln Center*



**10 WEST 65TH STREET** is a beautifully constructed, elevatored apartment building just steps from Central Park in one of the most sought after locations in all of Manhattan, the Upper West Side near Lincoln Square.







## Lincoln Square

*It's not tough to understand why so many New Yorkers want to live in Lincoln Square—after all, this Upper West Side locality is one of the city's most popular neighborhoods, thanks to its proximity to places like Lincoln Center, Columbus Circle and, of course, Central Park. Adding to the appeal of the neighborhood are the many shops, restaurants and markets that dot the area, all of which make sure that residents here have a great lifestyle both inside and outside their homes.*











# 305 WEST END AVENUE
## Upper West



*West End Avenue, with its tree-lined sidewalks flanked by the finest examples of pre-war architecture in the city, is a most beautiful backdrop. Just one block west is lovely Riverside Park with its splendid views of the Hudson, walking paths and year-round enjoyment of the ever-changing scenery. Then one block east is bustling Broadway with its potpourri of specialty shops, boutiques and bookstores. Just a short stroll downtown is Lincoln Center, with its many cultural offerings.*







On the Upper West Side, grand apartment buildings line Central Park West while newer high-rise condos have popped up on Broadway. Although it's primarily a residential neighborhood, the Upper West side is one of the city's cultural centers - this is where you'll find Lincoln Center. The neighborhood also offers unparalleled park access, with Central Park, Riverside Park and the Hudson River Greenway lining its edges. Old-school shops and restaurants give it a distinct New York feel. Some of its millions of visitors make a beeline for the American Museum of Natural History.

# UPPER WEST



















# 37 UNION SQUARE WEST
## UNION SQUARE – FLATIRON



# FLATIRON DISTRICT

Flatiron's crowded, fast-paced atmosphere reinforces New York City's no-nonsense business reputation.

This ultra-busy crossroads exudes a laid-back attitude in a fast-paced environment. Flatiron, named after its famously triangular Flatiron Building, is a veritable spectacle of big-city life. Suits and ties share the sidewalks with skateboarders, protesters, and peddlers, while droves of people-watchers take in the day in Madison Square Park. Bustling by day, Flatiron becomes quieter (if only a little) during the evening. Centrally located, Flatiron's congestion and crowds only add to its metropolitan mystique.

# 799 BROADWAY
## Union Square – Greenwich Village










*The building was built in 1853 as the St. Denis Hotel and was designed by James Renwick, Jr. who also designed Grace Church across Broadway. The hotel was called "architecturally one of the handsomest buildings on Broadway" and attracted clients such as Ulysses S. Grant, Mark Twain, Sarah Bernhardt, P.T. Barnum, Buffalo Bill Cody and Chester A. Arthur. Alexander Graham Bell gave the first demonstration of his new invention, the telephone, at the hotel.*



*Greenwich Village has been inspiring bohemians for almost a century. In the 1960s, 8th Street was the closest New York got to San Francisco's hippie Haight Street, but now it's one of the most expensive (and exclusive) neighborhoods in New York, and home to the ever-expanding NYU.*

*The neighborhood is roughly bounded by Broadway on the east, the Hudson River on the west, Houston Street on the south, and 14th St on the north. The neighborhoods surrounding it are the East Village to the east, SoHo to the south, and Chelsea to the north.*

## - Greenwich -





# Chapter 2 "Growth"

*At the intersection of what you do and where you want to be*












88 Leonard in Tribeca














265-7 Broadway in Tribeca







By many criteria, Tribeca could be considered the best place to live in the city. It enjoys minuscule crime levels, great schools, tons of transit, well-planned waterfront access, and light-filled loft-type apartments in painstakingly rehabbed industrial buildings.







Tribeca







Embracing Tribeca !

# 540 – 550 WEST 38TH STREET

## Hudson Yards











# Hudson Yards

## From the Pits to the Heights



*Hudson Yards is the area of Manhattan bounded by West 42nd and 43rd Streets, 7th and 8th Avenues, West 28th and 30th Streets, and Hudson River Park. Since 2001, the City of New York, Metropolitan Transportation Authority, and the State of New York have collaborated on extraordinary planning initiatives to create a development program that will transform the Hudson Yards area into a vibrant, pedestrian-friendly, transit-oriented mixed-use district. The new Hudson Yards district will accommodate a major and vital expansion of the Midtown central business district, as well as job growth and new housing for the City's growing population.*



The largest private real estate development in U.S. history, Hudson Yards will dramatically transform a vast desolate space into New York's next great neighborhood that mixes residences, offices, hotels, retail and vibrant street life, extending and enhancing the texture and feel of New York.

# CHAPTER 3 "RENAISSANCE"

















# 1800 PARK AVENUE

*- On the heart of the Harlem Real Estate Renaissance -*



**HARLEM** is among the most densely populated neighborhoods in New York City. The neighborhood's residential property values and market rents have increased dramatically in the past several years, as substantial growth in living costs in the core Manhattan residential markets has pushed many residents to seek lower-cost neighborhoods.



**East Harlem** is the relief location for the Upper East Side neighborhood to the south and the Morningside Heights/West Harlem neighborhood to the west.The neighborhood is only beginning to feel the effects of the extreme rents in the Manhattan core. Most new residential development in this area is sold as condominiums, leaving the rental market underserved with little newer product available.







# Prosperity
# Growth
# Renaissance

**Succeed with
WRE Consultancy**

EXHIBIT D

Case 1:19-cv-03875    Document 2-3    Filed 07/03/19    Page 2 of 42 PageID #: 138




# Jamestown Picks Up Waterton's 88 Leonard Street in Tribeca for About $240M

BY LAUREN ELKIES SCHRAM     SEPTEMBER 19, 2016 1:10 PM

88 LEONARD STREET. PHOTO: COSTAR GROUP

26

**Jamestown** has acquired **88 Leonard Street** from **Waterton Associates** in Tribeca for close to $240 million, Commercial Observer has learned.



Arranges 400 Madison Sale

The 21-story 305,155-square-foot **Costas Kondylis**-designed residential rental building between Broadway and Church Street includes 352 apartments, 11,365 square feet of ground-floor retail and an attached 249-stall below-grade parking garage.

Jamestown dealt directly with Waterton's brokers, **Meridian Investment Sales' Helen Hwang**, **Karen Wiedenmann**, **Brian Szczapa** and **John Charters** in the deal, which closed last Wednesday.

"88 Leonard epitomizes the fully amenitized lifestyle that is becoming more and more scarce in the Tribeca rental market," Hwang said in prepared remarks. "The building's top-tier features and outstanding location will consistently produce the type of demand that sustains value.

**Michael Phillips**, the president of Jamestown, declined to comment, but a spokesman said plans for the building are as yet undecided. A representative for Waterton didn't immediately respond to a request for comment.

KEYWORDS: 88 Leonard Street, Brian Szczapa, Costas Kondylis, Helen Hwang, Jamestown, John Charters, Karen Wiedenmann, Meridian Investment Sales, Michael Phillips, Waterton Associates

## Buildings in this story

### 343 Broadway
343 Broadway, New York, NY, 10013

## Organizations in this story

Owner

JAMESTOWN (/)

Premier Investor Login (https://services.sungarddx.com/Default.aspx?
DN=1,Do

## 88 Leonard

✖ Menu

88 Leonard Street
New York, NY

About

Track Rec

**Current P**

Fund Des

Responsil

Contact (/



New Y



**88 Leona**
88 Leona
New York





    

88 Leonard is a fully amenitized property located at the intersection of Leonard Street and Broadway in the Tribeca neighborhood of Lower Manhattan, one of New York's most desirable residential submarkets. The 21-story, 305,155 square foot building includes 352 luxury residential rental units, 11,365 square feet of ground floor retail, and an attached 249-stall below-grade parking garage.

DJIA **25027.07** -3.10% ▼    S&P 500 **2700.06** -3.24% ▼    U.S. 10 Yr **0/32 Yield** 2.912% ▼    Euro **1.1347** 0.04% ▲

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/investors-strike-150-million-deal-for-senior-residence-on-nycs-upper-west-side-1481241192

REAL ESTATE

# Investors Strike $150 Million Deal for Senior Residence on NYC's Upper West Side

Northwind Group, Harrison Street Real Estate and Engel Burman to buy property

*By Keiko Morris*
Updated Dec. 8, 2016 6:58 p.m. ET

An investor group has paid about $150 million for a senior residence on New York's Upper West Side, with plans to upgrade the facility and provide assisted-living and memory-care services.

The Northwind Group, Harrison Street Real Estate Capital LLC and the Engel Burman Group bought the 239-unit, 16-story art deco building at 305 West End Ave., according to Harrison Street, a real-estate investment management firm. The building was owned by the Scharf family, which operates a senior residence there called the Esplanade.

Harrison Street and Engel Burman have long been partners, offering senior communities with assisted-living and memory care services in the surrounding New York City area. The New York market, particularly Manhattan, has limited options for seniors to age in place, said Mike Gordon, a principal at Harrison Street.

"Seniors depart to New Jersey and Westchester County," Mr. Gordon said. "This will let them stay in Manhattan."

By 2040, the city's population of residents ages 60 and older is expected to reach 1.86 million—up 22% from 2013—and make up more than 20% of the population, according to projections from the New York City Department for the Aging.

Two similar senior facilities are being planned in Manhattan: an East Midtown project by real-estate investment trust Welltower Inc. and developer Hines, and an Upper East Side project by Maplewood Senior Living and its partner, Omega Healthcare Investors Inc.

Harrison Street is aiming to present a high-quality facility before those projects open.

"By virtue of the fact that this is not a ground-up development but a heavy-duty redevelopment, we're able to offer a very compelling value proposition to our residents," Mr.

DJIA **25027.07** S&P 500 **2700.06** U.S. 10 Yr **0/32 Yield** Euro **1.1347**

Write to Keiko Morris at Keiko.Morris@wsj.com

Copyright © 2018 Dow Jones &amp; Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.



Sections ⌄   **THE REAL DEAL**   **THE REAL DEAL**                    Subscribe    Log in
NEW YORK REAL ESTATE NEWS      NEW YORK CITY REAL ESTATE NEWS

# Clipper lands loan for $79M UWS rental buy
*Clipper paid Touro $79M for 10 W. 65th Street*

By E.B. Solomont and Mark Maurer | October 30, 2017 01:30PM                    f 𝕏 in ✉ ⌁



🔍 *10 West 65th Street and David Bistricer*

David Bistricer's Clipper Realty sewed up $34.5 million in financing for its acquisition of an Upper West Side rental building, the landlord told *The Real Deal.*

New York Community Bank provided the 10-year loan, which has an interest rate of 3.3 percent. Clipper closed on the 82-unit building, located at 🔍 10 West 65th Street, for $79 million on Friday, he said.

"It's an unbelievable basis," said Bistricer, describing the six-story property as having good bones and being in a great location, about half a block from Central Park.

Meridian Capital's Ralph Herzka arranged the financing after the real estate investment trust went into contract on the property in May. Touro bought the building for $44 million in 2008 from Extell Development, which snapped up the rental for $23 million in 2004 and renovated about half the units before selling the property.

Rosewood Realty Group's Aaron Jungreis and Devin Cohen brokered the sale on behalf of Touro.

At $79 million, Clipper paid $585 per square foot for the 82,230-square-foot building, plus an additional 53,000 square feet of air rights. Earlier this year, Bistricer told *TRD* the acquisition would be financed with a mortgage and cash on hand. Clipper will invest "incremental" capital to enhance the property.

In 2016, New York Community Bank gave Clipper a $104 million loan to buy the Brewster at 🔍 21 West 86th Street.

Clipper has made several acquisitions since its $86 million IPO last year.

In its first deal as a public firm, Clipper bought a 161-unit rental building at 107 Columbia Heights from the Jehovah's Witnesses. Clipper landed $74 million from the Blackstone Group for the $87.5 million deal.

Tags: Clipper Equity, Commercial Real Estate, new york community bank, Real Estate Finance

## Clipper to buy Touro College building on UWS for $79M

*The school shopped 10 West 65th Street for $115M in 2015*

By E.B. Solomont | May 24, 2017 11:20AM





⊕ *10 West 65th Street and David Bistricer*

David Bistricer's Clipper Realty is in contract to buy an Upper West Side rental building from Touro College for $79 million, the developer told *The Real Deal*.

The newly formed real estate investment trust entered into an agreement for ⊕ 10 West 65th Street, a six-story building with 82 apartments was shopped in 2015 for $115 million, or $850 per square foot. Clipper will pay $585 per square foot for the 82,230-square-foot building plus an additional 53,000 square feet of air rights.

Touro bought the building for $44 million in 2008 from Extell Development, property records show. The Gary Barnett-led firm picked up the site for $23 million in 2004 and gutted about half of the apartments before selling the property to Touro.

Over the past eight years, the school maintained the building for 30 rent-stabilized or rent-controlled tenants, and it rented out the remaining apartments to students.

Touro shopped the property for $115 million in 2015 with Cushman & Wakefield, but six months ago re-listed it for $85 million to $90 million with Rosewood Realty Group.

"They've been trying to sell it on and off for a while. They got the right buyer and decided to pull the trigger," said Rosewood's Aaron Jungreis, who shared the listing this year with Devin Cohen and brought in Bistricer. "It's a prime area, right near the park. Because he's a REIT, he can afford to hold it long term."

Clipper said it plans to finance the latest purchase with a mortgage and cash on hand, the company said. The sale is expected to close by the end of the year, and Clipper will invest "incremental capital" to enhance the property.

Last year, Clipper paid $106 million for the Aspen, a rental building at ⊙1955 First Avenue on the Upper East Side that has 232 apartments and 16,000 square feet of ground-floor retail.

Clipper raised $86 million in an IPO in February.

Excluding the Aspen, the REIT generated rental income of $80 million last year from properties that include Flatbush Gardens, a 59-building rent-controlled apartment complex in Brooklyn, ⊙As Well As 50 Murray Street and ⊙53 Park Place in Tribeca and two mixed-use buildings at 141 and ⊙150 Livingston Street in Brooklyn.

*(To view more commercial sales transactions from Clipper, click here)*

---

Tags: Clipper Equity, Commercial Real Estate, david bistricer, touro college



ABOUT | TOPICS | SUBSCRIBE

Search …

HOME     265 BROADWAY

# Permits Filed For 42-Story, Mixed-Use Tower At 265 Broadway, Financial District



ADVERTISEMENT

FEATURE STORIES



265-267 Broadway. Image via Google Maps

BY: REBECCA BAIRD-REMBA   7:30 AM ON JANUARY 12, 2017

Another sky-scraping residential tower is headed for the blocks near City Hall. Roe Corporation filed plans yesterday for a 42-story, mixed-use building at 265 Broadway, across from City Hall Park between Warren and Chambers streets.



**OCTOBER 8, 2018**

**Ten Questions With Robert Gladstone of Madison Equities, Developer of Downtown's First Residential Supertall Skyscraper, 45 Broad Street**

The 516-foot-tall tower would hold an 80-room hotel in the first 12 floors and 38 spacious condominiums in the remaining 30 stories. The hotel would fill 38,139 square feet of commercial space, and the apartments would occupy 92,671 square feet of residential space, meaning that typical units would measure roughly 2,438 square feet. Most of the apartments would be full-floor units or duplexes, and the top three floors would host a triplex penthouse.

The hotel would have a lounge, lobby, garden and offices on the ground floor, followed by a restaurant and kitchen on the second floor.

Gene Kaufman, one of the city's most prolific hotel designers, applied for the permits. The firm, headed by John Roe, picked up the 16,121-square-foot site in 1967. A five-story office building occupies the property, and demolition plans have not yet been filed.

The project would join several other high-end towers in the neighborhood, including the 54-story **23 Park Row**, which will replace the J&R electronics store, the Temple Court Building's new 51-story neighbor at **5 Beekman Place**, and the 67-story, Robert A.M. Stern-designed hotel and condominium building at **30 Park Place**.

265 BROADWAY     ARCHITECTURE

GENE KAUFMAN ARCHITECT     NEW YORK

RESIDENTIAL     ROE CORPORATION     TRIBECA

f  SHARE     🐦  TWEET     🔴  SHARE     8+  SHARE



❮ Previous post

Next post ❯



SEPTEMBER 11, 2018

**Larry Silverstein Tells YIMBY Foster's Design for 200 Greenwich Still A Contender, More**



AUGUST 17, 2018

**After A Decade of Failures, Newark's New Construction Boom Finally Takes Off**



AUGUST 9, 2018

**Alchemy Properties' Kenneth Horn Talks City Hall Park's Evolution, Converting The Woolworth, And More**

WATERLINE SQUARE — SALES GALLERY NOW OPEN — NO MINIMUM RESIDENCES STARTING FROM APPROXIMATELY $2 MILLION — ANTICIPATED 20-YEAR 421A TAX ABATEMENT

July 30, 2018

**YIMBY's 2018 Mid-Year Pipeline Report Shows Surge In New Development Filings With YTD Unit Count Increasing 67.5% Over 2017**

1 COMMENTS

ON "PERMITS FILED FOR 42-STORY, MIXED-USE TOWER AT 265 BROADWAY, FINANCIAL DISTRICT"

David | January 12, 2017 at 7:53 am |

The target of 42-story structure is mixed-use tower in Financial District, that diverting to business center on the area.

Greg | January 12, 2017 at 3:55 pm |

Isn't Gene Kaufman the architect that does cookie-cutter buildings?



TOM | January 12, 2017 at 8:31 pm |

A lot of lot-line windows to the north.
Any 'affordable'? The mayor will be asking.



Comments are closed.

RELATED ARTICLES

   

2018

**Gene Kaufman-Designed Skyscraper at 265 Broadway Appears Stalled in Lower Manhattan**

2018

**45 Park Place Nears Halfway Mark On Way To 667-Foot Pinnacle in Lower Manhattan**

2018

**New Rendering Revealed for DDG's Super Slender "JR Building" at 100 Franklin in Tribeca**

**Residential Addition Atop 131-135 Duane Street Heads to LPC in Tribeca**



THE RENNIE
HARLEM

Learn more

# Residential Tower 111 Murray Street Rises More Than Halfway To Planned 58 Stories













111 Murray Street on January 7, 2016. Photo by Vertical_Gotham via YIMBY Forums



BY: EVAN BINDELGLASS   7:00 AM ON JANUARY 9, 2017

While most of us probably tried to spend Saturday curled up inside, one intrepid YIMBY Forums user braved the snow to check out progress on 111 Murray Street, a new skyscraper rising between West Street and Greenwich Street in TriBeCa.

In June, YIMBY published an extensive history of 101 Murray Street, the site's predecessor. Now, the successor has risen well past the 30-story mark and will eventually rise 58 stories to 800 feet.

 newyorkyimby

In addition having achieved more half of its planned height, the façade has been installed on about one quarter of the building, as seen in the above **photo** by user **Vertical_Gotham**.



111 Murray Street. Credit: Kohn Pedersen Fox / Goldstein, Hill & West Architects via Tribeca Citizen

The design, one of at least two **champagne flute-like works of architecture** under construction in Manhattan, comes from Kohn Pederson Fox and Goldstein, Hill & West. Other design work will come from MR Architecture + Décor and the Rockwell Group. Edmund Hollander Landscape Architects is also working on the project.

Fisher Brothers, Witkoff, and New Valley are the developers. There will be 157 condominium units averaging over 2,300 square feet apiece, as we reported in August of last year.

The site is only a handful of blocks from the World Trade Center and the Oculus, with access to the PATH train and nearly a dozen subway lines. We expect the building to be complete in 2018.

Follow on Instagram



**BROOKLYN POINT**

NEW STUDIO TO THREE-BEDROOM
LUXURY RESIDENCES

From $837,000 to over $3,500,000

ADVERTISEMENT



111 Murray Street, rendering via teaser website

111 MURRAY STREET

EDMUND HOLLANDER LANDSCAPE ARCHITECTS

FISHER BROTHERS          GOLDSTEIN HILL & WEST ARCHITECTS

KOHN PEDERSEN FOX          MR ARCHITECTURE + DECOR

NEW VALLEY          NEW YORK          RESIDENTIAL

ROCKWELL GROUP          TRIBECA          WITKOFF

 SHARE           TWEET          SHARE          SHARE

**‹ Previous post**

**Next post ›**



Case 1:19-cv-03875    Document 2-3    Filed 07/03/19    Page 18 of 42 PageID #: 154



NEW YORK
# YIMBY

ABOUT    TOPICS    SUBSCRIBE

Search …

HOME    267 BROADWAY

# Reveal For 267 Broadway, 42-Story Mixed-Use Tower Coming To Tribeca



ADVERTISEMENT



267 Broadway, future and present

**BY: NIKOLAI FEDAK    8:00 AM ON AUGUST 2, 2017**

Back in January of 2017, YIMBY reported on new job applications for a site spanning 265-267 Broadway, in Tribeca. Gene Kaufman is designing the tower, and now we have the first look at plans for the project, which will yield a glassy skyscraper peaking 510 feet above the streets below.

FEATURE STORIES



OCTOBER 8, 2018

**Ten Questions With Robert Gladstone of Madison Equities, Developer of Downtown's First Residential Supertall Skyscraper, 45 Broad Street**

Building applications list the total size as 144,244 square feet, to be divided between 38,139 square feet of commercial space, occupied by a hotel with 80 rooms between floors 3 and 12, and 92,671 square feet of residential space. That part will be split between 37 apartments, including a three-level unit at the top of the tower.

The design certainly seems to pay homage to 56 Leonard a few blocks to the north, and features integrated balconies and greenery draped throughout. Despite the similarities, 267 Broadway lacks the actual cantilevers of its taller counterpart, though it does seem to offer a more value-engineered equivalent.



SEPTEMBER 11, 2018

**Larry Silverstein Tells YIMBY Foster's Design for 200 Greenwich Still A Contender, More**



AUGUST 17, 2018

**After A Decade of Failures, Newark's New Construction Boom Finally Takes Off**



AUGUST 9, 2018

**Alchemy Properties' Kenneth Horn Talks City Hall Park's Evolution, Converting The Woolworth, And More**

Case 1:19-cv-03676 Document 2-3 Filed 07/03/19 Page 20 of 42 PageID #: 156



265 Broadway, image by Gene Kaufman

July 30, 2018

**YIMBY's 2018 Mid-Year Pipeline Report Shows Surge In New Development Filings With YTD Unit Count Increasing 67.5% Over 2017**



25 PARK ROW

Worthy of the View

1-4 BEDROOM CONDOMINIUMS FROM $1.855MM TO OVER $12MM

A piece of authentic Manhattan to call mine.

Regardless of how heavily the inspiration has been modified, the condominium portion of the tower will

feature units that are extremely large, with an average size of almost 2,500 square feet (though the triplex penthouse distorts that a bit). Despite this, the hotel is expected to be a four-star boutique, which means prices are likely to be a substantial bit lower than what 30 Park Place is commanding just a few blocks away.

Completion of the tower is anticipated for 2020, and the Roe Corporation is developing the site. Demolition permits for the existing structures have yet to be filed with the Department of Buildings.

**Follow** the YIMBYgram for real-time photo updates
**Follow** YIMBY's Twitter for the latest in YIMBYnews



265 BROADWAY　　　ARCHITECTURE

GENE KAUFMAN ARCHITECT　　　MIXED-USE

NEW YORK　　　RESIDENTIAL　　　ROE CORPORATION

TRIBECA



🏵 SHARE　　🐦 TWEET　　🔴 SHARE　　🇬＋ SHARE

❮ **Previous post**

**Next post** ❯







3 COMMENTS

ON "REVEAL FOR 267 BROADWAY, 42-STORY MIXED-USE TOWER COMING TO TRIBECA"

6sqft

ARCHITECTURE, CONDOS, HOTELS, MIDTOWN WEST, NEW DEVELOPMENTS

# New Renderings for Chinese Lantern-inspired Skyscraper at 470 Eleventh Avenue

POSTED ON FRI, JANUARY 22, 2016 BY ONDEL HYLTON



## Sign up for our newsletters

Your email address

Sign up for our daily email

Sign up for our weekly newsletter

GET OUR NEWSLETTERS

## MOST POPULAR ARTICLES

Reaping the seeds of the Bloomberg administration's sweeping 2005 rezoning of the far west side, a consortium of developers led by Siras Development hopes to begin construction this year on a dramatic 720-foot skyscraper at 470 Eleventh Avenue. Anchoring the southeast corner of Eleventh Avenue and 38th Street, the 47-story tower will soar from a quarter-acre site across from the Jacob K. Javits Convention Center that the developers purchased in 2014 for $110 million.



This 1946 map shows how Native American trails became the streets of Brooklyn

The mixed-use project dubbed Hudson Rise will boast a total of 380,000 square feet split between a commercial podium, 328 hotel rooms/hotel condos, and topped by 40 condominiums that that will be marketed to Chinese buyers. Archilier Architects are the tower's designers, and though the firm has designed numerous large-scale developments in , this will be their first in New York. Said to be inspired by traditional Chinese lanterns, wer will be one of the most spatially complex skyscrapers in the city, distinguished by a al stack of alternating, cantilevering, and interlocking volumes that are clad in an array ade treatments.



FAO Schwarz will reopen this November in Rockefeller Center



Enjoy this page? Like 6sqft on Facebook!



81
SHARES

6sqft









William Wegman's famous dog murals cheer up the newly reopened 23rd Street F, M station



Limited-edition 'Game of Thrones' MetroCards launch today at Grand Central



Lord & Taylor will end its 104-year run with a massive sale and just two holiday windows



Beloved bookstore the Strand fights back against landmarking proposal



Our 4,700sqft: How European expats found a family home in a historic Hamilton Heights brownstone

Case 1:19-cv-03875 Document 2-3 Filed 07/03/19 Page 24 of 42 PageID #: 160

6sqft



There's a refreshing abundance of communal and private terraces that, along with most rooms and residences, will enjoy panoramic vistas of the Hudson River thanks to the low-rise Javits Center fronting the site. In spite of efforts to relocate the convention center to Queens, Governor Cuomo recently pushed ahead with plans to horizontally expand the existing building, in turn preserving views from Hudson Rise for the foreseeable future.




*470 Eleventh Avenue on the right*

Views to the west, south and north will likely be minimized, however. If the building opens in 2018 as planned, the tower will be the first of many along a stretch of Eleventh where several tall and supertall skyscrapers are planned. They include Moinian Group's 3 Hudson Yards, Related/Oxford/Mitsui Fudosan's 55 Hudson Yards, Related's 35 Hudson Yards and 15 Hudson Yards. Furthermore, development partner Blackhouse has hatched plans to construct a lithe 46-story condo-hotel tower almost next door at 550 West 38th Street, and adjacent to that parcel, the Chetrit Group has drawn up plans for a 50-story tower at 540 West 38th Street. It seems prophecies sung by little old Hell's Kitchen's ladies warning of "Hong Kong-on-the-Hudson" are finally coming true.



6sqft



The property's investors—Siras Development, Blackhouse Development, and Kuafu Properties—have undergone a soap opera worth of drama with the latest coming in earlier this week that Blackhouse's co-founder Sean Ludwick was nabbed by federal marshals plotting an escape to South America. Last year, an intoxicated Ludwick crashed his Porsche in the Hamptons, killing his passenger and then dumping the body on the side of the road.



To view upcoming listings for Hudson Rise, visit CityRealty.

**RELATED:**

- New Renderings and New Tenant Revealed for 90-Story Hudson Yards Tower
- Revealed: Crowne Plaza Hotel Rises South of Times Square, Boasts Streetwall-Friendly Atrium
- REVEALED: Inside Bjarke Ingels' Spectacular 57th Street Tetrahedron

*Renderings courtesy of Archilier Architects*

6sqft





 Like | Share | Be the first of your friends to like this.

TAGS : 470 ELEVENTH AVENUE, ARCHILIER ARCHITECTS, BLACKHOUSE DEVELOPEMENT, KUAFU PROPERTIES, SEAN LUDWICK, SIRAS DEVELOPMENT

NEIGHBORHOODS : MIDTOWN WEST

0 Comments  **6sqft**

Login

♡ Recommend    Tweet    f Share

Sort by Newest

 Start the discussion…

LOG IN WITH        OR SIGN UP WITH DISQUS ?

Name

Be the first to comment.

ALSO ON 6SQFT

**MTA to buy Grand Central Terminal for $35M**

1 comment • 21 days ago

 Ken Grant — $35 million seems incredibly cheap for Grand Central Terminal. Is there a catch?

**Despite city-wide ban, Amazon wants to put a rooftop helipad …**

1 comment • 22 days ago

 6637 — I doubt the FAA will approve a heliport so close to LGA's final approach corridor where airliners …

**Anne Hathaway takes a loss on $2.7M sale of Connecticut beach …**

1 comment • 5 days ago

 scotatus — Ugly house.

**MVRDV's vibrant 'vertical village' hotel breaks ground in …**

2 comments • 23 days ago

Zach Beale — Pure unadulterated ass.

✉ Subscribe    ⊕ Add Disqus to your siteAdd DisqusAdd    🔒 Disqus' Privacy PolicyPrivacy PolicyPrivacy



ABOUT | TOPICS | SUBSCRIBE

Search …

HOME    799 BROADWAY

# Major New Office Development Coming To 799 Broadway, Greenwich Village



ADVERTISEMENT




BY: SEBASTIAN MORRIS   7:30 AM ON APRIL 13, 2018

New building applications have revealed that a rumored high-end office development is moving forward at 799 Broadway, in **Greenwich Village**, Manhattan. Global architecture firm **Perkins+Will** will be in charge of its design.

Original reports said the development of 799 Broadway was limited to a gut renovation of the interior structure and a

FEATURE STORIES



OCTOBER 8, 2018

**Ten Questions With Robert Gladstone of Madison Equities, Developer of Downtown's First Residential Supertall Skyscraper, 45 Broad Street**

vertical expansion of the historic corner property. Permits filed this month, however, reveal the construction of a new, 12-story, 182-foot-tall building containing 182,626 square feet of Class-A office space. An additional 10,032 square feet will be dedicated to an unspecified community facility.

The total construction area measures 128,539 square feet.



Originally constructed in 1853 as the St. Denis Hotel, the building was designed by 19th century American architect James Renwick, Jr., who also designed Grace Church across Broadway. The property was purchased in 2016 for $101 million in by **Normandy Real Estate Partners** and Ares Management, when the building was nearly 100% occupied by short-leased retail storefronts and a local medical office.

Normandy is now reportedly the primary developer following the departure of Ares Management from the joint investment.

**Subscribe** to YIMBY's daily e-mail

**Follow** the YIMBYgram for real-time photo updates
**Like** YIMBY on Facebook
**Follow** YIMBY's Twitter for the latest in YIMBYnews



SEPTEMBER 11, 2018

**Larry Silverstein Tells YIMBY Foster's Design for 200 Greenwich Still A Contender, More**



AUGUST 17, 2018

**After A Decade of Failures, Newark's New Construction Boom Finally Takes Off**



AUGUST 9, 2018

**Alchemy Properties' Kenneth Horn Talks City Hall Park's Evolution, Converting The Woolworth, And More**

Search (/search/)

(https://www.facebook.com/Globestcom)

(https://twitter.com/GlobeStcom)

(https://www.linkedin.com/company/globest-com/)   (/rss/)

(/)

promoCode=REM:LIMITED&refDomain=store.glob

PROMOCODE=REM:LIMITED&REFDOMAIN=STO

MARKETS   (/MARKETS/)   SECTORS   (/SECTORS/)   TECHNOLOGY (/TECHNOLOGY/)   BEST PRACTICES   (/BEST-PRACTICES/)   REAL ESTATE FORUM   (/REAL-ESTATE-FC

News (/news/)

# Columbia and Normandy to Develop Office Building at 799 Broadway

By **Betsy Kim (/author/profile/Betsy-Kim/)**   |   September 14, 2018 at 04:00 AM

f   in   🐦   G+    📄 (http://www.almreprints.com)



**799 Broadway, architectural rendering/ Image credit: Binyan Studios**

NEW YORK CITY—Columbia Property Trust and Normandy Real Estate Partners have formed a joint venture to develop 799 Broadway. Columbia will own a 50% interest in the $300 million ground-up project. The construction is scheduled to be completed in the second half of 2020. Cushman & Wakefield's Adam Spies and Doug Harmon represented owner, Ares, in the sale of their 50% stake to Columbia Property Trust. Columbia's interest was purchased at $142.5 million gross value, according to industry sources.

799 Broadway is located at the corner of 11th St. and Broadway, where Union Square and Greenwich Village converge.

Case 1:19-cv-03875   Document 2-3   Filed 07/03/19   Page 31 of 42 PageID #: 167

Designed by Perkins+Will, the 12-story, loft-style building will comprise 182,000 square feet of boutique office space. The new development will have floor plates ranging from 3,600 to 22,000 square feet. It will have floor-to-ceiling glass, private terraces, and 15-foot high ceilings. The developers say that the highly desirable location and state-of-the-art design will attract progressive and creative companies.

"We are seeking selective development opportunities in our target markets to provide value and growth to our high quality, well-leased portfolio," says Nelson Mills, Columbia's CEO. "Normandy brings deep development expertise and success in Manhattan and elsewhere." He also notes Columbia's strong track record in repositioning and leasing properties.

Jeffrey Gronning, a founder and partner of Normandy Real Estate Partners, says with high-end amenities and features, the unique building will appeal to tenants seeking a creative and collaborative environment. He adds that the building "should benefit from the limited supply of newly developed properties in this highly desirable neighborhood."

However, some local residents say restrictions on out-of-scale developments is what keeps the neighborhood highly desirable. They lament the planned demolition of the St. Denis Hotel.

James Renwick, Jr., the architect who designed St. Patrick's Cathedral, created the hotel, which opened in 1853. The plain, pale pink exteriors do not reveal the ornate, decorative insides. Jeremiah Moss's article in *The New York Review of Books* about the St. Denis, titled **"The Death and Life of a Great American Building,"** **(https://www.nybooks.com/daily/2018/03/07/the-death-and-life-of-a-great-american-building/)** shows some of the interior's grandeur.



**799 Broadway, St. Denis Hotel building/ Wikimedia Commons**

Moss also describes a few of the building's historic moments. This includes Alexander Graham Bell's demonstrating the telephone to New Yorkers, Sarah Bernhardt's writing letters, and Ulysses S. Grant's penning his memoirs with the assistance of Mark Twain. The hotel was later converted to offices but was never landmarked.

Andrew Berman, the executive director of the Greenwich Village Society for Historic Preservation, opposes the office tower's replacing the St. Denis Hotel. He says it's the latest example of Silicon Alley and "Midtown South" moving into Greenwich Village with the recent **approval of the Tech Hub rezoning on 14th Street (https://www.globest.com/2018/08/10/city-council-approves-rezoning-for-union-square-tech-hub/).**

"A large glass office tower does not belong here, which is why we pushed for and continue to demand real zoning and landmark protections for this unique neighborhood, to protect its scale, history, and predominantly residential character," say Berman. "Responsibility for this kind of totally inappropriate development lies squarely with the mayor and the city council, for approving a plan which turns this neighborhood into the new center of the tech industry in New York City."

Columbia notes that 799 Broadway will complement its growing portfolio of differentiated assets in Midtown South. The properties' selling points include smaller floor plates, distinctive architecture, and high-end, modern finishes and amenities. Columbia's additional Manhattan properties include 218 W. 18th St., 249 W. 17th St., 114 Fifth Ave., 229 W. 43rd St., 315 Park Ave. South, and 149 Madison Ave.

f SHARE　　　🐦 SHARE

### Betsy Kim

Betsy Kim is the bureau chief, East Coast, and New York City reporter for Real Estate Forum and GlobeSt.com. As a lawyer and journalist, Betsy has worked as the director of editorial and content for LexisNexis Lawyers.com, a TV/multi-media journalist for NBC and CBS affiliated TV stations in the Midwest, and an associate producer at Court TV.

 ( /author/profile/Betsy-Kim/)

More from this author → (/author/profile/Betsy-Kim/)

### Dig Deeper

National (/National/)　　　New York (/New-York-Metro/)　　　Office (/Office/)

Development (/Development/)　　　Northeast (/Northeast/)

### Trending Stories

1　**LaGuardia's New, 250,000 SF Concourse Opened on Saturday (SLIDESHOW) (https://www.globest.com/2018/12/01/laguardias-new-250000-sf-concourse-opens-on-saturday-slideshow/)**

2　**The Next Downturn: It's Not a Matter of When But How (https://www.globest.com/2018/12/03/the-next-downturn-its-not-a-matter-of-when-but-how/)**

3

Case 1:19-cv-03875   Document 2-3   Filed 07/03/19   Page 33 of 42 PageID #: 169

6sqft

ARCHITECTURE, GREENWICH VILLAGE, NEW DEVELOPMENTS

# Office building in the Village's 'Silicon Alley' gets a new design

POSTED ON TUE, APRIL 17, 2018 BY DEVIN GANNON

 

*Current side via Wikimedia; 799 Broadway Rendering via Perkins+Will*

Plans for the office development proposed on the site of the former St. Denis Hotel in the East Village progressed last week, after Normandy Real Estate Partners filed new permit applications. Located at 799 Broadway, the 165-year-old hotel will be demolished and later replaced with a 12-story office building. New permits reveal a change in architects, from CetraRuddy to Perkins+Will as well as a slight shrinkage of space, from 190,000 to 183,000 square feet (h/t The Real Deal).

 

*derings of 799 Broadway by CentraRuddy*

## Sign up for our newsletters

Your email address

Sign up for our daily email

Sign up for our weekly newsletter

GET OUR NEWSLETTERS

## MOST POPULAR ARTICLES



This 1946 map shows how Native American trails became the streets of Brooklyn



FAO Schwarz will reopen this November in Rockefeller Center



Enjoy this page? Like 6sqft on Facebook!   s spring

 Like 16K 



As 6sqft reported last summer, CetraRuddy officially announced plans for an environmentally friendly, 17-story office building and revealed two separate concept proposals. Besides switching architects, the new permit applications say the office space will be located on floors two through 12 of the building, with retail situated on the ground level.

