UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------- X
JAMES CHOI *et al.*,

                    Plaintiffs,

              - against -

37 PARSONS REALTY LLC *et al.*,

                    Defendants.
----------------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

19-cv-3875 (BMC)

**COGAN**, District Judge.

      Plaintiffs bring this action under the Racketeer Influenced and Corrupt Organizations Act and several state law theories of liability. Defendants Jay Lau and Lau & Associates, P.C. ("L&A", and, together with Jay Lau, the "Lau Defendants"), move to dismiss plaintiffs' claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the motion is granted in part and denied in part.

## BACKGROUND

### I. Fraud Against Plaintiffs

      As alleged in the complaint, around August 2015, defendant Antonio Wong approached plaintiff James Choi with a real estate investment opportunity. Wong represented to Choi that he and his associates – several of whom are also defendants in the case – were real estate developers and investors with substantial experience and success in that business.

      The proposal was for the acquisition of a property in Flushing, Queens, to either be "flipped" to another buyer within a year or developed into a condominium within three years. Because the current owner of the Flushing property had already agreed to sell it to an unrelated third-party entity, My Capital Investment LLC ("MCI"), Wong told Choi that he and the other

defendants planned to purchase MCI and thereby gain control of the Flushing property indirectly. If Choi invested $500,000 toward the purchase of MCI, he would have a share in the profits reaped by either flipping or developing the Flushing property.

In order to persuade Choi to invest, Wong provided him with an "Investment Portfolio Overview" and "Brochure" that purported to highlight the success attained by Wong Real Estate Consultancy, LLC ("WRE"), in like endeavors. These materials represented that WRE had recently engaged in significant development projects throughout Manhattan. According to Choi, the overview and brochure convinced Choi that Wong and the other defendants were legitimate, reputable, and sophisticated real estate developers who he could trust with his money.

As a result of his meeting with Wong, Choi chose to contribute $500,000 to purchase a share in MCI, which would then acquire the Flushing property. Choi's investment was structured as a capital contribution through plaintiff 165 Gregory Road Associates LLC ("165 GRA"), of which Choi was the sole member. This contribution enabled 165 GRA to become a member of 37 Parson Capital Advisors LLC ("37 PCA"), which was to purchase MCI. Other members of 37 PCA were defendants WRE, Fok, and Cheung, and the address provided to the New York State Department of State for 37 PCA was "Wong Real Estate Consultancy, LLC, 136-20 38th Avenue, 3A-106, Flushing, New York 11354."

Choi was advised by defendants to send the $500,000 to the Lau Defendants, to be held in escrow until it was to be used to purchase the Flushing property. Choi sent the money to the Lau Defendants according to the bank wire instructions emailed to him by an L&A employee. After that, defendants ceased all communication with Choi.

After Choi had not heard from defendants for some time, he sent the Lau Defendants several emails seeking information regarding the status of the investment. Plaintiffs allege that,

2

in response, the Lau Defendants "deliberately concealed the true status of the Project." Counsel for Choi thereafter discovered that 37 PCA never purchased the Flushing property; rather, an entity called 37 Parsons Realty LLC ("37 PR") purchased it. In what plaintiffs describe as likely an error, the Lau Defendants sent Choi 37 PR's operating agreement, revealing that its membership included defendants Fok and Cheung.

As it currently stands, plaintiff Choi is out $500,000.

### II. Pattern of Racketeering Allegations

In addition to the above, plaintiffs allege that "the Defendants have practiced other and similar unlawful acts against other persons and parties." Citing to an attached verified complaint from 2013, plaintiffs describe a scheme in which "Defendant Wong and others committed fraud by, *inter alia*, obtaining loans secured by properties not owned by Defendant Wong by fraudulently prepared documents." In that case, which resulted in Wong giving a confession of judgment for $5,000,000, Wong was alleged to have masqueraded as the president of a company in order to procure the loans.

