UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
JAMES CHOI and 165 GREGORY ROAD :
ASSOCIATES, LLC, *et al.*, :
: **MEMORANDUM DECISION AND**
: **ORDER**
Plaintiffs, :
: 19-cv-3875 (BMC)
- against - :
:
:
37 PARSONS REALTY LLC, *et al.*, :
:
Defendants. :
---------------------------------------------------------- X

**COGAN**, District Judge.

Plaintiff James Choi was swindled out of half a million dollars by a fraudster, defendant Anthony Wong. But Wong is gone; Wong is in the wind. Choi is thus reaching out to others involved in the transaction who might be legally on the hook for Choi's $500,000.

Two summary judgment motions are before me. The first is by the recipient of Choi's funds, defendant 37 Parsons Realty LLC. That motion is denied because the direct receipt of Choi's funds from Wong could in and of itself allow a jury to reasonably find that it was in on the RICO scheme with Wong. The second motion is by defendants Jay Lau, Esq. and his law firm, Lau & Associates, P.C. (together, "Lau"). That motion is granted because all Lau did was act as a conduit for the money, and Choi had authorized Wong to instruct Lau as to the receipt and disposition of Choi's money.

## BACKGROUND

The parties agree that defendant Anthony Wong, together with his company, defendant Wong Real Estate Consultancy LLC ("WRE"), both of whom have defaulted, was operating a

RICO enterprise. Holding himself out as a successful real estate investor, he raised or stole millions of dollars, purportedly to invest in different real estate investments. One of those "investments" gave rise to this case.

In August 2015, Kevin Zhang was the managing member of a limited liability company, defendant My Capital LLC ("MyCap"). Zhang's plan was to buy a piece of real estate in Flushing from a social services organization, non-party Community Homes Housing Development Fund Company, Inc., and to either develop the property or flip it. Towards those ends, Zhang caused MyCap to enter into a written real estate purchase agreement with Community Homes, pursuant to which MyCap would buy the Flushing property for $9,700,000, with 10% down at contract signing, which MyCap paid. After the contract signing, Zhang had MyCap form defendant 37 Parsons Realty LLC ("37PR"), which acquired MyCap's purchase rights under the contract. (The property was located at 37-05 Parsons Blvd., hence the somewhat eponymous name 37 Parsons Realty LLC.)

Plaintiff does not contend that there was anything nefarious about this proposed investment. Rather, plaintiff contends that it turned criminal once Wong got involved.

That happened a couple of months after the contract was signed. It was then that Zhang's brother-in-law introduced him to Anthony Wong. Wong had learned about the Community Home deal from Zhang's brother-in-law, and Wong made a proposition to buy the deal from Zhang (technically, from 37PR) and give Zhang a substantial profit. Specifically, Wong would supply all the financing to accomplish the closing and then pay 37PR $3 million on top of that for the assignment of its interest in the property.

However, by the beginning of December, it became apparent to Zhang that Wong was not going to be able to hold up his end of the transaction – whatever contribution Wong might make

towards purchasing the property, he would not be able to obtain financing let alone pay Zhang a $3 million premium on the flip. Zhang therefore went out and arranged for a loan to 37PR from a lender named Rosenthal & Rosenthal, Inc. It appears, however, that Zhang envisioned Wong as contributing some amount towards the $9.7 million purchase and price and receiving some undefined interest in the transaction for having done so.

Plaintiff Choi had started looking for a real estate investment opportunity in the Fall of 2015. A mutual acquaintance introduced him to Wong, and he had a meeting with Wong to discuss potential opportunities. Wong provided Choi with brochures describing Wong's company, WRE, which touted that company's experience and success in the real estate investment business. In fact, the brochure was an exaggeration if not outright fabrication of what WRE had done.

On November 11, 2015, Choi met with Wong at Wong's office for the first and only time. No one else was present. Wong told Choi that he, Wong, was forming a company called 37 Parsons *Capital* Advisors LLC (emphasis added to distinguish it from 37 Parsons Realty LLC) to purchase the property. He offered Choi the opportunity to become one of ten investors who would supply the financing for the purchase; Choi's contribution would be $500,000. Wong told Choi that the plan was to acquire the company and then sell it to a real estate developer or develop the property itself in two or three years. Wong predicted that upon that sale, Choi would get about $1.2 million for his $500,000 investment. Wong gave Choi an unsigned operating agreement for 37 Parsons Capital.

After his November 11th meeting with Wong, Choi consulted with his attorney (the same law firm representing him in this case) and signed the 37 Parsons Capital operating agreement.

On November 17th, Choi made his $500,000 contribution through Wong, using a wholly-owned entity, plaintiff 165 Gregory Road LLC.