Opened in 1853, the St. Denis hotel was designed by iconic architect James Renwick, Jr., the same designer behind St. Patrick's Cathedral. Although it's not a landmarked building, nor located in a historic district, the hotel was where Ulysses S. Grant wrote his post-Civil War memoirs and where Alexander Graham Bell first demonstrated the telephone in New York. While it operated as a hotel for over six decades, the building now contains office space.

[Via The Real Deal]

**RELATED:**

- CetraRuddy proposes sustainable designs for first office building along the Village's 'Silicon Alley'
- East Village's landmarked Bathhouse Studios building is up for sale for $20M
- The Greenwich Village church that threw a presidential election

Like Share 3 people like this. Be the first of your friends.

TAGS : 799 BROADWAY, PERKINS + WILL

NEIGHBORHOODS : EAST VILLAGE, GREENWICH VILLAGE



William Wegman's famous dog murals cheer up the newly reopened 23rd Street F, M station



Limited-edition 'Game of Thrones' MetroCards launch today at Grand Central



Lord & Taylor will end its 104-year run with a massive sale and just two holiday windows



Beloved bookstore the Strand fights back against landmarking proposal



Our 4,700sqft: How European expats found a family home in a historic Hamilton Heights brownstone





ABOUT | TOPICS | SUBSCRIBE

Search ...

HOME    1800 PARK AVENUE

# Durst Plans New Mixed-Use Project With Affordable Housing At 1800 Park Avenue, Harlem



ADVERTISEMENT



Present-day stalled 1800 Park Avenue. Photo by Tectonic.

BY: REID WILSON    1:00 PM ON SEPTEMBER 12, 2016

Over the summer, the Durst Organization entered into contract to acquire the 36,281-square-foot site at 1800 Park Avenue, located between East 124th and 125th streets in Harlem. The developer has since closed on the purchase for just under $91 million, the New York Post reported. Durst will abandon the ODA New York-designed 24-story,

FEATURE STORIES



OCTOBER 8, 2018

**Ten Questions With Robert Gladstone of Madison Equities, Developer of Downtown's First Residential Supertall Skyscraper, 45 Broad Street**

670-unit mixed-use project (originally 32 stories and 682 units) envisioned by the Continuum Company, the site's previous owner. Instead, completely new plans will be drawn up, presumably by a different architect. Regardless, the final plans will include a large affordable housing component. Roughly 600,000 square feet of mixed-use space can be built as-of-right. The project is still eligible for the 421-a tax abatement since Continuum technically conducted foundation work at the site.



Previously proposed 1800 Park Avenue. Rendering by ODA New York.

**Subscribe** to the YIMBY newsletter for weekly updates on New York's top projects

1800 PARK AVENUE   AFFORDABLE HOUSING   BRIEF

COMMERCIAL   DURST ORGANIZATION   HARLEM

MIXED-USE   NEW YORK   RESIDENTIAL



f  SHARE      TWEET      SHARE      SHARE



SEPTEMBER 11, 2018

**Larry Silverstein Tells YIMBY Foster's Design for 200 Greenwich Still A Contender, More**



AUGUST 17, 2018

**After A Decade of Failures, Newark's New Construction Boom Finally Takes Off**



AUGUST 9, 2018

**Alchemy Properties' Kenneth Horn Talks City Hall Park's Evolution, Converting The Woolworth, And More**



## AXA Financial Center

37 Union Square West, New York, NY

37 Union Square West is located in New York, NY. Built in **1910**, this **5** story **office** property spans **19,434 SQFT**. CompStak has **3 lease comps** for this property, dating from **2012** to **2017**.



**37 Union Square West Commercial Lease Comps:**

TENANT

# Association Management Center

| LEASE SIZE: | 0-10K SQFT |
|---|---|
| SPACE TYPE: | Office |
| YEAR LEASED: | 2017 |
| YEAR EXPIRES: | 2020 |

Building Class
Building Floors

of Union Square West New York, NY commercial lease comps and tenants.

- Building Size
- Commencement Date
- Current Rent

*Available to CompStak members and customers

VIEW FULL LEASE COMP

**TENANT**

# Hype Gym West

| | |
|---|---|
| LEASE SIZE: | 0-10K SQFT |
| SPACE TYPE: | Retail |
| YEAR LEASED: | 2017 |
| YEAR EXPIRES: | 2022 |

- Building Class
- Building Floors
- Building Size
- Commencement Date
- Current Rent

*Available to CompStak members and customers

VIEW FULL LEASE COMP

**TENANT**

# Clinic Advantage

| | |
|---|---|
| LEASE SIZE: | 0-10K SQFT |

SPACE TYPE:                                                                    Office

YEAR LEASED:                                                                    2012

YEAR EXPIRES:                                                                   2020

- Building Class
- Building Floors
- Building Size
- Commencement Date
- Current Rent

*Available to CompStak members and customers

VIEW FULL LEASE COMP

## 37 Union Square West Tenants:

**Association Management Center**
2017   New Lease

**Hype Gym West**
2017   New Lease

**Clinic Advantage**
2012   New Lease

## Comparable properties for 37 Union Square West:

134 5th Avenue, New York

333 Park Avenue South, New York

139 5th Avenue, New York (139 Fifth Avenue)

936 Broadway, New York (936 Broadway (2nd-3rd FL))

COMPSTAK PRODUCTS

Sign up for a CompStak account to access the full lease comparables at **37 Union Square West**.



CompStak Exchange 

SIGN UP

CompStak Enterprise

Powering analysis with real-time records of commercial lease and sales transactions.

SIGN UP

PROUDLY USED BY























# Michael Mandel, Co-Founder and CEO

Michael Mandel is Co-Founder and CEO of CompStak. Since launching CompStak in early 2012, Michael has helped navigate the company through tremendous growth, with over $17 million raised, 70 major markets launched, and a 45 person team.

Before starting CompStak, Michael led the NY metro data center practice for Grubb & Ellis, where he was named National Rookie of the Year and inducted into Real Estate New York's 30 Under 30. He graduated Babson College in 2005, where he led the Babson Entrepreneurial Exchange and was a member of the world's first live-in business incubator, the e-tower.

**ACTIVE MARKETS**

Alabama - Other

Alaska

Arizona - Other

Arkansas - Other

Atlanta

EXHIBIT E

# ATTACHMENT A

## *Initial Contributions of the Members*

The Initial Contributions of the Members of 37 Parsons Capital Advisors, LLC are as follows:

1)WRE Consultancy, LLC

    42-11 Kissena Blvd. Flushing, NY 11355

    Contribution:

    Cash: $500,000.00

2) Manhai Wong

    42-11 Kissena Blvd. Flushing, NY 11355

    Contribution:

    Cash: $500,000.00

3) Yan S. Fok

    141-05 Holly Avenue Flushing, NY 11355

    Contribution:

    Cash: $500,000.00

4) Zheng Wang

    143-34 Ash Avenue Flushing, NY 11355

    Contribution:

    Cash: $500,000.00

5) Ming Yi Cheung

    6004 84th Street Middle Village, NY 11379

    Contribution:

    Cash: $500,000.00

6) Yang Fan

    50-52 26th Avenue Flushing, NY 11354

    Contribution:

    Cash: $500,000.00


7) Shi Meng Huang

    1836 83rd St 2Fl Brooklyn, NY 11214

    Contribution:

    Cash: $500,000.00


8) YPA Management Holdings, LLC

    36-07C College Point Blvd. Flushing, NY 113

    Contribution:

    Cash: $500,000.00


9) 165 Gregory Road Associates, LLC

    40 Matthews Street

    Goshen, NY 10294

    Contribution:

    Cash: $500,000.00


10) Jimmy Li

    511 Canal Street

    New  York, NY 10013

    Contribution:

    Cash: $500,000.00

EXHIBIT F

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement, dated as of **November  , 2015** (this "Agreement"), is entered into by and between **37 Parsons Capital Advisor LLC**, an New York limited liability company (the "Purchaser") on the one hand, and **My Capital Investments LLC**, a New York limited liability company (the "Company") and **Jian Zhang**, an individual ("Seller") on the other hand. Each of Purchase and Company may be individually referred to as a "Party" or collectively as the "Parties".

## RECITALS

WHEREAS, Jian Zhang is the sole owner of all the membership interests in My Capital Investment LLC (the "Company");

WHEREAS, The Purchaser desires to acquire 99.99 Units of the Company's membership interests, which amount totals ninety-nine and ninety nine one hundredths (99.99%) of the total issued and outstanding membership interests of the Company (the "Membership Interests"); and

WHEREAS, the Company has determined that it is in the Company's best interests that the Purchaser acquire such a percentage of the Company's issued and outstanding membership interests.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties, covenants and conditions set forth below, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

1.      Purchase and Sale of the Membership Interests

(a)    <u>Purchase and Sale</u>.  In reliance upon the representations, warranties and covenants of the parties set forth herein, and subject to the satisfaction of the conditions set forth herein, the Company agrees to issue, sell and deliver to the Purchaser, and the Purchaser agrees to purchase from the Company, at the Closing (as defined below), the Membership Interests for an aggregate purchase price of **THREE MILLION DOLLARS ($3,000,000)** (the "Purchase Price").

(b)    <u>Delivery of the Membership Interests; Payment of Purchase Price</u>.  At the Closing, the Company shall take all other actions necessary to reflect the ownership of the Membership Interests by the Purchaser on the books and records of the Company, and the Purchaser shall pay the Purchase Price by wire transfer of immediately available funds to the attorney trust account of Lowenstein and Sandler LLP ("Closing Attorney") for the benefit of the Company:

(i)    THREE MILLION DOLLARS ($3,000,000) at Closing;

Closing Attorney shall distribute the Purchase Price pursuant to the Closing Statement set forth as Exhibit "A".

2.     Conditions.

(a)    <u>Obligations of Purchaser to Close.</u> The obligations of the Purchaser under this Section 1 to be performed at the Closing are subject to satisfaction of the following conditions:

     (ii)     The representations and warranties of the Company contained in this Agreement shall be true and correct, in all material respects, at and as of the Closing, and the Company shall have performed and complied with all the covenants and agreements and satisfied all the conditions required by this Agreement to be performed or complied with or satisfied by the Company at or prior to the Closing.

     (iii)     The Company shall have received all consents and approvals of third parties necessary for the Company to consummate the transactions contemplated hereby.

     (iv)     The Purchaser shall have received from the Company such other documents confirming the accuracy and completeness of the representations and warranties of the Company set forth herein as the Purchaser may reasonably request.

     (v)     Simultaneously with the Closing, the following agreements shall have been executed and delivered by the parties thereto and the transactions specifically contemplated by such agreements shall have been consummated:

         (1)     The Amended and Restated Operating Agreement of the Company by and between Purchaser and SELLER ("Amended Operating Agreement") of the form attached to as Exhibit "F"); and

(b)    <u>Company to Close.</u> The obligations of the Company under Section 1 to be performed at the Closing shall be subject to satisfaction of the following conditions: The representations and warranties of the Purchaser contained in this Agreement shall be true and correct, in all material respects, at and as of the Closing, and the Purchaser shall have performed and complied with all the covenants and agreements and satisfied all the conditions required by this Agreement to be performed or complied with or satisfied by the Purchaser at or prior to the Closing.

(c)    <u>Closing.</u> The closing with respect to the purchase and sale of the Membership Interests (the "Closing") shall take place at the offices of the Closing Attorney on November--------, 2015 or on such other date as may be agreed by the Parties (the "Closing Date"). The parties may participate in the Closing through electronic transmission of documents.

3.    Representations and Warranties of the Company and SELLER.  The Company and  each represent and warrant to the Purchaser that the statements contained in the following paragraphs of this Section 3 are all true and correct.

(a)    Capitalization.  Except for the Membership Interests issued to Jian Zhang there are no other issued and outstanding membership interests of the Company, and no person or entity has any legal right, contingent or otherwise, to obtain any equity, ownership or revenue or distribution rights in the Company or any Subsidiary.

(b)    Organization and Good Standing.    The Company and each of the Subsidiaries is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York, with full corporate power and authority to (i) conduct its respective businesses as it is now being conducted, (ii) own or use the property and assets that it respectively owns or uses and (iii) performs all obligations under all contracts to which each is a party.

(c)    Authority; No Conflict.  (i) The Company has all requisite legal right, power and authority to execute and deliver this Agreement and to fully perform its obligations hereunder.  This Agreement constitutes the legal, valid, and binding obligation of the Company, enforceable against it in accordance with its terms; and (ii) Neither the execution, delivery and performance of this Agreement nor the consummation of the contemplated transactions will, directly or indirectly: (A) contravene, conflict with or result in a violation of any provision of the articles of organization, operating agreement or other organizational documents of the Company; (B) contravene, conflict with, or result in a violation of, or give any governmental body or other person the right to challenge any of the contemplated transactions or to exercise any remedy or obtain any relief under, any legal requirement to which the Company, or any of its subsidiaries is subject; and (C) result in the imposition or creation of any encumbrance upon or with respect to any of the property or assets of the Company.

(d)    Legal Proceedings.  There are no proceedings pending by or against the Company, SELLER or the Subsidiaries, or any of the Company's of any of the Subsidiaries'' properties or assets.  There is no court or governmental order to which the Company or any of its Subsidiaries, property or assets is subject.  No attachments, executions, assignments for the benefit of creditors, receiverships, conservatorships or voluntary or involuntary proceedings in bankruptcy or actions pursuant to any other debtor relief laws are pending against the Company or any of the Subsidiaries.

(e)    Brokers or Finders.  Except as set forth in Exhibit A, neither the Company nor any of the Subsidiaries has incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with this Agreement or the contemplated transactions for which the Company or Purchaser will have any liability.

(f)    Disclosure.  No representation or warranty made by the Company or SELLER in this Agreement or any related agreement contains any untrue statement of a material fact or omits to state any material fact required to be stated herein or therein or necessary to make the statements contained herein or therein not misleading in light of the circumstances

- 3 -

under which they were made.  To the Company's or SELLER's knowledge, except as corrected or explained by any of them prior to Closing, no written statement, exhibit or certificate or instrument made or furnished to Purchaser (by the Company or SELLER) pursuant to or in connection with this Agreement (including but not limited to their negotiation, execution or delivery) or in connection with the contemplated transactions contains contain any untrue statement of any material fact or omits to state any material fact required to be stated therein or necessary to make the statements contained therein not misleading in the light of the circumstances under which they were made.

4. Representations and Warranties of the Purchaser.  The Purchaser represents, and warrants to, and covenants with, the Company as follows:

(a) Investment Intent; Authority.  The Purchaser is acquiring the Membership Interests for investment for the Purchaser's own account, and not as nominee or agent for investment and not with a view to or for resale in connection with any distribution or public offering thereof within the meaning of the Securities Act.  The Purchaser has the full right, power, authority and capacity to enter into and perform this Agreement and this Agreement will constitute a valid and binding obligation upon the Purchaser.

(b) Membership Interests Not Registered.  The Purchaser understands and acknowledges that the issuance and sale of the Membership Interests hereunder has not been registered under the Securities Act or qualified under any state securities laws in reliance upon one or more exemptions from registration or qualification under the Securities Act and such state securities laws, and that the Company's reliance upon such exemption is predicated upon the Purchaser's representations set forth in this Agreement.  The Purchaser understands and acknowledges that resale of the Membership Interests may be restricted indefinitely unless they are subsequently registered under the Securities Act and qualified under state law or an exemption from such registration and such qualification is available.

(c) Accredited Investor.  The Purchaser is an "accredited investor" within the meaning of SEC Rule 501, as presently in effect.

(d) Access to Books and Records; Disclosure.  Purchaser acknowledges that

(i) Purchaser has been given full and adequate access to, and the opportunity to inspect and review, the financial statements of the Company and all such other books and records of the Company relating to the business, finances and operations of the Company as Purchaser has deemed necessary in connection with Purchaser's evaluation of the Company's offer to sell the Membership Interests and of the business, financial condition and prospects of the Company and the Subsidiaries.

(ii) Except as otherwise noted, Purchaser (individually and/or in conjunction with his legal and financial advisers) has such knowledge and experience in financial and business matters as to

be capable of evaluating the merits and risks of maintaining an investment in the Membership Interests.

(iii)   Purchaser has been given the opportunity to ask questions of, and receive answers from, the executive officers and managers of the Company and the Subsidiaries concerning the business, financial condition and prospects of the Company and Subsidiaries and has been provided with such other information as Purchaser has desired in order to evaluate purchase of the Membership Interests at the prices and on the terms set forth herein.

5.   Miscellaneous.

(a)   Governing Law.   This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of laws provisions of the State of Georgia or of any other state.

(b)   Entire Agreement.   This Agreement, together with the Exhibits hereto, constitute the full and entire understanding and agreement between the Parties with regard to the subjects hereof and thereof.

(c)   Expenses.   Each Party shall be responsible for and pay all costs and expenses, including attorney's fees and accountants' fees that it incurs in connection with the drafting and negotiation of this Agreement and the consummation of the transactions contemplated hereby, including without limitation the obtaining of any necessary and required governmental approvals.

(d)   Notices.   All notices, requests and other communications hereunder shall be in writing and shall be deemed to have been duly given at the time of receipt if delivered by hand or by facsimile transmission or three days after being mailed, registered or certified mail, return receipt requested, with postage prepaid to the applicable parties hereto at the address stated below or if any party shall have designated a different address or facsimile number by notice to the other party given as provided above, then to the last address or facsimile number so designated.

If to the Company or SELLER:

If to the Purchaser:
**37 Parsons Capital Advisor LLC**
**Attn: Antonio Wong**
136-20 38th Avenue, #3A
Flushing, NY11354

      (e)    <u>Validity</u>. If any provision of this Agreement shall be judicially determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions thereof shall not in any way be affected or impaired thereby.

      (f)    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, and a Party's delivery of a signed counterpart by facsimile transmission shall constitute that Party's due execution of this Agreement.

[SIGNATURES ON NEXT PAGE]

**IN WITNESS WHEREOF,** the parties have executed and delivered this Agreement as of the date and year first written above.

**COMPANY:**

**My Capital Investment, LLC**

By: _____

Name: Jiam Zhang
Title: Managing Member

**PURCHASER:**

**37 Parsons Capital Advisor LLC**

By: _____

Name: Antonio Wong Jr.
Title: Manager

EXHIBIT G

## JPMORGAN CHASE BANK WIRING INSTRUCTIONS

Lau & Associates, P.C.

Attorney Trust Account

133-47 Sanford Avenue, C1E

Flushing NY 11355

Tel:  718-359-9700

Fax: 718-762-9385

BANK

JPMorgan Chase Bank

3901 Main Street

Flushing, NY 11354

Attn:  Andy Tram

Telephone:  718-539-0976

Account Name: Lau & Associates, P.C.

Attorney Trust Account

Swift Code: CHASUS33

Routing Number:  ███████

Account Number:  ███████

EXHIBIT H

| NYC DEPARTMENT OF FINANCE OFFICE OF THE CITY REGISTER |  |
|---|---|
| This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document. | |

**2016010600509001001EC2EC**

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 5 |
|---|---|---|
| Document ID: **2016010600509001** | Document Date: 12-31-2015 | Preparation Date: 01-06-2016 |

Document Type: DEED
Document Page Count: 4

| PRESENTER: | RETURN TO: |
|---|---|
| LIBERTY LAND ABSTRACT, INC<br>42-40 BELL BLVD. SUITE 201<br>10771<br>BAYSIDE, NY 11361<br>718-281-0505<br>JASON@LLABSTRACT.COM | LOWENSTEIN SANDLER LLP<br>1251 AVENUE OF THE AMERICAS<br>NEW YORK, NY 10020 |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| QUEENS | 5015 | 8 | Entire Lot | 37-05 PARSONS BOULEVARD |

Property Type: APARTMENT BUILDING

### CROSS REFERENCE DATA

CRFN_____ *or* DocumentID_____ *or* _____ Year_____ Reel____ Page_____ *or* File Number_____

### PARTIES

| GRANTOR/SELLER: | GRANTEE/BUYER: |
|---|---|
| COMMUNITY HOMES HOUSING DEVELOPMENT<br>FUND COMPANY<br>111 DIVISION STREET<br>NEW YORK, NY 10002 | 37 PARSONS REALTY LLC<br>157-05 CROSS ISLAND PARKWAY<br>WHITESTONE, NY 11357 |

### FEES AND TAXES

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 250.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 38,800.00 |
| Spec (Additional): | $ | 0.00 | **RECORDED OR FILED IN THE OFFICE** | | |
| TASF: | $ | 0.00 | **OF THE CITY REGISTER OF THE** | | |
| MTA: | $ | 0.00 | **CITY OF NEW YORK** | | |
| NYCTA: | $ | 0.00 | Recorded/Filed      01-14-2016 09:19 | | |
| Additional MRT: | $ | 0.00 | City Register File No.(CRFN): | | |
| TOTAL: | $ | 0.00 | **2016000013794** | | |
| Recording Fee: | $ | 57.00 | | | |
| Affidavit Fee: | $ | 0.00 | *City Register Official Signature* | | |

**THIS BARGAIN AND SALE DEED WITH COVENANTS** (this "**Deed**") is made as of the 3 1ˢᵗ day of December, 2015, by COMMUNITY HOMES HOUSING DEVELOPMENT FUND COMPANY, INC., a New York not for profit corporation, having an address at 111 Division Street, New York, New York 10002 ("**Grantor**"), in favor of 37 PARSONS REALTY LLC, a New York Limited Liability Company, having an address at 157-05 Cross Island Parkway, Whitestone, New York 11357 ("**Grantee**").

## W I T N E S S E T H :

That Grantor, for and in consideration of Ten ($10.00) Dollars and other good and valuable consideration paid by Grantee, the receipt and sufficiency of which are hereby acknowledged, does hereby sell, grant, bargain, alien, remise, convey and transfer unto Grantee and the heirs or successors and assigns of Grantee, all that certain plot, piece or parcel of land, with the building and improvements thereon erected, situate, lying and being in the Borough of Queens, the City, County and State of New York (the "**Premises**") bounded and described as follows:

**ALL** that certain plot, piece or parcel of land, situate, lying and being in the Borough of Queens County, City and State of New York, bounded and described as follows:

SEE SCHEDULE A

**SAID PREMISES** being known as and by the Street Number 37-05 Parsons Boulevard, Flushing, in the Borough of Queens, New York City.

**TOGETHER** with all right, title and interest, if any, of Grantor in and to any street and roads abutting the above described Premises to the center lines thereof;

**TOGETHER** with the appurtenances and all the estate and rights of Grantor in and to said Premises;

**TO HAVE AND TO HOLD** the same unto Grantee and the heirs or successors and assigns of Grantee, forever.

**AND** Grantor, in compliance with Section 13 of the Lien Law, covenants that Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvements at the Premises and will apply the same first to the payment of the cost of the improvements before using any part of the total of the same for any other purpose.

## *Chicago Title Insurance Company*

### SCHEDULE A
### DESCRIPTION OF PREMISES

**Title No.**  LL-10771-15-Q
**Policy No.**  7230632-94901498

ALL that certain plot, piece or parcel of land, situate, lying and being in the Third Ward of the Borough and County of Queens, City and State of New York, being more particularly bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of 37th Avenue (formerly known as Washington Street) with the easterly side of Parsons Boulevard (formerly known Parsons Avenue);

RUNNING THENCE easterly, along the southerly side of 37th Avenue, a distance of 178.33 feet;

THENCE southerly, parallel with Parsons Boulevard (formerly Parsons Avenue); a distance of 90.00 feet;

THENCE westerly, parallel with 37th Avenue, a distance of 178.33 feet to the easterly side of Parsons Boulevard (formerly Parsons Avenue); and

THENCE northerly, along the easterly side of Parsons Boulevard (formerly Parsons Avenue), a distance of 90.00 feet to the point or place of BEGINNING.

**SCHEDULE A**
**A.L.T.A 2006 OWNERS POLICY**



**IN WITNESS WHEREOF**, Grantor has duly executed this Deed as of the day and year first above written.

COMMUNITY HOMES HOUSING DEVELOPMENT FUND COMPANY, INC

By: _____

Name: YUEN YEE CHRISTOPHER KUI

Title: DIRECTOR

STATE OF NEW YORK        )
                        ) ss:
COUNTY OF NEW YORK       )

On this the 23 day of December, 2015, before me came Yue Yee Christopher Kui personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that they executed the same in their capacity, and that by their signature on the instrument, the individual or the entity on behalf of which the individual acted, executed the instrument.

_____
Notary Public

BEAU CORDOVA
Notary Public, State of New York
No. 01CO6128489
Qualified in New York County
Commission Expires June 13, 2017

**Bargain and Sale Deed**
With Covenant Against Grantor's Acts

SECTION:
BLOCK:      5015
LOT:        8
COUNTY:     Queens
ADDRESS:    37-05 Parsons Blvd
            Flushing NY 11354

COMMUNITY HOMES HOUSING
DEVELOPMENT FUND COMPANY, INC.

RETURN BY MAIL TO:

TO

37 PARSONS REALTY LLC

LOWENSTEIN SANDLER LLP
1251 AVENUE OF THE AMERICAS
NEW YORK NY 10020

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2016010600509001001S0C6D

| SUPPORTING DOCUMENT COVER PAGE | | PAGE 1 OF 1 |
|---|---|---|

**Document ID: 2016010600509001**    Document Date: 12-31-2015    Preparation Date: 01-06-2016
Document Type: DEED

**ASSOCIATED TAX FORM ID:**    2015121700281

**SUPPORTING DOCUMENTS SUBMITTED:**

| | Page Count |
|---|---|
| DEP CUSTOMER REGISTRATION FORM FOR WATER AND SEWER BILLING | 1 |
| MISCELLANEOUS | 2 |
| RP - 5217 REAL PROPERTY TRANSFER REPORT | 2 |
| SMOKE DETECTOR AFFIDAVIT | 1 |

**REMARKS:**
MISCELLANEOUS - IRS EXEMPTION LETTER AND EXEMPTION ORGANIZATION CERTIFICATE



The City of New York
Department of Environmental Protection
Bureau of Customer Services
59-17 Junction Boulevard
Flushing, NY  11373-5108

## Customer Registration Form for Water and Sewer Billing

### Property and Owner Information:

(1)    Property receiving service: BOROUGH:  QUEENS          BLOCK: 5015       LOT:  8

(2)    Property Address: 37-05  PARSONS BOULEVARD, QUEENS, NY 11354

(3)    Owner's Name:        37 PARSONS REALTY LLC

       Additional Name:

### Affirmation:

 Your water & sewer bills will be sent to the property address shown above.

### Customer Billing Information:

**Please Note:**

A.  Water and sewer charges are the legal responsibility of the owner of a property receiving water and/or sewer service. The owner's responsibility to pay such charges is not affected by any lease, license or other arrangement, or any assignment of responsibility for payment of such charges. Water and sewer charges constitute a lien on the property until paid. In addition to legal action against the owner, a failure to pay such charges when due may result in foreclosure of the lien by the City of New York, the property being placed in a lien sale by the City or Service Termination.

B.  Original bills for water and/or sewer service will be mailed to the owner, **at the property address or to an alternate mailing address**. DEP will provide a duplicate copy of bills to one other party (such as a managing agent), however, any failure or delay by DEP in providing duplicate copies of bills shall in no way relieve the owner from his/her liability to pay all outstanding water and sewer charges. Contact DEP at (718) 595-7000 during business hours or visit www.nyc.gov/dep to provide us with the other party's information.

### Owner's Approval:

The undersigned certifies that he/she/it is the owner of the property receiving service referenced above; that he/she/it has read and understands Paragraphs A & B under the section captioned "Customer Billing Information"; and that the information supplied by the undersigned on this form is true and complete to the best of his/her/its knowledge.

Print Name of Owner:

Signature: _____  12/23/15 Date (mm/dd/yyyy)

Name and Title of Person Signing for Owner, if applicable:

37 Parsons Realty LLC

Jian Yang Zheng, member

BCS-7CRF-ACRIS  REV. 8/08

2

2015121700281101



**The City of New York**
**Department of Environmental Protection**
**Bureau of Customer Services**
**59-17 Junction Boulevard**
**Flushing, NY   11373-5108**

## Customer Registration Form for Water and Sewer Billing

### Property and Owner Information:

(1)   **Property receiving service:** BOROUGH: **QUEENS**          BLOCK: **5015**          LOT: **8**

(2)   **Property  Address:** **37-05  PARSONS BOULEVARD, QUEENS, NY 11354**

(3)   **Owner's Name:**       **37 PARSONS REALTY LLC**

       **Additional Name:**

### Affirmation:

☑   Your water & sewer bills will be sent to the property address shown above.

### Customer Billing Information:

**Please Note:**

A.   Water and sewer charges are the legal responsibility of the owner of a property receiving water and/or sewer service. The owner's responsibility to pay such charges is not affected by any lease, license or other arrangement, or any assignment of responsibility for payment of such charges. Water and sewer charges constitute a lien on the property until paid. In addition to legal action against the owner, a failure to pay such charges when due may result in foreclosure of the lien by the City of New York, the property being placed in a lien sale by the City or Service Termination.

B.   Original bills for water and/or sewer service will be mailed to the owner, **at the property address or to an alternate mailing address.** DEP will provide a duplicate copy of bills to one other party (such as a managing agent), however, any failure or delay by DEP in providing duplicate copies of bills shall in no way  relieve the owner from his/her liability to pay all outstanding water and sewer charges. Contact DEP at (718) 595-7000 during business hours or visit www.nyc.gov/dep to provide us with the other party's information.

### Owner's Approval:

The undersigned certifies that he/she/it is the owner of the property receiving service referenced above; that he/she/it has read and understands Paragraphs A & B under the section captioned "Customer Billing Information"; and that the information supplied by the undersigned on this form is true and complete to the best of his/her/its knowledge.

Print Name of Owner:

Signature: _____Date (mm/dd/yyyy)

Name and Title of Person Signing for Owner, if applicable:

BCS-7CRF-ACRIS  REV. 8/08

2

201512170028110

INTERNAL REVENUE SERVICE
P. O. BOX 2508
CINCINNATI, OH  45201

DEPARTMENT OF THE TREASURY

Date: JUL 1 1 2005

Employer Identification Number:
13-4145926
DLN:
17053085784075
Contact Person:
  L. WAYNE BOTHE                ID# 31462
Contact Telephone Number:
  (877) 829-5500
Public Charity Status:
  509(a)(2)

COMMUNITY HOMES HOUSING
  DEVELOPMENT FUND COMPANY
111 DIVISION ST
NEW YORK, NY  10002

Dear Applicant:

Our letter dated July 2001, stated you would be exempt from Federal
income tax under section 501(c)(3) of the Internal Revenue Code, and you would
be treated as a public charity, rather than as a private foundation, during
an advance ruling period.

Based on the information you submitted, you are classified as a public charity
under the Code section listed in the heading of this letter.  Since your
exempt status was not under consideration, you continue to be classified as
an organization exempt from Federal income tax under section 501(c)(3) of the
Code.

Publication 557, Tax-Exempt Status for Your Organization, provides detailed
information about your rights and responsibilities as an exempt organization.
You may request a copy by calling the toll-free number for forms,
(800) 829-3676.  Information is also available on our Internet Web Site at
www.irs.gov.

If you have general questions about exempt organizations, please call our
toll-free number shown in the heading between 8:30 a.m. - 5:30 p.m. Eastern
time.

Please keep this letter in your permanent records.

Sincerely yours,

Lois G. Lerner
Director, Exempt Organizations
Rulings and Agreements

Letter 1050 (DO/CG)

New York State Department of Taxation and Finance

# Exempt Organization Certificate

## ST-119 (12/09)

The organization named below is exempt from payment of the New York State and local sales and use tax.

**Note:** This is your organization's proof of exemption and must be retained in your organization's permanent files.

The **number** shown on this certificate must be entered on any Form ST-119.1, *Exempt Organization Exempt Purchase Certificate*, presented to a vendor. If this certificate is lost or destroyed, you may obtain a replacement by notifying the Exempt Organizations Unit.

This certificate will remain in effect unless it is revoked or canceled. Misuse of the authority granted under this certificate will result in the revocation of exempt status and subject the organization to substantial civil and criminal penalties.

| Certificate number |
| --- |
| EX  226031 |
| Date issued |
| October 16, 2001 |

COMMUNITY HOMIS HOUSING DEVELOPMENT FUND COMPANY INC
111 DIVISION ST
NEW YORK, NY 10002

This certificate may not be altered, changed, lent, or transferred to another organization or person.

**FOR CITY USE ONLY**

C1. County Code [          ]   C2. Date Deed Recorded [    ] / [    ] / [    ]   Month / Day / Year

C3. Book [          ]   C4. Page [          ]
OR
C5. CRFN [                    ]

**REAL PROPERTY TRANSFER REPORT**
STATE OF NEW YORK
STATE BOARD OF REAL PROPERTY SERVICES

**RP - 5217NYC**

## PROPERTY INFORMATION

**1. Property Location**   37-05 — STREET NUMBER   PARSONS BOULEVARD — STREET NAME   QUEENS — BOROUGH   11354 — ZIP CODE

**2. Buyer Name**   37 PARSONS REALTY LLC
LAST NAME / COMPANY   FIRST NAME
LAST NAME / COMPANY   FIRST NAME

**3. Tax Billing Address**   Indicate where future Tax Bills are to be sent if other than buyer address (at bottom of form)
LAST NAME / COMPANY   FIRST NAME
STREET NUMBER AND STREET NAME   CITY OR TOWN   STATE   ZIP CODE

**4. Indicate the number of Assessment Roll parcels transferred on the deed**   [ 1 ]  # of Parcels  OR  [ ] Part of a Parcel

4A. Planning Board Approval - N/A for NYC
4B. Agricultural District Notice - N/A for NYC

**5. Deed Property Size**   [          ] FRONT FEET  X  [          ] DEPTH  OR  [          ] ACRES

Check the boxes below as they apply:
6. Ownership Type is Condominium  [ ]
7. New Construction on Vacant Land  [ ]

**8. Seller Name**   COMMUNITY HOMES HOUSING DEVELOPMENT FUND COR
LAST NAME / COMPANY   FIRST NAME
LAST NAME / COMPANY   FIRST NAME

**9. Check the box below which most accurately describes the use of the property at the time of sale:**

A [ ] One Family Residential   C [ ] Residential Vacant Land   E [ ] Commercial   G [ ] Entertainment / Amusement   I [ ] Industrial
B [ ] 2 or 3 Family Residential   D [ ] Non-Residential Vacant Land   F [✓] Apartment   H [ ] Community Service   [ ] Public Service

## SALE INFORMATION

**10. Sale Contract Date**   8 / 27 / 2015   Month / Day / Year

**11. Date of Sale / Transfer**   12 / 3̶1̶ 3 i / 2015   Month / Day / Year

**12. Full Sale Price** $   9 7, 0 0 0, 0 0 0

( Full Sale Price is the total amount paid for the property including personal property. This payment may be in the form of cash, other property or goods, or the assumption of mortgages or other obligations.)  *Please round to the nearest whole dollar amount.*

**13. Indicate the value of personal property included in the sale**   [          ]

**14. Check one or more of these conditions as applicable to transfer:**

A [ ] Sale Between Relatives or Former Relatives
B [ ] Sale Between Related Companies or Partners in Business
C [ ] One of the Buyers is also a Seller
D [ ] Buyer or Seller is Government Agency or Lending Institution
E [ ] Deed Type not Warranty or Bargain and Sale (Specify Below)
F [ ] Sale of Fractional or Less than Fee Interest ( Specify Below )
G [ ] Significant Change in Property Between Taxable Status and Sale Dates
H [ ] Sale of Business is Included in Sale Price
I [ ] Other Unusual Factors Affecting Sale Price ( Specify Below )
J [✓] None

## ASSESSMENT INFORMATION - Data should reflect the latest Final Assessment Roll and Tax Bill

**15. Building Class**   [ C 1 ]   **16. Total Assessed Value (of all parcels in transfer)**   9 1 8 0, 0 0 0

**17. Borough, Block and Lot / Roll Identifier(s)  ( If more than three, attach sheet with additional Identifier(s) )**

QUEENS 5015 8

| CERTIFICATION | I certify that all of the items of information entered on this form are true and correct (to the best of my knowledge and belief) and understand that the making of any willful false statement of material fact herein will subject me to the provisions of the penal law relative to the making and filing of false instruments. |
|---|---|

| BUYER | | DATE | BUYER'S ATTORNEY | |
|---|---|---|---|---|
| BUYER SIGNATURE | | 12/23/15 | LAST NAME | FIRST NAME |

157-05 CROSS ISLAND PARKWAY

37 Parsons Realty LLC, by: Jian Yang Huang,
STREET NUMBER    (STREET NAME (AFTER SALE)        member

| | AREA CODE | TELEPHONE NUMBER |

WHITESTONE | NY | 11357 | SELLER | 12/23/15
CITY OR TOWN | STATE | ZIP CODE | SELLER SIGNATURE | DATE

Community Homes Housing
Development Fund Company, Inc.
by: Yuen Yee Christopher Kui,
Director

**FOR CITY USE ONLY**

C1. County Code [        ]   C2. Date Deed Recorded [    /    /    ] Month Day Year

C3. Book [        ] OR   C4. Page [        ]
C5. CRFN [                    ]

**REAL PROPERTY TRANSFER REPORT**
STATE OF NEW YORK
STATE BOARD OF REAL PROPERTY SERVICES
# RP - 5217NYC

**PROPERTY INFORMATION**

1. Property Location: 37-05 [STREET NUMBER]  PARSONS BOULEVARD [STREET NAME]  QUEENS [BOROUGH]  11354 [ZIP CODE]

2. Buyer Name: 37 PARSONS REALTY LLC
   LAST NAME / COMPANY   FIRST NAME
   LAST NAME / COMPANY   FIRST NAME

3. Tax Billing Address: Indicate where future Tax Bills are to be sent if other than buyer address (at bottom of form)
   LAST NAME / COMPANY   FIRST NAME
   STREET NUMBER AND STREET NAME   CITY OR TOWN   STATE   ZIP CODE

4. Indicate the number of Assessment Roll parcels transferred on the deed  1  # of Parcels OR [ ] Part of a Parcel

4A. Planning Board Approval - N/A for NYC
4B. Agricultural District Notice - N/A for NYC

5. Deed Property Size: [FRONT FEET] X [DEPTH] OR [ACRES]
   Check the boxes below as they apply:
   6. Ownership Type is Condominium [ ]
   7. New Construction on Vacant Land [ ]

8. Seller Name: COMMUNITY HOMES HOUSING DEVELOPMENT FUND CO[
   LAST NAME / COMPANY   FIRST NAME
   LAST NAME / COMPANY   FIRST NAME

9. Check the box below which most accurately describes the use of the property at the time of sale:

A [ ] One Family Residential
B [ ] 2 or 3 Family Residential
C [ ] Residential Vacant Land
D [ ] Non-Residential Vacant Land
E [ ] Commercial
F [✓] Apartment
G [ ] Entertainment / Amusement
     Community Service
I [ ] Industrial
J [ ] Public Service

**SALE INFORMATION**

10. Sale Contract Date  8 / 27 / 2015  Month Day Year

11. Date of Sale / Transfer  12 / 31 / 2015  Month Day Year

12. Full Sale Price $  9,700,000.00
( Full Sale Price is the total amount paid for the property including personal property. This payment may be in the form of cash, other property or goods, or the assumption of mortgages or other obligations.)  Please round to the nearest whole dollar amount.