In a further attached 2015 complaint, Wong was alleged to have participated in a ruse in which he and several others solicited $500,000 from a married couple, presumably to invest in residential property in Jamaica, Queens. Upon receiving the money, "Defendants then failed to invest [the] funds as promised, and misappropriated and converted a substantial portion of the [funds] to their own benefit without the knowledge or authorization of the investors." The defendants used WRE to carry out this investment scheme by assigning it the obligation to pay back the plaintiffs under the promissory note.

A 2016 complaint alleges that defendants Wong, WRE, Fok, and others swindled the plaintiff in a manner quite similar to the events of this case. As described in plaintiffs'

3

complaint, the participants in this sham "[held] themselves out to be real estate investors, [took] the plaintiffs' money on the pretext of assisting them in investing in real estate, and then unlawfully" kept the money for their own benefit.

And in a 2017 complaint, the plaintiff in that case entered into a contract of sale with defendant 37 PR to purchase property in Flushing, Queens. Upon the plaintiff delivering a $500,000 down payment to defendant's unnamed attorney to hold in an "IOLA account until closing or otherwise pursuant to the Contract of sale," defendant took off with the money.

Plaintiffs also attach to their pleading two additional complaints in which the Lau Defendants are specifically alleged to have "released plaintiffs' money held in escrow by [them] . . . to other parties, including without limitation Defendant Wong and his associated entities at the direction of parties who thereafter absconded with the plaintiffs' money[.]" In the first such complaint, Wong approached the plaintiffs for participation in a Flushing, Queens real estate investment project. Wong Real Estate Fund I, LLC (WRE I) was to purchase and develop the property and the plaintiffs, through intermediary corporations, wired $500,000 to the Lau Defendants to hold in escrow until the funds were used to pay for the property. When Wong requested release of the funds for the purchase of a different property in Elmhurst, Queens, the plaintiffs told Lau to do so on condition that they be given an interest in the Flushing property as "additional collateral." This condition notwithstanding, the plaintiffs alleged that Lau ceased communication with them, made no effort to secure the Flushing property on their behalf, and distributed the $500,000 to Wong. Upon later contacting the majority shareholder of the holding company that owned the Elmhurst property, plaintiffs learned that Lau never transferred the $500,000 to purchase that property.

In the second complaint – filed by different plaintiffs but appearing to relate to the events of the first complaint (and filed on the same day by the same attorney) – Wong solicited investments in WRE I from the two plaintiffs with the understanding that WRE I was to purchase and develop the Flushing property.  The plaintiffs wired a total of $500,000 to the Lau Defendants for a combined 10% interest in WRE I.  Upon receiving a text message from someone purporting to be one of the plaintiffs, telling Lau to release the money, Lau "distributed each of the Plaintiff[s'] $250,000 without verifying the authenticity of this text message or reaching out to Plaintiffs."

According to our plaintiffs, "[t]he repeated instances of Lau and L&A's losing their clients['] money deposited with them in escrow in instances of Defendant Wong's involvement forces Plaintiffs to conclude that Lau and L&A were materially participating in or aiding and abetting the Defendants' defrauding of Plaintiffs and the Other Aggrieved Parties."

With reference to the foregoing, plaintiffs Choi and 165 GRA bring this lawsuit against defendants for RICO violations premised on mail fraud, wire fraud, and financial institution fraud; and state theories of common law fraud, conversion, breach of fiduciary duty, breach of contract, unjust enrichment, accounting, and deceptive business practices.  Plaintiffs also bring derivative claims on behalf of 37 PCA and MCI for declaratory judgment, accounting, and breach of fiduciary duty.

The Lau Defendants move to dismiss all claims against them, or in the alternative to dismiss the RICO claim and ask that the Court refuse supplemental jurisdiction over the remaining state claims.

DISCUSSION

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks and citations omitted). Said otherwise, plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

In conducting the above analysis, the Court must accept as true all of the well-pleaded allegations contained in the complaint. Iqbal, 556 U.S. at 678. But this tenet "is inapplicable to legal conclusions." Id. "[D]etailed factual allegations" are not required, but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555).