At Wong's direction, Choi sent the money to Lau & Associates, a real estate law firm that frequently serves as an escrow agent for buyers or sellers of property. Wong told Choi that Lau would hold the money in escrow until the closing occurred. However, neither Choi nor his lawyer ever requested or obtained any kind of written agreement as to the disposition of the $500,000 investment.

Lau had met Wong in 2014 or 2015. Wong said he was engaged in forming investment syndicates for various pieces of property. Wong asked Lau to act as 37 Parsons Capital's attorney for the closing of the purchase of the property, telling Lau that he (Wong) was the manager of 37 Parsons Capital. Lau had nothing to do with forming 37 Parsons Capital, or in soliciting investors, or in communicating with Choi. Lau had no role in the marketing materials that Wong developed for 37 Parsons Capital.

When Lau received the $500,000 from Choi/165 Gregory Road on November 17th, he called Wong to ask who 165 Gregory Road was. Wong told Lau that the funds were part of 37 Parsons Capital's purchase price for the property. Wong also directed Lau to send the money he was holding for the property purchase to the Lowenstein Sandler law firm. At Wong's direction, Lau transferred Choi's $500,000 contribution to the Lowenstein Sandler firm's escrow account. At the closing, that money went to Community Homes as part of the closing price for the property, except that approximately $248,000 was directed to Zhang's sister-in-law, Judy Wong, and Lowenstein Sandler released funds to itself for legal fees.

Lau undertook one final action on behalf of Wong before he exited the transaction. He rendered a legal opinion letter to Rosenthal & Rosenthal to secure the financing. The opinion

4

letter recited that Lau had reviewed the documentation concerning the purchase of the property and the Rosenthal financing, and that his opinion was, in essence, that everything with regard to that loan was on the up-and-up. The reason Lau gave the opinion instead of Lowenstein Sandler, according to Lau, was as a courtesy because Lowenstein Sandler, as a big firm, charges a lot for opinion letters.

After the closing, Choi continued to inquire of Wong as to the status of the property, and Wong continued to assure him that all was well. Choi received such assurances all the way through August 2016, eight months after closing. Finally, in January 2017, Choi had his attorney look into what was happening. He found that title had not been taken in 37 Parsons Capital's name, as Choi had expected, but in the name of 37PR. In April, Wong notified Choi that he had had a falling out with his partners in the deal, and that they were threatening to cut him out (and, presumably, Choi as well) by selling to a foreign buyer. Choi finally sent demand letters in July 2018, and when no response was received, this action followed.

Plaintiff's complaint asserts claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*, against 37PR, together with common law claims. I previously dismissed the RICO claims against Lau, but retained supplemental jurisdiction over the common law and state statutory claims against him. 37PR and Lau have separately moved for summary judgment.

## DISCUSSION

### I.

Under Federal Rule of Civil Procedure 56, a court may not grant a motion for summary judgment unless the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that "there is no genuine dispute as to any material fact and

that the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that he or she is entitled to summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 122 (2d Cir. 2004) (quotation omitted); see Anderson, 477 U.S. at 248 (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). For this reason, "if 'there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.'" Binder & Binder PC v. Barnhart, 481 F.3d 141, 148 (2d Cir. 2007) (quoting R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997)) (alteration in original).

## II.

To establish a RICO claim, a plaintiff must show: "(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of § 1962." Pinnacle Consultants, Ltd. v. Leucadia Nat'l Corp., 101 F.3d 900, 904 (2d Cir. 1996) (citing First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 765 (2d Cir. 1994)). To establish a violation of the RICO statute, a plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496 (1985); Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc., 187 F.3d 229, 242 (2d Cir. 1999); Azrielli v. Cohen Law Offices, 21 F.3d 512, 520 (2d Cir. 1994).

There is no reason to discuss 37PR's position in detail because its perfunctory brief does not present any substantial argument. 37PR does not contest that Wong was running a RICO

6

enterprise and that all the elements of the scheme are satisfied as to Wong. It concedes that Wong committed the required predicate acts. In fact, 37PR has not cited the RICO statute, nor any cases applying it, at all. Instead, 37PR asserts that it has no liability because Zhang and Choi never met. According to 37PR, this makes it self-evident that it had no connection with the RICO scheme because "there is no proof connecting 37 Parsons to Wong's criminal enterprise."