13. Indicate the value of personal property included in the sale

14. Check one or more of these conditions as applicable to transfer:
A [ ] Sale Between Relatives or Former Relatives
B [ ] Sale Between Related Companies or Partners in Business
C [ ] One of the Buyers is also a Seller
D [ ] Buyer or Seller is Government Agency or Lending Institution
E [ ] Deed type not Warranty or Bargain and Sale (Specify Below )
F [ ] Sale of Fractional or Less than Fee Interest (Specify Below )
G [ ] Significant Change in Property Between Taxable Status and Sale Dates
H [ ] Sale of Business is Included in Sale Price
I [ ] Other Unusual Factors Affecting Sale Price (Specify Below )
J [✓] None

**ASSESSMENT INFORMATION - Data should reflect the latest Final Assessment Roll and Tax Bill**

15. Building Class  C, 1   16. Total Assessed Value (of all parcels in transfer)  9,180,000

17. Borough, Block and Lot / Roll Identifier(s) ( If more than three, attach sheet with additional identifier(s) )
   QUEENS 5015 8

2015121700028120103



| CERTIFICATION | I certify that all of the items of information entered on this form are true and correct (to the best of my knowledge and belief) and understand that the making of any willful false statement of material fact herein will subject me to the provisions of the penal law relative to the making and filing of false instruments. |

| BUYER | BUYER'S ATTORNEY |
|---|---|
| BUYER SIGNATURE | DATE | LAST NAME | FIRST NAME |

157-05 CROSS ISLAND PARKWAY

| STREET NUMBER | STREET NAME (AFTER SALE) | AREA CODE | TELEPHONE NUMBER |

WHITESTONE                    NY        11357                    SELLER

| CITY OR TOWN | STATE | ZIP CODE | SELLER SIGNATURE | DATE |

201512170028120l

Affidavit of Compliance with Smoke Detector Requirement for One and-Two Family Dwellings

# AFFIDAVIT OF COMPLIANCE
# WITH SMOKE DETECTOR REQUIREMENT
# FOR ONE- AND TWO-FAMILY DWELLINGS

State of New York )
) SS.:
County of *New York* )

The undersigned, being duly sworn, depose and say under penalty of perjury that they are the grantor and grantee of the real property or of the cooperative shares in a cooperative corporation owning real property located at

| 37-05 PARSONS BOULEVARD | | | | |
|---|---|---|---|---|
| Street Address | | | , | Unit/Apt. |
| QUEENS | New York, | 5015 | 8 | (the "Premises"); |
| Borough | | Block | Lot | |

That the Premises is a one or two family dwelling, or a cooperative apartment or condominium unit in a one- or two-family dwelling, and that installed in the Premises is an approved and operational smoke detecting device in compliance with the provisions of Article 6 of Subchapter 17 of Chapter 1 of Title 27 of the Administrative Code of the City of New York concerning smoke detecting devices;

That they make affidavit in compliance with New York City Administrative Code Section 11-2105 (g). (The signatures of at least one grantor and one grantee are required, and must be notarized).

Community Homes Housing
Development Fund Company, Inc.
_____
Name of Grantor (Type or Print)

_____
Signature of Grantor

by: Yuen Yee Christopher Kni, Director

Sworn to before me
this ____ date of December 20 15

57 Parsons Realty LLC
_____
Name of Grantee (Type or Print)

_____
Signature of Grantee

by: Jian Yang Zhang, member

Sworn to before me
this ____ date of December 20 15

CAROLYN CAMACHO
Notary Public, State of New York
No. 01CA6148806
Qualified in Richmond County
Commission Expires Dec. 20, 2018

CAROLYN CAMACHO
Notary Public, State of New York
No. 01CA6148806
Qualified in Richmond County
Commission Expires Dec. 20, 2018

These statements are made with the knowledge that a willfully false representation is unlawful and is punishable as a crime of perjury under Article 210 of the Penal Law.

**NEW YORK CITY REAL PROPERTY TRANSFER TAX RETURNS FILED ON OR AFTER FEBRUARY 6th, 1990, WITH RESPECT TO THE CONVEYANCE OF A ONE- OR TWO-FAMILY DWELLING, OR A COOPERATIVE APARTMENT OR A CONDOMINIUM UNIT IN A ONE- OR TWO-FAMILY DWELLING, WILL NOT BE ACCEPTED FOR FILING UNLESS ACCOMPANIED BY THIS AFFIDAVIT.**

1

2015121700281101

# AFFIDAVIT OF COMPLIANCE
## WITH SMOKE DETECTOR REQUIREMENT
### FOR ONE- AND TWO-FAMILY DWELLINGS

State of New York        )
                         ) SS.:
County of                )

The undersigned, being duly sworn, depose and say under penalty of perjury that they are the grantor and grantee of the real property or of the cooperative shares in a cooperative corporation owning real property located at

| 37-05 PARSONS BOULEVARD | | , | | , |
|---|---|---|---|---|
| Street Address | | | | Unit/Apt. |

| QUEENS | New York, | 5015 | 8 | (the "Premises"); |
|---|---|---|---|---|
| Borough | | Block | Lot | |

That the Premises is a one or two family dwelling, or a cooperative apartment or condominium unit in a one- or two-family dwelling, and that installed in the Premises is an approved and operational smoke detecting device in compliance with the provisions of Article 6 of Subchapter 17 of Chapter 1 of Title 27 of the Administrative Code of the City of New York concerning smoke detecting devices;

That they make affidavit in compliance with New York City Administrative Code Section 11-2105 (g). (The signatures of at least one grantor and one grantee are required, and must be notarized).

| Name of Grantor (Type or Print) | Name of Grantee (Type or Print) |
|---|---|
| Signature of Grantor | Signature of Grantee |

Sworn to before me                          Sworn to before me
this _____ date of _____ 20 _____    this _____ date of _____ 20 _____

These statements are made with the knowledge that a willfully false representation is unlawful and is punishable as a crime of perjury under Article 210 of the Penal Law.

**NEW YORK CITY REAL PROPERTY TRANSFER TAX RETURNS FILED ON OR AFTER FEBRUARY 6th, 1990, WITH RESPECT TO THE CONVEYANCE OF A ONE- OR TWO-FAMILY DWELLING, OR A COOPERATIVE APARTMENT OR A CONDOMINIUM UNIT IN A ONE- OR TWO-FAMILY DWELLING, WILL NOT BE ACCEPTED FOR FILING UNLESS ACCOMPANIED BY THIS AFFIDAVIT.**

**1**

2015121700281101

EXHIBIT I

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

OF

## 37 PARSONS REALTY LLC

A Member-Managed New York Limited Liability Company

30301/5
12/09/2015 40348852.1

**THIS LIMITED LIABILITY COMPANY OPERATING AGREEMENT** (this "Agreement") of 37 PARSONS REALTY LLC, a New York limited liability company (the "Company"), is made as of December___, 2015, by and among Yan S. Fok, Man Chung Wong, Ming Yi Cheung, Henry Yau and Jian Yang Zhang (each a "Member," and collectively, "Members") and such other persons or entities who become Members as provided in this Agreement.

## RECITALS

A.      The parties formed the Company by filing with the New York Secretary of State Articles of Organization on September 24, 2015 pursuant to the New York Limited Liability Company Law as amended; and

B.      The parties desire to and hereby set forth the terms and conditions pursuant to which the Company shall operate from the date hereof by amending and modifying any prior operating agreement entered into by and between the parties prior to this date, if any; and

C.      By the execution hereof, each Member represents that he is familiar with the business operations of the Company which is primarily engaged in owning, maintaining, managing, developing, and leasing the property located at 37-05 Parsons Boulevard, Flushing, Queens, New York (Block 5015; Lot 8) (the "Property"); and

D.      As of the date hereof, the Members beneficially own the Member Interests of the Company set forth in the Member Schedule ("Member Schedule") attached hereto; and

E.      The parties hereto deem it in their best interests and in the best interests of the Company to provide consistent and uniform management for the Company and desire to enter into this Agreement in order to effectuate that purpose and to set forth their respective rights and obligations in connection with their investment in the Company; and

F.      The parties hereto also desire to restrict the sale, assignment, transfer, encumbrance or other disposition of the Member Interest of the Company and to provide for certain rights and obligations in respect thereto as hereinafter provided; and

G.      By execution hereof, each Member represents that he has sufficient right and authority to execute this Agreement and are not acting on behalf of any undisclosed or partially disclosed principal; and

## AGREEMENTS

**NOW, THEREFORE,** in consideration of the Recitals and the mutual covenants hereinafter set forth, the parties hereto do hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

As used herein the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

1.1     "Law" shall mean the New York Limited Liability Company Law, as amended from time to time and any successor statute.

1.2     "Affiliate" shall mean, with respect to a specified Person, (i) any Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person and (ii) any Person that is an officer, director, trustee, member or general partner of, or serves in a similar capacity with respect to, the specified Person, or of which the specified Person is an officer, director, trustee, member or general partner, or with respect to which the specified Person serves in a similar capacity. For purposes of this definition the term "control" when used with respect to a Person means (a) the beneficial ownership (as defined in Rule 13d-3 promulgated under the Securities and Exchange Law of 1934, as amended) of 10 percent or more of the voting interests in such Person, or (b) the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise,

1.3     "Agreement" shall mean this Limited Liability Company Operating Agreement as originally executed, and as amended, modified, supplemented or restated from time to time.

1.4     "Articles" shall mean the Articles of Organization of the Company filed with the New York Secretary of State as originally executed, and as amended, modified, supplemented or restated from time to time.

1.5     "Assignee" shall mean any Person that receives an Assignment of a Member Interest.

1.6     "Assignment" or "Assign" shall mean, with respect to the Member Interest of any Member, the Assignment by a Member to any Person of all or any part of such Member's Member Interest. Except as otherwise provided in this Agreement, an Assignment shall not constitute the Assignee as a Substitute Member.

1.7     "Bankruptcy Code" shall mean Title 11 of the United States Code, as now in effect or as hereafter amended.

1.8     "Capital Account" shall have the meaning given such term in Section 5.2.1 hereof.

1.9     "Capital Contribution" shall mean, with respect to any Member, such Member's Initial Capital Contribution and any other capital contributions which may be made by such Member.

1.10    "Capital Transactions" shall mean any sale of any capital assets of the Company or any liquidation or recapitalization of the Company.

1.11    "Cash Flow" with respect to any Company fiscal period shall mean all cash receipts of the Company during such fiscal period (other than contributions to Company capital or proceeds of any Capital Transactions) less (i) all Company cash disbursements during such fiscal period as the Members shall determine are necessary for the conduct of the Company's business, and (ii) such other reserves established by the Members during such fiscal period for anticipated Company expenses or Company debt repayments. Cash Flow shall also include any other Company funds, including, without limitation, any amounts previously set aside as reserves by the Members which are no longer deemed by the Members necessary for the conduct of the Company's business.

1.12    "Code" shall mean the Internal Revenue Code of 1986, as amended, or corresponding provisions of future laws.

1.13    "Company" shall mean the limited liability company formed pursuant to the Articles.

1.14    "Non-Contributing Member" shall have the meaning given such term in Section 3.3 hereof.

1.15    "Delegate" shall have the meaning given such term in Section 9.1 hereof.

1.16    "Dissolution" shall have the meaning given such term in Section 8.2.1  hereof.

1.17    "Federal Law" shall have the meaning given such term in the legend at the beginning hereof.

1.18    "Fiscal Year" shall have the meaning given such term in Section 5.4 hereof.

1.19    "Income" shall have the meaning given such term in Section 4.9 hereof.

1.20    "Initial Capital Contribution" shall mean, with respect to any Member the cash and fair market value (as determined by the Members) of other property actually contributed to the capital of the Company by that Member to the date hereof pursuant to Section 3.1.

1.21    "Lending Member" shall have the meaning given such term in Section 3.7 hereof.

1.22    "Loss" shall have the meaning given such term in Section 4.10 hereof.

1.23    "Member" shall mean any Person owning a Member Interest in the Company, or any substitutes, replacements or permitted transferees hereunder for such Person, unless otherwise indicated.

1.24    "Member Interest" shall mean, when used with reference to any Person, the entire ownership interest of such Person in income, gains, losses, deductions, tax credits, distributions and Company assets, the Person's right to vote or participate in the management of the Company,

-4-

and all other rights and obligations of such Person under the terms and provisions of this Agreement and the Law.

1.25    "Notice" shall mean a written communication given in accordance with the provisions of Section 10.4 hereof.

1.26    "Percentage Interest" shall mean the percentage interest of a Member as set forth in Schedule A, as adjusted from time to time to reflect the admission or Withdrawal of Members or any issuances, repurchases or redemptions of Member Interests, in whole or in part, it being agreed that the aggregate of the Percentage Interests of all of the Members shall at all times be 100%.

1.27    "Permitted Transfer" shall have the meaning given such term in Section 7.2 hereof.

1.28    "Person" shall mean any individual, partnership, corporation, limited liability company, trust or other entity, or any government or political subdivision, or any agency, department or instrumentality thereof.

1.29    "Proceeding" shall have the meaning given such term in Section 9.1 hereof.

1.30    "Property" means all the improvements located on the Land commonly known as 37-05 Parsons Boulevard, Flushing, Queens, New York (Block 5015; Lot 8) all real, personal and mixed properties, cash, assets, interest and rights of any type owned by the Company. All assets acquired with Company funds or in exchange for Property shall be deemed Property for purposes of this Agreement.

1.31    "Regulations" shall mean the Treasury Regulations promulgated under the Code, as such Treasury Regulations shall be in effect from time to time.

1.32    "Required Percentage" shall have the meaning given such term in Section 6.1.4.3 hereof.

1.33    "State" shall mean the State of New York.

1.34    "Substitute Member" shall mean an Assignee of a Member Interest who is admitted to the Company as a Member pursuant to Section 7.1 hereof.

1.35    "Target Final Balances" shall have the meaning given such term in Section 4.9 hereof.

1.36    "Tax Matters Member" shall have the meaning given such term in Section 6.2.1 hereof.

1.37    "Term" shall have the meaning given such term in Section 2.6 hereof.

1.38    "Transfer" shall mean any sale, exchange, transfer, gift, encumbrance, Assignment, pledge, mortgage, hypothecation or other disposition, whether voluntary or involuntary.

1.39    "Undertaking" shall have the meaning given such term in <u>Section 9.2</u> hereof.

1.40    "Voluntary Loans" shall have the meaning given such term in <u>Section 3.7</u> hereof.

## ARTICLE 2
## FORMATION, PURPOSES AND DURATION

2.1    <u>Articles of Organization</u>. To the extent the Articles and this Agreement are inconsistent, the Agreement shall supersede.

2.2    <u>Formation</u>. The Company has been formed as a limited liability company pursuant to the Law to carry on the Company's business and purposes set forth herein.

2.3    <u>Name</u>. The name of the Company is and shall be 37 PARSONS REALTY LLC.

2.4    <u>Purpose: Powers</u>. The Company is organized for the purpose or purposes set forth in the Articles, as amended, modified, supplemented or restated from time to time. The Company shall possess and may exercise all the powers and privileges granted by the State, by any other law or by this Agreement, together with any powers incident thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion, or attainment of the business, purposes or activities of the Company.

2.5    <u>Place of Business</u>. The principal office and place of business of the Company shall be located at _____ or at such other place as the Members may from time to time designate.

2.6    <u>Term</u>. The term of the Company commenced upon the filing of the Articles with the New York Secretary of State, and shall continue thereafter in perpetuity (the "Term"), unless the Company is earlier dissolved, wound up and terminated as provided in this Agreement.

2.7    <u>Registered Agent and Office</u>. The registered agent in the State for service of process upon the Company is, and the Company's registered office in the State shall be, as set forth in the Articles. Members may remove the Company's registered agent and appoint a replacement therefor, may change the Company's registered office, and may effect such amendments to the Articles as are required under the Law to effect and/or evidence the same.

2.8    <u>Certificates.</u> The Company may issue certificates which shall reflect the ownership interest of each Member. The Company shall initially be permitted to issue Ten Thousand (10,000) units of ownership. The number of ownership units issued may vary from time to time as determined by the Managing Member, provided however, that the Managing Member shall not be permitted to change the relative Membership Interest of any Member except as otherwise provided in this Agreement.

## ARTICLE 3
## CAPITAL CONTRIBUTIONS

3.1     Capital Contributions and Percentage Interests. To the date hereof, the Members have made the Capital Contributions as recorded in company records and have the Percentage interests set forth on Schedule A to this Agreement.

3.2     Additional Contributions. Each Member shall be required to make additional capital contributions as authorized, from time to time, by the Managing Member pursuant to this Agreement, provided that no Member shall be required to make additional capital contributions other than in an amount which bears the same relation to the additional capital contributions required of all of the Members that the then Percentage Interest of such Member bears to the aggregate Percentage Interests of all of the other Members.

3.3     Failure to Make Additional Contributions.

3.3.1   In the event that any Member (a "Non-Contributing Member") fails to make any additional capital contributions required pursuant to Section 3.2 by the date determined by the Members, provided that such date is at least ten (10) days after such determination, for such additional capital contributions to be made, then, in addition to any other remedies available to the Company at law or in equity, each of the Members who did timely make their additional capital contributions shall have the right, but not the obligation, to make a loan to the Non-Contributing Member in an amount equal to (i) the full amount of the additional capital contribution not made by the Non-Contributing Member ("Additional Contribution Share") if only one Contributing Member is making such loan or (ii) in proportion to the Percentage Interests of all Contributing Members making such loan if more than one Contributing is making such loan or (iii) as otherwise mutually agreed by all Contributing Members making such loan. All such loans shall bear annual interest equal to Six (6%) percent and shall be due on demand and shall be secured, on a pari-passu basis, by a pledge of the Non-Contributing Member's Member Interest.

3.3.2   If a Non-Contributing Member cannot obtain a loan from a Contributing Member(s) as described above, then all Contributing Members, shall be notified of the shortfall amount (the "Shortfall Notice") and shall have the option to make the Additional Contribution Share not made by the Non-Contributing Member in which case the Percentage Interests of the Contributing Member and the Non-Contributing Member shall be adjusted as set forth in Section 3.4 below. In the event that more than one Contributing Member desires to make an Additional Capital Contribution on account of the Non-Contributing Member, each such Contributing Member shall be permitted to participate in proportion to their respective Percentage Interests and shall have ten (10) days from the date of delivery of the Shortfall Notice to contribute such Additional Capital Contribution. In the event of disagreement as to the computation of the valuation of the Percentage Interest, the Company's certified public account shall render a final decision.

3.4     Percentage Interest Adjustment. Upon the making of an Additional Capital Contribution pursuant to Section 3.3(b) or if only certain Members contribute the Additional

Contribution Share and contributions pursuant to a Shortfall Notice are not made under Section 3.3 above, the Percentage Interest of the Noncontributing Member and the Contributing Member(s) shall be adjusted as follows: (1) the Noncontributing Member's Percentage Interest shall be decreased (but not below zero) by the number of percentage points equal to the quotient of (A) the amount of the Additional Contribution Share not made by the Non-Contributing Member giving rise to the application of this Section 3.4, multiplied by 100, divided by (B) the fair market value of such Member's Percentage Interest; and (2) the Percentage Interest of the Contributing Members shall be increased by an amount equal to the number of percentage points by which the Noncontributing Member's Percentage Interest was decreased pursuant to clause (1) above (and if there shall be more than one Contributing Member, the increase in percentage points shall be allocated pro rata, based on their relative Percentage Interests).

      3.5    No Interest on Capital. No interest shall be paid by the Company upon any Capital Contribution to the Company, or on or with respect to the Capital Accounts attributable to the Member Interests held by the Members, or to any Member on any undistributed or reinvested income or gains of the Company.

      3.6    Withdrawal of Capital. Except as expressly provided in this Agreement, no Member shall be entitled to withdraw any amount of its Capital Contribution nor any amount on account of its Capital Account, nor shall any Member receive any distribution from the Company, demand or receive any property from the Company other than cash, or receive any payments or distributions in respect of its Capital Contributions or Capital Account or in respect of any undistributed or reinvested income or profits of the Company.

      3.7    Voluntary Loans. Upon prior approval by the Members, any Member (the "Lending Member") may make loans to the Company ("Voluntary Loans"), which Voluntary Loans may be secured by assets of the Company at the discretion of the Members. Voluntary Loans shall not constitute an increase in the Lending Member's Capital Account or Percentage Interest. All Voluntary Loans shall bear annual interest at Six (6%) percent and shall be repaid pursuant to such loans, as applicable.

      3.8    Limitation on Liability and Obligation of Members. Except as provided in Section 3.2, no Member shall be required to make any additional contributions to the Company other than such Member's Capital Contribution to the date hereof, nor shall any Member be required to restore any deficit in such Member's Capital Account and any such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose. The Members shall have no liability or obligation for any debts, liabilities or obligations of the Company beyond the Member's respective Capital Contribution, except as may be required by law.

## ARTICLE 4

## DISTRIBUTIONS AND ALLOCATIONS

4.1     Distributions. Distribution of cash or property shall be made from the Company to the Members at such time and in such amounts as the Managing Member may determine; provided however, that for any calendar year, the Company shall distribute in cash no less that the "Minimum Distribution" (as defined in Section 4.3). All distributions to the Members shall be made as follows: Subject to the Law, (i) Cash Flow not reasonably needed over the foreseeable future to meet expected operating demands and capital expenditure requirements, and (ii) proceeds from Capital Transactions not reasonably needed over the foreseeable future to meet expected operating demands and capital expenditure requirements, in each case plus some margin for contingencies, all of which shall be determined in good faith by the Managing Member, must be declared distributable by the Managing Member within 45 days after the end of each Fiscal Year as follows:

4.1.1    First, to the Members, to the extent of accrued and unpaid interest on Voluntary Loans owing to each, such interest to be paid on the Voluntary Loans on a pari-passu basis to the Members.

4.1.2    Second, to the Members, to the extent of accrued and unpaid principal on Voluntary Loans owing to each, such principal to be paid on the Voluntary Loans on a pari-passu basis to the Members.

4.1.3    Third, to the Members in proportion to their respective Percentage Interests.

4.2     Minimum Tax Distribution. Notwithstanding any other provision in this Agreement, if any Member is allocated Income for any Fiscal Year, then such Member shall be entitled to receive a Minimum Distribution. The "Minimum Distribution" is the amount, if any, by which (i) the Income allocated to the Member for such Fiscal Year multiplied by the combined maximum individual Federal and New York state income tax rates (reduced to reflect the maximum individual Federal tax benefit from the deduction of state income taxes), exceeds (ii) the amount of cash previously distributed to such Member. The Minimum Distribution shall be payable before any other distributions under Section 4.1. Any Minimum Distribution received by a Member shall be credited against or reduce the amount of distributions that such Member would otherwise be entitled to receive under Section 4.1.3.

4.3     Allocation of income and Losses. Subject to any special allocations pursuant to Section 4.4 hereof, Income and Losses for any Company fiscal period shall be allocated to the Members in proportion to their respective Percentage Interests.

4.4     Special Allocations.

4.4.1    Minimum Gain Chargeback. Notwithstanding any other provision of this Agreement, if there is a net decrease in Company minimum gain (as defined in

Regulations Section I .704-2(d)(2)), items of income and gain shall be allocated to all Members in accordance with Regulations Section 1.704-2(f), and such allocations are intended to comply with the minimum gain chargeback requirements of Regulations Section 1.704-2 and shall be interpreted consistently therewith.

4.4.2    Section 704(c) Allocation. Solely for Federal, state, and local income tax purposes and not for book or Capital Account purposes, depreciation, amortization, gain, or loss with respect to property that is properly reflected on the Company's books at a value that differs from its adjusted basis for Federal income tax purposes shall be allocated in accordance with the principles and requirements of Code Section 704(c) and the Regulations promulgated thereunder, and in accordance with the requirements of the relevant provisions of the Regulations issued under Code Section 704(b). For Capital Account purposes, depreciation, amortization, gain, or loss with respect to property that is properly reflected on the Company's books at a value that differs from its adjusted basis for tax purposes shall be determined in accordance with the rules of Regulations Section 1.704-1(b)(2)(iv)(g).

4.4.3    Risk of Loss Allocation. Any item of Member nonrecourse deduction (as defined in Regulation Section 1.704-2(i)(2)) with respect to a Member nonrecourse debt (as defined in Regulation Section I.704-2(b)(4)) shall be allocated to the Member or Members who bear the economic risk of loss for such Member nonrecourse debt in accordance with Regulations Section 1.704-2(i)(1).

4.4.4    Allocation of Excess Nonrecourse Liabilities. For the purpose of determining each Member's share of Company nonrecourse liabilities pursuant to Regulations Section I.752-3(a)(3), and solely for such purpose, each Member's interest in Company profits is hereby specified to be such Member's Percentage Interest.

4.4.5    Unexpected Allocations and Distributions. No allocation may be made to a Member to the extent such allocation causes or increases a deficit balance in such Member's Adjusted Capital Account. Notwithstanding any other provision of this Agreement except Sections 4.4.1 and 4.4.3 hereof, in the event that a Member unexpectedly receives an adjustment, allocation or distribution described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6) which results in such Member having a negative Adjusted Capital Account balance (as determined above), then such Member shall be allocated items of income and gain in an amount and manner sufficient to eliminate, to the extent required by the Regulations, such negative balance in such Member's Adjusted Capital Account as quickly as possible. This provision is intended to satisfy the "qualified income offset" requirements of the Regulations.

4.5    Capital Accounts of Transferred Member Interest. Upon the Transfer of all or any part of a Member Interest as permitted by this Agreement, the Capital Account (or portion

thereof) of the transferor that is attributable to the transferred interest (or portion thereof) shall carry over to the transferee, as prescribed by Regulations Section 1 .704- 1 (b)(2)(iv)( 1 ).

4.6     Transfers During Taxable Year. All Income and Loss allocable pursuant to Section 4.3 hereof for a Fiscal Year with respect to any Member Interest which may have been transferred during such year shall be allocable between the transferor and transferee based upon the number of days that each was recognized by the Company as the owner of such Member Interest, without regard to the results of Company operations during the particular days of such Fiscal Year and without regard to which cash distributions were made to the transferor or transferee.

4.7     Time of Allocation. The allocations set forth above shall be made as of the end of each Fiscal Year.

4.8     Right to Use Alternative Method of Calculations. Notwithstanding anything else in this Section 4 (other than Section 4.9), the Company shall have the right to use a different method of allocating Income and Loss if it is advised by the Company accountant or tax counsel that the method of allocation provided herein violates the Code or Regulations.

4.9     Target Capital Accounts. After all allocations for a taxable year are made, Capital Accounts shall be adjusted by the Company to the extent necessary to comply with applicable laws, regulations and administrative pronouncements. The tax allocation provisions of this Agreement are intended to produce final Capital Account balances that are at levels ("Target Final Balances") which would permit liquidating distributions made in accordance with such Final Capital Account balances to be equal to the distributions that will occur under Section 4.1 hereof. To the extent that the tax allocation provisions of this Agreement would not produce the Target Final Balances, allocations of income, gain, loss and deduction (including items of gross income, gain, loss and deduction) shall be made prospectively as necessary to produce such Target Final balances.

4.10    Calculation of Income and Loss. For purposes of this Agreement, the Income and Loss for each Company fiscal year or other period shall be equal to the Company's taxable income, gain, loss and deductions, as the case may be, for such year or period, determined in accordance with Section 703(a) of the Code, with the following adjustments:

4.10.1 Any income of the Company described in Section 705(a)(l)(B) of the Code that is exempt from Federal income tax and not otherwise taken into account shall be added to such taxable income or subtracted from such taxable loss, as the case may be.

4.10.2 Any expenditures of the Company described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures pursuant to Section 1.704-

1(b)(2)(iv)(i) of the Regulations and not otherwise taken into account shall be subtracted from taxable income or added to such taxable loss, as the case may be.

4.10.3 In the event the value at which any Company asset is reflected in Capital Accounts is adjusted pursuant to Section 1.704-1(b)(2)(iv)(f) of the Regulations, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset.

4.10.4 Gain or loss resulting from any disposition of an asset with respect to which gain or loss is recognized for Federal income tax purposes shall be computed by reference to the value at which the asset disposed of is properly reflected in the Capital Accounts of the Members pursuant to Section I .704-1 (b)(2)(iv) of the Regulations.

4.10.5 In lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account depreciation, cost recovery or amortization computed in accordance with Section 1.704-I (b)(2)(iv)(g)(3) of the Regulations.

4.11    Distributions in Kind. If any assets of the Company are to be distributed in kind (other than a distribution which is a liquidating distribution to a redeemed Member), each Member receives such interest therein as a tenant-in-common with all other Members so entitled in the same proportions as they would have shared in a cash distribution equal to the value of such property at the time of such distribution. Any difference between the fair market value and the amount at which such assets are carried on the books of the Company is to be recorded as Income or Loss, as the case may be, and allocated to the Members immediately prior to such distribution as set forth in Section 4.3 or 4.4, as applicable, and allocated to each Member's Capital Account as required by Treasury Regulation § 1.704-l(b)(2)(iv)(e). Such assets are to be distributed on the basis of the fair market value thereof.

## ARTICLE 5
## ACCOUNTING AND RECORDS

5.1    Books and Records.

5.1.1    Maintenance. At all times during the Term, the Managing Member shall use his best efforts to cause accurate books and records of account to be maintained for the Company in which shall be entered all matters relating to the business and operations of the Company, including all Company income, gains, losses, deductions, credits, assets and liabilities. The Company's books and records shall be maintained at the Company's principal place of business. Each Member, its authorized representatives, and any supervisory or regulatory authority shall have the reasonable right to inspect, examine and copy the books, records, files and other documents of the Company during normal business hours at the Company's principal place of business. No accounts, including

reserve accounts, or funds of the Company shall be commingled with the funds or accounts of any other Person.

5.1.2   Recordkeeping. The Managing Member shall maintain at the Company's principal place of business each of the following:

5.1.2.1   A list of the full name and last known address of each past and present Member or manager in alphabetical order, identifying each Member, and setting forth the cash and a description and statement of the agreed value of other property or services contributed and to be contributed by each Member, and the date on which each became or ceased to be a Member or manager;

5.1.2.2   A copy of the Articles, as amended or restated;

5.1.2.3   Copies of the Company's Federal, state and local income tax returns and reports (or, if such were not prepared, information or statements provided to the Members for filing purposes) for the four (4) most recent years;

5.1.2.4   Copies of this Agreement, as amended or restated;

5.1.2.5   Copies of any financial statements of the Company for the three most recent Fiscal Years;

5.1.2.6   Copies of any other instruments or documents reflecting matters required to be in writing pursuant to this Agreement; and

5.1.2.7   Copies of other items as may be required under New York law.

5.1.3   Method of Accounting. Company books and financial records shall be kept in accordance with the cash method of accounting and as otherwise may be required by law and generally accepted accounting principles, and shall otherwise be adequate to provide each Member with all such financial information as such Member shall reasonably require to satisfy the tax and financial reporting obligations of such Member. Each Member shall be entitled to any additional information necessary for the Member to adjust its 'financial basis statements to Federal income tax basis statements (or vice versa) as the Member's individual needs may dictate.

5.2   Accounts and Accounting.

5.2.1   Capital Accounts. There shall be established a capital account for each Member (a "Capital Account"), which shall be determined and maintained throughout the full term of the Company in accordance with the capital accounting rules of Regulation Section 1.704-1(b) from time to time in effect. In no event shall any adjustment in the

Capital Contributions or Percentage Interest of any Member be made on account of any adjustment having been made to the Capital Account of such Member.

5.2.2 Account Balances. Except as otherwise provided in this Agreement, whenever it becomes necessary to ascertain the balance of any Member's Capital Account, such determination shall be made after giving effect to all allocations of Company income, gains, losses and deductions for the current year, and all distributions for such year, in each case in respect of transactions effected prior to the date as of which such determination is being made.

5.3 Basis Information. Each Member shall provide to the Company all information for the Company to determine the tax basis for Federal income tax purposes of its interest in any property contributed to the Company.

5.4 Fiscal Periods. The Fiscal Year of the Company ("Fiscal Year") shall be from January 1 to December 31, except that the first Fiscal Year shall begin on the date of the formation of the Company and the last Fiscal Year shall end on the date that the Company terminates.

5.5 Reports. The books of account for the Company shall be closed promptly at the end of each Fiscal Year.

## ARTICLE 6
## MANAGEMENT, OPERATIONS, RIGHTS AND DUTIES

6.1 Authority of Managing Member. The management and control of the Company and its business shall be vested exclusively in the Managing Member. The Managing Member shall have all of the rights, powers and authority generally conferred under the Law or other applicable law, on behalf and in the name of the Company, to carry out any and all of the objects and purposes of the Company and to perform all acts and enter into, perform, negotiate and execute any and all leases, documents, contracts and agreements on behalf of the Company that the Managing Member deems necessary or desirable. Without limiting the foregoing, the Managing Member shall have the power to make the following decisions at his sole and absolute discretion on behalf of the Company: (i) to hire, engage or retain professionals or consultants, including but not limited to, legal counsel, accountants, insurance consultants and building managers; (ii) to cause or permit the Company to enter into any business outside of the Company; (iii) to redeem or repurchase any Interests; (iv) to approve Transfers of Member Interests pursuant to Section 7.1 hereof; and (v) to break any tie votes among the Members, including those votes taken pursuant to Section 6.2 hereof. The Managing Member shall retain always the authority to make management decisions notwithstanding the delegation of duties by the Managing Member to employees or agents. No Member shall receive any compensation for serving as a Managing Member, although the Managing Member shall be entitled to receive

from the Company (i) reimbursement of reasonable expenses expended by such Managing Member in the performance of his or her duties hereunder; and (ii) reasonable compensation for services requiring an extraordinary investment of time and/or effort on behalf of the Company. The Members hereby unanimously designate Kevin Zhang as the Managing Member of the Company.

6.2     Powers Requiring Vote of Members. Notwithstanding anything to the contrary in this Article 6, a majority vote given in writing or at a meeting of the Members duly called and held, shall be required to authorize any of the following actions of the Company:

6.2.1   to merge or consolidate the Company with or into any another entity in which the Company is not the surviving entity, whether as part of a single transaction or series of transactions undertaken pursuant to a plan;

6.2.2   to sell, transfer or otherwise dispose of all or substantially all of the assets of the Company, or enter into any agreement or amendment thereto with respect to the foregoing, other than in the ordinary course of business of the Company; and

6.2.3   to voluntarily dissolve or terminate the Company or to file in the name, or on behalf, of the Company any petition for relief under the Bankruptcy Code or any other debtor relief laws of any jurisdiction.

6.3     Business Activities. None of the Members (including the Managing Member) shall be required to engage in the business of or manage the Company as such Member's sole and exclusive function and each Member may have other business interests and may engage in other any other activity, business, investment or profession in addition to those relating to the Company without breaching any fiduciary or other duty to the other Members. Each of the Members (including the Managing Member) shall use its commercially reasonable efforts in furtherance of the Company's business interests or activities as provided hereunder; provided, however that nothing in this Agreement shall prevent a Member or any affiliate of a Member from pursuing any business interests, whether or not the same is in conflict or competition with the business of the Company. Neither the Company nor any Member shall have any right pursuant to this Agreement to share or participate in such other business interests or activities or to the income or proceeds derived therefrom.

6.4     Resignation. A Member may not resign from the Company prior to the dissolution and winding up of the Company, except upon the assignment of his Interest including any redemption, repurchase or other acquisition by the Company or the other Members, as the case may be, in accordance with the provisions of this Agreement or upon a forfeiture of said Interest. A resigning Member shall not be entitled to receive any distribution and shall not otherwise be entitled to receive the fair value of his, her or its Interest except as otherwise expressly provided for in this Agreement.

6.5     Removal and Replacement of a Managing Manager. The Managing Member may be removed as the Manager of the Company by the unanimous consent of all other Members if the Managing Member dies or by the entry of a judgment by a court of competent jurisdiction to the effect that the said Managing Member who is an individual is incompetent to manage such Member's affairs, or the appointment of a guardian ad litem by a court of competent jurisdiction to manage such Member's affairs; or the physical or mental incapacity of such Managing Member who is an individual to perform his duties as a Managing Member which continues for four (4) months or an aggregate of 150 days in any 12 month period as determined the certification of a physician selected by mutual agreement between such Managing Member and all other Members. The other Members, at their sole discretion, shall elect whether to appoint a new replacement Managing Member, or if at that time other Manager(s) are serving the Company, not to appoint a replacement Manager.

6.6     Meetings of the Members: Action by the Members.

6.6.1     Meetings. Meetings of the Members may be called by the Managing Member; or alternatively, any one or more Members having, in the aggregate, no less than 50% of the Percentage Interests. All meetings shall be held at the principal office of the Company unless another location is approved by the Members.