I. **RICO Claim Against the Lau Defendants**

To state a RICO claim, a plaintiff must plead facts sufficient to support (1) a RICO violation, (2) an injury to his business or property, and (3) a proximate causal connection between the injury and a substantive RICO violation. See 18 U.S.C. §§ 1962(c), 1964(c); Holmes v. Secs. Inv'r Prot. Corp., 503 U.S. 258, 265-68 (1992). A RICO violation requires allegations of "(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering

activity." Lundy v. Catholic Health Sys. of Long Island Inc., 711 F.3d 106, 119 (2d Cir. 2013) (*colatus*[1]). The pattern of racketeering activity must consist of two or more predicate acts of racketeering. Id.

An enterprise under 18 U.S.C. § 1961 includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." "The Supreme Court has interpreted this definition to include 'a group of persons associated together for a common purpose of engaging in a course of conduct[.]'" Liberty Mut. Ins. Co. v. Blessinger, 06-cv391, 2007 WL 951905, at *9 (E.D.N.Y. Mar. 27, 2007) (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)).

As defined in the RICO statute, "racketeering" is broadly defined to include "any act which is indictable under . . . section 1341 [of title 18] (relating to mail fraud), section 1343 (relating to wire fraud), [and] section 1344 (relating to financial institution fraud)." 18 U.S.C. § 1961(1). "To establish a 'pattern' of racketeering activity, a plaintiff must plead 'at least two predicate acts, and show that the predicate acts are related, and that they amount to, or pose a threat of, continuing criminal activity.'" 4 K & D Corp. v. Concierge Auctions, LLC, 2 F. Supp. 3d 525, 535 (S.D.N.Y. 2014) (quoting Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 97 (2d Cir.1997)). "Predicate acts are 'related' for RICO purposes when they 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" Id. (quoting H.J. Inc., 492 U.S. 229, 240 (1989)). "A plaintiff must allege, at a minimum, that 'a defendant personally committed or aided and abetted the commission of two predicate acts.'" Id. at 537 (quoting McLaughlin v. Anderson, 962 F.2d 187, 192 (2d Cir. 1992)).

---

[1] I.e., edited citation.

Where, as here, the complaint alleges fraud, the allegations are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b). Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). And in RICO fraud cases, "Rule 9(b) calls for the complaint to specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." See 4 K & D Corp., 2 F. Supp. 3d at 537-38 (quoting Moore v. PaineWebber, Inc., 189 F.3d 165, 173 (2d Cir. 1999)). But for the "other elements of a RICO claim – such as non-fraud predicate acts or . . . the existence of an 'enterprise' – a plaintiff's complaint need satisfy only the 'short and plain statement' standard of Rule 8(a)." See D. Penguin Bros. Ltd. v. City Nat. Bank, 587 F. App'x 663, 666 (2d Cir. 2014) (citing McLaughlin v. Anderson, 962 F.2d 187, 194 (2d Cir. 1992)).

Here, the Lau Defendants contend that the complaint offers "little more than conclusory allegations" and that plaintiffs "fail to allege an enterprise sufficient to maintain their Civil RICO causes of action or that the Lau Firm engaged in the conduct of the purported RICO enterprise." Although the Lau Defendants attack the complaint both as to themselves and as a whole, their better argument is undoubtedly the former. Indeed, plaintiffs may set forth facts adequate to plausibly allege, as a general matter, the existence of a criminal enterprise, numerous predicate acts aiding the enterprise, and a violation of at least one of the racketeering statutes that caused plaintiffs' injury in this case. See Holmes, 503 U.S. at 268; Lundy, 711 F.3d at 119. However, plaintiffs' allegations against the Lau Defendants in particular, though perhaps evidencing extreme incompetence or even willful misappropriation of plaintiffs' money, do not satisfy the demanding requirements of the RICO statute.