One needs a rather large set of blinders to make that assertion. It ignores the facts that 37PR was the direct beneficiary of the money that Wong obtained from Choi by fraud, and used that money, in part, to buy the property. If direct receipt and expenditure of the proceeds of the RICO scheme is not a "connection" to the RICO scheme, I don't know what is. 37PR has the real estate, and Choi has nothing except a hole in his pocket where $500,000 used to be. Moreover, plaintiff has shown that $248,000 of the purchase price ended up with Zhang's sister-in-law. 37PR has not even attempted to explain why that happened. Thus, whether 37PR was an innocent but fortuitous beneficiary of Wong's RICO scheme or an active participant in it is a factual issue for a jury to determine. See, e.g., Related Companies, L.P. v. Ruthling, No. 17-CV-4175, 2019 WL 10947100, at *7 (S.D.N.Y. July 23, 2019) (receipt of wrongfully diverted funds provides circumstantial evidence of participation in racketeering scheme); Eastman Kodak Co. v. Camarata, No. 05-CV-6384, 2006 WL 3538944, at *4 (W.D.N.Y. Dec. 6, 2006) (defendant's receipt of fraudulently obtained funds and transfer of some of those funds to other alleged participants in the scheme presented a fact issue as to defendant's participation in the scheme).

That portion of 37PR's motion directed to Choi's common law claims against it is no more substantial than its "argument" on the RICO claim. As to each common law claim (conversion, unjust enrichment, fraud, and fraudulent misrepresentation), 37PR simply recites the elements of the claim, and then adds one sentence asserting that those elements have not been

7

met.  Apparently, all of those single-sentence assertions turn on its argument that Choi cannot prove that 37PR was in cahoots with Wong.  All of them ignore 37PR's receipt and use of plaintiff's money.  If there are any other reasons to dismiss those claims, 37PR has not told me what they are.

Because 37PR's motion disregards the reasonable inference that can be made from its direct receipt of the funds out of which Choi was defrauded, its motion for summary judgment is denied.

**III.**

Choi's remaining claims against Lau are breach of contract, breach of fiduciary duty, conversion, and New York General Business Law § 349.  They are all predicated on the existence of an implied escrow agreement that sprung into existence when Choi, through 165 Gregory Road Associates, LLC, wired the $500,000 to Lau.  They all fail because they sidestep one unavoidable fact: whatever duties and responsibilities Lau had towards Choi, Lau complied with them by following the directions of Choi's designated agent, Wong.[1]  Choi does not dispute that he had both expressly and implicitly authorized Wong to transfer these funds as Wong saw fit.  Choi has adduced no evidence that Lau had any reason to believe that Wong was doing anything wrong.  Choi and Lau believed the funds would be used for the purchase of the property, and in fact, they were.  Lau had no reason to question Wong's direction to forward the funds to Lowenstein Sandler for closing.

---

[1] Choi's GBL § 349 claims fail because a $500,000 investment in an attempt to make a killing in non-residential real estate is not a consumer transaction.  See Spirit Locker, Inc. v. EVO Direct, LLC, 696 F. Supp. 2d 296, 301 (E.D.N.Y. 2010) ("With § 349's purpose in mind, courts have stated consistently that unique private transactions between sophisticated business parties do not give rise to liability under the statute.") (collecting cases).

For this reason, Choi's insistence that Lau had a fiduciary duty towards him and that there was an escrow agreement misses the point. Even assuming the existence of such a duty or agreement, see Amusement Indus., Inc. v. Stern, 786 F. Supp. 2d 758, 787 (S.D.N.Y. 2011) (escrow agreement need not be in writing), Choi gave Lau no reason to believe that Wong was engaged in a fraud. Choi was happy enough to embrace Wong as his agent with authority to direct wiring of the funds to Lau; he cannot distance himself from Wong's authority to direct the transfer of the funds to use in the purchase of the property. Choi's claim is against Wong, his faithless agent (or, as suggested above, 37PR, the beneficiary of the RICO scheme); it is not with Lau.

Of course, Choi had some kind of implied contract with Lau. It would not have been permissible for Lau to simply keep the funds and use them for its own account. But, unlike 37PR, Choi has produced no evidence of self-enrichment by Lau. Any implied contract required Lau to follow Wong's directions for the use of the funds in the purchase of the property, and that is what Lau did.

For some reason not disclosed on the record, Choi's lawyers permitted him to transfer half a million dollars with no written agreement pursuant to directions from a fraudster. His effort to treat Lau as if he had obtained any protection for that transfer does not support a claim against Lau.

## CONCLUSION

37PR's motion for summary judgment is denied, and Lau's motion for summary

9

judgment is granted. By separate Order, the Court will set this matter down for a final pretrial conference and trial.

**SO ORDERED.**

                                                                                                  _____
                                                                                                    U.S.D.J.

Dated: Brooklyn, New York
        July 6, 2021