6.6.2     Notice of Meetings. Notice of any meeting of the Members shall be given at least two (2) days previously thereto by written notice delivered personally or sent by mail, overnight courier service, or email to each Members at his, her or its address as shown by the records of the Company. If mailed, such notice shall be deemed to be delivered three business days after being deposited in the United States mail in a sealed envelope so addressed, with postage thereon prepaid. If notice be given by email or overnight courier service, such notice shall be deemed to be delivered the following business day. Any Member may waive notice of any meeting. The attendance of a Member, in person or by proxy, at any meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business because the meeting is not lawfully called or convened. The business to be transacted at, and the purpose of, any meeting of the Members must be specified in the notice of such meeting unless otherwise approved by all of the Members.

6.6.3     Quorum and Voting of Member. Each Member shall have a vote equal to its Percentage Interest. In the event that a Permitted Transfer of certain Percentage Interest is made to a trust or entity that Member controls, then for purposes of voting only, Member shall be deemed to have not transferred said Percentage Interest. Members having 66% of the Percentage Interests entitled to vote at such meeting shall constitute a quorum for the transaction of business by the Members. The affirmative vote of more than or equal to the Required Percentage of the Percentage Interests entitled to vote on

any matter present at a meeting at which a quorum is present shall be the approval or action of the Members. The "Required Percentage" shall mean 66% of the total Percentage Interests.

6.6.4 <u>Informal Action by Members.</u> Any action required to be taken at a meeting of the Members of the Company, or any other action which may be taken at a meeting of Members, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by Members having, in the aggregate, no less than the Required Percentage of the Percentage Interests; provided, however, that if any such action is taken with the written consent of less than all the Members, then the Company shall, within five days after the taking of such action, deliver a copy of such written consent to each Member who was not a party to such written consent.

6.6.5 <u>Dealings with Members and Affiliates.</u> Subject to any restrictions contained elsewhere in this Agreement, the Members may, for, in the name and on behalf of the Company, enter into agreements or contracts, including employment of any Member or Affiliate (in an independent capacity as distinguished from his or its capacity, if any, as a Member) to undertake and carry out the business of the Company as an employee, agent, officer or independent contractor; and the Members may obligate the Company to pay reasonable compensation for and on account of any such services.

6.7     Tax Matters Member.

6.7.1 <u>Description of Tax Matters Member.</u> _____, LLC is designated the "tax matters partner" ("Tax Matters Member") as provided in Section 623I(a)(7) of the Code and corresponding provisions of applicable state law. This designation is effective only for the purpose of activities performed pursuant to the Code, corresponding provisions of applicable state law and under this Agreement.

6.7.2 <u>Indemnification of Tax Matters Member.</u> The Company shall indemnify and reimburse the Tax Matters Member for all reasonable expenses, including legal and accounting fees, claims, liabilities, losses and damages incurred in connection with any administrative or judicial proceeding with respect to the tax liability of the Members. The payment of all such expenses shall be made before any distributions are made to the Members hereunder, and before any discretionary reserves are set aside by the Member. The taking of any action and the incurring of any expense by the Tax Matters Member in connection with any such proceeding, except to the extent required by law, is a matter in the sole discretion of the Tax Matters Member, and the provisions hereof limiting the liability of and providing indemnification for the Member shall be fully applicable to the Tax Matters Member in his capacity as such.

6.8     Exculpation of Members and Officers. No Member or officer shall be liable, responsible or accountable, whether directly or indirectly, in contract, tort or otherwise, to the Company or to any other Member or any Affiliate thereof for any losses, claims, damages, liabilities or expenses asserted against, suffered or incurred by any of them arising out of, relating to or in connection with any action taken or omitted by such Member or officer in good faith and in a manner reasonably believed by such Member or such officer to be in or not opposed to the best interests of the Company, including, without limitation, in connection with the management or conduct of the business of the Company or any other Person in which the Company has or had made an investment (debt or equity) or otherwise has or had an interest; provided, however, that such action or omission did not constitute gross misconduct or gross negligence, or a material and intentional breach of such Member's or officer's obligations under this Agreement. Nothing in this Section 6.8 shall qualify, negate, or mitigate any of the duties of a Member under the Law.

## ARTICLE 7
## TRANSFERABILITY

7.1     Transfer Restrictions. Subject to Section 7.2 herein, no Member shall Transfer, Assign, pledge or otherwise encumber his Member Interest in the Company (or any portion thereof, including any economic interest in the profits or losses of the Company or any other interests in the Company) without the consent of the Managing Member. If such consent is not first obtained, the proposed transferee or assignee of the Member Interest (or portion thereof) so transferred or assigned shall have no right to be, and shall not be, admitted as a Member and no right to participate in, and shall not participate in, the management of the business and affairs of the Company. For purposes of this Agreement, the Transfer of a Member Interest in the Company shall include the transfer or assignment of 50% or more of the voting or beneficial share or interest in a Member who is a corporation, partnership, limited liability company or other legal entity.

7.2     Permitted Transfers. Notwithstanding Section 7.1 herein, a Member may, without the consent of the Managers, transfer or assign his or her Member Interest (or any portion thereof) to a trust or limited liability company the sole beneficiary (or beneficiaries) of which is (or are) the Member and/or one or more immediate family members of such Member for estate planning purposes provided that such trust or limited liability company first agrees, in writing, to be bound by all of the provisions of this Agreement. The transferring or assigning Member shall promptly notify the Managing Member, in writing, of any such Permitted Transfer and provide such other information with respect to such Permitted Transfer as the Managing Member shall reasonably request.

7.3     Contravention Voids Transfer.

7.3.1   Any attempted Transfer in contravention of the provisions of this Article 7 shall be void and ineffectual and shall not bind or be recognized by the Company.

7.3.2   Notwithstanding anything herein contained to the contrary, the Company shall be entitled to treat the record holder of the Interest of a Member as the absolute owner thereof, and shall incur no liability by reason of distributions made in good faith to such record holder, unless and until there has been delivered to the Company the assignment or other instrument of transfer and such other evidence as may be reasonably required by the Company to establish to the satisfaction of the Company that an Interest has been assigned or transferred in accordance with this Agreement.

7.3.3   No assignment, transfer or other disposition of all or any part of the interest of any Member permitted under this Agreement shall be binding upon the Company unless and until a duly executed and acknowledged counterpart of such assignment or instrument of transfer, in form and substance satisfactory to the Company, has been delivered to the Company.

7.4   Transfer Costs. The Managing Member may require the transferor and transferee of a Member Interest to reimburse the Company for all reasonable expenses (including, reasonable attorneys' fees) with respect to any Assignment or other Transfer of such a Member Interest.

# ARTICLE 8
## DISSOLUTION, WINDING UP AND TERMINATION

8.1   Dissolution. The Company shall dissolve upon the occurrence of any of the following events:

8.1.1   Upon the unanimous approval of the Members;

8.1.2   At such time as when no Members exist; or

8.1.3   Upon the entry of a decree of judicial dissolution under the Law;

8.2   Winding Up and Termination.

8.2.1   Distribution Priority. Upon the dissolution of the Company as provided in Section 8.1 hereof ("Dissolution"), the Company assets shall be liquidated (except as permitted by Section 8.3 hereof) and the affairs of the Company shall be wound up and terminated by the Members. Upon completion of such liquidation and winding up, but not later than six months after the end of the Fiscal Year during which dissolution occurs, and after taking into account all Capital Account adjustments and allocations of income, gains, losses and deductions for the Company taxable year during which dissolution occurs, including, without limitation, the allocation of all income, gains, losses and deductions pursuant to Section 4 hereof that would arise if all Company assets to be distributed in kind were sold for their fair market values, the assets of the Company shall be liquidated and disposed of and distributed as follows:

8.2.2    First, to the payment of debts and liabilities of the Company and expenses of the liquidation and winding up;

8.2.3    Second, to the setting up of any reserves (to be held in a special interest-bearing account) which the Managing Member may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; provided, however, that at the expiration of such time as the Managing Member shall deem advisable (not to exceed two years from the event which caused Dissolution, except in the case of any litigation matter where the length of time such reserves are maintained shall be determined by the Managing Member), the balance of such reserves remaining after payment of such contingent liabilities shall be distributed in the manner set forth in Sections 8.2.4 below;

8.2.4    Third, to the Members up to the positive balances in their Capital Accounts (or pro-rata in accordance with such positive balances if there are insufficient assets to pay all of such positive balances); and

8.2.5    Fourth, to the Members in accordance with Member Interests of the Company.

8.2.6    Prior to such time as the Company shall be terminated as provided herein the Company's business and the affairs of the Members, as such, shall continue to be governed by this Agreement.

8.3    Liquidation of Assets. Notwithstanding the provisions of Section 8.2, if the Managing Member shall determine that an immediate sale of all or part of the Company assets would cause undue loss to the Members, then the Managing Member may defer liquidation of and withhold from distribution for a reasonable time any assets of the Company not required to satisfy the Company's debts and obligations, or may distribute the Company's assets to the Members in kind. The Managing Member may not so defer liquidation and distribution of Company assets, however, to the extent prohibited by the laws of any jurisdiction in which the Company is then formed or qualified.

8.4    Final Accounting. The Managing Member shall prepare a financial statement setting forth the assets and liabilities of the Company as of the date of dissolution and all income, gains, losses and deductions realized by the Company upon completion of the liquidation of Company assets. Upon compliance by the Managing Member with the foregoing distribution plan, the Managing Member shall take such steps as are required under the Law to cancel the Articles, upon the completion of which the Company shall terminate and the Members shall cease to be such.

8.5    Use of Company Name. Upon dissolution, winding up and termination of the Company and its business, no Member shall use the name of any other Member in the conduct of its separate business without the prior consent of such other Member, nor shall any Member use the Company name in the conduct of its separate business.

## ARTICLE 9
## INDEMNIFICATION

9.1    Indemnification of Members, Officers and Delegates. Each person who was or is made a party or is threatened to be made a party to or is involved in or called as a witness in any action, suit or proceeding, whether civil, criminal, administrative or investigative, and any appeal therefrom (hereinafter, collectively a "Proceeding"), by reason of the fact that he or she, or a person of whom he or she is the legal representative, is, was or had agreed to become a Member, an Officer or a Delegate (as defined herein), shall be indemnified and held harmless by the Company to the fullest extent permitted under Law, as the same now exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than the Law permitted the Company to provide prior to such amendment) against all expenses (including, but not limited to, reasonable attorneys' fees and expenses of litigation) and all liabilities and losses (including, but not limited to, judgments; fines; excise taxes or penalties and amounts paid or to be paid in settlement) incurred or suffered by such person in connection therewith; provided, that, except as provided in Section 9.3 hereof, the Company shall indemnify any such person seeking indemnity in connection with a Proceeding (or part thereof) initiated by such person only if such Proceeding (or part thereof) was authorized by the Members.

For purposes of Article 9, a "Delegate" is any person serving at the request of the Members as a managing member, director, officer, trustee, fiduciary, partner, employee or agent of an entity or enterprise other than the Company (including, but not limited to, service with respect to employee benefit plans).

9.2    Advances. Expenses, including reasonable attorneys' fees, incurred by a person referred to in Section 9.1 hereof in defending or otherwise being involved in a Proceeding shall be paid by the Company in advance of the final disposition of such Proceeding, including any appeal therefrom, upon receipt of an undertaking (the "Undertaking") by or on behalf of such person to repay such amount if it shall ultimately be determined that he or she is not entitled to be indemnified by the Company; provided, that in connection with a Proceeding (or part thereof) initiated by such person, except as provided in Section 9.3 hereof, the Company shall pay such expenses in advance of the final disposition only if such proceeding (or part thereof) was authorized by the Members. The Undertaking shall provide that if the person to whom the expenses were advanced has commenced Proceedings in a court of competent jurisdiction to secure a determination that he or she should be indemnified by the Company, such person shall not be obligated to repay the Company during the pendency of such Proceeding.

9.3     Suits. If a claim under Section 9.1 hereof or any agreement ("Other Agreement") providing indemnification to any Member, Officer or Delegate is not promptly paid in full by the Company after a written claim has been received by the Company or if expenses pursuant to Section 9.2 or an Other Agreement have not been promptly advanced after a written request for such advancement accompanied by the Undertaking has been received by the Company, the claimant may at any time thereafter bring suit against the Company to recover the unpaid amount of the claim or the advancement of expenses. If successful, in whole or in part, in such suit, such claimant shall also be entitled to be paid the reasonable expense thereof. It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any Proceeding in advance of its final disposition where the required Undertaking has been tendered to the Company) that the claimant has not met the standards of conduct which make it permissible under the Law for the Company to indemnify the claimant for the amount claimed, but the burden of proving such defense shall be on the Company. Neither the failure of the Company to have made a determination that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct required under the Law, nor an actual determination by the Company that the claimant had not met such applicable standard of conduct, shall be a defense to the action or create a presumption that such claimant had not met the applicable standard of conduct.

9.4     No Presumptions. For the purposes of this Section 9, the termination of any Proceeding, by judgment, order, settlement (whether with or without court approval) or conviction, or upon a plea of nolo contendere or its equivalent, shall not create a presumption that a claimant did not meet any particular standard of conduct or have any particular belief or that a court has determined that indemnification or contribution is not permitted by applicable law.

9.5     Indemnification of Other Officers, Employees and Agents. The Members shall have the authority to provide for such indemnification of such other officers, employees or agents of the Company as it shall deem appropriate.

9.6     Non-Exclusivity. The rights conferred on any person by this Section shall not be exclusive of any rights which such person may have or hereafter acquire under any statute, provision of the Certificate, agreement, or otherwise.

9.7     Insurance. The Company may, at the Managing Member's discretion, maintain insurance, at its expense, to protect itself and any Member, Officer, Delegate, officer, employee or agent, or person serving in any capacity with the Company or another limited liability company, corporation, partnership, joint venture, trust or other enterprise against any expenses, liabilities or losses, whether or not the Company would have the power to indemnify such person against such expenses, liabilities or losses under the Law.

9.8     Subrogation. In the event of any payment under this Section to a claimant, the Company shall be subrogated to the extent of any such payment to all of the rights of recovery of such claimant, who shall execute all papers required and shall do everything that may be necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

9.9     Contract Rights. The rights conferred by this Section shall be contract rights enforceable by each person who, at any time that this Section is in effect, serves or agrees to serve in any capacity which entitles that person to indemnification hereunder, and any repeal or other modification of this Section or any repeal or modification of the Law or any other applicable law shall not limit any rights of indemnification then existing or arising out of events, acts or omissions prior to such repeal or modification, including, without limitation, the right to indemnification for proceedings commenced after such repeal or modification to enforce this Section with regard to acts, omissions or events arising prior to such repeal or modification.

9.10     Continuing Effect. If this Section or any portion hereof shall be invalidated or held to be unenforceable, such invalidity or unenforceability shall not affect the other provisions hereof, and this Section shall be deemed to be modified to the minimum extent necessary to avoid such invalidity or unenforceability, and as so modified this Section and the remaining provisions hereof shall remain valid and enforceable in accordance with their terms to the fullest extent permitted by law.

## ARTICLE 10
## GENERAL PROVISIONS

10.1     Member Representations. Each Person becoming a Member, at the inception of the Company or at the execution hereof or at any time in the future, hereby represents that such Person: (i) is acquiring a Member Interest solely for such Person's own account with the intent of holding such Member Interest for investment and without a view towards the distribution thereof, (ii) has such knowledge and experience in business and financial matters as to be capable of evaluating the merits and risk of such investment, (iii) understands that such investment bears a high degree of risk and could result in a total loss of such Person's investment, (iv) has sufficient financial strength to hold the same as an investment and to bear the economic risks of such investment (including possible loss of such investment) for an indefinite period of time, (v) intends to hold such Member Interest indefinitely unless it is subsequently registered under the Federal Law and any applicable State Law, or unless an exemption from registration is available thereunder, (vi) understands that the Company has no obligation or intent to register such Member Interests, and (vii) has been given the opportunity to ask questions of, and receive answers from, representatives of the Company concerning the terms and conditions of such investment, and has received all information such Person has

requested from the Company and considers necessary or appropriate for deciding whether to invest.

10.2   Complete Agreement. This Agreement, together with its Schedule and Exhibit, constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and thereof, and supersedes all prior agreements, representations, warranties, statements, promises and understandings, whether oral or written, with respect to the subject matter hereof and thereof. No party hereto shall be bound by or charged with any oral or written agreements, representations, warranties, statements, promises or understandings with respect to the subject matter hereof not specifically set forth in this Agreement. The terms of this Agreement supersede any description of the Company appearing in any other document.

10.3   Amendments. Any term, covenant, agreement or condition contained in this Agreement may be amended, or compliance therewith may be waived (either generally or in particular instances and either retroactively or prospectively), with the approval of all the Members. This Agreement shall not be altered, amended or supplemented except by such approval of all the Members. Any waiver of any term, covenant, agreement or condition contained in this Agreement shall not be deemed a waiver of any other term, covenant, agreement or condition, and any waiver of any default in any such term, covenant, agreement or conditions shall not be deemed a waiver of any later default thereof or of any other term, covenant, agreement or condition. No delay on the part of any party in exercising any right or privilege hereunder shall operate as a waiver thereof.

10.4   Notices. All Notices to the Members under this Agreement shall be in writing and shall be (i) delivered by personal service, (ii) delivered by courier service, or (iii) telecopied to the Members at the addresses and fax numbers set forth herein. Any Notice given by telecopier, facsimile or similar means shall be confirmed by hard copy delivered as soon as possible. Rejection or other refusal to accept a Notice or the inability to deliver a Notice because of a changed address or fax number of which no Notice was given as provided herein shall be deemed to be receipt of the Notice sent. By giving to the other parties Notice thereof, the parties hereto and their respective permitted successors and Assigns shall have the right from time to time and at any time during the term of this Agreement to change their respective addressee or address for Notices, and each shall have the right to specify as its address for Notices any other address within the United States of America.

10.5   Severability. In the event that any provision of this Agreement shall be held to be invalid or unenforceable, the same shall not affect in any respect whatsoever the validity or enforceability of the remainder of this Agreement.

10.6   Survival of Rights. Except as provided herein to the contrary, this Agreement shall be binding upon and inure to the benefit of the parties signatory hereto, and their respective permitted successors and Assigns.

10.7    Governing Law. This Agreement shall be governed by and construed in accordance with the internal laws of the State, without regard to its conflict of law principles; provided that nothing contained herein shall be deemed to limit a party instituting legal proceedings hereunder to any single venue.

10.8    Terminology and Construction. All personal pronouns used in this Agreement, whether used in the masculine, feminine or neuter gender, shall include all other genders, and the singular shall include the plural and vice versa. Titles of Articles, Sections and Subsections are for convenience only, and neither limit nor amplify the provisions of this Agreement. All references herein to Articles, Sections, Subsections, clauses and schedules should be deemed references to such parts of this Agreement unless the context otherwise requires.

10.9    Counterparts; Facsimile. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which shall constitute one and the same agreement. This Agreement may be executed by telecopied signatures with the same effect as original signatures.

10.10   Further Assurances. Each party hereto agrees to do all acts and things, and to make, execute and deliver such written instruments, as shall from time to time be reasonably required to carry out the terms and provisions of this Agreement.

10.11   No Third-Party Rights. This Agreement shall not (directly, indirectly, contingently or otherwise) confer or be construed as conferring any rights or benefits on any Person that is not named a Member or a permitted transferee of a Member hereunder.

10.12   Confidentiality. Except as required in the normal conduct of a Member's business or by law, no Member, without the approval of the Members, during continuance of the Company or after its termination shall at any time during the term of this Agreement or thereafter divulge to any person not a Member of the Company, other than its attorneys, accountants, employees and professional advisers, any information concerning the business of the Company or the content of this Agreement or any other contract or agreement entered into by the Company. A Member may, however, disclose to third parties the existence of the Company and the names of the Members.

10.13   Legal Representation. The Parties have duly negotiated this documents and same is a result of collective drafting by all parties involved. Each Party has had an opportunity to review this Agreement with legal and for financial advisors of their choice. Managing Member was represented by Lowenstein Sandler, LLP and each other member was represented by Jay Lau & Associates, P.C. Accordingly, the preparation of this Agreement has been a joint effort of all Parties involved, each of whom have had an adequate opportunity to consult with counsel of their choice or elected to waive its right to be represented, and this Agreement shall be construed without regard to any presumption or other rule requiring construction against the party causing

this Agreement to be drafted. The Parties warrant that they understand and agree to the terms and conditions contained herein and have voluntarily entered into this Agreement. No inference of construction against any Party shall be raised as a defense to any dispute hereunder.

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the day and year first above written.

MEMBERS:

_____
Kevin Zhang, Member

_____
Yan S. Fok, Member

_____
Man Chung Wong, Member

_____
Ming Yi Cheung , Member

_____
Henry Yau, Member

## MEMBER SCHEDULE

| MEMBER | PERCENTAGE INTEREST | UNITS |
|---|---|---|
| KEVIN ZHANG | 1% | 100 |
| Yan S. Fok | 24 ¾ % | 2475 |
| Man Chung Wong | 24 ¾ % | 2475 |
| Henry Yau | 24 ¾ % | 2475 |
| Ming Yi Cheung | 24 ¾ % | 2475 |

EXHIBIT J

Case 1:19-cv-03875 Document 2-9 Filed 07/03/19 Page 2 of 62 PageID #: 239

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
----------------------------------------------------------------x
GREAT WALL REALTY CORP.,

                              Plaintiff,               **Index No.              /13**

          -against-                                    **VERIFIED
                                                        COMPLAINT**
ANTONIO WONG, JR., CHRIS LIN and
QUONTIC BANK,

                              Defendants.
----------------------------------------------------------------x

Plaintiff Great Wall Realty Corp., by its attorneys Law Offices of Christopher E.

Chang, for its complaint herein states as follows:

### NATURE OF THE ACTION

1. In this action, plaintiff Great Wall Realty Corp. ("Great Wall") seeks the recovery

of monies from defendants Antonio Wong, Jr. ("Junior") and Chris Lin ("Lin") and punitive

damages against Junior and Lin and equitable relief as to defendant Quontic Bank ("Quontic") based

on fraudulent criminal conduct engaged in by Junior and Lin in 2012 and 2013. In July 2012 and,

again, in January 2013, Junior and Lin obtained loans in the name of Great Wall, initially from

private lenders and then from Quontic, by falsely and fraudulently representing to the lenders that

they were the owners and officers of Great Wall. In fact, the true owners, officers and directors of

Great Wall are Agostinho Wong and his wife, Anna C. Wong. Agostinho Wong and Anna C. Wong

are Junior's grandparents. To secure repayment of these loans, Junior and/or his accomplice, Lin,

provided the lenders mortgages fraudulently executed in the name of Great Wall on Great Wall's

sole asset, a 26-unit residential apartment building located in Astoria, New York. Prior to these

loans, Great Wall's apartment building was free and clear of any liens and/or encumbrances. The amounts of the loans are substantial. The loan from the private lenders in July 2012 was in the principal amount of One Million One Hundred Thousand Dollars ($1,100,000). The loan from Quontic in January 2013 was in the principal amount of Two Million Five Hundred Thousand Dollars ($2,500,000). The proceeds of the loans were taken by Junior and Lin and have been used for their personal use and benefit. Great Wall's sole asset -- the apartment building -- remains saddled with a substantial mortgage.

### THE PARTIES

2. Great Wall is a corporation duly organized and existing under the laws of the State of New York, having its principal place of business located at 35-44 28th Street, Astoria, New York 11106.

3. Junior is a resident of the State of New York residing at 35-44 28th Street, Apt. 4C, Long Island City, New York 11106.

4. Upon information and belief, Lin is a resident of the State of New York residing at 173 Henry Street, Apt. 7C, New York, New York 10002.

5. Upon information and belief, Quontic is a banking corporation organized and existing under the laws of the State of New York having a place of business located at 31-05 Broadway, Astoria, New York 11106.

6. Quontic is named a party defendant herein solely for the purpose of effectuating the equitable relief sought by Great Wall in this action.

-2-

## VENUE

7.  Venue of this action is properly in this Court pursuant to CPLR § 503 in that Great Wall's principal place of business is located in Queens County and, alternatively, Junior resides in Queens County and Quontic maintains a place of business in Queens County.

## STATEMENT OF THE CASE

### *Great Wall Realty Corp.*

8.  Agostinho Wong is a resident of the State of New York residing at 40-22 College Point Blvd., #PH 2N, Flushing, New York 11354.

9.  Anna C. Wong is a resident of the State of New York residing at 40-22 College Point Blvd., #PH 2N, Flushing, New York 11354.

10.  Agostinho Wong and Anna C. Wong are married.

11.  Agostinho Wong is 90 years of age.

12.  Anna C. Wong is 86 years of age.

13.  Agostinho Wong and Anna C. Wong are the sole officers, directors and shareholders of Great Wall and have been the sole officers, directors and shareholders of Great Wall since its creation in 1977.

14.  Agostinho Wong is the President of Great Wall.

15.  Anna C. Wong is the Vice President/Secretary of Great Wall.

16.  Great Wall owns and operates a 26-unit residential apartment building located at 35-44 28th Street, Astoria, New York 11106 ("Apartment Building").

17.  The Apartment Building is Great Wall's sole asset.

18.  Prior to July 2012, there were no liens and/or encumbrances on the Apartment Building.

*The July 26, 2012 Mortgage*

19.  Upon information and belief, a mortgage dated July 26, 2012 in the principal amount of One Million One Hundred Thousand Dollars ($1,100,000) in favor of Wisdom Ventures, LLC ("Wisdom") and Bloomingdale Drive Funding Co ("Bloomingdale"), as mortgagees, was recorded with the New York City Department of Finance, Office of The City Register against the Apartment Building on August 23, 2012 ("July 26, 2012 Mortgage").

20.  The July 26, 2012 Mortgage is signed in the name of "Antonio Wong" as the "President" of Great Wall.

21.  The July 26, 2012 Mortgage was signed before a notary public on July 26, 2012..

22.  A related "Collateral Assignment of Leases and Rents" dated July 26, 2012 was also signed in the name of "Antonio Wong" as the "President" of Great Wall before a notary public on July 26, 2012.

23.  The July 26, 2012 Mortgage and related assignment were signed by Junior.

24.  Upon information and belief, the July 26, 2012 Mortgage and related assignment were given by Junior and/or Lin to Wisdom and Bloomingdale to secure repayment of a loan extended by Wisdom and Bloomingdale in the amount of $1,100,000.

25.  Upon information and belief, in order to induce Wisdom and Bloomingdale to extend the aforesaid loan Junior and/or Lin delivered and presented to Wisdom and Bloomingdale on or before July 26, 2012 a purported corporate resolution by Great Wall purportedly signed by Agostinho Wong as "Director" before a notary public on May 15, 2012 ("Corporate Resolution").

26.  The Corporate Resolution falsely provided, *inter alia*, that:

a.  Agostinho Wong was the sole shareholder of Great Wall;

b.   Agostinho Wong had transferred all his shares in Great Wall to Junior; and

c.   Junior was designated President, Treasurer and Secretary of Great Wall,  and Lin was designated Vice President of Great Wall.

27.   The Corporate Resolution was not signed by Agostinho Wong.  Instead, the Corporate Resolution was signed by Junior who fraudulently signed Agostinho Wong's name before the notary public.

28.   Upon information and belief, based on the Corporate Resolution and other statements and representations made by Junior and Lin, Wisdom and Bloomingdale were fraudulently induced to loan Junior and Lin the sum of $1,100,000 as secured by the July 26, 2012 Mortgage.

29.   Junior and/or Lin were not authorized to enter into the loan transaction with Wisdom and Bloomingdale on behalf of Great Wall.

30.   The only individuals who would be authorized to enter into such a loan transaction would be Agostinho Wong or Anna C. Wong.

31.   Junior and/or Lin -- or anyone acting at or under their direction -- were never authorized by Agostinho Wong or Anna C. Wong to execute the July 26, 2012 Mortgage or any such document (or related documents) on behalf of Great Wall purporting to place a mortgage on the Apartment Building.

32.   The only individuals who would be authorized to execute such documents would be Agostinho Wong or Anna C. Wong.

33.   Junior is not and has never been "President" of Great Wall, and Lin is not and has never been an officer of Great Wall.

34. Great Wall never received any proceeds from the July 26, 2012 Mortgage.

35. Upon information and belief, the loan proceeds paid by Wisdom and Bloomingdale as secured by the July 26, 2012 Mortgage were received and taken by Junior and Lin and have been used for their own personal use and benefit.

36. Agostinho Wong and Anna C. Wong first learned of the existence of the July 26, 2012 Mortgage on or about January 7, 2013.

### *The January 9, 2013 Mortgage*

37. Upon information and belief, a mortgage dated January 9, 2013 in the principal amount of Two Million Five Hundred Thousand Dollars ($2,500,000) in favor of Quontic, as mortgagee, was recorded with the New York City Department of Finance, Office of The City Register against the Apartment Building on January 28, 2013 ("January 9, 2013 Mortgage").

38. The January 9, 2013 Mortgage and related documents are signed in the name of "Chris Lin" as the "Vice President" of Great Wall.

39. The January 9, 2013 Mortgage was signed before a notary public on January 9, 2013.

40. A related "Assignment of Leases and Rents" dated January 9, 2013 was also signed in the name of "Chris Lin" as the "Vice President" of Great Wall before a notary public on January 9, 2013.

41. Upon information and belief, the January 9, 2013 Mortgage and related assignment were signed by Lin at the instance of Junior.

42. Upon information and belief, the January 9, 2013 Mortgage and related assignment were given by Junior and/or Lin to Quontic to secure repayment of a loan extended by

-6-

Quontic in the amount of $2,500,000.

43. Upon information and belief, in order to induce Quontic to extend the aforesaid loan Junior and/or Lin delivered and presented to Quontic on or before January 9, 2013 a purported corporate resolution by Great Wall signed by Lin as "Secretary" of Great Wall before a notary public on January 2, 2013 ("Quontic Resolution").

44. The Quontic Resolution provided, *inter alia*, that:

a. Junior was President of Great Wall and Lin was Vice President and Treasurer of Great Wall; and

b. As officers of Great Wall, Junior and Lin were authorized to enter into the loan transaction with Quontic and to sign any and all documents to effectuate said loan.

45. Upon information and belief, based on the Quontic Resolution and other statements and representations made by Junior and Lin, Quontic was fraudulently induced to loan Junior and Lin the sum of $2,500,000 as secured by the January 9, 2013 Mortgage.

46. Junior and/or Lin were not authorized to enter into the loan transaction with Quontic on behalf of Great Wall.

47. The only individuals who would be authorized to enter into such a loan transaction would be Agostinho Wong or Anna C. Wong.

48. Junior and/or Lin -- or anyone acting at or under their direction -- were never authorized by Agostinho Wong or Anna C. Wong to execute the January 9, 2013 Mortgage or any such document (or related documents) on behalf of Great Wall purporting to place a mortgage on the Apartment Building.

49. The only individuals who would be authorized to execute such documents would

be Agostinho Wong or Anna C. Wong.

50. Great Wall never received any proceeds from the January 9, 2013 Mortgage.

51. Upon information and belief, the July 26, 2012 Mortgage was fully paid and satisfied with proceeds from the Quontic loan transaaction.

52. Upon information and belief, the July 26, 2012 Mortgage was fully paid and satisfied at the closing of the January 9, 2013 Mortgage on January 9, 2013.

53. Upon information and belief, the remaining loan proceeds paid by Quontic -- after payment of the July 26, 2012 Mortgage -- as secured by the January 9, 2013 Mortgage were received and taken by Junior and Lin and have been used for their own personal use and benefit.

54. Agostinho Wong and Anna C. Wong first learned of the existence of the January 9, 2013 Mortgage on or about February 7, 2013.

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST JUNIOR AND LIN
*(Fraud)*

55. Great Wall repeats and realleges paragraphs "1" through "54" above as though fully stated herein.

56. As set forth above, Junior and Lin have defrauded Great Wall in fraudulently obtaining loan proceeds in the name of Great Wall from Quontic without the authority, consent or permission of Great Wall.

57. Junior and Lin are and have been using the Ouontic loan proceeds for their personal use and benefit.

58. As of the date hereof, Great Wall has not been able to ascertain the precise amount of the net proceeds Junior and Lin received at the closing of the January 9, 2013 Mortgage.

-8-

59. Based upon the foregoing, Great Wall is entitled to recover from Junior and Lin all monies received by them by reason of the Quontic loan transaction with interest thereon from January 9, 2013 and punitive damages in the amount of not less than $5 million based upon their unlawful conduct.

### AS AND FOR A SECOND CAUSE OF ACTION AGAINST JUNIOR AND LIN
### *(Unjust Enrichment)*

60. Great Wall repeats and realleges paragraphs "1" through "54" and "56" through "59" above as though fully stated herein.

61. In obtaining and receiving the monies from the Quontic loan transaction, Junior and Lin have been unjustly enriched.

62. As of the date hereof, Great Wall has not been able to ascertain the precise amount of the net proceeds Junior and Lin received at the closing of the January 9, 2013 Mortgage.

63. Based upon the foregoing, Great Wall is entitled to recover from Junior and Lin all monies received by them by reason of the Quontic loan transaction with interest thereon from January 9, 2013 and punitive damages in the amount of not less than $5 million based upon their unlawful conduct.

### AS AND FOR A THIRD CAUSE OF ACTION AGAINST QUONTIC
### *(Declaratory Judgment)*

64. Great Wall repeats and realleges paragraphs "1" through "54", "56" through "59", and "61" through "63" above  as though fully stated herein.

65. Junior and Lin did not have the authority, permission or consent of Great Wall to enter into the Quontic loan transaction and/or to execute and deliver the January 9, 2013 Mortgage and related assignment to Quontic.

66.   The January 9, 2013 Mortgage and related assignment were recorded against the Apartment Building with the New York City Department of Finance, Office of The City Register on January 28, 2013 and remain recorded against the Apartment Building.

67.   The January 9, 2013 Mortgage and related assignment are a cloud on clean title for the Apartment Building.

68.   Based upon the foregoing, Great Wall is entitled to judgment declaring the January 9, 2013 Mortgage and related assignment null and void as against Great Wall and discharging the January 9, 2013 Mortgage and related assignment as against the Apartment Building.

**WHEREFORE**, Great Wall demands judgment as follows:

a.   In respect of the First and Second Causes of Action, judgment against Junior and Lin, jointly and severally, in the amount of all monies received by Junior and Lin as a result of the Quontic loan transaction with interest thereon from January 9, 2013 and punitive damages against Junior and Lin, jointly and severally, in the amount of not less than $5 million;

b.   In respect of the Third Cause of Action, judgment pursuant to CPLR § 3001 declaring the January 9, 2013 Mortgage and related assignment  null and void as against Great Wall and discharging the January 9, 2013 Mortgage and related assignment as against the Apartment Building;

c.   The costs and disbursements of this action including attorneys' fees; and

        d.  Such other and further relief as the Court deems just and proper.

Dated: New York, New York
      February 15, 2013

Christopher E. Chang, Esq.
Law Offices of Christopher E. Chang
*Attorneys for Plaintiff*
140 Broadway, 46th Floor
New York, New York 10005
(212) 208-1470
E-mail: cechang@juno.com

-11-

## VERIFICATION

STATE OF NEW YORK

                   ss.:

COUNTY OF NEW YORK

       Agostinho Wong, being duly sworn, deposes and states:

       I am the President of Great Wall Realty Corp., a New York corporation and the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof, and the same is true to my own knowledge except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true. This verification is made by me because the above party is a corporation and I am the President thereof.

                                      _____
                                        Agostinho Wong

Subscribed and sworn to before
me this 1st day of February, 2013

_____
     Notary Public

ANITA M. WONG
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01WO6246437
Qualified in Queens County
Commission Expires August 8, 2015

-12-

## VERIFICATION

STATE OF NEW YORK

COUNTY OF NEW YORK        ss.:

Anna C. Wong, being duly sworn, deposes and states:

I am the Vice President/Secretary of Great Wall Realty Corp., a New York corporation and the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof, and the same is true to my own knowledge except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true. This verification is made by me because the above party is a corporation and I am the Vice President/Secretary thereof.

_Anna C. Wong_
Anna C. Wong

Subscribed and sworn to before
me this 15th day of February, 2013

_/Notary Public_

ANITA M. WONG
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01WO6246437
Qualified in Queens County
Commission Expires August 8, 2015

-13-

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF QUEENS**

-------------------------------------------------------X

GREAT WALL REALTY CORP.,                              :

                Plaintiff/Counter-                 :
                Defendant,                          :
                                                    :

    -against-                                       :

ANTONIO WONG, JR., CHRIS LIN                          :
                                                    :
                Defendants,                         :

and QUONTIC BANK,                                    :
                                                    :
                Defendant/Counter-                  :
                Claimant.                           :
                                                    :

-------------------------------------------------- X

                                                    :

QUONTIC BANK,                                        :

                                                    :   Index No. 700536/13

                Defendant/Third-Party               :   **THIRD-PARTY SUMMONS**
                Plaintiff,                          :

                                                    :   Date Of Issuance:  May 10, 2013

    -against-                                       :

AGOSTINHO WONG, ANNA C. WONG,                        :
DAVID WONG, ESTEVAO WONG,                            :
ANTONIO WONG, FRANCISCO WONG,                        :
IDA WONG, ALBERTO WONG, LUIS C.                      :
WONG, JOHN MESSER, KRISTIN                           :
DODSON, PPC CAPITAL LLC, PPC                         :
CAPITAL PARTNERS INCORPORATED,                       :
PPC CAPITAL INTERNATIONAL TRADING                    :
COMPANY, JENNY P. LIU A/K/A PEI                      :
CHANG LIU and JOHN DOES 1-10                         :

                                                    :

                Third-Party Defendants.             :

                                                    :

-------------------------------------------------- X

TO THE ABOVE-NAMED THIRD-PARTY DEFENDANTS:

**YOU ARE HEREBY SUMMONED** to answer the attached Third-Party Complaint of the Third-Party Plaintiff dated May 10, 2013, a copy of which is hereby served upon you, together with all prior pleadings, and to serve copies of your Answer upon Loeb & Loeb LLP, the Attorneys for Third-Party Plaintiff, within twenty (20) days after service hereof, exclusive of the day of service, or within thirty (30) days after service is complete if this Summons is not personally served upon you within the State of New York.