8

To start, the complaint falls short of alleging that the Lau Defendants engaged in conduct "of an enterprise." Plaintiffs conclusorily state that the "repeated instances of Lau and L&A's losing their clients['] money deposited with them in escrow in instances of Defendant Wong's involvement forces Plaintiffs to conclude that Lau and L&A were materially participating in or aiding and abetting" the enterprise. But this correlation-equals-causation reasoning does not suffice under the standard for RICO cases, which requires allegations that the accused participants "associated together for a common purpose." See Turkette, 452 U.S. at 583.

Moreover, the case law distinguishes between participating in the "conduct of the enterprise's affairs" and engaging in the conduct of one's "own affairs." See Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163 (2001) (*colatus*). Because Lau made a living as an attorney and escrow agent, the actions he took *as an escrow agent* were in furtherance of his "own affairs." Thus, absent some more express connection with the enterprise's unique purpose, the allegations do not permit the Court to draw a "reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

This disconnect between the Lau Defendants and the enterprise is further confirmed by looking at the Lau Defendants' supposed "predicate acts." Although plaintiffs allege that "Lau facilitates the fraudulent taking of the escrowed funds," the two examples plaintiffs provide just as plausibly point to more innocent explanations than engaging in an intentional fraud. As alleged in one of the previous complaints, Lau released the money to Wong after receiving the following text message:

> "Hi Jay this is Jun hong zhang please release the money we have in the escrow to close the property located at 40-36 77th street. Hotel will be additional collateral for 41st ave."

9

That complaint goes on to criticize the Lau Defendants for making "no effort to properly secure the 77th Street Property as collateral" and saying that the owners of the 77th Street Property "never received the $500,000."

Yet neither of these accusations necessarily compels (or even plausibly suggests) that Lau engaged in or knew about any fraudulent activity. Indeed, even in hindsight, the text message's supposed "instructions" are ambiguous as to what Jun Hong Zhang expected Lau to do beyond releasing the money. And that complaint itself only claims that the Lau Defendants breached their fiduciary duties and "failed to exercise the care, skill, and diligence commonly possessed and exercised by members of the legal profession." These allegations speak of incompetence rather than fraud.

Likewise, according to the other complaint, Lau distributed the plaintiffs' money upon receiving the following text message:

> "Jay, I am shin lung zheng, I spoke to the other shareholders, I am in China now, please release the money we have in escrow to close the property located at 40-36 77th street."

The plaintiffs in that case alleged that the "Lau Defendants received a fraudulent message from an unknown party . . . [and] acted upon this fraudulent text message . . . without verifying the authenticity." Just as in the other case, Lau is accused of little more than being a dolt, with no plausible facts suggesting that he acted on behalf of a criminal enterprise.

The two proposed "predicate acts" of the Lau Defendants, each occurring at around the same time, are thus, ironically, additional evidence that Lau was not knowingly benefitting the enterprise. In fact, even in the instant case, plaintiffs make room for the possibility that Lau was unwittingly duped by the other defendants, saying that he was "either aiding and abetting the

scheme *or fraudulently induced by Wong*, to release the funds" (emphasis added). And in describing how the alleged criminal enterprise operated, plaintiffs aver that

> [t]he Defendants' group functions to fulfill the purpose of, *inter alia*, deceiving innocent investors, including without limitation Plaintiffs and the Other Aggrieved Parties, into believing that they are *bona fide*, successful real estate developers; persuading said investors to wire their money for the purpose of purchasing real property to an attorney escrow account; **inducing the escrow agent by fraud, or perhaps nefarious cooperation in the case of Defendant Lau and L&A**, to release the escrowed money to the Defendants, whereupon they disappear and abscond with their victims' money.

(Emphasis added.) It thus appears as though plaintiffs themselves are not quite convinced of the Lau Defendants' role in the criminal enterprise, or even that they engaged in intentional fraud separate from the enterprise.