In case of your failure to answer the Third-Party Complaint of Third-Party Plaintiff, judgment will be taken against you, in default, for the relief sought in the Third-Party Complaint.

This action will be heard in the Supreme Court of the State of New York in and for the County of Queens. The basis of the venue designated is the residence of the Third-Party Plaintiff Quontic Bank, which is situated in the State of New York, County of Queens.

Dated: New York, New York
      May 10, 2013

                       LOEB & LOEB LLP

                       By: _____
                         David M. Satnick
                         Tal E. Dickstein
                         345 Park Avenue
                         New York, NY 10154
                         Telephone: 212.407.4000

                       *Attorneys for Third-Party Plaintiff Quontic Bank*

To:

Great Wall Realty Corp.
c/o Law Offices of Christopher E.
Chang, Esq.
140 Broadway, 46th Floor
New York, NY 10005

Francisco Wong
357 Hollywood Ave.
Little Neck, NY 11363

Antonio Wong, Jr.
35-44 28th Street, Apt 4B
Astoria, NY 11106

Ida Wong

Chris Lin
173 Henry Street, Apt 7C
New York, NY 10002

Alberto Wong
2 Terrace Drive A
Great Neck, NY 11021

Agostinho Wong
c/o Law Offices of Christopher E.
Chang, Esq.
140 Broadway, 46th Floor
New York, NY 10005

John Messer
6106 Cloverdale Blvd.
Oakland Gardens, NY 11364

Anna C. Wong
c/o Law Offices of Christopher E.
Chang, Esq.
140 Broadway, 46th Floor
New York, NY 10005

Kristin Dodson
15 Elton St., Apt. 2
Brooklyn, NY 11208

David Wong
c/o Law Offices of Christopher E.
Chang, Esq.
140 Broadway, 46th Floor
New York, NY 10005

PPC Capital LLC
41-41 24th Street, Suite 401
Long Island City, NY 11101

Luis C. Wong
4741 159th St.
Flushing, NY 11358

PPC Capital Partners Inc.
41-41 24th Street, Suite 401
Long Island City, NY 11101

Estevao Wong
29 Ludlow St., Apt. 2B
New York, NY 10002

PPC Capital International Trading
Co.
41-41 24th Street, Suite 401
Long Island City, NY 11101

Antonio Wong
35-44 28th Street, Apt 3A
Astoria, New York 11106

Jenny P. Liu
3215 30th St., Apt A31
Astoria, NY 11106

3

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF QUEENS**
-------------------------------------------------------X

GREAT WALL REALTY CORP.,                                  :
                                                         :
             Plaintiff/Counter-                      :
             Defendant,                                :
                                                         :
    -against-                                        :
                                                         :
ANTONIO WONG, JR., CHRIS LIN                              :
                                                         :
             Defendants,                               :
                                                         :
and QUONTIC BANK,                                        :
                                                         :
             Defendant/Counter-                         :
             Claimant.                                 :
                                                         :
-------------------------------------------------- X
                                                         :
QUONTIC BANK,                                            :       Index No. 700536/13
                                                         :
             Defendant/Third-Party      :       **VERIFIED THIRD-PARTY**
             Plaintiff,                 :       **COMPLAINT OF QUONTIC BANK**
                                                         :
    -against-                                        :
                                                         :
AGOSTINHO WONG, ANNA C. WONG,                             :
DAVID WONG, ESTEVAO WONG,                                 :
ANTONIO WONG, FRANCISCO WONG,                             :
IDA WONG, ALBERTO WONG, LUIS C.                           :
WONG, JOHN MESSER, KRISTIN                                :
DODSON, PPC CAPITAL LLC, PPC                              :
CAPITAL PARTNERS INCORPORATED,                            :
PPC CAPITAL INTERNATIONAL TRADING  :
COMPANY, JENNY P. LIU A/K/A PEI                           :
CHANG LIU and JOHN DOES 1-10                              :
                                                         :
             Third-Party Defendants.   :
                                                         :
-------------------------------------------------- X

Defendant Quontic Bank ("Quontic"), by its attorneys Loeb & Loeb LLP, as and for its verified third-party complaint against the Third-Party Defendants, alleges as follows:

## THIRD-PARTY COMPLAINT

### Facts Common to All Third-Party Claims

1.     On or about January 9, 2013, Quontic entered a mortgage loan transaction with Great Wall in which Quontic lent Plaintiff Great Wall Realty Corp. ("Great Wall") the original principal amount of $2.5 million pursuant to the terms of a note, the repayment of which was secured by (i) a Mortgage Loan Agreement granting Quontic a mortgage lien against the real property known as 35-44 28th Street, Astoria, New York 11106 and the multi-family apartment building situated thereon (the "28th Street Property" or what Great Wall calls the "Apartment Building") and (ii) an Assignment of Leases and Rents with respect to the 28th Street Property (together the "Quontic Mortgage").

2.     The Quontic Mortgage was given to Quontic by Defendant Antonio Wong, Jr. ("Junior"), as President of Great Wall, and by Chris Lin ("Lin") as Vice President of Great Wall.

3.     In connection with the Quontic Mortgage, Junior and Lin provided Quontic with certain books and records of Great Wall, including, among other things, copies of lease agreements with respect to the 28th Street Property, as well as tax returns, bank account records and the certificate of incorporation of Great Wall.

4.     In connection with the Quontic Mortgage, Junior and Lin provided Quontic with a notarized Unanimous Consent of Board of Directors to Action Without Meeting and Corporate Resolution for the Transfer of Stock of Great Wall, dated May 15, 2012 ("May 15, 2012 Corporate Resolution"), which purported to transfer all of the issued and outstanding shares of Great Wall from Agostinho Wong to Junior, and appointed Junior as President, Treasurer and Secretary, and Junior as Vice President, of Great Wall.

5.     Quontic reasonably relied on the genuineness and authenticity of the May 15, 2012 Corporate Resolution in lending $2.5 million to Great Wall.

6.     In its complaint, Great Wall alleges that Agostinho Wong's signature on the May 15, 2012 Corporate Resolution was forged by Junior, and that Junior and Lin were not shareholders, officers or directors of Great Wall, and lacked actual authority to enter the Quontic Mortgage on behalf of Great Wall.

7.     Upon information and belief, in or about April 2012, Junior falsely claimed to be the president of 8 Wilson Realty Corp, which, upon information and belief, was and is owned by Junior's grandmother, Anna C. Wong, and which owns real property located at 8-10 Wilson Avenue, Brooklyn, NY (the "Wilson Avenue Property").

8.     Upon information and belief, in or about April 2012, Junior, for his own benefit, mortgaged, sold, transferred or otherwise encumbered the Wilson Avenue Property under false pretenses in exchange for at least $450,000.

9.     Great Wall alleges in its complaint that, on or about July 26, 2012, Junior, fraudulently claiming to be Great Wall's President and sole shareholder, entered a $1.1 million mortgage transaction on behalf of Great Wall with private lenders Wisdom Ventures, LLC and Bloomingdale Drive Funding Co., whereby Great Wall mortgaged and encumbered the 28th Street Property (the "July 26, 2012 Wisdom/Bloomingdale Mortgage").

**First Third-Party Claim Against Agostinho Wong, Anna C. Wong, David Wong, Estevao Wong, Antonio Wong, Francisco Wong, Ida Wong, Alberto Wong, Luis C. Wong And John Does 1-10**
**(Indemnification)**

10.     Quontic repeats and re-alleges the allegations in paragraphs "1" through "9" above as though fully set forth herein.

3

11.     Upon information and belief, Agostinho Wong is a resident of the State of New York residing at 40-22 College Point Boulevard, PH 2N, Flushing, New York 11354.

12.     Upon information and belief, Anna C. Wong is a resident of the State of New York residing at 40-22 Collect Point Boulevard, PH 2N, Flushing, New York 11354.

13.     Upon information and belief, Agostinho Wong and Anna C. Wong are married.

14.     In its complaint, Great Wall alleges that, since Great Wall's creation in 1977, Agostinho Wong and Anna C. Wong have been the sole officers, directors and shareholders of Great Wall.

15.     Upon information and belief, David Wong is a resident of the State of New York residing at 40-22 Collect Point Boulevard, PH 2N, Flushing, New York 11354.

16.     Upon information and belief, David Wong is a son of Agostinho Wong and Anna C. Wong.

17.     Upon information and belief, Agostinho Wong and Anna C. Wong purportedly transferred shares of Great Wall to David Wong and granted David Wong a Power of Attorney to act on their behalf.

18.     Upon information and belief, Luis C. Wong is a resident of the State of New York residing at 4741 159th Street, Flushing, New York 11358-3630.

19.     Upon information and belief, Luis C. Wong is a son of Agostinho Wong and Anna C. Wong.

20.     Upon information and belief, Agostinho Wong and Anna C. Wong purportedly transferred shares of Great Wall to Luis C. Wong, and granted Luis C. Wong a Power of Attorney to act on their behalf.

21.     Upon information and belief, Estevao Wong is a resident of the State of New York residing at 29 Ludlow Street, Apt. 2B, New York, NY 10002.

22.     Upon information and belief, Estevao Wong is a son of Agostinho Wong and Anna C. Wong.

23.     Upon information and belief, Agostinho Wong and Anna C. Wong purportedly transferred shares of Great Wall to Estevao Wong.

24.     Upon information and belief, Antonio Wong is a resident of the State of New York residing at 35-44 28th Street, Apt 3A, Astoria, New York 11106.

25.     Upon information and belief, Antonio Wong is a son of Agostinho Wong and Anna C. Wong.

26.     Upon information and belief, Agostinho Wong and Anna C. Wong purportedly transferred shares of Great Wall to Antonio Wong.

27.     Upon information and belief, Francisco Wong is a resident of the State of New York residing at 357 Hollywood Avenue, Little Neck NY 11363.

28.     Upon information and belief, Francisco Wong is a son of Agostinho Wong and Anna C. Wong.

29.     Upon information and belief, Agostinho Wong and Anna C. Wong purportedly transferred shares of Great Wall to Francisco Wong.

30.     Upon information and belief, Ida Wong is a resident of the State of New York residing in New York.

31.     Upon information and belief, Ida Wong is the daughter of Agostinho Wong and Anna C. Wong.

32.     Upon information and belief, Agostinho Wong and Anna C. Wong purportedly transferred shares of Great Wall to Ida Wong.

33.     Upon information and belief, Alberto Wong is a resident of the State of New York residing at 2 Terrace Drive A, Great Neck, NY 11021-3916.

34.     Upon information and belief, Alberto Wong is a son of Agostinho Wong and Anna C. Wong.

35.     Upon information and belief, Agostinho Wong and Anna C. Wong purportedly transferred shares of Great Wall to Alberto Wong.

36.     Upon information and belief, Does 1-10 are current or former officers, directors, representatives, agents and/or attorneys of Great Wall who participated in the wrongful acts alleged herein, and whose identities are presently unknown to Quontic.  Quontic will seek leave to amend its pleading to incorporate the identities of John Does 1-10 after they are discovered.

37.     Upon information and belief, prior to the Quontic Mortgage, each of Agostinho Wong, Anna C. Wong, David Wong, Luis C. Wong, Estevao Wong, Antonio Wong, Francisco Wong, Ida Wong, Alberto Wong and John Does 1-10 (collectively the "Wong Third-Party Defendants"), had control over the books and records of Great Wall.

38.     Upon information and belief, and if the allegations of Great Wall are found to be true, prior to the Quontic Mortgage, the Wong Third-Party Defendants were aware that Junior and Lin had the inclination, ability and propensity to claim, under false pretenses, authority to act on behalf of Great Wall or related entities, and to mortgage or encumber property owned by Great Wall or related entities, for their own benefit and that they had done so in the past.

39.     Upon information and belief, prior to the Quontic Mortgage, the Wong Third-Party Defendants were aware that Junior had entered the Wilson Avenue Property transaction purportedly on behalf of 8 Wilson Realty Corp.

40.     Upon information and belief, prior to the Quontic Mortgage, the Wong Third-Party Defendants were aware that Junior had entered the July 26, 2012 Wisdom/Bloomingdale Mortgage transaction with respect to the 28th Street Property, purportedly on behalf of Great Wall.

41.     Despite the Wong Third-Party Defendants' knowledge of Junior's involvement in the Wilson Avenue Property transaction and the July 26, 2012 Wisdom/Bloomingdale Mortgage, the Wong Third-Party Defendants failed to take any, much less reasonable, steps to prevent Junior and his associates from claiming ownership or authority to act on behalf of Great Wall, or to mortgage, transfer or otherwise encumber property owned by Great Wall or related entities, including the 28th Street Property.

42.     As a direct and proximate result of the Wong Third-Party Defendants' failures, Junior and Lin were placed in a position, and cloaked with the authority, to grant the $2.5 million Quontic Mortgage, which Great Wall now alleges was entered into by Junior and Lin on behalf of Great Wall without authorization.

43.     In the event it is determined that the Quontic Mortgage was entered into by Junior and Lin without proper authority, and Great Wall thereby prevails on its cause of action for a declaration that the Quontic Mortgage is null and void, then in such event each of the Wong Third-Party Defendants are jointly and severally obligated to indemnify Quontic for the direct, proximate and consequential damages resulting therefrom, in an amount not less than

7

$2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage.

## Second Third-Party Claim Against John Messer
### (Fraudulent Misrepresentation)

44.     Quontic repeats and re-alleges the allegations in paragraphs "1" through "43" above as though fully set forth herein.

45.     Upon information and belief, John Messer ("Messer") is a resident of the State of New York residing at 6106 Cloverdale Boulevard, Oakland Gardens, NY 11364.

46.     Upon information and belief, at all relevant times, John Messer has been an attorney admitted to practice law in this state, and served as Vice President and Counsel of a California corporation named DC Solar Solutions, Inc. ("DC Solar").

47.     Upon information and belief, in or about June 2012, Messer asked an individual named Lance Falow to lend $1.5 million to DC Solar.

48.     Upon information and belief, Falow declined to loan any money to DC Solar.

49.     Upon information and belief, in or about July 2012, Messer proposed to Falow that, instead of lending money directly to DC Solar, Falow lend money to Great Wall, which loan would be secured by a mortgage on the 28th Street Property.

50.     Upon information and belief, Messer explained to Falow that Great Wall was owned by Junior, whom Messer introduced to Falow.

51.     On or about July 26, 2012, Wisdom Ventures, LLC, to which Falow served as counsel, and Bloomingdale Drive Funding LLC, lent $1.1 million to Great Wall.

52.     Contemporaneously with the July 26, 2012 Wisdom/Bloomingdale Mortgage, DC Solar executed a Secured Promissory Note with Great Wall (the "DC Solar/Great Wall Note"),

whereby Great Wall lent DC Solar $1.1 million, which is the same sum as the principal amount of the July 26, 2012 Wisdom/Bloomingdale Mortgage.

53.     The DC Solar/Great Wall Note was executed by John Messer, as Vice President of DC Solar, and by Jeff Carpoff, as President of DC Solar.

54.     Upon information and belief, as a result of Messer's prior acquaintance with Junior and his involvement in the July 26, 2012 Wisdom/Bloomingdale Mortgage, Messer gained knowledge regarding the true status of Junior and Lin as putative shareholders, officers and directors of Great Wall.

55.     John Messer personally guaranteed Great Wall's repayment of the July 26, 2012 Wisdom/Bloomingdale Mortgage.

56.     In connection with the Quontic Mortgage, Messer represented Great Wall, acting through Junior and Lin.

57.     On or about December 31, 2012, Messer issued his opinion letter to Quontic (the "Messer Opinion Letter"), wherein he represented to Quontic that:

> To the best of our knowledge . . . Borrower [Great Wall, by Lin and Junior] has full power and authority to enter into and perform the Loan Documents executed by it, to borrow the Loan and to pledge the collateral and create the mortgage and lien provided for in the Loan documents to be delivered by it, all of which have been duly authorized by all necessary and proper action;
>
> To the best of our knowledge, CHRIS LIN, holds 180 Shares of the Borrower corporation (90% Shareholder) and is the Vice President, Secretary and Treasurer; and ANTONIO WONG, holds 20 Shares of the Borrower corporation (10% Shareholder) and is the President;
>
> To the best of our knowledge, no other consent or approval (governmental or otherwise) or the taking of any other action is required as a condition to the validity or enforceability of any Loan Documents except for any consents and approvals heretofore delivered to you;
>
> To the best of our knowledge, each of the Loan Documents has been duly executed and delivered and constitutes the valid and legally binding obligations of the Borrower enforceable in accordance with their respective terms . . . .

58.     Upon information and belief, Messer wrote the Messer Opinion Letter and delivered it to Quontic in order to induce Quontic to lend $2.5 million to Great Wall to be secured by the Quontic Mortgage.

59.     Upon information and belief, Messer knew and intended that Quontic would rely on the Messer Opinion Letter in making the aforesaid loan and accepting the Quontic Mortgage to secure the repayment of said loan.

60.     Great Wall alleges in its complaint that Junior and Lin were not shareholders, officers or directors of Great Wall, and that they were not authorized by to enter the Quontic Mortgage on behalf of Great Wall.

61.     In the event it is determined that Junior or Lin lacked authority to act on behalf of Great Wall in granting the Quontic Mortgage, then in such event the Messer Opinion Letter was false and was knowingly issued by Messer to fraudulently induce Quontic to lend $2.5 million secured by the Quontic Mortgage.

62.     By reason thereof, in the event it is determined that Junior or Lin entered the Quontic Mortgage without proper authority, Messer is liable to Quontic for the direct, proximate and consequential damages resulting therefrom, in an amount not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage, together with punitive and exemplary damages in an amount not less than $5 million.

## Third Third-Party Claim Against John Messer
### (Negligent Misrepresentation)

63.     Quontic repeats and re-alleges the allegations in paragraphs "1" through "62" above as though fully set forth herein.

64.     Upon information and belief, as a result of Messer's prior relationship with Junior and Great Wall in connection with the July 26, 2012 Wisdom/Bloomingdale Mortgage, and his representation of Great Wall in connection with the Quontic Mortgage, Messer held unique knowledge regarding the corporate ownership of Great Wall and Junior's and Lin's status as putative officers, directors and shareholders of Great Wall.

65.     Upon information and belief, Messer issued the Messer Opinion Letter to Quontic for the purpose of inducing Quontic to loan the $2.5 million secured by the Quontic Mortgage.

66.     Upon information and belief, in issuing the Messer Opinion Letter to Quontic, Messer knew and intended that Quontic would rely upon his knowledge regarding the corporate ownership of Great Wall and Junior's and Lin's status as putative officers, directors and shareholders of Great Wall in loaning the $2.5 million secured by the Quontic Mortgage.

67.     In the event it is determined that Junior or Lin lacked authority to act on behalf of Great Wall in entering the Quontic Mortgage, then in such event Messer reasonably should have known that the Messer Opinion Letter was false and misleading.

68.     By reason thereof, Messer should be found liable to Quontic for the direct, proximate and consequential damages resulting therefrom, in an amount not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage.

### Fourth Third-Party Claim Against John Messer
### (Indemnification)

69.     Quontic repeats and re-alleges the allegations in paragraphs "1" through "68" above as though fully set forth herein.

70.     In the event it is determined that the Quontic Mortgage was entered into by Junior or Lin without proper authority, and Great Wall thereby prevails on its cause of action for a

declaration that the Quontic Mortgage is null and void, then in such event Messer is obligated to indemnify Quontic for the direct, proximate and consequential damages resulting therefrom, in an amount not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage.

### Fifth Third-Party Claim Against Kristin Dodson
### (Notarial Misconduct; Executive Law § 135)

71.    Quontic repeats and re-alleges the allegations in paragraphs "1" through "70" above as though fully set forth herein.

72.    Upon information and belief, Kristin Dodson ("Dodson") is a resident of the State of New York, residing at 15 Elton Street, Apt. 2, Brooklyn, NY 11208.

73.    Upon information and belief, Dodson has been a licensed Notary Public in the State of New York, Kings County, as of at least December 6, 2010.

74.    Dodson, as a notary public, acknowledged and certified the purported signature of Agostinho Wong on the May 15, 2012 Corporate Resolution.

75.    In notarizing the May 15, 2012 Corporate Resolution, Dodson represented that she had actual knowledge that Agostinho Wong had appeared before her and had signed the May 15, 2012 Corporate Resolution.

76.    Quontic reasonably relied upon Dodson's certification as to the authenticity of Agostinho Wong's signature on the May 15, 2012 Corporate Resolution in entering Quontic Mortgage.

77.    Great Wall alleges that the May 15, 2012 Corporate Resolution was not signed by Agostinho Wong, but by Junior who forged Agostinho Wong's name.

78.     Upon information and belief, on May 15, 2012, Agostinho Wong was 89 years old and Junior was 30 years old.

79.     Upon information and belief, on or about May 15, 2012 Agostinho Wong could not reasonably be mistaken for Junior.

80.     In the event it is determined that Agostinho Wong's name was forged on the May 15, 2012 Corporate Resolution, then in such event Dodson was reckless, negligent and careless in performing her duties as a Notary Public, in violation of Executive Law § 135.

81.     As a result of Dodson's reckless, negligent and careless actions, Quontic has been damaged in an amount not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage.

### Sixth Third-Party Claim Against Kristin Dodson
#### (Negligence)

82.     Quontic repeats and re-alleges the allegations in paragraphs "1" through "81" above as though fully set forth herein.

83.     In the event it is determined that Agostinho Wong's name was forged on the May 15, 2012 Corporate Resolution, Dodson was negligent in performing her duties as a Notary Public, and as a direct, proximate and foreseeable result of Dodson's negligence, Quontic has been damaged in an amount not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage.

### Seventh Third-Party Claim Against Kristin Dodson
#### (Indemnification)

84.     Quontic repeats and re-alleges the allegations in paragraphs "1" through "83" above as though fully set forth herein.

85.     In the event it is determined that the Quontic Mortgage was entered into by Junior or Lin without proper authority, and Great Wall thereby prevails on its cause of action for a declaration that the Quontic Mortgage is null and void, then in such event Dodson is obligated to indemnify Quontic for the direct, proximate and consequential damages resulting therefrom, in an amount not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage.

### Eighth Third-Party Claim Against PPC Capital LLC, PPC Capital Partners Incorporated, and PPC Capital International Trading Company
### (Unjust Enrichment)

86.     Quontic repeats and re-alleges the allegations in paragraphs "1" through "85" above as though fully set forth herein.

87.     Upon information and belief, PPC Capital LLC is a domestic limited liability company with a principal place of business at 41-41 24th Street, Suite 401, Long Island City, NY 11101.

88.     Upon information and belief, PPC Capital Partners Inc. is a domestic corporation with a principal place of business at 41-41 24th Street, Suite 401, Long Island City, NY 11101.

89.     Upon information and belief, PPC Capital International Trading Co. is a domestic corporation with a principal place of business at 41-41 24th Street, Suite 401, Long Island City, NY 11101.

90.     Upon information and belief, Junior and Lin are co-owners of PPC Capital LLC, PPC Capital Partners Inc. and PPC Capital International Trading Co. (collectively, "PPC Capital") along with Jenny P. Liu.

91. On or about January 9, 2013 and on other subsequent occasions, Junior or Lin caused at least $861,491 of the loan proceeds from the Quontic Mortgage to be transferred to PPC Capital.

92. Upon information and belief, no valuable consideration was given by PPC Capital in exchange for the Quontic Mortgage loan proceeds it received.

93. In the event it is determined that Junior or Lin lacked authority to enter the Quontic Mortgage and to direct the proceeds thereof, PPC Capital knew, upon information and belief, that it was not entitled to receive said loan proceeds, and it would be against equity and good conscience to permit PPC Capital to retain the funds transferred to it by Junior or Lin.

94. By reason thereof, PPC Capital should be found liable to Quontic in an amount not less than of $861,491, plus interest thereon to the date of the entry of judgment.

### Ninth Third-Party Claim Against Jenny P. Liu
### (Unjust Enrichment)

95. Quontic repeats and re-alleges the allegations in paragraphs "1" through "94" above as though fully set forth herein.

96. Upon information and belief, Jenny P. Liu, also known as Pei Chang Liu ("Liu"), is a resident of the State of New York residing at 3215 30th St., Apt A31, Astoria, NY 11106.

97. Upon information and belief, Liu is a co-owner of PPC Capital along with Junior and Lin.

98. On or about January 10, 2013, Junior caused $70,000 of the proceeds of the Quontic Mortgage to be transferred to Liu.

99. Upon information and belief, no valuable consideration was given by Liu in exchange for the $70,000 of loan proceeds that she received.

100.   In the event it is determined that Junior or Lin lacked authority to enter the Quontic Mortgage and to direct the proceeds thereof, Liu, upon information and belief, knew that she was not entitled to receive said loan proceeds, and it would be against equity and good conscience to permit Liu to retain the funds transferred to her by Junior or Lin.

101.   By reason thereof, Liu should be found liable to Quontic in an amount not less than $70,000, plus interest thereon to the date of entry of judgment.

**DEMAND IS HEREBY MADE** that the Third-Party Defendants answer the Third-Party Claims against each of them contained herein, and that service of such answer be made within twenty (20) days after service hereof.

**WHEREFORE**, Quontic demands judgment as follows:

a.   In respect of the First Third-Party Claim against the Wong Third-Party Defendants, judgment against the Wong Third-Party Defendants, jointly and severally, in the amount of the direct, proximate and consequential damages resulting to Quontic from a judgment in favor of Great Wall on its cause of action for a declaration that the Quontic Mortgage is null and void, which amount is not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage;

b.   In respect of the Second Third-Party Claim against John Messer, judgment against Messer in an amount not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage, together with punitive and exemplary damages in an amount not less than $5 million;

c.      In respect of the Third Third-Party Claim against John Messer, judgment against Messer in an amount not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage;

d.      In respect of the Fourth Third-Party Claim against John Messer, judgment against Messer in the amount of the direct, proximate and consequential damages resulting to Quontic from a judgment in favor of Great Wall on its cause of action for a declaration that the Quontic Mortgage is null and void, which amount is not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage;

e.      In respect of the Fifth Third-Party Claim against Kristin Dodson, judgment against Dodson in the amount of damages sustained by Quontic from Dodson's misconduct as a notary public, which damages are not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage;

f.      In respect of the Sixth Third-Party Claim against Kristin Dodson, judgment against Dodson in an amount not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage;

g.      In respect of the Seventh Third-Party Claim against Kristin Dodson, judgment against Dodson in the amount of the direct, proximate and consequential damages resulting to Quontic from a judgment in favor of Great Wall on its cause of action for a declaration that the Quontic Mortgage is null and void, which amount is not less than $2,472,230, representing the

outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage;

      h.      In respect of the Eighth Third-Party Claim against PPC Capital LLC, PPC Capital Partners Inc. and PPC Capital International Trading Co., judgment against PPC Capital LLC, PPC Capital Partners Inc. and PPC Capital International Trading Co., jointly and severally, in an amount not less than $861,491, plus interest thereon;

      i.      In respect of the Ninth Third-Party Claim against Jenny P. Liu, judgment against Liu in an amount not less than $70,000, plus interest thereon;

      j.      Granting Quontic its attorneys' fees, costs and expenses incurred in the action;

      k.      Such other and further relief as the Court may find just and proper.

Dated:   New York, New York
           May 10, 2013

                               LOEB & LOEB LLP

                               By: _____
                                   David M. Satnick
                                   Tal E. Dickstein
                                   345 Park Avenue
                                   New York, NY 10154
                                   Telephone: 212.407.4000

                                   *Attorneys for*
                                   *Defendant/Counterclaimant/Cross-*
                                   *Complainant/Third-Party Plaintiff Quontic*
                                   *Bank*

To:

      Great Wall Realty Corp.              Francisco Wong
      c/o Law Offices of Christopher E.     357 Hollywood Ave.
      Chang, Esq.                       Little Neck, NY 11363
      140 Broadway, 46th Floor
      New York, NY 10005

Antonio Wong, Jr.
35-44 28th Street, Apt 4B
Astoria, NY 11106

Ida Wong

Chris Lin
173 Henry Street, Apt 7C
New York, NY 10002

Alberto Wong
2 Terrace Drive A
Great Neck, NY 11021

Agostinho Wong
c/o Law Offices of Christopher E.
Chang, Esq.
140 Broadway, 46th Floor
New York, NY 10005

John Messer
6106 Cloverdale Blvd.
Oakland Gardens, NY 11364

Anna C. Wong
c/o Law Offices of Christopher E.
Chang, Esq.
140 Broadway, 46th Floor
New York, NY 10005

Kristin Dodson
15 Elton St., Apt. 2
Brooklyn, NY 11208

David Wong
c/o Law Offices of Christopher E.
Chang, Esq.
140 Broadway, 46th Floor
New York, NY 10005

PPC Capital LLC
41-41 24th Street, Suite 401
Long Island City, NY 11101

Luis C. Wong
4741 159th St.
Flushing, NY 11358

PPC Capital Partners Inc.
41-41 24th Street, Suite 401
Long Island City, NY 11101

Estevao Wong
29 Ludlow St., Apt. 2B
New York, NY 10002

PPC Capital International Trading
Co.
41-41 24th Street, Suite 401
Long Island City, NY 11101

Antonio Wong
35-44 28th Street, Apt 3A
Astoria, New York 11106

Jenny P. Liu
3215 30th St., Apt A31
Astoria, NY 11106

## VERIFICATION

STATE OF NEW YORK   )
                          ) ss.:
COUNTY OF NEW YORK  )

Tal E. Dickstein, being duly sworn, deposes and states:

     I am associated with the law firm Loeb & Loeb LLP, attorneys for Defendant /

Counterclaimant / Cross-Claimant / Third-Party Plaintiff Quontic Bank. I have read the

foregoing Verified Third-Party Complaint of Quontic Bank and know the contents thereof; and

the same is true to my knowledge, except as to the matters therein stated to be alleged upon

information and belief, and as to those matters I believe them to be true based upon information

received in the course of my duties as attorney for Quontic in connection with this matter. This

affidavit is made by me as Quontic does not reside in the county where the firm of the

undersigned attorney maintains its law office.

                                                                    Tal E. Dickstein

Sworn to before me this
____th day of May 2013.

Notary Public

TIMOTHY B. CUMMINS
Notary Public, State of New York
No. 01CU6113096
Qualified in New York County
Commission Expires July 19, 2016

NY1202137

20

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK        )
                              )        SS.
COUNTY OF NEW YORK  )

       TIMOTHY B. CUMMINS, being duly sworn, deposes and says:

1.     I am not a party to this action and am over 18 years of age.

2.     On May 10, 2013, I served true copies of the foregoing

Third-Party Summons and Complaint by first-class mail to the below listed parties:

> Baum & Bailey, P.C.
> 48 Wall Street
> New York, New York 10005
> Attorneys for Defendants
> Antonio Wong, Jr. and
> Chris Lin
>
> Antonio Wong, Jr.
> 35-44 28th Street
> Apartment 4B
> Astoria, New York 11106
>
> Chris Lin
> 173 Henry Street
> Apartment 7C
> New York, New York 10002

                                        Timothy B. Cummins

Sworn to before me this
10th Day of May, 2013

Notary Public

COURTNEY L. TREUBERT
Notary Public, State of New York
No. 01TR6206397
Qualified in Nassau County
Commission Expires May 18, 2013

NY1202164.1
215764-10023

FILED: QUEENS COUNTY CLERK 05/10/2013

INDEX NO. 700536/2013

NYSCEF DOC. NO. 1    Case 1:19-cv-03875    Document 2-9    Filed 07/03/19    Page 39 of 62 PageID #: 276    RECEIVED NYSCEF: 05/10/2013

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF QUEENS**

-----------------------------------------------------X

GREAT WALL REALTY CORP.,                              :

        Plaintiff/Counter-                          :
        Defendant,                                  :
                                                    :
    -against-                                       :

ANTONIO WONG, JR., CHRIS LIN                          :
                                                    :
        Defendants,                                 :

and QUONTIC BANK,                                    :
                                                    :
        Defendant/Counter-                          :
        Claimant.                                   :

----------------------------------------------------- X
                                                    :
QUONTIC BANK,                                        :    Index No. 700536/13
                                                    :
        Defendant/Third-Party                       :    **THIRD-PARTY SUMMONS**
        Plaintiff,                                  :
                                                    :    Date Of Issuance: May 10, 2013
    -against-                                       :

AGOSTINHO WONG, ANNA C. WONG,                        :
DAVID WONG, ESTEVAO WONG,                            :
ANTONIO WONG, FRANCISCO WONG,                        :
IDA WONG, ALBERTO WONG, LUIS C.                      :
WONG, JOHN MESSER, KRISTIN                           :
DODSON, PPC CAPITAL LLC, PPC                         :
CAPITAL PARTNERS INCORPORATED,                       :
PPC CAPITAL INTERNATIONAL TRADING                    :
COMPANY, JENNY P. LIU A/K/A PEI                      :
CHANG LIU and JOHN DOES 1-10                         :
                                                    :
        Third-Party Defendants.                     :
                                                    :
----------------------------------------------------- X

TO THE ABOVE-NAMED THIRD-PARTY DEFENDANTS:

**YOU ARE HEREBY SUMMONED** to answer the attached Third-Party Complaint of the Third-Party Plaintiff dated May 10, 2013, a copy of which is hereby served upon you, together with all prior pleadings, and to serve copies of your Answer upon Loeb & Loeb LLP, the Attorneys for Third-Party Plaintiff, within twenty (20) days after service hereof, exclusive of the day of service, or within thirty (30) days after service is complete if this Summons is not personally served upon you within the State of New York.

In case of your failure to answer the Third-Party Complaint of Third-Party Plaintiff, judgment will be taken against you, in default, for the relief sought in the Third-Party Complaint.

This action will be heard in the Supreme Court of the State of New York in and for the County of Queens. The basis of the venue designated is the residence of the Third-Party Plaintiff Quontic Bank, which is situated in the State of New York, County of Queens.

Dated:  New York, New York
        May 10, 2013

                                LOEB & LOEB LLP


                        By: _____
                            David M. Satnick
                            Tal E. Dickstein
                            345 Park Avenue
                            New York, NY 10154
                            Telephone: 212.407.4000

                            *Attorneys for Third-Party Plaintiff Quontic Bank*

To:

Great Wall Realty Corp.
c/o Law Offices of Christopher E.
Chang, Esq.
140 Broadway, 46th Floor
New York, NY 10005

Francisco Wong
357 Hollywood Ave.
Little Neck, NY 11363

Antonio Wong, Jr.
35-44 28th Street, Apt 4B
Astoria, NY 11106

Ida Wong

Chris Lin
173 Henry Street, Apt 7C
New York, NY 10002

Alberto Wong
2 Terrace Drive A
Great Neck, NY 11021

Agostinho Wong
c/o Law Offices of Christopher E.
Chang, Esq.
140 Broadway, 46th Floor
New York, NY 10005

John Messer
6106 Cloverdale Blvd.
Oakland Gardens, NY 11364

Anna C. Wong
c/o Law Offices of Christopher E.
Chang, Esq.
140 Broadway, 46th Floor
New York, NY 10005

Kristin Dodson
15 Elton St., Apt. 2
Brooklyn, NY 11208

David Wong
c/o Law Offices of Christopher E.
Chang, Esq.
140 Broadway, 46th Floor
New York, NY 10005

PPC Capital LLC
41-41 24th Street, Suite 401
Long Island City, NY 11101

Luis C. Wong
4741 159th St.
Flushing, NY 11358

PPC Capital Partners Inc.
41-41 24th Street, Suite 401
Long Island City, NY 11101

Estevao Wong
29 Ludlow St., Apt. 2B
New York, NY 10002

PPC Capital International Trading
Co.
41-41 24th Street, Suite 401
Long Island City, NY 11101

Antonio Wong
35-44 28th Street, Apt 3A
Astoria, New York 11106

Jenny P. Liu
3215 30th St., Apt A31
Astoria, NY 11106

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
-------------------------------------------------------X

GREAT WALL REALTY CORP.,           :
                                   :
                Plaintiff/Counter- :
                Defendant,         :
                                   :
        -against-                  :
                                   :
ANTONIO WONG, JR., CHRIS LIN       :
                                   :
                Defendants,        :
                                   :
and QUONTIC BANK,                  :
                                   :
                Defendant/Counter- :
                Claimant.          :
                                   :
-------------------------------------------------- X
                                   :
QUONTIC BANK,                      :     Index No. 700536/13
                                   :
                Defendant/Third-Party :  **VERIFIED THIRD-PARTY**
                Plaintiff,         :     **COMPLAINT OF QUONTIC BANK**
                                   :
        -against-                  :
                                   :
AGOSTINHO WONG, ANNA C. WONG,      :
DAVID WONG, ESTEVAO WONG,          :
ANTONIO WONG, FRANCISCO WONG,      :
IDA WONG, ALBERTO WONG, LUIS C.    :
WONG, JOHN MESSER, KRISTIN         :
DODSON, PPC CAPITAL LLC, PPC       :
CAPITAL PARTNERS INCORPORATED,     :
PPC CAPITAL INTERNATIONAL TRADING  :
COMPANY, JENNY P. LIU A/K/A PEI    :
CHANG LIU and JOHN DOES 1-10       :
                                   :
                Third-Party Defendants. :
                                   :
-------------------------------------------------- X

Defendant Quontic Bank ("Quontic"), by its attorneys Loeb & Loeb LLP, as and for its verified third-party complaint against the Third-Party Defendants, alleges as follows:

### THIRD-PARTY COMPLAINT

### Facts Common to All Third-Party Claims

1.      On or about January 9, 2013, Quontic entered a mortgage loan transaction with Great Wall in which Quontic lent Plaintiff Great Wall Realty Corp. ("Great Wall") the original principal amount of $2.5 million pursuant to the terms of a note, the repayment of which was secured by (i) a Mortgage Loan Agreement granting Quontic a mortgage lien against the real property known as 35-44 28th Street, Astoria, New York 11106 and the multi-family apartment building situated thereon (the "28th Street Property" or what Great Wall calls the "Apartment Building") and (ii) an Assignment of Leases and Rents with respect to the 28th Street Property (together the "Quontic Mortgage").