Turning to the alleged racketeering crime at issue in this case, plaintiffs also fail to aver facts sufficient to show that the Lau Defendants committed any of the three types of federal fraud identified in the complaint. There is no indication that the Lau Defendants themselves said anything to Choi to convince him to wire the money. The complaint merely states that "Plaintiffs sent their $500,000.00 capital contribution to 37 PCA by sending such funds to Defendants Lau and L&A to be held in escrow until such funds were to be used to pay the sellers of the Property the remaining balance."

Nor can the Court perceive a misleading statement in the "wire instructions emailed from an employee of Lau and L&A providing to Plaintiffs to send said funds." Those instructions, attached as an exhibit to the complaint, simply list L&A's contact information, JPMorgan Chase Bank's contact information, and the relevant routing and account numbers for the transaction. There don't appear to be any affirmative representations made upon which plaintiffs could have detrimentally relied, and if there is anything misleading in this document, plaintiffs have not identified it. Because both a materially misleading statement and justifiable reliance on that

11

statement are necessary elements of fraudulent inducement, plaintiffs have not adequately pleaded that crime.  See 4 K & D Corp., 2 F. Supp. 3d at 537-40.

Plaintiffs suggest, however, that the Lau Defendants may have aided and abetted the fraud more directly perpetrated by Wong.  "To establish liability under New York law for aiding and abetting fraud, the [plaintiffs] must prove: (1) the existence of a fraud; (2) a defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission."  JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005) (*colatus*).  The complaint no doubt alleges, in detail, Wong's fraud against plaintiffs.  But, as discussed above, plaintiffs have not sufficiently connected the Lau Defendants with Wong's criminal enterprise to plausibly support the inference that the Lau Defendants "affirmatively assisted" Wong or the other defendants in any way.  See Nigerian Nat. Petroleum Corp. v. Citibank, N.A., No. 98-cv-4960, 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999) (quoting Diduck v. Kaszycki & Sons Contractors, Inc., 974 F.2d 270, 284 (2d Cir. 1992), abrogated on other grounds by Gerosa v. Savasta & Co., Inc., 329 F.3d 317 (2d Cir.2003)).  Nor, as will be discussed below, have plaintiffs alleged facts sufficient to show that the Lau Defendants knew about the fraud as it was happening.

For these same reasons, plaintiffs have also failed to allege fraud by fraudulent concealment.  That theory requires that a duty-bound defendant "knew that the plaintiff was acting under a mistaken belief with respect to a material fact."  See Brass v. Am. Film Techs., Inc., 987 F.2d 142, 152 (2d Cir. 1993) (*colatus*).  To that end, the complaint alleges that Lau "deliberately concealed the true status of the Project" in response to Choi's inquiries about the status of his investment.  This is a legal conclusion with no underlying facts to support it.  And although the Lau Defendants may have owed a heightened duty to plaintiffs as their escrow

agent, there are no allegations in the complaint that the Lau Defendants ever even communicated with Wong beyond what was necessary to arrange the escrow disbursements.

Nevertheless, plaintiffs argue that the Lau Defendants' knowledge of Wong's fraud was at the very least plausible considering that several of their other clients had been victims of Wong's fraud by nearly identical means. Yet this conclusion assumes too much, as it ignores that those other two[2] instances largely occurred after the events in this case.[3] Furthermore, those other complaints weren't filed until 2018, several years after the fraud at issue here. This timeline makes it unlikely that Lau had notice of Wong's other frauds at the time he was acting as plaintiffs' escrow agent.

Taking the allegations in the complaint as true, there is little question that the Lau Defendants are at least partially responsible for plaintiffs' misfortunes. But the RICO statute is clearly not the appropriate mechanism for recouping their money from these particular defendants.

## II. Tort Claims Against Lau and L&A

The Lau Defendants move to dismiss plaintiffs' state law claims for negligence, conversion, legal malpractice,[4] and deceptive business practices on statute of limitation grounds. These causes of action all sound in tort, which type of claim is generally barred in New York if brought more than three years after it accrues. See N.Y. C.P.L.R. § 214; Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 92, 595 N.Y.S.2d 931, 932 (1993). Plaintiffs first filed their complaint on

---

[2] Plaintiffs say there were at least three other such events, citing ¶¶55-57, 73, and 169 of the complaint, but those paragraphs only specifically mention two other complaints.