2.      The Quontic Mortgage was given to Quontic by Defendant Antonio Wong, Jr. ("Junior"), as President of Great Wall, and by Chris Lin ("Lin") as Vice President of Great Wall.

3.      In connection with the Quontic Mortgage, Junior and Lin provided Quontic with certain books and records of Great Wall, including, among other things, copies of lease agreements with respect to the 28th Street Property, as well as tax returns, bank account records and the certificate of incorporation of Great Wall.

4.      In connection with the Quontic Mortgage, Junior and Lin provided Quontic with a notarized Unanimous Consent of Board of Directors to Action Without Meeting and Corporate Resolution for the Transfer of Stock of Great Wall, dated May 15, 2012 ("May 15, 2012 Corporate Resolution"), which purported to transfer all of the issued and outstanding shares of Great Wall from Agostinho Wong to Junior, and appointed Junior as President, Treasurer and Secretary, and Junior as Vice President, of Great Wall.

5.    Quontic reasonably relied on the genuineness and authenticity of the May 15, 2012 Corporate Resolution in lending $2.5 million to Great Wall.

6.    In its complaint, Great Wall alleges that Agostinho Wong's signature on the May 15, 2012 Corporate Resolution was forged by Junior, and that Junior and Lin were not shareholders, officers or directors of Great Wall, and lacked actual authority to enter the Quontic Mortgage on behalf of Great Wall.

7.    Upon information and belief, in or about April 2012, Junior falsely claimed to be the president of 8 Wilson Realty Corp, which, upon information and belief, was and is owned by Junior's grandmother, Anna C. Wong, and which owns real property located at 8-10 Wilson Avenue, Brooklyn, NY (the "Wilson Avenue Property").

8.    Upon information and belief, in or about April 2012, Junior, for his own benefit, mortgaged, sold, transferred or otherwise encumbered the Wilson Avenue Property under false pretenses in exchange for at least $450,000.

9.    Great Wall alleges in its complaint that, on or about July 26, 2012, Junior, fraudulently claiming to be Great Wall's President and sole shareholder, entered a $1.1 million mortgage transaction on behalf of Great Wall with private lenders Wisdom Ventures, LLC and Bloomingdale Drive Funding Co., whereby Great Wall mortgaged and encumbered the 28th Street Property (the "July 26, 2012 Wisdom/Bloomingdale Mortgage").

**First Third-Party Claim Against Agostinho Wong, Anna C. Wong, David Wong, Estevao Wong, Antonio Wong, Francisco Wong, Ida Wong, Alberto Wong, Luis C. Wong And John Does 1-10**
**(Indemnification)**

10.    Quontic repeats and re-alleges the allegations in paragraphs "1" through "9" above as though fully set forth herein.

3

11. Upon information and belief, Agostinho Wong is a resident of the State of New York residing at 40-22 College Point Boulevard, PH 2N, Flushing, New York 11354.

12. Upon information and belief, Anna C. Wong is a resident of the State of New York residing at 40-22 Collect Point Boulevard, PH 2N, Flushing, New York 11354.

13. Upon information and belief, Agostinho Wong and Anna C. Wong are married.

14. In its complaint, Great Wall alleges that, since Great Wall's creation in 1977, Agostinho Wong and Anna C. Wong have been the sole officers, directors and shareholders of Great Wall.

15. Upon information and belief, David Wong is a resident of the State of New York residing at 40-22 Collect Point Boulevard, PH 2N, Flushing, New York 11354.

16. Upon information and belief, David Wong is a son of Agostinho Wong and Anna C. Wong.

17. Upon information and belief, Agostinho Wong and Anna C. Wong purportedly transferred shares of Great Wall to David Wong and granted David Wong a Power of Attorney to act on their behalf.

18. Upon information and belief, Luis C. Wong is a resident of the State of New York residing at 4741 159th Street, Flushing, New York 11358-3630.

19. Upon information and belief, Luis C. Wong is a son of Agostinho Wong and Anna C. Wong.

20. Upon information and belief, Agostinho Wong and Anna C. Wong purportedly transferred shares of Great Wall to Luis C. Wong, and granted Luis C. Wong a Power of Attorney to act on their behalf.

21.     Upon information and belief, Estevao Wong is a resident of the State of New York residing at 29 Ludlow Street, Apt. 2B, New York, NY 10002.

22.     Upon information and belief, Estevao Wong is a son of Agostinho Wong and Anna C. Wong.

23.     Upon information and belief, Agostinho Wong and Anna C. Wong purportedly transferred shares of Great Wall to Estevao Wong.

24.     Upon information and belief, Antonio Wong is a resident of the State of New York residing at 35-44 28th Street, Apt 3A, Astoria, New York 11106.

25.     Upon information and belief, Antonio Wong is a son of Agostinho Wong and Anna C. Wong.

26.     Upon information and belief, Agostinho Wong and Anna C. Wong purportedly transferred shares of Great Wall to Antonio Wong.

27.     Upon information and belief, Francisco Wong is a resident of the State of New York residing at 357 Hollywood Avenue, Little Neck NY 11363.

28.     Upon information and belief, Francisco Wong is a son of Agostinho Wong and Anna C. Wong.

29.     Upon information and belief, Agostinho Wong and Anna C. Wong purportedly transferred shares of Great Wall to Francisco Wong.

30.     Upon information and belief, Ida Wong is a resident of the State of New York residing in New York.

31.     Upon information and belief, Ida Wong is the daughter of Agostinho Wong and Anna C. Wong.

5

32.     Upon information and belief, Agostinho Wong and Anna C. Wong purportedly transferred shares of Great Wall to Ida Wong.

33.     Upon information and belief, Alberto Wong is a resident of the State of New York residing at 2 Terrace Drive A, Great Neck, NY 11021-3916.

34.     Upon information and belief, Alberto Wong is a son of Agostinho Wong and Anna C. Wong.

35.     Upon information and belief, Agostinho Wong and Anna C. Wong purportedly transferred shares of Great Wall to Alberto Wong.

36.     Upon information and belief, Does 1-10 are current or former officers, directors, representatives, agents and/or attorneys of Great Wall who participated in the wrongful acts alleged herein, and whose identities are presently unknown to Quontic.  Quontic will seek leave to amend its pleading to incorporate the identities of John Does 1-10 after they are discovered.

37.     Upon information and belief, prior to the Quontic Mortgage, each of Agostinho Wong, Anna C. Wong, David Wong, Luis C. Wong, Estevao Wong, Antonio Wong, Francisco Wong, Ida Wong, Alberto Wong and John Does 1-10 (collectively the "Wong Third-Party Defendants"), had control over the books and records of Great Wall.

38.     Upon information and belief, and if the allegations of Great Wall are found to be true, prior to the Quontic Mortgage, the Wong Third-Party Defendants were aware that Junior and Lin had the inclination, ability and propensity to claim, under false pretenses, authority to act on behalf of Great Wall or related entities, and to mortgage or encumber property owned by Great Wall or related entities, for their own benefit and that they had done so in the past.

39.     Upon information and belief, prior to the Quontic Mortgage, the Wong Third-Party Defendants were aware that Junior had entered the Wilson Avenue Property transaction purportedly on behalf of 8 Wilson Realty Corp.

40.     Upon information and belief, prior to the Quontic Mortgage, the Wong Third-Party Defendants were aware that Junior had entered the July 26, 2012 Wisdom/Bloomingdale Mortgage transaction with respect to the 28th Street Property, purportedly on behalf of Great Wall.

41.     Despite the Wong Third-Party Defendants' knowledge of Junior's involvement in the Wilson Avenue Property transaction and the July 26, 2012 Wisdom/Bloomingdale Mortgage, the Wong Third-Party Defendants failed to take any, much less reasonable, steps to prevent Junior and his associates from claiming ownership or authority to act on behalf of Great Wall, or to mortgage, transfer or otherwise encumber property owned by Great Wall or related entities, including the 28th Street Property.

42.     As a direct and proximate result of the Wong Third-Party Defendants' failures, Junior and Lin were placed in a position, and cloaked with the authority, to grant the $2.5 million Quontic Mortgage, which Great Wall now alleges was entered into by Junior and Lin on behalf of Great Wall without authorization.

43.     In the event it is determined that the Quontic Mortgage was entered into by Junior and Lin without proper authority, and Great Wall thereby prevails on its cause of action for a declaration that the Quontic Mortgage is null and void, then in such event each of the Wong Third-Party Defendants are jointly and severally obligated to indemnify Quontic for the direct, proximate and consequential damages resulting therefrom, in an amount not less than

7

$2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage.

## Second Third-Party Claim Against John Messer
### (Fraudulent Misrepresentation)

44.    Quontic repeats and re-alleges the allegations in paragraphs "1" through "43" above as though fully set forth herein.

45.    Upon information and belief, John Messer ("Messer") is a resident of the State of New York residing at 6106 Cloverdale Boulevard, Oakland Gardens, NY 11364.

46.    Upon information and belief, at all relevant times, John Messer has been an attorney admitted to practice law in this state, and served as Vice President and Counsel of a California corporation named DC Solar Solutions, Inc. ("DC Solar").

47.    Upon information and belief, in or about June 2012, Messer asked an individual named Lance Falow to lend $1.5 million to DC Solar.

48.    Upon information and belief, Falow declined to loan any money to DC Solar.

49.    Upon information and belief, in or about July 2012, Messer proposed to Falow that, instead of lending money directly to DC Solar, Falow lend money to Great Wall, which loan would be secured by a mortgage on the 28th Street Property.

50.    Upon information and belief, Messer explained to Falow that Great Wall was owned by Junior, whom Messer introduced to Falow.

51.    On or about July 26, 2012, Wisdom Ventures, LLC, to which Falow served as counsel, and Bloomingdale Drive Funding LLC, lent $1.1 million to Great Wall.

52.    Contemporaneously with the July 26, 2012 Wisdom/Bloomingdale Mortgage, DC Solar executed a Secured Promissory Note with Great Wall (the "DC Solar/Great Wall Note"),

whereby Great Wall lent DC Solar $1.1 million, which is the same sum as the principal amount of the July 26, 2012 Wisdom/Bloomingdale Mortgage.

53.    The DC Solar/Great Wall Note was executed by John Messer, as Vice President of DC Solar, and by Jeff Carpoff, as President of DC Solar.

54.    Upon information and belief, as a result of Messer's prior acquaintance with Junior and his involvement in the July 26, 2012 Wisdom/Bloomingdale Mortgage, Messer gained knowledge regarding the true status of Junior and Lin as putative shareholders, officers and directors of Great Wall.

55.    John Messer personally guaranteed Great Wall's repayment of the July 26, 2012 Wisdom/Bloomingdale Mortgage.

56.    In connection with the Quontic Mortgage, Messer represented Great Wall, acting through Junior and Lin.

57.    On or about December 31, 2012, Messer issued his opinion letter to Quontic (the "Messer Opinion Letter"), wherein he represented to Quontic that:

> To the best of our knowledge . . . Borrower [Great Wall, by Lin and Junior] has full power and authority to enter into and perform the Loan Documents executed by it, to borrow the Loan and to pledge the collateral and create the mortgage and lien provided for in the Loan documents to be delivered by it, all of which have been duly authorized by all necessary and proper action;
>
> To the best of our knowledge, CHRIS LIN, holds 180 Shares of the Borrower corporation (90% Shareholder) and is the Vice President, Secretary and Treasurer; and ANTONIO WONG, holds 20 Shares of the Borrower corporation (10% Shareholder) and is the President;
>
> To the best of our knowledge, no other consent or approval (governmental or otherwise) or the taking of any other action is required as a condition to the validity or enforceability of any Loan Documents except for any consents and approvals heretofore delivered to you;
>
> To the best of our knowledge, each of the Loan Documents has been duly executed and delivered and constitutes the valid and legally binding obligations of the Borrower enforceable in accordance with their respective terms . . . .

58.     Upon information and belief, Messer wrote the Messer Opinion Letter and delivered it to Quontic in order to induce Quontic to lend $2.5 million to Great Wall to be secured by the Quontic Mortgage.

59.     Upon information and belief, Messer knew and intended that Quontic would rely on the Messer Opinion Letter in making the aforesaid loan and accepting the Quontic Mortgage to secure the repayment of said loan.

60.     Great Wall alleges in its complaint that Junior and Lin were not shareholders, officers or directors of Great Wall, and that they were not authorized by to enter the Quontic Mortgage on behalf of Great Wall.

61.     In the event it is determined that Junior or Lin lacked authority to act on behalf of Great Wall in granting the Quontic Mortgage, then in such event the Messer Opinion Letter was false and was knowingly issued by Messer to fraudulently induce Quontic to lend $2.5 million secured by the Quontic Mortgage.

62.     By reason thereof, in the event it is determined that Junior or Lin entered the Quontic Mortgage without proper authority, Messer is liable to Quontic for the direct, proximate and consequential damages resulting therefrom, in an amount not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage, together with punitive and exemplary damages in an amount not less than $5 million.

## Third Third-Party Claim Against John Messer
### (Negligent Misrepresentation)

63.     Quontic repeats and re-alleges the allegations in paragraphs "1" through "62" above as though fully set forth herein.

64.     Upon information and belief, as a result of Messer's prior relationship with Junior and Great Wall in connection with the July 26, 2012 Wisdom/Bloomingdale Mortgage, and his representation of Great Wall in connection with the Quontic Mortgage, Messer held unique knowledge regarding the corporate ownership of Great Wall and Junior's and Lin's status as putative officers, directors and shareholders of Great Wall.

65.     Upon information and belief, Messer issued the Messer Opinion Letter to Quontic for the purpose of inducing Quontic to loan the $2.5 million secured by the Quontic Mortgage.

66.     Upon information and belief, in issuing the Messer Opinion Letter to Quontic, Messer knew and intended that Quontic would rely upon his knowledge regarding the corporate ownership of Great Wall and Junior's and Lin's status as putative officers, directors and shareholders of Great Wall in loaning the $2.5 million secured by the Quontic Mortgage.

67.     In the event it is determined that Junior or Lin lacked authority to act on behalf of Great Wall in entering the Quontic Mortgage, then in such event Messer reasonably should have known that the Messer Opinion Letter was false and misleading.

68.     By reason thereof, Messer should be found liable to Quontic for the direct, proximate and consequential damages resulting therefrom, in an amount not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage.

### Fourth Third-Party Claim Against John Messer
#### (Indemnification)

69.     Quontic repeats and re-alleges the allegations in paragraphs "1" through "68" above as though fully set forth herein.

70.     In the event it is determined that the Quontic Mortgage was entered into by Junior or Lin without proper authority, and Great Wall thereby prevails on its cause of action for a

declaration that the Quontic Mortgage is null and void, then in such event Messer is obligated to indemnify Quontic for the direct, proximate and consequential damages resulting therefrom, in an amount not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage.

### Fifth Third-Party Claim Against Kristin Dodson
### (Notarial Misconduct; Executive Law § 135)

71.     Quontic repeats and re-alleges the allegations in paragraphs "1" through "70" above as though fully set forth herein.

72.     Upon information and belief, Kristin Dodson ("Dodson") is a resident of the State of New York, residing at 15 Elton Street, Apt. 2, Brooklyn, NY 11208.

73.     Upon information and belief, Dodson has been a licensed Notary Public in the State of New York, Kings County, as of at least December 6, 2010.

74.     Dodson, as a notary public, acknowledged and certified the purported signature of Agostinho Wong on the May 15, 2012 Corporate Resolution.

75.     In notarizing the May 15, 2012 Corporate Resolution, Dodson represented that she had actual knowledge that Agostinho Wong had appeared before her and had signed the May 15, 2012 Corporate Resolution.

76.     Quontic reasonably relied upon Dodson's certification as to the authenticity of Agostinho Wong's signature on the May 15, 2012 Corporate Resolution in entering Quontic Mortgage.

77.     Great Wall alleges that the May 15, 2012 Corporate Resolution was not signed by Agostinho Wong, but by Junior who forged Agostinho Wong's name.

78. Upon information and belief, on May 15, 2012, Agostinho Wong was 89 years old and Junior was 30 years old.

79. Upon information and belief, on or about May 15, 2012 Agostinho Wong could not reasonably be mistaken for Junior.

80. In the event it is determined that Agostinho Wong's name was forged on the May 15, 2012 Corporate Resolution, then in such event Dodson was reckless, negligent and careless in performing her duties as a Notary Public, in violation of Executive Law § 135.

81. As a result of Dodson's reckless, negligent and careless actions, Quontic has been damaged in an amount not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage.

### Sixth Third-Party Claim Against Kristin Dodson
#### (Negligence)

82. Quontic repeats and re-alleges the allegations in paragraphs "1" through "81" above as though fully set forth herein.

83. In the event it is determined that Agostinho Wong's name was forged on the May 15, 2012 Corporate Resolution, Dodson was negligent in performing her duties as a Notary Public, and as a direct, proximate and foreseeable result of Dodson's negligence, Quontic has been damaged in an amount not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage.

### Seventh Third-Party Claim Against Kristin Dodson
#### (Indemnification)

84. Quontic repeats and re-alleges the allegations in paragraphs "1" through "83" above as though fully set forth herein.

85.     In the event it is determined that the Quontic Mortgage was entered into by Junior or Lin without proper authority, and Great Wall thereby prevails on its cause of action for a declaration that the Quontic Mortgage is null and void, then in such event Dodson is obligated to indemnify Quontic for the direct, proximate and consequential damages resulting therefrom, in an amount not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage.

### Eighth Third-Party Claim Against PPC Capital LLC, PPC Capital Partners Incorporated, and PPC Capital International Trading Company
### (Unjust Enrichment)

86.     Quontic repeats and re-alleges the allegations in paragraphs "1" through "85" above as though fully set forth herein.

87.     Upon information and belief, PPC Capital LLC is a domestic limited liability company with a principal place of business at 41-41 24th Street, Suite 401, Long Island City, NY 11101.

88.     Upon information and belief, PPC Capital Partners Inc. is a domestic corporation with a principal place of business at 41-41 24th Street, Suite 401, Long Island City, NY 11101.

89.     Upon information and belief, PPC Capital International Trading Co. is a domestic corporation with a principal place of business at 41-41 24th Street, Suite 401, Long Island City, NY 11101.

90.     Upon information and belief, Junior and Lin are co-owners of PPC Capital LLC, PPC Capital Partners Inc. and PPC Capital International Trading Co. (collectively, "PPC Capital") along with Jenny P. Liu.

91.    On or about January 9, 2013 and on other subsequent occasions, Junior or Lin caused at least $861,491 of the loan proceeds from the Quontic Mortgage to be transferred to PPC Capital.

92.    Upon information and belief, no valuable consideration was given by PPC Capital in exchange for the Quontic Mortgage loan proceeds it received.

93.    In the event it is determined that Junior or Lin lacked authority to enter the Quontic Mortgage and to direct the proceeds thereof, PPC Capital knew, upon information and belief, that it was not entitled to receive said loan proceeds, and it would be against equity and good conscience to permit PPC Capital to retain the funds transferred to it by Junior or Lin.

94.    By reason thereof, PPC Capital should be found liable to Quontic in an amount not less than of $861,491, plus interest thereon to the date of the entry of judgment.

### Ninth Third-Party Claim Against Jenny P. Liu
### (Unjust Enrichment)

95.    Quontic repeats and re-alleges the allegations in paragraphs "1" through "94" above as though fully set forth herein.

96.    Upon information and belief, Jenny P. Liu, also known as Pei Chang Liu ("Liu"), is a resident of the State of New York residing at 3215 30th St., Apt A31, Astoria, NY 11106.

97.    Upon information and belief, Liu is a co-owner of PPC Capital along with Junior and Lin.

98.    On or about January 10, 2013, Junior caused $70,000 of the proceeds of the Quontic Mortgage to be transferred to Liu.

99.    Upon information and belief, no valuable consideration was given by Liu in exchange for the $70,000 of loan proceeds that she received.

100.    In the event it is determined that Junior or Lin lacked authority to enter the Quontic Mortgage and to direct the proceeds thereof, Liu, upon information and belief, knew that she was not entitled to receive said loan proceeds, and it would be against equity and good conscience to permit Liu to retain the funds transferred to her by Junior or Lin.

101.    By reason thereof, Liu should be found liable to Quontic in an amount not less than $70,000, plus interest thereon to the date of entry of judgment.

**DEMAND IS HEREBY MADE** that the Third-Party Defendants answer the Third-Party Claims against each of them contained herein, and that service of such answer be made within twenty (20) days after service hereof.

**WHEREFORE**, Quontic demands judgment as follows:

a.    In respect of the First Third-Party Claim against the Wong Third-Party Defendants, judgment against the Wong Third-Party Defendants, jointly and severally, in the amount of the direct, proximate and consequential damages resulting to Quontic from a judgment in favor of Great Wall on its cause of action for a declaration that the Quontic Mortgage is null and void, which amount is not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage;

b.    In respect of the Second Third-Party Claim against John Messer, judgment against Messer in an amount not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage, together with punitive and exemplary damages in an amount not less than $5 million;

c.   In respect of the Third Third-Party Claim against John Messer, judgment against Messer in an amount not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage;

d.   In respect of the Fourth Third-Party Claim against John Messer, judgment against Messer in the amount of the direct, proximate and consequential damages resulting to Quontic from a judgment in favor of Great Wall on its cause of action for a declaration that the Quontic Mortgage is null and void, which amount is not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage;

e.   In respect of the Fifth Third-Party Claim against Kristin Dodson, judgment against Dodson in the amount of damages sustained by Quontic from Dodson's misconduct as a notary public, which damages are not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage;

f.   In respect of the Sixth Third-Party Claim against Kristin Dodson, judgment against Dodson in an amount not less than $2,472,230, representing the outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage;

g.   In respect of the Seventh Third-Party Claim against Kristin Dodson, judgment against Dodson in the amount of the direct, proximate and consequential damages resulting to Quontic from a judgment in favor of Great Wall on its cause of action for a declaration that the Quontic Mortgage is null and void, which amount is not less than $2,472,230, representing the

17

outstanding indebtedness secured by the Quontic Mortgage, plus applicable interest thereon and other fees and expenses due under said mortgage;

      h.      In respect of the Eighth Third-Party Claim against PPC Capital LLC, PPC Capital Partners Inc. and PPC Capital International Trading Co., judgment against PPC Capital LLC, PPC Capital Partners Inc. and PPC Capital International Trading Co., jointly and severally, in an amount not less than $861,491, plus interest thereon;

      i.      In respect of the Ninth Third-Party Claim against Jenny P. Liu, judgment against Liu in an amount not less than $70,000, plus interest thereon;

      j.      Granting Quontic its attorneys' fees, costs and expenses incurred in the action;

      k.      Such other and further relief as the Court may find just and proper.


Dated:   New York, New York
          May  10, 2013

                         LOEB & LOEB LLP


                         By: _____
                            David M. Satnick
                            Tal E. Dickstein
                            345 Park Avenue
                            New York, NY  10154
                            Telephone: 212.407.4000

                            *Attorneys for*
                            *Defendant/Counterclaimant/Cross-*
                            *Complainant/Third-Party Plaintiff Quontic*
                            *Bank*


To:

     Great Wall Realty Corp.          Francisco Wong
     c/o Law Offices of Christopher E.   357 Hollywood Ave.
     Chang, Esq.                 Little Neck, NY 11363
     140 Broadway, 46th Floor
     New York, NY 10005

Antonio Wong, Jr.
35-44 28th Street, Apt 4B
Astoria, NY 11106

Ida Wong

Chris Lin
173 Henry Street, Apt 7C
New York, NY 10002

Alberto Wong
2 Terrace Drive A
Great Neck, NY 11021

Agostinho Wong
c/o Law Offices of Christopher E.
Chang, Esq.
140 Broadway, 46th Floor
New York, NY 10005

John Messer
6106 Cloverdale Blvd.
Oakland Gardens, NY 11364

Anna C. Wong
c/o Law Offices of Christopher E.
Chang, Esq.
140 Broadway, 46th Floor
New York, NY 10005

Kristin Dodson
15 Elton St., Apt. 2
Brooklyn, NY 11208

David Wong
c/o Law Offices of Christopher E.
Chang, Esq.
140 Broadway, 46th Floor
New York, NY 10005

PPC Capital LLC
41-41 24th Street, Suite 401
Long Island City, NY 11101

Luis C. Wong
4741 159th St.
Flushing, NY 11358

PPC Capital Partners Inc.
41-41 24th Street, Suite 401
Long Island City, NY 11101

Estevao Wong
29 Ludlow St., Apt. 2B
New York, NY 10002

PPC Capital International Trading
Co.
41-41 24th Street, Suite 401
Long Island City, NY 11101

Antonio Wong
35-44 28th Street, Apt 3A
Astoria, New York 11106

Jenny P. Liu
3215 30th St., Apt A31
Astoria, NY 11106

## **VERIFICATION**

STATE OF NEW YORK    )
                       ) ss.:
COUNTY OF NEW YORK  )

Tal E. Dickstein, being duly sworn, deposes and states:

I am associated with the law firm Loeb & Loeb LLP, attorneys for Defendant /

Counterclaimant / Cross-Claimant / Third-Party Plaintiff Quontic Bank.  I have read the

foregoing Verified Third-Party Complaint of Quontic Bank and know the contents thereof; and

the same is true to my knowledge, except as to the matters therein stated to be alleged upon

information and belief, and as to those matters I believe them to be true based upon information

received in the course of my duties as attorney for Quontic in connection with this matter.  This

affidavit is made by me as Quontic does not reside in the county where the firm of the

undersigned attorney maintains its law office.

                                                       Tal E. Dickstein

Sworn to before me this
_10_th day of May 2013.

Notary Public

TIMOTHY B. CUMMINS
Notary Public, State of New York
No. 01CU6113096
Qualified in New York County
Commission Expires July 19, 2016

NY1202137

20

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK    )
                     )    SS.
COUNTY OF NEW YORK   )

      TIMOTHY B. CUMMINS, being duly sworn, deposes and says:

1.     I am not a party to this action and am over 18 years of age.

2.     On May 10, 2013, I served true copies of the foregoing

Third-Party Summons and Complaint by first-class mail to the below listed parties:

> Baum & Bailey, P.C.
> 48 Wall Street
> New York, New York 10005
> Attorneys for Defendants
> Antonio Wong, Jr. and
> Chris Lin
>
> Antonio Wong, Jr.
> 35-44 28th Street
> Apartment 4B
> Astoria, New York 11106
>
> Chris Lin
> 173 Henry Street
> Apartment 7C
> New York, New York 10002

                                              Timothy B. Cummins

Sworn to before me this
10th Day of May, 2013

Notary Public

COURTNEY L. TREUBERT
Notary Public, State of New York
No. 01TR6206397
Qualified in Nassau County
Commission Expires May 18, 2013

EXHIBIT K

Case 1:19-cv-03875   Document 2-10   Filed 07/03/19   Page 2 of 7 PageID #: 301

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

-------------------------------------------------------------------x

GREAT WALL REALTY CORP.,

                              Plaintiff,

                                                    Index No. 709653/14

          -against-                                 **JUDGMENT BY CONFESSION**

ANTONIO WONG, JR.,                                  (C.P.L.R. § 3218)

                              Defendant.

-------------------------------------------------------------------x

         Upon reading and filing the annexed affidavit of confession of judgment, sworn to

on the 10th day of November, 2014, by defendant Antonio Wong, Jr. and on the motion of Law

Offices of Christopher E. Chang, attorneys for plaintiff Great Wall Realty Corp., it is

         ~~ORDERED~~, ADJUDGED ~~AND DECREED~~, that plaintiff Great Wall Realty Corp.

having its principal place of business located at 35-44 28th Street, Astoria, New York 11106 recover

of defendant Antonio Wong, Jr. having his principal residence located at 35-44 28th Street, Apt. 4C,

Astoria, New York 11106, the sum of Five Million Dollars and No Cents ($5,000,000), and that

plaintiff have execution therefor.                                   - DOCKET

         Judgment signed this 18TH day of December, 2014

                                        _Audrey I. Pheffer_
                                        Clerk of the Court

**FILED & RECORDED**

DEC 18 2014

**COUNTY CLERK**
**QUEENS COUNTY**

ENTERED
9:09 AM/PM
DEC 18 2014
COUNTY CLERK
COUNTY OF QUEENS

INDEX NO. UNASSIGNED

NYSCEF DOC. NO. 1

RECEIVED NYSCEF: 12/16/2014

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
-----------------------------------------------------------------X

GREAT WALL REALTY CORP.,

Index No.: ~~700530/2013~~ **709653/2014**

Plaintiff,

**AFFIDAVIT FOR
JUDGMENT BY
CONFESSION**

-against-

ANTONIO WONG, JR., CHRIS LIN and
QUONTIC BANK.

**(N.Y. C.P.L.R. § 3218)**

· Defendants.

-----------------------------------------------------------------X

State of New York    )
                     ) ss.:
County of New York   )

**FILED & RECORDED**

**DEC 18 2014**

**COUNTY CLERK
QUEENS COUNTY**

Antonio, Wong, Jr., being duly sworn, deposes and says:

1.    That I ("Wong, Jr.") am a defendant in the instant action and my principal

residence is 35-44 28th Street, Apt. 4C, Astoria, New York 11106 in the County of Queens, State

of New York.

2.    I hereby confess judgment herein and authorizes entry thereof against me, Wong,

Jr., in the sum of five million dollars ($5,000,000.00).

4.    This confession of judgment is for a debt justly due to the plaintiff arising out of

the following facts:

a.    The Plaintiff is the owner of the real property located at 35-44 28th Street,

Astoria, New York 11106.

b.    On February 15, 2013, the Plaintiff commenced the instant action against

Wong, Jr., among others, seeking to recover damages for Wong Jr.'s alleged fraud and unjust

enrichment relating to a loan from Quontic Bank secured by the Real Property.

FILED & RECORDED

DEC 18 2014

COUNTY CLERK
QUEENS COUNTY

c. On November 10, 2014, the Plaintiff and Wong, Jr. entered into a settlement agreement (the "Agreement"), whereby the parties agreed to settle the instant action.

d. Pursuant to the Agreement, Wong, Jr. agrees to the entry of a judgment in favor of the Plaintiff and against Wong, Jr. in the amount of five million dollars ($5,000,000.00).

5. This confession of judgment is not for the purpose of securing the plaintiff against a contingent liability.

6. This Affidavit for Judgment by Confession is not made in connection with an agreement for the purchase of one thousand, five hundred dollars ($1,500.00) or less of any commodities for any use other than a commercial or business use upon any plan of deferred payments whereby the price or cost is payable in two (2) or more installments.

Name: Antonio Wong, Jr.

Sworn to before me this
10th day of November, 2014

Notary Public

CHRISTOPHER JAMES BAUM
Notary Public - State of New York
NO. 02BA6233740
Qualified in Nassau County
My Commission Expires ___11/2/15

EXHIBIT L

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
--------------------------------------------------------------------X
XIAO DONG CHEN,
YAN JIE HUANG,

                             Plaintiffs,

                  -against-

JIMMY LI, PATRICK K. CHAN, ANTONIO WONG,
WONG REAL ESTATE CONSULTANCY, LLC, d/b/a
WRE CONSULTANCY, COLLEGE POINT
RENAISSANCE, LLC,

                         Defendants.
--------------------------------------------------------------------X

Date Purchased:
Index No.:

**SUMMONS**
Plaintiffs designate Queens
County as the place of trial.

The basis of venue is:
Plaintiffs' residence.

To the above named Defendants:

      You are hereby summoned to answer the complaint in this action, and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance on the Plaintiffs' attorney within twenty days after the service of this summons, exclusive of the day of service, where service is made by delivery upon you personally within the state, or, within 30 days after completion of service where service is made in any other manner. In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
      May 17, 2017

                                  Robert E. Brown, Esq.
                                  44 Wall Street, 12th Floor
                                  New York, N.Y. 10005
                                  (212) 766-9779

TO:
Jimmy Li
59-31 160 Street
Fresh Meadows, NY 11365

Patrick K. Chan
20 Confucius Plaza, Apt. 7B
New York NY 10002

FILED: QUEENS COUNTY CLERK 05/17/2017 03:39 PM

INDEX NO. 706754/2017

NYSCEF DOC. NO. 1    Case 1:19-cv-03875    Document 2-11    Filed 07/03/19    Page 3 of 18 PageID #: 309    RECEIVED NYSCEF: 05/17/2017

Antonio Wong
35-44 28th Street, Apt. 4B
Astoria, NY 11106

Wong Real Estate Consultancy, LLC
136-20 38th Ave, Suite 3A-106
Flushing, NY
11354

College Point Renaissance, LLC
136-20 38th Ave, Suite 3A-106
Flushing, NY
11354

FILED: QUEENS COUNTY CLERK 05/17/2017 03:39 PM INDEX NO. 706754/2017

NYSCEF DOC. NO. 1    Case 1:19-cv-03875   Document 2-11   Filed 07/03/19   Page 4 of 18 PageID #: 310    RECEIVED NYSCEF: 05/17/2017

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
-------------------------------------------------------------------X
XIAO DONG CHEN,
YAN JIE HUANG,

                              Plaintiffs,

                         -against-

                                                 Index No.:

                                             **VERIFIED COMPLAINT**

JIMMY LI, PATRICK K. CHAN, ANTONIO WONG,
WONG REAL ESTATE CONSULTANCY, LLC, d/b/a
WRE CONSULTANCY, COLLEGE POINT
RENAISSANCE, LLC,

                             Defendants.
-------------------------------------------------------------------X
        Plaintiffs, by their attorneys, Law Offices of Robert E. Brown, P.C., complaining of the

above-named Defendants, alleges, upon information and belief, the following:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Xiao Dong Chen ("Chen") is an individual residing in the county of Queens and the

    State of New York.

2. Plaintiff Yan Jie Huang ("Huang") is an individual residing in the county of Queens and the

    State of New York.  Chen and Huang are collectively referred to as Plaintiffs.

3. Plaintiffs are individuals, and a married couple, residing at 104-48 37th Drive, Apt. 3A,

    Corona New York 11368.

4. Defendant Jimmy Li ("Li") is an individual, residing at 59-31 160 Street, Fresh Meadows,

    NY 11365.

5. Defendant Patrick K. Chan ("Chan") is an individual, residing at 20 Confucius Plaza, Apt.

    7B, New York NY 10002.

6. Defendant Antonio Wong ("Wong") is an individual, residing at 35-44 28th Street, Apt. 4B,

                                     **1**

Astoria, NY 11106.

7. WONG REAL ESTATE CONSULTANCY, LLC, d/b/a WRE CONSULTANCY ("WRE")
is a Domestic Business Corporation located at 136-20 38th Ave, Suite 3A-106, Flushing,
New York 11354.

8. Defendant Wong is the owner of Defendant WRE.

9. Defendant Wong is the director of Defendant WRE.

10. Defendant Chan is the Chief Operating Officer of Defendant WRE.

11. COLLEGE POINT RENAISSANCE, LLC, ("College Point") is a Domestic Business
Corporation located at 136-20 38th Ave, Suite 3A-106, Flushing, New York 11354.

12. Defendant Wong is the owner of Defendant College Point.

13. Defendant Wong is the Director of Defendant College Point.

14. Defendant Chan is an Officer of Defendant College Point.

15. Venue is proper in that all parties reside in the County of Queens, State of New York.

## NATURE OF ACTION AND ALLEGATIONS
## COMMON TO ALL CAUSES OF ACTION

16. This is an action arising out of a classic fraudulent Ponzi scheme perpetrated on Plaintiff
Chen and Plaintiff Huang, innocent investors, by and with the active participation,
cooperation, assistance and wrongful conduct of each of the Defendants, who directly
either orchestrated or participated in the scheme and/or aided and abetted the other
Defendants in the scheme. As a result of this fraudulent scheme, Plaintiffs lost
$335,000.00.

17. In or about June 2015, Plaintiff Chen and his wife Plaintiff Huang, were looking to purchase
a house.

2

18. Plaintiff Chen inquired with a longtime customer of his, Defendant Li, about locating and purchasing an affordable house.

19. Plaintiff Chen had known Defendant Li for years and believed him to be quite knowledgeable about real estate matters.

20. Defendant Li showed the Plaintiffs several houses and informed Plaintiffs that he would try to by the "best" house at the lowest price.

21. With Defendant Li advising them, Plaintiffs put in a number of bids on houses that Defendant Li had shown them.

22. Defendant Li continually advised Plaintiffs to bid very low and as a result, Plaintiffs were never able to win any of the bids.

23. The fraudulent Ponzi scheme began in or about September, 2015, when Defendant Li informed Plaintiffs that house prices were currently too high, and suggested that Plaintiffs instead invest money with Defendant Li and his business partners, and then buy a house with their profits from investment.

24. Defendants had the express intent of defrauding investors such as Plaintiffs and effectively stealing their funds.

25. Defendant Li introduced Plaintiff Chen to his "business partners" Antonio Wong and Patrick Chan (Defendants Wong and Chan).  Defendant Li falsely misrepresented that Defendants Wong and Chan were trustworthy.

26. Defendants Li, Wong and Chan suggested that Plaintiffs invest with them in a property located at 111-16 147th Street, Jamaica, New York ("Jamaica Property").

27. Defendants Li, Wong and Chan stated that the investment would be for a renovation of the Jamaica Property and promised a 40% profit on Plaintiffs' investment within three (3)

3

months.

28. Defendants Li, Wong and Chan insisted that Chinese people should help Chinese people in coaxing Plaintiffs to invest with them.

29. Defendants devised and perpetrated a scheme to defraud investors by soliciting funds under false pretenses. Defendants then failed to invest investors' funds as promised, and misappropriated and converted a substantial portion of the investors' funds to their own benefit without the knowledge or authorization of the investors.

30. Due to the fact that Plaintiff Chen had known Defendant Li for years, he believed him to have good credit, and believed that Defendant Li had previously worked hard on his behalf, Plaintiffs agreed to invest with the Defendants.

31. Plaintiff Chen signed a contract for the Jamaica Property and tendered a check for $100,000.00 on or about September 24, 2015.