[3] The other two frauds occurred between November 2015 and December 2015, whereas the events of this case took place between August 2015 and November 2015.

[4] Although malpractice is not specifically alleged, the Lau Defendants claim that "Plaintiffs have compared the Lau Firm's alleged wrongful acts to those alleged in the Zhang and Lin Actions, which are founded in legal malpractice."

13

July 3, 2019, and the Lau Defendants argue that the cause of action accrued, at the latest, on December 31, 2015, because "that was the date when the sale of the Property to 37 Parsons Realty closed." If true, that would mean plaintiffs filed this case about six months too late.

Plaintiffs respond that where, as here, the original possession of the property in question is lawful, the claim does not accrue until the owner becomes aware of the misappropriation. Moreover, plaintiffs argue that a statute of limitations defense "is usually inappropriate to use as a basis for dismissal in a pre-answer motion to dismiss."

I agree with plaintiffs that it would be premature to dismiss these state law claims at this point in time. "[U]nless the complaint alleges facts that create an ironclad defense, a limitations argument must await factual development." Bild v. Konig, No. 09-cv-5576, 2011 WL 666259, at *3 (E.D.N.Y. Feb. 14, 2011) (*colatus*). "[W]hen the original possession of the property in question by a third party is lawful, 'a conversion claim does not [accrue] until after [the] plaintiff demands [the] property and [the] defendant refuses to return the property.'" Calcutti v. SBU, Inc., 224 F. Supp. 2d 691, 702 (S.D.N.Y. 2002) (quoting D'Amico v. First Union National Bank, 285 A.D.2d 166, 172, 728 N.Y.S.2d 146, 151 (1st Dep't 2001)).

The complaint does not provide a concrete date for either a demand or a refusal. Nor is it even clear that plaintiffs ever demanded their money back at any point prior to filing the instant complaint. Thus, the grounds for a dismissal on a statute of limitations defense are certainly not "ironclad." See Bild, 2011 WL 666259, at *3.

### III. Constructive Trust Remedy Against L&A

The Lau Defendants move to dismiss plaintiffs' constructive trust claim because (1) "the Lau Firm does not have title to the alleged funds" and (2) plaintiffs have not "alleged the Lau Firm was unjustly enriched."

14

"Under New York law, the equitable remedy of a constructive trust is appropriate when there is clear and convincing evidence of (1) a confidential or fiduciary relationship; (2) an express or implied promise; (3) a transfer in reliance on such a promise; and (4) unjust enrichment." Martha Graham School & Dance Found., Inc. v. Marth Graham Ctr. Of Contemporary Dance, Inc., 380 F.3d 624, 646 (2d Cir. 2004). Moreover, "[t]he essential inquiry in any action for unjust enrichment . . . is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." Paramount Film Distrib. Corp. v. New York, 30 N.Y.2d 415, 421, 334 N.Y.S.2d 388, 393 (1972). Thus, logically, in order to state a claim for unjust enrichment, and invoke its remedy of constructive trust, a plaintiff must allege, at least, that the defendant in question retains the benefit.

Here, plaintiffs allege facts that could give rise to a fiduciary relationship, an express or implied promise that the Lau Defendants would appropriately disburse the money, and a transfer by plaintiffs in reliance on that promise. However, because plaintiffs' ultimate contention is that defendant 37 PR purchased the Flushing property with Lau's money, any unjustly enriched entity would need to have some ownership stake in 37 PR. But plaintiffs allege that "[p]ursuant to the operating agreement of 37 PR, the members of that entity are Kevin Zhang, Man Chung Wong, Henry Yau, and the Defendants Fok and Cheung," not the Lau Defendants. Nor is there plausible support for the conclusion that the Lau Defendants otherwise held some kind of interest in 37 PR (or, as discussed above, in the criminal enterprise alleged to have masterminded the fraud). Plaintiffs have therefore failed to allege the elements of constructive trust as to the Lau Defendants, and so that claim is dismissed.