32. Thereafter, believing Defendants to be trustworthy partners in real estate investment, Plaintiff Chen brought to Defendants a posting he saw for a pre-foreclosure house located at 22-18 Ryan Ct, Whitestone, New York ("Whitestone Property").

33. Plaintiff Chen asked Defendant Li and Defendant Wong what they thought of the Whitestone Property as a potential investment.

34. Defendants Li and Wong informed Plaintiff Chen that they were connected with someone at Capital One Bank and that they could buy the Note for that property and foreclose on the property.

35. Plaintiffs reasonably relied on the misrepresentations of Defendants Li and Wong

36. Defendants Li and Wong informed Plaintiff Chen how lucky he was that they were going into this opportunity together.

4

FILED: QUEENS COUNTY CLERK 05/17/2017 03:39 PM
INDEX NO. 706754/2017

NYSCEF DOC. NO. 1
Case 1:19-cv-03875   Document 2-11   Filed 07/03/19   Page 8 of 18 PageID #: 314
RECEIVED NYSCEF: 05/17/2017

37. Defendants Li and Wong solicited $400,000.00 from Plaintiff Chen to purchase the Whitestone Property.

38. Defendants Li and Wong informed Plaintiff Chen that they would contribute $475,000.00 to the purchase price of $875,000.00 for Whitestone Property.

39. Defendants Li and Wong informed Plaintiff Chen that the market value of the Whitestone Property was $1,200,000.00.

40. Plaintiffs reasonably relied on the misrepresentations of Defendants Li and Wong.

41. Defendants Li and Wong insisted that Plaintiff Chen not consult a lawyer regarding the contract for Plaintiffs' contribution to the purchase of the Whitestone Property.

42. Needless to say, if Plaintiffs had been informed of any of the true material facts, they never would have invested or maintained their investment.

43. Plaintiff Chen signed the contract with Defendants Wong and Chan on or about October 1, 2015.

44. Plaintiff Chen wrote two (2) checks to Defendants Wong and Chan and/or their business entities for the Whitestone Property.

45. Plaintiff Chen wrote one check for $190,000.00 and one check for $210,000.00 for a total of $400,000.00 for the Whitestone Property.

46. In or about November 2015, Defendants showed Plaintiff Chen what they purported to be a Note for the Whitestone Property.

47. Plaintiffs later discovered that the purported Note for the Whitestone Property was fraudulent.

48. In or about December 2015, Defendants paid to Plaintiff Chen $40,000.00 claiming same was profits from the Jamaica Property investment.

5

49. In a classic Ponzi scheme, the purported profits were used to support false representations of positive economic performance, and to support efforts to induce investors, such as Plaintiffs, not only to maintain their investment but to acquire additional property.

50. After paying to Plaintiff Chen the $40,000.00 of purported profits, Defendants requested that Plaintiff Chen recruit more investors for them.

51. Plaintiffs later discovered that Defendants never purchased and/or didn't currently own the Jamaica Property.

52. In or about December 2015, Defendants Wong and Li approached Plaintiff Chen and requested that Plaintiff Chen pay the balance of $450,000.00 for the Whitestone Property.

53. At this point, Plaintiff insisted upon involving a lawyer in the contract or getting a loan from a bank, not just more money contributed by Plaintiffs.

54. Defendants emailed Plaintiff Chen a Uniform Residential Loan Application which attempted to have Plaintiff Chen borrow $1,000,000.00 on behalf of Defendants.

55. After this action, Plaintiff Chen began to suspect that the actions of Defendants were fraudulent and as a result Plaintiff Chen refused to fill out the Loan Application.

56. At this point, Plaintiff demanded to visit and go inside the Whitestone Property and requested a copy of the key.

57. When Plaintiff Chen requested the key to the Whitestone Property, Defendants claimed falsely that they could not visit because the "Marshall" was allowing the current occupants of the house to stay there until February 2016.

58. Plaintiff Chen continued to investigate and ask questions about the Whitestone Property, and as a result, Defendants announced that they no longer wanted to sell Plaintiffs the Whitestone Property.

6

59. Defendants claimed that they would refund Plaintiffs' money after they managed to sell the Whitestone Property.

60. On or about February 16, 2016, Defendants emailed to Plaintiffs a purported promissory note for $525,000.00 ("Note") which obligated WRE to pay Plaintiff Chen on behalf of all Defendants.

61. Upon information and belief, the Note was used to allay Plaintiffs' fears of non-payment and/or losing their investment as well as to further the Ponzi scheme.

62. The Note required repayment of $525,000.00 to Plaintiff Chen on or before March 31, 2016.

63. On or about March 31, 2016, instead of returning Plaintiffs' money pursuant to the Note, Defendants attempted to sell Plaintiff Chen a house located at 14 W. End Avenue, Great Neck, New York 11023 ("Great Neck Property") in lieu of repayment.

64. Plaintiffs discovered that the Great Neck Property was actually two (2) parcels and Defendants were actually just trying to sell Plaintiffs one parcel containing just the garage for $525,000.00.

65. Upon information and belief, Defendant Wong sold the Great Neck Property in or about March 2016.

66. Upon information and belief, Defendant Wong provided Plaintiffs with a key to the Great Neck Property and allowed Plaintiffs to inspect said property, after Defendant Wong no longer owned it.

67. Plaintiffs refused to purchase the Great Neck Property and demanded their money back.

68. On or about May 25, 2016, Defendants sent to Plaintiffs a check for $25,000.00 claiming it was interest on the money owed to Plaintiffs pursuant to the Note.

69. On or about July 7, 2016, Defendants presented Plaintiffs with two (2) checks, one for

7

$400,000.00 and one for $100,000.00 for repayment of the Note.

70. Plaintiffs attempted to deposit the checks, but were advised by bank personnel that there was no money in the account.

71. In or about July 2016, after Plaintiffs informed Defendants that the checks had bounced, Defendant Wong paid Plaintiffs $100,000.00 in cash and took back the $100,000.00 check.

72. On or about August 2016, Plaintiffs attempted to again deposit the $400,000.00 check and it bounced.

73. On or about August 15, 2016, Defendants sent to Plaintiffs a check for $30,000.00 and it too bounced.

74. On or about September 8, 2016, Defendant Wong presented Plaintiff with another purported promissory note, which Plaintiff Chen refused to sign.

75. Thereafter, Plaintiffs never heard from Defendants again despite many attempts to contact them.

76. In sum, Plaintiffs paid Defendants a total of $500,000, by checks in the amounts of $100,000. $190,000 and $210,000.

77. Defendants paid Plaintiffs back a total of $165,000 by payments in the amounts of $40.000, $25,000 and $100,000.

78. Therefore, $335,000.00 remains unpaid and owed by Defendants to Plaintiffs.

## AS AND FOR A FIRST CAUSE OF ACTION FOR
## UNJUST ENRICHMENT

79. All prior paragraphs are repeated and re-alleged as if separately set forth anew herein.

80. Upon information and belief, Defendants purposefully misled the Plaintiffs into investing in purported real estate deals.

8

81. As a result of these lies, as set forth herein, by Defendants, Defendants were paid sums of money by Plaintiffs.

82. By virtue of Defendants improperly receiving these benefits, due to falsely claiming to be investing in real estate on behalf of Plaintiffs, and then keeping the money, Defendants have been substantially and unjustly enriched.

83. Equity and good conscience require that Defendants make restitution to Plaintiffs.

84. By reason of the foregoing, Plaintiffs are entitled to an amount to be determined at a trial of this matter but in no amount less than **$335,000.00** plus interest.

85. In addition, because of the willful, wanton and malicious nature of the Defendants' actions, Plaintiffs should be awarded **$1,000,000.00** in punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION FOR
## MONEY HAD AND RECEIVED

86. All prior paragraphs are repeated and re-alleged as if separately set forth anew herein.

87. Beginning in or around 2015, Defendants have improperly diverted funds properly belonging to Plaintiffs.

88. Defendants have benefited from their own wrongful conduct, as set forth herein.

89. Under the principles of equity and good conscience, Defendants should not be permitted to keep these funds.

90. The conduct of the Defendants was intentional, willful and egregious, causing severe harm and damage to Plaintiffs.

91. By reason of the foregoing, Plaintiffs are entitled to an amount to be determined at a trial of this matter but in no amount less than **$335,000.00** plus interest.

92. In addition, because of the willful, wanton and malicious nature of the Defendants' actions,

9

Plaintiffs should be awarded **$1,000,000.00** in punitive damages.

## AS AND FOR A THIRD CAUSE OF ACTION FOR
## PRIMA FACIE TORT

93. All prior paragraphs are repeated and re-alleged as if separately set forth anew herein.

94. The actions of Defendants as alleged and set forth herein were designed to cause injury to Plaintiffs deprive them of monies without any cause or justification therefor.

95. By reason of the foregoing, Plaintiffs are entitled to an amount to be determined at a trial of this matter but in no amount less than **$335,000.00** plus interest.

96. In addition, because of the willful, wanton and malicious nature of the Defendants' actions, Plaintiffs should be awarded **$1,000,000.00** in punitive damages.

## AS AND FOR A FOURTH CAUSE OF ACTION FOR
## FRAUD

97. All prior paragraphs are repeated and re-alleged as if separately set forth anew herein.

98. Defendants made numerous false representations to Plaintiffs regarding their experience and actions they were taking as real estate investors on behalf of Plaintiffs.

99. Defendants represented that they would act in good faith on behalf of Plaintiffs in purchasing properties that would be profitable for Plaintiffs.

100.     Plaintiffs paid Defendants sums of money in exchange for these services

101.     Plaintiffs believed the misrepresentations of Defendants.

102.     Plaintiffs relied upon the false representations made by Defendants, as a result, permitted continued payment of monies to Defendants.

103.     Plaintiffs relied upon the false representations made by Defendants and, as a result, paid to Defendants large sums of monies.

104.      Plaintiffs would not have allowed for the continued payment of monies to

10

Defendants but for Plaintiffs' reliance on the materially false representations made by Defendants.

105.    Defendants kept the monies paid to them for their own benefit.

106.    Defendants actions in falsifying documents caused financial harm to Plaintiffs.

107.    Defendants benefited greatly due to their misrepresentations to Plaintiffs.

108.    By reason of the foregoing, Plaintiffs are entitled to an amount to be determined at a trial of this matter but in no amount less than **$335,000.00** plus interest.

109.    In addition, because of the willful, wanton and malicious nature of the Defendants' actions, Plaintiffs should be awarded **$1,000,000.00** in punitive damages.

## AS AND FOR A FIFTH CAUSE OF ACTION FOR
## DECEPTIVE TRADE PRACTICES

110.    All prior paragraphs are repeated and re-alleged as if separately set forth anew herein.

111.    Upon information and belief, Defendants are engaged in the business of real estate investing. Defendants acts constituted deceptive acts and practices in the conduct of Defendants' business, trade and commerce under New York State's General Business Law § 349 (the "Statute").

112.    Plaintiffs relied to their detriment on Defendant's deceptive practices.

113.    Defendants willfully or knowingly violated the Statute.

114.    Pursuant to the Statute, Plaintiffs are entitled to an award of reasonable attorneys' fees in their favor against Defendants.

115.    Pursuant to the Statute, Plaintiffs are entitled to an award of treble damages.

116.    By reason of the foregoing, Plaintiffs have been caused to be damaged in an amount to be determined at trial, treble damages, reasonable attorneys' fees and punitive damages in the sum of $1,000,000.00.

11

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief against the Defendants for the damages caused thereby:

A. On the first cause of action for, unjust enrichment, judgment against Defendants in an amount to be determined at a trial of this matter but in no amount less than **$335,000.00** plus interest, and **$1,000,000.00** in punitive damages.

B. On the second cause of action for, money had and received, judgment against Defendants in an amount to be determined at a trial of this matter but in no amount less than **$335,000.00** plus interest, and **$1,000,000.00** in punitive damages.

C. On the third cause of action, prima facie tort, judgment against Defendants in an amount to be determined at a trial of this matter but in no amount less than **$335,000.00** plus interest, and **$1,000,000.00** in punitive damages.

D. On the fourth cause of action, for fraud, judgment against Defendants in an amount to be determined at a trial of this matter but in no amount less than **$335,000.00** plus interest, and **$1,000,000.00** in punitive damages.

E. On the fifth cause of action, for deceptive trade practices, judgment against Defendants in an amount to be determined at a trial of this matter but in no amount less than **$335,000.00** plus interest, treble damages, reasonable attorneys' fees and **$1,000,000.00** in punitive damages.

F. Granting Plaintiffs such other, further relief as this Court deems just and proper.

12

Case 1:19-cv-03875    Document 2-11    Filed 07/03/19    Page 16 of 18 PageID #: 322

Dated: New York, New York
      May 17, 2017

                Robert E. Brown, Esq.
                **ROBERT E. BROWN, P.C.**
                *Attorneys for Plaintiffs*
                44 Wall Street, 12th Floor
                New York, N.Y. 10005
                (212) 766-9779

13

FILED: QUEENS COUNTY CLERK 05/17/2017 03:39 PM INDEX NO. 706754/2017

NYSCEF DOC. NO. 4 Case 1:19-cv-03875 Document 2-11 Filed 07/03/19 Page 17 of 18 PageID #: 323 RECEIVED NYSCEF: 05/17/2017

## PLAINTIFF'S VERIFICATION

STATE OF NEW YORK      )
                       ) ss:
COUNTY OF QUEENS       )

XIAO DONG CHEN, being duly sworn, deposes and says:

I am the PLAINTIFF in the within action.  I have read the foregoing **VERIFIED COMPLAINT** and know the contents thereof; the same is true to my own knowledge, except as to matters therein to be alleged upon information and belief, and as to those matters I believe it to be true.

_____
XIAO DONG CHEN

Sworn to before me this
_17_ day of __MAY__ 2017

_____

Notary Public

ROBERT E. BROWN
Notary Public, State of New York
No. 01BR5041233
Qualified in Richmond County
Commission Expires 3/27/20 __19__

14

Case 1:19-cv-03875   Document 2-11   Filed 07/03/19   Page 18 of 18 PageID #: 324

## PLAINTIFF'S VERIFICATION

STATE OF NEW YORK      )
                       ) ss:
COUNTY OF QUEENS       )

YAN JIE HUANG, being duly sworn, deposes and says:

I am the PLAINTIFF in the within action. I have read the foregoing **VERIFIED COMPLAINT** and know the contents thereof; the same is true to my own knowledge, except as to matters therein to be alleged upon information and belief, and as to those matters I believe it to be true.

_____
YAN JIE HUANG

Sworn to before me this
17th day of  May  2017

_____
Notary Public

ROBERT E. BROWN
Notary Public, State of New York
No. 01BR5041233
Qualified in Richmond County
Commission Expires 3/27/20 19

15

EXHIBIT M

FILED: QUEENS COUNTY CLERK 10/15/2018 07:14 PM INDEX NO. 715727/2018

NYSCEF DOC. NO. 1 Case 1:19-cv-03875 Document 2-12 Filed 07/03/19 Page 2 of 13 PageID #: 326 RECEIVED NYSCEF: 10/15/2018

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
--------------------------------------------------------------X
ZI KUO ZHANG, JUN HONG ZHANG,
A & A EXPRESS INC., Z & Z EXPRESS INC.
and FIVE STARS REALTY ESTATE INC.

                                        Index No.:
                    Plaintiffs,         Date Filed:

          - against -


JAY LAU, LAU & ASSOCIATES P.C.,                 **SUMMONS**
FRANKLIN LAND SERVICES, INC.,
and CORNERSTONE LAND ABSTRACT LLC,      Plaintiffs designate Queens
                                        County as the place of trial
                    Defendants.
--------------------------------------------------------------X

To the above-named Defendants:

    **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiffs' attorney within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty [30] days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: October 15, 2018

                              Xue & Associates, P.C.
                              *Attorneys for Plaintiffs*


                    By:    /s/ Benjamin B. Xue_____
                           Benjamin B. Xue, Esq.
                           1 School Street, Suite 303A
                           Glen Cove, NY 11542
                           Tel.: (516) 595-8887
                           Fax: (212) 219-2276

FILED: QUEENS COUNTY CLERK 10/15/2018 07:14 PM INDEX NO. 715727/2018

NYSCEF DOC. NO. 1 Case 1:19-cv-03875 Document 2-12 Filed 07/03/19 Page 3 of 13 PageID #: 327 RECEIVED NYSCEF: 10/15/2018

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
-------------------------------------------------------------X
ZI KUO ZHANG, JUN HONG ZHANG,
A & A EXPRESS INC., Z & Z EXPRESS INC.                   Index No:
and FIVE STARS REALTY ESTATE INC.                       Date Filed:

                        Plaintiffs,

        - against -                                     **VERIFIED COMPLAINT**

JAY LAU, LAU & ASSOCIATES P.C.,
FRANKLIN LAND SERVICES, INC.,
and CORNERSTONE LAND ABSTRACT LLC,

                        Defendants.
-------------------------------------------------------------X

Plaintiffs ZI KUO ZHANG ("Z. Zhang"),  JUN HONG ZHANG ("J. Zhang"),  A & A EXPRESS INC. ("A & A Express"), Z & Z EXPRESS INC ("Z & Z Express"), and FIVE STARS REALTY ESTATE INC. ("Five Stars")   (Collectively "Plaintiffs"), by their undersigned attorneys, Xue & Associates, P.C., for their Complaint against Defendants JAY LAU, LAU & ASSOCIATES P.C. ("Lau & Associates"), FRANKLIN LAND SERVICES, INC. ("Franklin Inc."), and CORNERSTONE LAND ABSTRACT LLC. ("Cornerstone LLC") (Collectively "Defendants"), respectfully alleges as follows:

## NATURE OF ACTION

1. Plaintiffs bring this action against Defendants for (1) breach of fiduciary duty, (2) legal malpractice and (3) unjust enrichment.

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action and the parties.

Case 1:19-cv-03875   Document 2-12   Filed 07/03/19   Page 4 of 13 PageID #: 329

3. The matter in controversy exceeds $100,000, exclusive of interest and costs, and the cause of action arose in the State of New York, County of Queens.

## **PARTIES**

4. Plaintiff Z. Zhang is an individual residing in New York County, New York.

5. Plaintiff J. Zhang is an individual residing in Queens County, New York.

6. Plaintiff A & A Express, a duly formed corporation in the State of New York, has its principle place of business located at 35-43 88th Street, 2nd Floor, Jackson Heights, NY 11373.

7. Plaintiff Z & Z Express, a duly formed corporation in the State of New York, has its principle place of business located at 35-43 88th Street, 2nd Floor, Jackson Heights, NY 11373.

8. Plaintiff Five Stars, a duly formed corporation in the State of New York, has its principle place of business located at 35-43 88th Street, 2nd Floor, Jackson Heights, NY 11373.

9. Defendant Jay Lau is a New York attorney and, upon information and belief, managing attorney of the law firm Lau & Associates.

10. Upon information and belief, Defendant Lau & Associates is a duly formed corporation in the State of New York, with its principal place of business located at 40 Cuttermill Road, Suite 504, Great Neck, New York 11021. In 2015, Defendants Lau and Lau & Associates operated out of an office in Flushing, Queens, New York.

11. Upon information and belief, Defendant Franklin Inc. is a duly formed corporation in the State of New York, with its principal place of business located at 136-20 38th Ave. # 11J, Flushing New York, 11354.

Case 1:19-cv-03875 Document 2-12 Filed 07/03/19 Page 5 of 13 PageID #: 329

12. Upon information and belief, Defendant Cornerstone is a duly formed corporation in the State of New York, with its principal place of business located at 248-52 Jericho Turnpike, Bellerose Village, New York 11001.

## **RELEVANT FACTS**

13. Plaintiffs Z. Zhang and J. Zhang are sole owners of Five Stars Realty Estate Inc. ("Five Stars"), a corporation with a principle place of business at 35-43 88th Street, 2nd Floor, Jackson Heights, New York, 11373.

14. Plaintiffs were solicited by an individual named Antonio Wong Jr. for an investment project, Wong Real Estate Fund I, LLC ("WRE I").

15. The purpose of WRE I was to purchase and develop the property located at 136-46 41st Avenue, Flushing, New York 11354 (the "41st Avenue property").

16. Plaintiffs Z. Zhang, J. Zhang and Five Stars entered into an agreement to invest in WRE I, with an initial contribution by Five Stars of five hundred thousand dollars ($500,000) on or about November 20, 2015, representing a 10% ownership interest in WRE I.

17. In furtherance of the investment project, Plaintiffs J. Zhang, and Z. Zhang, as officers of A & A Express and Z & Z Express, caused A & A Express and Z & Z Express to wire and/or send a total of five hundred thousand dollars ($500,000.00) to Defendants Lau and Lau & Associates ("Lau Defendants"). Lau Defendants received the funds on or about November 24, 2015.

18. Upon information and belief, Lau Defendants represented J. Zhang and Z Zhang in their individual capacity as well as represented Five Stars.

19. Upon information and belief, Lau Defendants also represented WRE I.

Case 1:19-cv-03875  Document 2-12  Filed 07/03/19  Page 6 of 13 PageID #: 330

20. In or around December 2015, Antonio Wong Jr. approached Plaintiff J. seeking to use the $500,000 he had in Lau Defendants' trust account for the purchase of a property located at 40-36 77th Street, Elmhurst, New York 11373 (the "77th Street Property"). Plaintiffs J. Zhang agreed but wanted a security interest in the Hotel on the 77th Street Property to secure their investment.

21. In or around December 2015, upon the request from Antonio Wong Jr., Plaintiff J. Zhang sent Defendant Jay Lau a text message which stated "Hi Jay this is Jun hong zhang please release the money we have in the escrow to close the property located at 40-36 77th street. Hotel will be additional collateral for 41st ave."

22. Upon information and belief, Lau Defendants acted solely upon this text message, and distributed Plaintiffs' $500,000.

23. Upon information and belief, Lau Defendants made no attempts to contact Plaintiffs after receiving the text message, before or after distributing the funds.

24. Upon information and belief, Lau Defendants made no effort to properly secure the 77th Street Property as collateral for the Plaintiffs' investment.

25. Plaintiffs received no ownership interest in the 41st Avenue Property, or the 77th Street Property in connection with their contribution to WRE I.

26. The title of the 77th Street Property currently rests with YSF Holdings, LLC ("YSF Holdings"). Lau Defendants appear as attorneys for YSF Holdings in the purchase of the property, and received payment for their representation of YSF Holdings on or around December 21, 2015, showing a conflict of interest.

27. In or around September 2018, Plaintiffs Z. Zhang and J. Zhang approached the majority shareholder of YSF holdings. The majority shareholder of YSF holdings stated they

Case 1:19-cv-03875   Document 2-12   Filed 07/03/19   Page 7 of 13 PageID #: 331

never received the $500,000 from the Lau Defendants' trust account that belongs to

Plaintiffs in connection with the purchase of the 77th street property.

28. Upon information and belief on or about December 21, 2015, without any notice or

authorization of Plaintiffs, Lau Defendants wrote a check payable to Cornerstone LLC in

an amount of $61,634.64, for reasons currently unclear to Plaintiffs.

29. Upon information and belief on or about December 21, 2015, without any notice or

authorization of Plaintiffs, Lau Defendants transferred $930,621.49 to Franklin Inc., for

reasons currently unclear to Plaintiffs.

30. Upon information and belief, WRE I was set up by Antonio Wong Jr. as one of many

schemes to defraud investors. Antonio Wong Jr. has defrauded investors out of tens of

millions of dollars, and has since disappeared with the money.

## FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty against Lau Defendants)

31. Plaintiffs repeat and reiterate each and every allegation contained in Paragraphs 1 through

30 with the same force and effect as if fully set forth herein.

32.  Defendant Jay Lau was a fiduciary to Plaintiffs Z. Zhang, J. Zhang, and Five Stars, by

virtue of being their attorney.

33. As an attorney and fiduciary, Defendant Jay Lau must be charged with a high degree of

loyalty and duty of care to his clients.

34. Lau Defendants failed to take any steps to secure the hotel located at the 77th Street

Property as collateral for Plaintiff's $500,000 investment, a direct request from Plaintiff

J. Zhang.

35. Lau Defendants had a conflict of interest due to their simultaneous representation of Plaintiffs, Five Stars and WRE I.

36. Lau Defendants also had a conflict of interest due to their simultaneous representation of Plaintiffs, Five Stars and YSF Holdings.

37. Lau Defendants failed to properly scrutinize any transactions involving Plaintiffs when WRE I's interests were also involved. This violated Lau Defendants duty of loyalty and duty of care to Plaintiffs.

38. Lau Defendants also represented YSF Holdings in purchasing the 77th Street Property. After the completion of the transaction, only YSF Holdings had an interest in the property. Plaintiffs gained no property interest in the 77th Street Property in connection with any of the funds Lau Defendants transferred.  Lau Defendants prioritized the interests of YSF Holdings over the interests of Plaintiffs in this transaction, and thus violated their duty of loyalty and duty of care to Plaintiffs.

39. As a result of Lau Defendants' conduct, Plaintiffs have lost their funds totaling five hundred thousand dollars ($500,000.00).

## SECOND CAUSE OF ACTION
### (Legal Malpractice against Lau Defendants)

40. Plaintiffs reallege and incorporate by reference each and every allegation set forth above, as though fully set forth herein.

41. Lau Defendants are the attorney(s) for Plaintiffs Z. Zhang, J. Zhang, and Five Stars in connection with the WRE I agreement and YSF Holdings' purchase of the 77th Street Property.

42. Lau Defendants failed to exercise the care, skill, and diligence commonly possessed and exercised by members of the legal profession.

FILED: QUEENS COUNTY CLERK 10/15/2018 07:14 PM INDEX NO. 715727/2018

NYSCEF DOC. NO. 1 Case 1:19-cv-03875 Document 2-12 Filed 07/03/19 Page 9 of 13 PageID #: 333 RECEIVED NYSCEF: 10/15/2018

43. Lau Defendants had a duty of care to protect their clients' interests and to safeguard their funds.

44. Lau Defendants negligently, improperly, and unskillfully represented Plaintiffs J. Zhang, Z. Zhang and Five Stars.

45. Lau Defendants negligently, improperly and unskillfully handled Plaintiff J. Zhang, Z. Zhang, and Five Stars' funds in their trust account.

46. Lau Defendants failed to do their due diligence before transferring funds. Despite Plaintiffs' funds being transferred by Lau Defendants, no ownership interest of the 77th Street Property, or the 41st Avenue property was obtained in connection with those funds.

47. Despite Plaintiffs' funds being transferred by Lau Defendants, Plaintiffs received no security interest in the hotel located on the 77th Street Property,

48. The actions of Lau Defendants were and are improper, grossly negligent, and constitute malpractice.

49. As proximate cause of Lau Defendants' conduct, Plaintiffs have incurred actual damages of $500,000, and have also incurred unnecessary and substantial attorney's fees in an amount to be determined at trial.

50. But for Lau Defendants' negligence, Plaintiffs would not have incurred these damages.

## THIRD CAUSE OF ACTION

### (Unjust Enrichment against Franklin and Cornerstone)

51. Plaintiffs reallege and incorporate by reference each and every allegation set forth above, as though fully set forth herein.

52. On information and belief on or about December 21, 2015, Lau Defendants wrote a check payable to Defendant Cornerstone LLC in an amount of $61,634.64.

FILED: QUEENS COUNTY CLERK 10/15/2018 07:14 PM
INDEX NO. 715727/2018

NYSCEF DOC. NO. 1
Case 1:19-cv-03875 Document 2-12 Filed 07/03/19 Page 10 of 13 PageID #: 334
RECEIVED NYSCEF: 10/15/2018

53. On information and belief on or about December 21, 2015, Lau Defendants transferred to Franklin Inc. $930,621.49.

54. Plaintiffs believe the money paid to Defendants Cornerstone LLC and Franklin Inc. by Defendant Jay Lau was comprised of money rightfully belonging to Plaintiffs.

55. Upon information and belief, Defendants Franklin Inc. and Cornerstone LLC benefited at the expense of Plaintiffs by receiving money transferred to them by Defendant Jay Lau. Equity and good conscience require restitution.

56. Defendants' actions, as described above, has caused, and continues to cause, substantial injury to Plaintiffs, for which Plaintiffs seek restitution in the amount of $500,000, the cost of the action with Plaintiffs' reasonable attorney's fees, and such other additional relief as the Court may find just according to the circumstances of the case.

**WHEREFORE,** the Plaintiffs respectfully requests that the Court enter judgment against Defendants:

(1) For the first cause of action, granting judgment in favor of Plaintiffs and against Lau Defendants, awarding Plaintiffs compensatory damages in the amount of $500,000, along with pre-judgment interest from December 21, 2015;

(2) For the second cause of action, granting judgment in favor of Plaintiffs and against Lau Defendants, awarding Plaintiffs compensatory damages in the amount of $500,000, together with pre-judgment interest from December 21, 2015;

(3) For the third cause of action, granting judgment in favor of Plaintiff and against Defendants Franklin Inc. and Cornerstone LLC in the amount of $500,000, together with pre-judgment interest from December 21, 2015;

(4) Granting Plaintiffs cost, expenses, and reasonable legal fees, and

(5) Granting such other and further relief as the Court may be just and proper.

Dated:  **October 15, 2018**

Xue & Associates, P.C.
Attorneys for Plaintiff

By:      /s/ Benjamin B. Xue
Benjamin B. Xue, Esq.
1 School Street, Suite 303A
Glen Cove, NY 11542
Tel.: (212) 219-2275

## **VERIFICATION**

STATE OF NEW YORK     )
                           ) ss:
COUNTY OF NEW YORK   )

      JUN HONG ZHANG, being duly sworn, deposes and says:

      I have read the foregoing document and know its contents. I am President of A & A

Express Inc., Z & Z Express, Inc. and Five Stars Realty Estate Inc. The statements in the

foregoing document are true to my own knowledge, except as to those matters therein stated to

be alleged upon information and belief, and as to those matters I believe them to be true. The

source of my information and belief is my personal knowledge and corporate records.

JUN HONG ZHANG

Sworn to before me this

15th day of October , 2018

Notary Public

BENJAMIN B XUE
Notary Public, State of New York
No. 02XU6093045
Qualified in Nassau County
Commission Expires May 27, 20 19

11 of 12

## VERIFICATION

STATE OF NEW YORK          )
                           ) ss:
COUNTY OF NEW YORK         )

ZI KUO ZHANG, being duly sworn, deposes and says:

I have read the foregoing document and know its contents. The statements in the

foregoing document are true to my own knowledge, except as to those matters therein stated to

be alleged upon information and belief, and as to those matters I believe them to be true. The

source of my information and belief is my personal knowledge and corporate records.

ZI KUO ZHANG

Sworn to before me this

15th day of October, 2018

Notary Public

BENJAMIN B XUE
Notary Public, State of New York
No. 02XU6093045
Qualified in Nassau County
Commission Expires May 27, 20 19

EXHIBIT N

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
-------------------------------------------------------------X
SHAN YUN LIN and SHIN LUNG ZHENG

                    Plaintiffs,

           - against -

JAY LAU, LAU & ASSOCIATES P.C.,
FRANKLIN LAND SERVICES, INC.,
and CORNERSTONE LAND ABSTRACT LLC,

                   Defendants.
-------------------------------------------------------------X

Index No.:
Date Filed:

**SUMMONS**

Plaintiffs designate Queens
County as the place of trial

To the above-named Defendants:

      **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiffs' attorney within twenty (20) days after the service of this summons, exclusive of the day of service (or within thirty [30] days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: October 5, 2018

                        Xue & Associates, P.C.
                        *Attorneys for Plaintiffs*

           By:    /s/ Benjamin B. Xue_____
                  Benjamin B. Xue, Esq.
                  1 School Street, Suite 303A
                  Glen Cove, NY 11542
                  Tel.: (516) 595-8887
                  Fax: (212) 219-2276

Case 1:19-cv-03875   Document 2-13   Filed 07/03/19   Page 3 of 12 PageID #: 340

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
-------------------------------------------------------------X
SHAN YUN LIN and SHIN LUNG ZHENG

                    Plaintiffs,

      - against -

JAY LAU, LAU & ASSOCIATES P.C.,
FRANKLIN LAND SERVICES, INC., and
CORNERSTONE LAND ABSTRACT LLC,

                 Defendants.

   -------------------------------------------------------------X

Index No.:
Date Filed:

**<u>VERIFIED COMPLAINT</u>**

       Plaintiffs SHAN YUN LIN ("Lin") and SHIN LUNG ZHENG ("Zheng")

(Collectively "Plaintiffs"), by their undersigned attorneys, Xue & Associates, P.C., for their

Complaint against Defendants JAY LAU, LAU & ASSOCIATES P.C. ("Lau & Associates"),

FRANKLIN LAND SERVICES, INC. ("Franklin Inc."), and CORNERSTONE LAND

ABSTRACT LLC ("Cornerstone LLC") (collectively "Defendants"), respectfully alleges as

follows:

### <u>NATURE OF ACTION</u>

1. Plaintiffs bring this action against Defendants for (1) breach of fiduciary duty, (2) legal

   malpractice, and (3) unjust enrichment.

### <u>JURISDICTION AND VENUE</u>

2. This Court has jurisdiction over the subject matter of this action and the parties.

3. The matter in controversy exceeds $100,000, exclusive of interest and costs, and the

   cause of action arose in the State of New York, County of Queens.

FILED: QUEENS COUNTY CLERK 10/15/2018 07:01 PM INDEX NO. 715728/2018

NYSCEF DOC. NO. 1 Case 1:19-cv-03875 Document 2-13 Filed 07/03/19 Page 4 of 12 PageID #: 341 RECEIVED NYSCEF: 10/15/2018

## PARTIES

4.  Plaintiff Lin is an individual residing in Dallas County, Texas.

5.  Plaintiff Zheng Residing in Middlesex County, New Jersey.

6.  Defendant Jay Lau is a New York attorney and, upon information and belief, managing attorney of the law firm Lau & Associates.

7.  Upon information and belief, Defendant Lau & Associates is a duly formed corporation in the State of New York, with its principal place of business located at 40 Cuttermill Road, STE 504, Great Neck, New York 11021. In 2015, Defendants Lau and Lau & Associates operated out of an office in Flushing, Queens, New York.

8.  Upon information and belief, Defendant Franklin Inc. is a duly formed corporation in the State of New York, with its principal place of business located at 136-20 38th Ave. # 11J, Flushing New York, 11354.

9.  Upon information and belief, Defendant Cornerstone LLC is a duly formed corporation in the State of New York, with its principal place of business located at 248-52 Jericho Turnpike, Bellerose Village, New York 11001.

## RELEVANT FACTS

10. Plaintiffs were solicited by an individual named Antonio Wong Jr. for an investment project, Wong Real Estate Fund I, LLC ("WRE I").

11. The purpose of WRE I was to purchase and develop the property located at 136-46 41st Avenue, Flushing, New York 11354.

12. Plaintiffs entered into an agreement to invest in WRE I, with an initial contribution of $250,000 each on or about November 20, 2015, representing a 5% ownership interest in WRE I each.

13. In furtherance of the investment project, Plaintiffs each wired and/or sent two hundred and fifty thousand dollars ($250,000.00) to Defendants Lau and Lau & Associates ("Lau Defendants"), which they received on or about November 25, 2015.

14. The total amount wired and/or sent to Lau Defendants was five hundred thousand dollars ($500,000.00).

15. Upon information and belief, Lau Defendants represented Plaintiffs in their individual capacity.

16. Upon information and belief, Lau Defendants also represented WRE I.

17. Upon information and belief, Lau Defendants received a fraudulent message from an unknown party claiming to be Plaintiff Shin Lung Zheng stating "Jay, I am shin lung zheng, I spoke to the other shareholders, I am in China now, please release the money we have in escrow to close the property located at 40-36 77th street."

18. Plaintiff Shin Lung Zheng did not send the fraudulent message.

19. Upon information and belief, Lau Defendants acted upon this fraudulent text message, and distributed each of the Plaintiff's $250,000 without verifying the authenticity of this text message or reaching out to Plaintiffs through phone calls or other known means. As a result, the funds were transferred without authorization from, or notice to Plaintiffs.

20. Despite the transfer of Plaintiff's funds, neither WRE I nor Plaintiffs are the title holders of 136-46 41st Ave, Flushing, New York 11354 or 40-36 77th Street, Elmhurst, New York 11373.

21. The title of 40-36 77th Street, Elmhurst, New York 11373, currently rests with YSF Holdings, LLC ("YSF Holdings"). Lau Defendants appear as attorneys for YSF Holdings

Case 1:19-cv-03875 Document 2-13 Filed 07/03/19 Page 6 of 12 PageID #: 343

in the purchase of the property, and received payment for their representation from YSF

Holdings on or around December 21, 2015, showing a conflict of interest.

22. Upon information and belief on or about December 21, 2015, without any notice or

authorization of Plaintiffs, Lau Defendants wrote a check payable to Cornerstone LLC in

an amount of $61,634.64, for reasons currently unclear to Plaintiffs.

23. Upon information and belief on or about December 21, 2015, without any notice or

authorization of Plaintiffs, Lau Defendants transferred $930,621.49 to Franklin Inc., for

reasons currently unclear to Plaintiffs.

24. Upon information and belief, WRE I was set up by Antonio Wong Jr. as one of many

schemes to defraud investors. Antonio Wong Jr. has defrauded investors out of tens of

millions of dollars, and has since disappeared with the money.

## FIRST CAUSE OF ACTION
### (Breach of Fiduciary Duty against Lau Defendants)

25. Plaintiffs repeat and reiterate each and every allegation contained in Paragraphs 1 through

24 with the same force and effect as if fully set forth herein.

26. Defendant Jay Lau was a fiduciary to Plaintiffs by virtue of being their attorney.

27. As an attorney and fiduciary, Defendant Jay Lau must be charged with a high degree of

loyalty and duty of care to his clients.

28. Lau Defendants had a conflict of interest due to their simultaneous representation of both

WRE I and Plaintiffs.

29. Lau Defendants failed to properly scrutinize any transactions involving Plaintiffs when

WRE I's interests were also involved. This violated Lau Defendants duty of loyalty and

duty of care to Plaintiffs.