## IV. Breach of Contract Claim Against the Lau Defendants

The Lau Defendants argue that the complaint only contains "one, conclusory allegation concerning the Lau Defendants alleged breach of contract," namely:

> Plaintiffs entered on[e] or more valid, binding and enforceable contracts with the Defendants Lau and L&A that Lau and L&A would hold Plaintiffs' funds in escrow and release said funds only for the purchase of the Property by an entity in which Plaintiffs' had an ownership or other interest.

They further contend that this allegation is unclear as to the number of contracts that existed between plaintiffs and L&A, the relevant dates, the parties bound, and the content.

To state a claim for breach of contract, a complaint need allege only "the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of that contract, and resulting damages." See JP Morgan Chase v. J.H. Elec. of N.Y., Inc., 69 A.D.3d 802, 803, 893 N.Y.S.2d 237, 239 (2d Dep't 2010). At this stage, plaintiffs have averred facts plausibly supporting each of these elements.

## V. Derivative Claims

Although raised only in a footnote, the Lau Defendants point out several defects in plaintiffs' derivative claims, including that these are not true derivative claims because plaintiffs actually "allege that Mr. Choi personally suffered harm" and that "the alleged damages should be awarded to" Choi rather than the business entities. Defendants are correct. See Yudell v. Gilbert, 99 A.D.3d 108, 113, 949 N.Y.S.2d 380, 383 (1st Dep't 2012) ("A plaintiff asserting a derivative claim seeks to recover for injury to the business entity. A plaintiff asserting a direct claim seeks redress for injury to him or herself individually."). The derivative claims in this case are merely dressed-up direct claims aimed at recompensing Choi for the money he lost.

In addition, a "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly

situated in enforcing the right of the corporation or association." Fed. R. Civ. P. 23.1. Although there is "[no] per se rule within the Second Circuit prohibiting plaintiffs from simultaneously pursuing derivative and direct claims," Cordts-Auth v. Crunk, LLC, 815 F. Supp. 2d 778, 793 (S.D.N.Y. 2011), many cases recognize that it can be problematic. "Courts in this Circuit have long found that plaintiffs attempting to advance derivative and direct claims in the same action face an impermissible conflict of interest." St. Clair Shores Gen. Emp. Ret. Sys. v. Eibeler, 06-cv-688, 2006 WL 2849783 (S.D.N.Y. Oct. 4, 2006). And some courts in this Circuit have even held that "[a]ny individual claims raised by a shareholder in a derivative action present an impermissible conflict of interest." Tuscano v. Tuscano, 403 F. Supp. 2d 214, 223 (E.D.N.Y. 2005) (collecting cases).

Because plaintiffs' derivative claims are truly direct claims and would lead to a conflict of interest with at least some of the other members of 37 PCA and MCI, the derivative claims are dismissed.

## VI. Supplemental Jurisdiction

In light of the dismissal of plaintiffs' federal RICO claim against the Lau Defendants, the Court has the option to decline to exercise supplemental jurisdiction over the remaining state claims against those defendants. See 28 U.S.C. § 1367(c). Although the Lau Defendants request this result, it makes more sense for the Court to maintain jurisdiction as the facts relevant to the state claims largely overlap with those undergirding the rest of the case.

## CONCLUSION

Defendants' [38] motion to dismiss is granted in part and denied in part. Plaintiffs' RICO and constructive trust claims are dismissed as to the Lau Defendants and plaintiffs' derivative

claims are dismissed as to all defendants. The Court will retain jurisdiction over plaintiffs' remaining state law claims against the Lau Defendants.

**SO ORDERED.**

_____<br>U.S.D.J.

Dated: Brooklyn, New York
       March 16, 2020