Case 1:19-cv-03875  Document 2-13  Filed 07/03/19  Page 7 of 12 PageID #: 344

30. Lau Defendants also represented YSF Holdings in purchasing the property located at 40-36 77th Street, Elmhurst, New York 11373. After the completion of the transaction, only YSF Holdings had an interest in the property; Plaintiffs hold no interest in YSF Holdings and currently hold no interest in the property. Lau Defendants prioritized the interests of YSF Holdings over the interests of Plaintiffs in this transaction, and thus violated their duty of loyalty and duty of care to Plaintiffs.

31. As a result of Lau Defendants' conduct, Plaintiffs have each lost their funds of $250,000, totaling a loss of $500,000.

**SECOND CAUSE OF ACTION**
**(Legal Malpractice against Lau Defendants)**

32. Plaintiffs reallege and incorporate by reference each and every allegation set forth above, as though fully set forth herein.

33. Lau Defendants are the attorney(s) for Plaintiffs in connection with the WRE I agreement.

34. Lau Defendants failed to exercise the care, skill, and diligence commonly possessed and exercised by members of the legal profession.

35. Lau Defendants had a duty of care to protect their clients' interests and to safeguard their funds.

36. Lau Defendants negligently, improperly, and unskillfully represented Plaintiffs.

37. Lau Defendants negligently, improperly, and unskillfully handled Plaintiffs funds in their trust account.

38. Lau Defendants released the entirety of Plaintiff's money from its escrow account based upon the directions of a fraudulent text message sent by an unknown party impersonating Plaintiff Shin Lung Zheng.

FILED: QUEENS COUNTY CLERK 10/15/2018 07:01 PM          INDEX NO. 715728/2018

NYSCEF DOC. NO. 1          Case 1:19-cv-03875   Document 2-13   Filed 07/03/19   Page 8 of 12 PageID #: 345          RECEIVED NYSCEF: 10/15/2018

39. Lau Defendants failed to take any actions to verify the legitimacy of the text message, such as telephoning Plaintiffs or contacting them through other means before and after releasing the funds in their trust account.

40. Accordingly, Lau Defendants distributed these funds without authorization from, or notice to the Plaintiffs.

41. Lau Defendants failed to do their due diligence before transferring funds. Despite Plaintiffs' funds being transferred by Lau Defendants, Plaintiffs currently hold no interest in the property located at 40-36 77th Street, Elmhurst, New York 11373 or the property located at 136-46 41st Avenue, Flushing, New York 11354.

42. The actions of Lau Defendants were and are improper, grossly negligent, and constitute malpractice.

43. As a proximate cause of Lau Defendants' conduct, Plaintiffs have incurred actual damages of $250,000 each, totaling damages of $500,000, and have also incurred unnecessary and substantial attorney's fees in an amount to be determined at trial.

44. But for Lau Defendants' negligence, Plaintiffs would not have incurred these damages.

### THIRD CAUSE OF ACTION

**(Unjust Enrichment against Franklin and Cornerstone)**

45. Plaintiffs reallege and incorporate by reference each and every allegation set forth above, as though fully set forth herein.

46. On information and belief on or about December 21, 2015, Lau Defendants wrote a check payable to Defendant Cornerstone LLC in an amount of $61,634.64.

47. On information and belief on or about December 21, 2015, Lau Defendants transferred to Franklin Inc. $930,621.49.

48. Plaintiffs believe the money paid to Defendants Cornerstone LLC and Franklin Inc. by Defendant Jay Lau was comprised of money rightfully belonging to Plaintiffs.

49. Upon information and belief, Defendants Franklin Inc. and Cornerstone LLC benefited at the expense of Plaintiffs by receiving money transferred to them by Defendant Jay Lau. Equity and good conscience require restitution.

50. Defendants' actions, as described above, has caused, and continues to cause, substantial injury to Plaintiffs, for which Plaintiffs seek restitution in the amount of $500,000, the cost of the action with Plaintiffs' reasonable attorney's fees, and such other additional relief as the Court may find just according to the circumstances of the case.

**WHEREFORE,** the Plaintiffs respectfully requests that the Court enter judgment against Defendants:

(1) For the first cause of action, granting judgment in favor of Plaintiffs and against Lau Defendants, awarding Plaintiffs compensatory damages in the amount of $500,000, along with pre-judgment interest from December 21, 2015;

(2) For the second cause of action, granting judgment in favor of Plaintiffs and against Lau Defendants, awarding Plaintiffs compensatory damages in the amount of $500,000, together with pre-judgment interest from December 21, 2015;

(3) For the third cause of action, granting judgment in favor of Plaintiff and against Defendants Franklin Inc. and Cornerstone LLC in the amount of $500,000, together with pre-judgment interest from December 21, 2015;

(4) Granting Plaintiffs cost, expenses, and reasonable legal fees, and

(5) Granting such other and further relief as the Court may be just and proper.

FILED: QUEENS COUNTY CLERK 10/15/2018 07:01 PM INDEX NO. 715728/2018

NYSCEF DOC. NO. 1    Case 1:19-cv-03875    Document 2-13    Filed 07/03/19    Page 10 of 12 PageID #: 347    RECEIVED NYSCEF: 10/15/2018

Dated:    **October 5, 2018**

Xue & Associates, P.C.
Attorneys for Plaintiff

By:    /s/ Benjamin B. Xue
Benjamin B. Xue, Esq.
1 School Street, Suite 303A
Glen Cove, NY 11542
Tel.: (212) 219-2275

## VERIFICATION

State of Texas )
                    ) ss:
County of Dallas )

SHAN YUN LIN, being duly sworn, deposes and says:

I have read the foregoing document and know its contents. The statements in the
foregoing document are true to my own knowledge, except as to those matters therein
stated to be alleged upon information and belief, and as to those matters I believe them
to be true. The source of my information and belief is my personal knowledge and
corporate records.



SHAN YUN LIN

Sworn to before me this

_____ Db<sup>th</sup> day of October_____, 2018

Notary Public

DORIS M LAGO
NOTARY PUBLIC STATE OF TEXAS
MY COMM. EXP. 7/14/2021
NOTARY ID 13120793-2

FILED: QUEENS COUNTY CLERK 10/15/2018 07:01 PM

INDEX NO. 715728/2018

NYSCEF DOC. NO. 1   Case 1:19-cv-03875   Document 2-13   Filed 07/03/19   Page 12 of 12 PageID #: 349   RECEIVED NYSCEF: 10/15/2018

## VERIFICATION

State of New Jersey )
                     ) ss:
County of Middlesex )

SHIN LUNG ZHENG, being duly sworn, deposes and says:

I have read the foregoing document and know its contents. The statements in the

foregoing document are true to my own knowledge, except as to those matters therein stated to

be alleged upon information and belief, and as to those matters I believe them to be true. The

source of my information and belief is my personal knowledge and corporate records.

SHIN LUNG ZHENG

Sworn to before me this

___7th___ day of _October_ , 2018

Notary Public

Debra A. Gambaro
Notary Public
State of New Jersey
Commission # 50061842
My Commission Expires June 5, 2022

EXHIBIT O

FILED: QUEENS COUNTY CLERK 07/22/2016 04:48 PM INDEX NO. 708617/2016

NYSCEF DOC. NO. 1 Case 1:19-cv-03875 Document 2-14 Filed 07/03/19 Page 2 of 15 PageID #: 351 RECEIVED NYSCEF: 07/22/2016

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

-----------------------------------------------------------------X

KWANBO VENTURE CORP.,

                                Plaintiff,

                -against-

ANTONIO WONG JR., WRE FUND II LLC,
WONG REAL ESTATE CONSULTANCY LLC,
SISSY YAN FOK, MANHAI WONG,
and PATRICK CHAN,

                           Defendants.

-----------------------------------------------------------------X

Index No.:

Date Purchased:

**SUMMONS**

Plaintiff designated Queens County
as the place of trial.

Venue is based on the
location of the Defendants.

       **YOU ARE HEREBY SUMMONED** to answer the Verified Complaint in this action and to serve a copy of your Answer, or, if the Verified Complaint is not served with this Summons, to serve a Notice of Appearance, on the Plaintiff's Attorneys within twenty (20) days after the service of this Summons, exclusive of the day of service (or within 30 days after the service is complete if this Summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer; judgment will be taken against you by default for the relief demanded in the Verified Complaint.

DATED: July 22, 2016

                                      Yours, etc.,

                                      **WHITE, CIRRITO & NALLY, LLP**

**By:**                                      

                                    CHRISTOPHER M. LYNCH, ESQ.
                                    Attorneys for Plaintiff
                                    58 Hilton Avenue
                                    Hempstead, NY 11550
                                    (516) 292-1818

**Defendants' Addresses:**

**LIST ON NEXT PAGE**

**ANTONIO WONG JR.:** 3544 28th Street, Apt. 4C, Astoria, NY 11106

**WRE FUND II, LLC:** 136-20 38th Avenue, Suite 3A-106, Flushing, NY 11354

**WONG REAL ESTATE CONSULTANCY, LLC:** 136-20 38th Avenue, Suite 3A-106, Flushing, NY 11354

**SISSY YAN FOK:** 42-11 Kissena Boulevard, Apt. 6C, Flushing, NY 11355

**MANHAI WONG:** 55-28 84th Street, Second Floor, Elmhurst, NY 11373

**PATRICK CHAN:** 136-20 38th Avenue, Suite 3A-106, Flushing, NY 11354

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
-------------------------------------------------------------------------X        Index No.:

KWANBO VENTURE CORP.,

                                        Plaintiff,                                 Date Purchased:

                      -against-                                                    **VERIFIED COMPLAINT**

ANTONIO WONG JR., WRE FUND II LLC,
WONG REAL ESTATE CONSULTANCY LLC,
SISSY YAN FOK, MANHAI WONG,
and PATRICK CHAN,

                                        Defendants.
-------------------------------------------------------------------------X

        Plaintiff, KWANBO VENTURE CORP., by and through its attorneys WHITE, CIRRITO

& NALLY, LLP, as and for its Verified Complaint alleges as follows:

## PARTIES

        1.      At all times hereinafter mentioned, Plaintiff KWANBO VENTURE CORP.

("KWANBO") was and still is a domestic corporation with a principal place of business at 70

Saratoga Drive, Jericho, County of Nassau, State of New York.

        2.      Upon information and belief, at all times hereinafter mentioned, Defendant

ANTONIO WONG JR., was and is a natural person who resides at 3544 28th Street, Apt. 4C,

Astoria, in the County of Queens, State of New York.

        3.      Upon information and belief, at all times hereinafter mentioned, Defendant WRE

FUND II LLC is a domestic limited liability company authorized to do business in the State of

New York with its principal executive office located at 136-20 38th Avenue, Suite 3A-106,

Flushing, County of Queens, State of New York.

        4.      Upon information and belief, at all times hereinafter mentioned, Defendant

WONG REAL ESTATE CONSULTANCY LLC is a domestic limited liability company

authorized to do business in the State of New York with its principal executive office located at 136-20 38th Avenue, Suite 3A-106, Flushing, County of Queens, State of New York and upon information and belief is owned and/or controlled by the Defendants WONG, CHAN, FOK and M. WONG and was utilized in this transaction as the entity which converted the funds from the Plaintiff to WONG, CHAN, FOK and M. WONG.

5.     Upon information and belief, at all times hereinafter mentioned, Defendant SISSY YAN FOK ("FOK") was and is a natural person who resides at 42-11 Kissena Boulevard, Apt. 6C, Flushing, in the County of Queens, State of New York.

6.     Upon information and belief, at all times hereinafter mentioned, Defendant MANHAI WONG ("M. WONG") was and is a natural person who resides at 55-28 84th Street, Second Floor, Elmhurst, in the County of Queens, State of New York.

7.     Upon information and belief, at all times hereinafter mentioned, Defendant PATRICK CHAN ("CHAN") was and is a natural person who resides in the County of Queens, State of New York, and has an actual place of employment at 136-20 38th Avenue, Suite 3A-106, Flushing, County of Queens, State of New York.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction pursuant to CPLR §§ 301 and 302

9.     Venue is proper in this Court because the Defendants reside and/or maintain offices in Queens County, State of New York.

## BACKGROUND

10.     Upon information and belief, on or about September 24, 2014, Simplicity Computer Corp. as seller and Sean Ludwick as purchaser entered into a Contract of Sale ("Contract of Sale") for the property located at 550-552 West 38th Street, New York, New York.

11.     Upon information and belief, the Contract of Sale was subsequently assigned to Landz Development, LLC.

12.     On or about December 24, 2015, Defendants WONG, CHAN, FOK and M. WONG, individually and as members of WONG REAL ESTATE CONSULTANCY, contacted Kwan Cheung, one of the principals of Plaintiff, and advised Mr. Cheung of a potential investment opportunity.

13.     These Defendants notified Mr. Cheung that Landz Development, LLC had executed an agreement to assign the Contract of Sale.

14.     Landz Development had agreed to assign the Contract of Sale to Defendant WRE FUND II, LLC.

15.     Mr. WONG notified Mr. Cheung that the agreed-upon consideration for the assignment of the Contract of Sale was $4,000,000.00 which represented Landz Development's down payment.

16.     The assignment of the Contract of Sale was also conditioned on the consent of the seller Simplicity Computer Corp.

17.     Defendants further notified Mr. Cheung that to close on the assignment of the Contract of Sale, $1,000,000.00 had to be wired to the escrow account of the law firm of Herrick Feinstein LLP, Landz Development's attorneys, that day, and the balance of $3,000,000.00 was to be paid at the assignment closing.

18.     Plaintiff KWANBO wired $1,000,000.00 to the escrow account of Herrick Feinstein LLP in furtherance of the Contract of Sale assignment.

19.     KWANBO and Defendants agreed that KWANBO would become a twenty-five (25%) percent member of WRE FUND II, LLC based upon KWANBO'S $1,000,000.00 contribution.

20. Upon information and belief, the other members of WRE FUND II, LLC and their membership percentage at this time were going to be WONG REAL ESTATE CONSULTANCY: 25%, Fivestars Realty: 25% ("Fivestars"), and B Share Option Pool: 25%.

21. WONG REAL ESTATE CONSULTANCY and Fivestars were also required to make an initial contribution of $1,000,000.00 each to WRE FUND II, LLC.

22. Fivestars did not make the $1,000,000.00 initial contribution, and the operating agreement of WRE FUND II, LLC was revised so Fivestars would only be required to make an initial contribution of $500,000.00 and would acquire a twelve-and-a-half (12.5%) percent membership interest.

23. The WRE FUND II, LLC operating agreement was further revised so that KWANBO would acquire an additional twelve-and-a-half (12.5%) percent membership interest based upon an additional contribution of $500,000.00, such that KWANBO'S total contribution would now be $1,500,000.00 and its membership interest in WRE FUND II, LLC would be thirty-seven-and-a-half (37.5%) percent.

24. KWANBO made the additional contribution of $500,000.00 to WRE FUND II, LLC and thus its total contribution stood at $1,500,000.00 and its membership interest in WRE FUND II, LLC is thirty-seven-and-a-half (37.5%) percent.

25. After KWANBO made its contribution of $1,500,000.00 to WRE FUND II, LLC, Defendants stopped consistently communicating with KWANBO.

26. In one of the few communications from Defendants, KWANBO was notified that the parties to the Contract of Sale were involved in litigation and that WRE FUND II, LLC would realize its profit when Landz Development was awarded judgment for specific performance.

27.     The parties to the Contract of Sale are currently involved in litigation under Supreme Court, New York County index number 652572/16, but it is an action by Landz Development to recover its down payment based upon its cancellation of the Contract of Sale and is not nor has it ever been an action for specific performance of the Contract of Sale.

28.     Upon information and belief, the $1,000,000.00 that was wired to Landz Development's attorneys to be held in escrow was released directly to WRE FUND II, LLC and/or WONG REAL ESTATE CONSULTANCY without notice to KWANBO and was thereafter absconded by WONG, CHAN, FOK and M. WONG.

29.     That the stated business purpose of WRE FUND II, LLC was to acquire the property located at 550-552 West 38th Street, New York, New York, pursuant to the assignment of the Contract of Sale.

30.     WRE FUND II, LLC failed to close on the assignment of the Contract of Sale so KWANBO demanded the return of its $1,500,000.00 contribution.

31.     That Defendants agreed to pay to KWANBO $2,000,000.00 by June 30, 2016 which represented a return of its $1,500,000.00 contribution and an additional $500,000.00 for nominal interest and lost profits.

32.     To that end a proposed settlement agreement was circulated but never executed, as Defendants would not agree to include any enforcement mechanism if the payment was not made.

33.     Defendants did not make the payment by June 30, 2016 as he had agreed, and it is clear that Defendants had no intention of paying KWANBO back its money.

## AS AND FOR A FIRST CAUSE OF ACTION:
### CONVERSION

34.     Plaintiff repeats and reiterates each and every allegation in paragraphs 1 through 33 as if fully set forth herein.

35.     That Plaintiff contributed $1,500,000.00 to WRE FUND II, LLC for the purpose of securing the Contract of Sale and acquiring the property located at 550-552 West 38th Street.

36.     That WRE FUND II, LLC did not secure the Contract of Sale and/or acquire the property located at 550-552 West 38th Street.

37.     That Plaintiff is entitled to a return of its $1,500,000.00 and has a possessory right or interest in its $1,500,000.00.

38.     That Defendants took possession of Plaintiff's $1,500,000.00 and have not returned it despite Plaintiff's demands.

39.     As such, Defendants have converted Plaintiff's $1,500,000.00 and Plaintiff is entitled to judgment as against all Defendants in the sum of $1,500,000.00 plus interest, costs, expenses and reasonable attorney's fees.

## AS AND FOR A SECOND CAUSE OF ACTION:
### FRAUD

40.     Plaintiff repeats and reiterates each and every allegation in paragraphs 1 through 39 as if fully set forth herein.

41.     The Plaintiff contributed $1,500,000.00 to WRE FUND II, LLC based upon the representations of the Defendants that said money would be used toward the acquisition of the Contract of Sale and the premises located at 550-552 West 38th Street.

42.     According to Landz Development's Verified Complaint in the action under New York County Supreme Court index number 652572/16, the Contract of Sale was cancelled.

43.     WRE FUND II, LLC has not acquired the premises located at 550-552 West 38th Street.

44.     Defendants did not use Plaintiff's $1,500,000.00 to acquire the Contract of Sale or the premises located at 550-552 West 38th Street or for any other legitimate purpose of WRE FUND II, LLC.

45.     Defendants then fraudulently represented to Plaintiff that Plaintiff would realize the profit on its investment when Landz Development was awarded specific performance but Landz Development's action is for the return of its down payment based upon its cancellation of the Contract of Sale.

46.     Said misrepresentation was made so that Plaintiff would be placated not seek the return of its money.

47.     Defendants thereafter admitted to Plaintiff that Plaintiff's $1,500,000.00 was used to fund the other projects that were owned by the Defendants.

48.     Defendants misrepresented the purpose for which Plaintiff's money would be used, and Plaintiff has been damaged as a result.

49.     That Defendants' representations were false and Defendants knew them to be false when they were made, and said representations were made with the intent to deceive the Plaintiff.

50.     Plaintiff is entitled to treble damages by virtue of the Defendants' fraud.

51.     As such, Plaintiff is entitled to a judgment in the sum of $1,500,000.00 plus interest, costs, expenses, reasonable attorney's fees, and triple punitive damages for the Defendants' fraudulent actions in the sum of $4,500,000.00.

## AS AND FOR A THIRD CAUSE OF ACTION:
### BREACH OF CONTRACT AS AGAINST WONG REAL ESTATE CONSULTANCY

52.     Plaintiff repeats and reiterates each and every allegation in paragraphs 1 through 51 as if fully set forth herein.

53.     That Plaintiff KWANBO and Defendant WONG REAL ESTATE CONSULTANCY entered into the operating agreement for WRE FUND II, LLC for the purpose of securing the Contract of Sale and acquiring the property located at 550-552 West 38th Street.

54.     That pursuant to the operating agreement KWANBO contributed $1,500,000.00 to WRE FUND II, LLC.

55.     That WONG REAL ESTATE CONSULTANCY as managing member of WRE FUND II, LLC failed to secure the Contract of Sale and/or acquire the property located at 550-552 West 38th Street.

56.     WONG REAL ESTATE CONSULTANCY as managing member of WRE FUND II LLC has failed to return KWANBO'S contribution of $1,500,000.00.

57.     WONG REAL ESTATE CONSULTANCY has breached the operating agreement of WRE FUND II, LLC and KWANBO has been damaged as a result.

58.     That KWANBO is entitled to judgment in the sum of $1,500,000.00 plus interest, costs and reasonable attorney's fees.

## AS AND FOR A FOURTH CAUSE OF ACTION:
### UNJUST ENRICHMENT

59.     The Plaintiff repeats and realleges each and every allegation contained in Paragraphs "1" through "58" of this complaint as if fully set forth herein.

60.     That the Plaintiff tendered $1,500,000.00 to the Defendants as an investment.

61.     That the Defendants failed to acquire the investment properties and the Plaintiff's investment money was returned to Defendants or never used by Defendants.

62.     That Defendants have been unjustly enriched in the amount of $1,500,000.00.

63.     That Plaintiff is entitled to judgment jointly and severally as against all Defendants in the sum of $1,500,000.00 plus interest, costs, expenses and reasonable attorney's fees.

## AS AND FOR A FIFTH CAUSE OF ACTION:
## BREACH OF CONTRACT AS AGAINST ANTONIO WONG JR. INDIVIDUALLY

64.     The Plaintiff repeats and realleges each and every allegation contained in Paragraphs "1" through "63" of this complaint as if fully set forth herein.

65.     That the Defendant ANTONIO WONG JR. sought Plaintiff's investment to secure the Contract of Sale and acquire the premises located at 550-552 West 38th Street.

66.     That Plaintiff did invest $1,500,000.00 toward the endeavor but the Contract of Sale was cancelled, the property was not acquired, and Plaintiff's money was returned to Defendants.

67.     As the reason for Plaintiff's investment had become a nullity, Defendant ANTONIO WONG JR. agreed to tender to Plaintiff by June 30, 2016 the sum of $2,000,000.00 representing a return of Plaintiff's $1,500,000.00 and an additional $500,000.00 to cover nominal interest and the Plaintiff's loss of profits.

68.     That Defendant's agreement to pay Plaintiff $2,000,000.00 is a valid, binding agreement.

69.     That Defendant has breached the agreement by failing to tender to Plaintiff $2,000,000.00 by June 30, 2016.

70.     That Plaintiff has been damaged in the sum of $2,000,000.00.

71.     That Plaintiff is entitled to judgment as against Defendant ANTONIO WONG JR. in the sum of $2,000,000.00 plus interest, costs, expenses and reasonable attorney's fees.

**WHEREFORE**, Plaintiff demands judgment as follows:

(a)    **ON THE FIRST CAUSE OF ACTION,** as against all Defendants jointly and severally the sum of $1,500,000.00 plus interest, costs, expenses and reasonable attorney's fees;

(b)    **ON THE SECOND CAUSE OF ACTION,** as against all Defendants jointly and severally the sum of $4,500,000.00 plus interest, costs, expenses and reasonable attorney's fees;

(c)    **ON THE THIRD CAUSE OF ACTION,** as against Defendant WONG REAL ESTATE CONSULTANCY LLC the sum of $1,500,000.00 plus interest, costs, expenses and reasonable attorney's fees;

(d)    **ON THE FOURTH CAUSE OF ACTION,** as against all Defendants jointly and severally the sum of $1,500,000.00 plus interest, costs, expenses and reasonable attorney's fees;

(e)    **ON THE FIFTH CAUSE OF ACTION,** as against Defendant ANTONIO WONG JR. the sum of $2,000,000.00 plus interest, costs, expenses and reasonable attorney's fees;

(f)    Such other and further relief as to this Court may seem just and proper.

Dated: Hempstead, New York
      July 22, 2016

                    Yours, etc.,

                    **WHITE, CIRRITO & NALLY, LLP**

        By:

                    Christopher M. Lynch, Esq.
                    Attorneys for Plaintiff
                    58 Hilton Avenue
                    Hempstead, NY 11550
                    (516) 292-1818

## VERIFICATION

STATE OF NEW YORK }
          Nassau  ss.:
COUNTY OF ~~QUEENS~~ }

     **Kwan Cheung**, being duly sworn deposes and says:

     I am an officer of **KWANBO VENTURE CORP.**, the Plaintiff in the within action and

I have read the foregoing **COMPLAINT**, know the contents thereof, and the same is true to

deponent's own knowledge, except as to the matters therein stated to be alleged on information

and belief, and as to those matters, deponent believes it to be true.

                              **Kwan Cheung, President**
                              **KWANBO VENTURE CORP.**

Sworn to before me this
___ day of July, 2016.

_____
   Notary Public

JAMES T LOFASO
Notary Public - State of New York
NO. 01LO6085613
Qualified in Nassau County
My Commission Expires Dec 30, 2018

Index No.:

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS
-------------------------------------------------------------------X

KWANBO VENTURE CORP.,

Plaintiff,

-against-

ANTONIO WONG JR., WRE FUND II LLC,
WONG REAL ESTATE CONSULTANCY LLC,
SISSY YAN FOK, MANHAI WONG,
and PATRICK CHAN,

Defendants.
-------------------------------------------------------------------X

## SUMMONS AND VERIFIED COMPLAINT

White, Cirrito & Nally, LLP
Attorneys for Plaintiff
58 Hilton Avenue
Hempstead, New York 11550
(516) 292-1818

To:

Attorneys for:

Service of a copy of the within _____
is hereby admitted.

Dated: _____

_____

Attorneys for _____

Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney
admitted to practice in the courts of New York State, certifies that,
upon information and belief and reasonable inquiry, the
contentions contained in the annexed document are not frivolous.

Date: __7/22/16__  Signature: _____

EXHIBIT P

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF QUEENS**

-------------------------------------------------------------- X    Index No.:

WING FUNG CHAU and
FLUSHING PARSONS 888 LLC,

                                        Date of Purchase:
                                        Plaintiff designates QUEENS
                                        County as the place of trial
                                        The basis of venue is
                    Plaintiffs,          CPLR §503
     -against-

                                         **SUMMONS**

37 PARSONS REALTY LLC,

                                         Defendant resides at:
                                         See below

                    Defendant.
-------------------------------------------------------------- X

To the above named Defendant

      **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded herein.

Dated: December 15, 2016

                            */s/ William X. Zou*

                            LAW OFFICES OF XIAN FENG ZOU
                            By: WILLIAM X. ZOU, ESQ.
                            Attorney for Plaintiff
                            136-20 38th Avenue, Suite 10D
                            Flushing, NY 11354
                            (718) 661-9562

TO:    37 Parsons Realty LLC
         157-05 Cross Island Pkwy
         Whitestone, NY 11357

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF QUEENS**

_____X   Index No.:

WING FUNG CHAU and
FLUSHING PARSONS 888 LLC,

                Plaintiffs,

   -against-

                                  **VERIFIED COMPLAINT**

37 PARSONS REALTY LLC,

                Defendant,

_____X

Plaintiffs herein, by and through their attorney, Law Offices of Xian Feng Zou, complaining of Defendant, alleges:

### THE PARTIES

1.     That at all times herein mentioned, Plaintiff Wing Fung Chau ("CHAU") is a resident of the county of Queens, New York;

2.     That at all times herein mentioned, Plaintiff Flushing Parsons 888 LLC ("FLUSHING") was and continues to be limited liability company of the State of New York.

3.     Upon information and belief that at all times herein mentioned, Defendant 37 Parsons Realty LLC ("37 PARSONS") was and continues to be limited liability company duly organized in the State of New York.

### AS AND FOR A FIRST CAUSE OF ACTION

4.     Upon information and belief, since and for some time before September, 2016, Defendant has been and now is the owner in fee simple absolute and seized and possessed of the following described lands and premises: 37-05 Parsons Boulevard, Flushing, NY 11354, Tax Map Designation: Block 5015, Lot 8 (hereinafter referred to as the "Premises").

5.      In or about September, 2016, Plaintiffs as Purchaser entered into a contract of sale with Defendant as the Seller, whereby the Defendant agreed to sell to Plaintiffs the above-described premises, in consideration of the sum of $8,000,000.00 (the "Purchase Price"). Plaintiff agreed to purchase from the Defendant the above-described premises for such Purchase Price (the "Contract" or "Contract of Sale").

6.      Pursuant to the Contract of Sale, Plaintiff paid the Defendant $500,000.00 (the "Downpayment") on the execution of said Contract of Sale by paying to Defendant as a part of the purchase price.

7.      Pursuant to the Contract of Sale, the Downpayment shall be held by the Defendant's attorney to hold in her IOLA account until closing or otherwise pursuant to the Contract of Sale.

8.      At the instruction of the Defendant, the Plaintiffs made $500,000.00 Downpayment.

9.      Pursuant to the Contract of Sale, Defendant shall deliver marketable and insurable title free and clear of all liens and encumbrance.

10.     The Contract of Sale provides an "on or before 60 days from fully executed contract of sale" closing date.

11.     After execution of the Contract of Sale, Plaintiffs performed all its obligations under the contract.

12.     Pursuant to Schedule D of the Contract of Sale, the time of closing is on or before November 30, 2016 at 10:00 AM E.S.T. time being of the essence. At the Law Office of Malan Lentini, PLLC, at 41-25 Kissena Blvd., Suite 116, Flushing, NY 11355.

13.     However, after execution of the Contract of Sale, the Defendant is nowhere to be found despite of Plaintiffs' numerous phone calls.

14.     On November 30, 2016 at 10:00 AM, Plaintiff was ready willing and able to proceed with closing, but Defendant failed to perform its obligations under the Contract of Sale, thus breached the Contract of Sale.

15.     The Plaintiff lacks adequate remedy at law.

16.     Due to Defendant's breach of Contract, Plaintiff prays for an order that the Defendant be ordered and compelled to specifically oblige and perform the aforesaid Contract of Sale calling for the transfer and sale of the Premises hereinbefore described to the Plaintiffs with modified terms to reflect the damages suffered by the Plaintiff in the sum of $500,000.00; or if specific performance cannot be granted, the Plaintiff be granted an order and decree ordering, directing and compelling the Defendant to return the Plaintiff Down payment of $500,000.00, awarding the Plaintiff interests thereof against the Defendant from September, 2016, awarding the Plaintiff reasonable compensation for expenses and damages in the sum of $500,000.00 sustained due to loss of purchasing comparable housing and/or due to the Defendant's breach of the Contract of Sale.

## AS AND FOR A SECOND CAUSE OF ACTION

17.     Plaintiff repeats, reiterates and re-alleges each and every allegation set forth in the foregoing paragraphs as if were fully set forth at length herein.

18.     Pursuant to the Contract of Sale, all payments made under the contract and expenses of examination of the title to the premises are liens on the Premises.

19.     Upon information and belief, Defendant is selling the Premises without satisfying Plaintiffs' liens for a higher selling price.

20.     Without an injunction restraining Defendant from selling the Premises, any judgment against Defendant(s) might be rendered ineffectual.

21.     Plaintiff is entitled to common law vendee's lien against the Premises.

22.     Plaintiff is entitled to foreclose its vendee's lien against the Premises.

23.     Plaintiff lacks adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

1) that on the First Cause of Action, the Defendant be ordered and compelled to specifically oblige and perform the aforesaid Contract of Sale calling for the transfer and sale of the Premises hereinbefore described to the Plaintiff with modified terms to reflect the damages suffered by the Plaintiff in the sum of $500,000.00; or if specific performance cannot be granted, the Plaintiff be granted an order and decree ordering, directing and compelling the Defendant to return the Plaintiff's Downpayment of $500,000.00, awarding the Plaintiff interests thereof against the Defendant from September, 2016, awarding the Plaintiff reasonable compensation for expenses and damages in the sum of $500,000.00 sustained due to loss of purchasing comparable housing and/or due to the Defendant's breach of the Contract of Sale; and

2) that on the Second Cause of Action, granting the Plaintiff a judgment against the Defendant foreclosing the liens against the Premises, an injunction restraining the sale of the Premises to any third party and a money judgment in the sum of $500,000.00; and

3) granting Plaintiff reasonable legal fees and costs and such other and further relief as the court may deem just and proper.

Dated: Queens, New York
          December 15, 2017

Yours, etc.,

/s/ William X. Zou

_____

LAW OFFICES OF XIAN FENG ZOU
By: WILLIAM X. ZOU, ESQ.
Attorney for Plaintiff
136-20 38th Avenue, Suite 10D
Flushing, NY 11354
(718) 661-9562

## VERIFICATION

STATE OF NEW YORK)
COUNTY OF QUEENS)   ss:

     Wing Fung Chau, being duly sworn, says: I am the Plaintiff in the within action, I have read the foregoing Complaint and know the contents thereof, the contents are true to my own knowledge except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

 

Wing Fung Chau

Sworn to before me on this
15th day of December, 2016

Notary Public

XIANFENG ZOU
Notary Public, State of New York
No. 02ZO6003042
Qualified in Queens County
Commission Expires February 23, 20

EXHIBIT Q

# COHEN, LaBARBERA & LANDRIGAN, LLP
## ATTORNEYS AT LAW

RONALD J. COHEN (NY BAR & LL.M. IN TAXATION)
STEPHEN P. LA BARBERA (NY BAR)
THOMAS C. LANDRIGAN (NY & NJ BAR)
-------------------------------------------------
JOSHUA A. SCERBO (NY & NJ BAR)
PATRICK HICKEY (NY BAR)
KYLE A. SEISS (NY & NJ BAR)
MELISSA A. PERRY (NY BAR)

99 BROOKSIDE AVENUE
CHESTER, NEW YORK 10918
TELEPHONE (845) 291-1900
FACSIMILE (845) 291-8601*
*Not for Service of Process
EMAIL: Call for Individual Email Addresses
-------------------------------------------------
SUSAN M. YEOMAN (PARALEGAL SUPERVISOR)

July 25, 2018

*Sent via Certified Mail, Return Receipt Requested:*

Antonio Wong
3544 28th St., 4C
Astoria, NY 11106

Jian Zhang
7483 SW 24 St. Ste.101
Miami, FL 33155

Jimmy Li
511 Canal St.
New York, NY 10013

Manhai Wong
42-11 Kissena Blvd.
Flushing, NY 11355

Ming Yi Cheung
6004 84th St.
Middle Village, NY 11379

Shi Meng Huang
1836 83rd St., 2Fl
Brooklyn, NY 11214

Yang Fan
50-52 26th Ave.
Flushing, NY 11354

Yan S. Fok
141-05 Holly Ave.
Flushing, NY 11355

Zheng Wang
143-34 Ash Ave.
Flushing, NY 11355

My Capital Investment LLC
7483 SW 24 St. Ste.101
Miami, FL 33155

YPA Capital Management
Holdings, LLC
36-07C College Pt Blvd.
Flushing, NY 11354

WRE Consultancy LLC
42-11 Kissena Blvd.
Flushing, NY 11355

37 Parsons Capital Advisors LLC
136-20 38th Ave., Ste. 3A-106
Flushing, NY 11354

37 Parsons Realty LLC
157-05 Cross Island Pkwy
Whitestone, NY, 11357

Re:   *James Choi and 165 Gregory Road Associates, LLC v. My Capital Investment LLC, Jian Zhang, WRE Consultancy, LLC, Manhai Wong, Yan S. Fok, Zheng Wang, Min Yi Cheung, Yang Fan, Shi Meng Huang, YPA Capital Management Holdings, LLC, Jimmy Li, Antonio Wong, Lau & Associates, P.C., 37 Parsons Capital Advisors LLC, 37 Parsons Realty LLC, John and Jane Does 1-50 and ABC Entities 1-50*

Gentlemen:

We represent Mr. James Choi and 165 Gregory Road Associates, LLC in the matter of the real property transaction or transactions described in the contract dated August 27, 2015 to purchase that certain parcel of real property located at and commonly known as 3705 Parsons Blvd., Flushing, New York 11354 and the ensuing actions and/or failures to act by the above-named Defendants, resulting in immediate irreparable harm and significant damages to our clients,

including without limitation the elimination of our clients' participation in the aforesaid real estate transaction and anticipated profits therefrom and the retaining of their contribution of $500,000.00 to 37 Parsons Capital Advisors LLC.

**PLEASE TAKE NOTICE** that we hereby demand that your firm return our clients' $500,000.00, plus $1,000,0000.00 as our clients' one-tenth share of the anticipated profit of $10,000,000.00 arising from the above-described real property transaction, together with statutory interest of nine (9%) percent per annum, for a total amount of $1,852,500.00, on or before August 25, 2018.

**PLEASE TAKE FURTHER NOTICE** that we hereby demand that your firm produce for inspection and copying, at the offices of Cohen, LaBarbera & Landrigan, LLP, located at 99 Brookside Avenue, Chester, New York 10918, any and all records pertaining to the above described entities, persons, real property, and events, including without limitation all contracts; operating agreements; memoranda of understanding; financial, payment and other banking records; emails, letters, voicemails, telephone records, text messages, and other communications; books, records, and accountings of all related entities; and all other records, documents, communications; and evidentiary material on or before August 25, 2018.

**PLEASE TAKE FURTHER NOTICE** that if you fail to comply, our client reserves all rights to take such actions as he deems advisable to prevent further such conduct, including without limitation seeking all available legal and equitable remedies.

**PLEASE TAKE FURTHER NOTICE** that if you fail to comply, our client reserves all rights to take such actions as he deems advisable to recover for your and the other above-named parties, your and their agents, members, officers, employees, parents, subsidiaries, affiliates, and any other related parties' actions, including without limitation, seeking all available legal and equitable remedies, including without limitation full indemnification for all liabilities, costs, legal costs, expenses, damages, and losses (including any direct, indirect, and consequential losses, loss of profit, loss of reputation and all interest, penalties, and other costs and expenses) for any breach, action, or omission resulting in injury to our client.

Please confirm that you will be complying with the foregoing demands immediately. The foregoing is without waiver of or prejudice to any rights, claims, privileges, or defenses of our clients.

Very truly yours,

Kyle A. Seiss, Esq.
*Litigation Associate*